# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

F'REAL FOODS, LLC and RICH PRODUCTS
CORPORATION,

              Plaintiffs,

      v.

HAMILTON BEACH BRANDS, INC. and
HERSHEY CREAMERY COMPANY,

              Defendants.

C.A. No. 16-41-CFC
CONSOLIDATED

## OPENING BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE TESTIMONY OF
## DR. MICHAEL P. AKEMANN AND DANIEL MAYNES, Ph.D

Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com

*Of Counsel*:

William S. Foster, Jr.
Kenneth M. Vorrasi
Brianna L. Silverstein
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005-1209
(202) 842-8800
william.foster@dbr.com
kenneth.vorrasi@dbr.com
brianna.silverstein@dbr.com

Dated: December 14, 2018

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................... **ERROR! BOOKMARK NOT DEFINED.**

TABLE OF AUTHORITIES ............. **ERROR! BOOKMARK NOT DEFINED.**

I.    INTRODUCTION.................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS .........................1

III.  SUMMARY OF ARGUMENT .........................................................2

IV.   STATEMENT OF FACTS................................................................3

     A.    Plaintiffs .............................................................................3

     B.    Hamilton Beach...................................................................3

     C.    Hershey ...............................................................................4

     D.    Dr. Akemann's Damages Opinions ............................................4

          1.    Lost Profits.................................................................4

          2.    Reasonable Royalty .....................................................7

V.    ARGUMENT ...............................................................................8

     A.    Legal Standard .....................................................................8

     B.    Dr. Akemann's Damages Testimony Must Be Excluded..........8

          1.    Dr. Akemann's lost profits opinion is not based on
sufficient facts, and Dr. Akemann has not reliably
applied the principles and methods to the facts of
the case................................................................8

          2.    Dr. Akemann's reasonable royalty should be
excluded because of his failure to account for
apportionment.................................................22

     C.    Portions of Dr. Maynes' Testimony Should Be Excluded ......24

          1.    Dr. Maynes' testimony regarding facts outside of
his specialized knowledge, opining on Hamilton
Beach's state of mind, and merely summarize
evidence should be excluded. ........................................24

          2.    Dr. Maynes' testimony equating infringement with
copying should be excluded. ........................................26

VI.   CONCLUSION .................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Abbott Biotech. Ltd. v. Centocor Ortho Biotech, Inc.*,
2014 WL 7330777 (D. Mass. Dec. 19, 2014)....................................19

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001)............................................18

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
C.A. No. 15-1452-RGA, 2018 WL 4691047 (D. Del. Sept. 28,
2018) ...............................................................................................9, 23

*BMC Software, Inc. v. ServiceNow, Inc.*,
Case No. 2:14-cv-903-JRG, 2016 WL 379620 (E.D. Tex. Feb. 1,
2016) .....................................................................................................23

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ..........................................................21

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..............................................................................8

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ............................................................9

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ...........................................8, 11, 12, 24

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014) ..........................................................22

*EZ Dock, Inc. v. Schafer Sys., Inc.*,
No. Civ. 98-2364(PHK/AJB), 2003 WL 1610781 (D. Minn. Mar.
8, 2003) ............................................................................................9, 21

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)............................................................................21

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999) ...................................................8, 9, 19

*Herbert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ...........................................................26

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
  392 F.3d 1317 (Fed. Cir. 2004) .........................................................27

*Joy v. Bell Helicopter Textron, Inc.*,
  999 F.2d 549 (D.C. Cir. 1993) ...........................................................11

*Linear Tech. Corp. v. Micrel, Inc.*,
  No. C-94-1633 MHP, 2006 WL 8425047 (N.D. Cal. June 9, 2006)..................21

*Leister v. Jewell Transport, Inc.*,
  C.A. No. 14-1411, 2016 WL 26070 (E.D. Pa. Jan. 4, 2016).............................24

*Oxford Gene Tech., Ltd. v. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004).......................................24, 25, 26

*Three Crown Ltd. P'ship v. Salomon Bros.*,
  906 F. Supp. 876 (S.D.N.Y. 1995) ....................................................12

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ...................................................22, 23

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) .........................................................27

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P. 37(c)(1)....................................................................7

Fed. R. Evid. 702 .................................................................1, 3, 8, 9

Fed. R. Evid. 702(b)-(d)...................................................................8

Fed. R. Evid. 702(a) .......................................................................8

## I.    INTRODUCTION

Pursuant to Federal Rule of Evidence 702, Defendants Hamilton Beach Brands, Inc. ("Hamilton Beach") and Hershey Creamery Company ("Hershey") (collectively, "Defendants") move to exclude the entire damages testimony of Dr. Michael P. Akemann and to exclude portions of the testimony of Daniel Maynes, Ph.D.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On January 26, 2016, Plaintiffs f'real Foods, LLC ("f'real") and Rich Products Corporation ("Rich") (collectively, "Plaintiffs") filed this action alleging that Defendants infringe U.S. Patent Nos. 5,803,377 ("'377 patent"), 7,144,150 ("'150 patent"), 7,520,658 ("'658 patent"), and 7,520,662 ("'662 patent").[1]  D.I. 1. On August 24, 2018, Plaintiffs served the Opening Expert Report of Dr. Michael P. Akemann on damages (**Exhibit 1**[2]) and the Opening Expert Report of Daniel Maynes, Ph.D Concerning Infringement of f'real's Patents-in-Suit ("Maynes Opening Report") (**Exhibit 3**).  On September 24, 2018, Plaintiffs served the Expert Rebuttal Report of Dr. Michael P. Akemann on antitrust (**Exhibit 2**) and the Rebuttal Expert Report of Daniel Maynes Ph.D Concerning Validity of f'real's Patents-in-

---

[1] The '150 patent, '658 patent, and '662 patent comprise "the '150 patent family."

[2] Numbered exhibits are attached to the Declaration of Brianna L. Silverstein, filed contemporaneously.

Suit ("Maynes Rebuttal Report") (**Exhibit 4**).   Dr. Akemann was deposed on October 16 and 17, 2018,[3] and Dr. Maynes was deposed on October 17, 2018.[4] Defendants now move to exclude Dr. Akemann's damages testimony and portions of Dr. Maynes' testimony.

## III.   SUMMARY OF ARGUMENT

1.   Dr. Akemann's lost profits opinion is based on assumptions that are purely speculative and contrary to record evidence.  He assumes that f'real would have adopted a less profitable business model in a but-for world that it never adopted in the real world; he opines that f'real is entitled to lost profits based on sales never made by anyone in the real world; and he uses a completely speculative market share calculation that fails to account for all relevant competitors and for price elasticity of demand when determining the number of customers f'real would have captured in the but-for world.  Each of these missteps alone is reason to exclude Dr. Akemann's lost profits opinion.

2.   Dr. Akemann's reasonable royalty opinion is unreliable and must be excluded because he fails to properly apportion value between the patented and unpatented features of the accused products.

---

[3] Excerpts from Volume I of Dr. Akemann's deposition transcript are included as **Exhibit 5**, and excerpts from Volume II of his transcript are included as **Exhibit 6**.

[4] Excerpts of Dr. Maynes' deposition transcript are included as **Exhibit 7**.

2

3.     Portions of Dr. Maynes' testimony reach beyond the bounds of Rule 702, and must be excluded.  He testifies to areas beyond his expertise, opines regarding the Defendants' state of mind, and recites factual evidence unrelated to his technical opinions.  Further, Dr. Maynes uses an improper legal standard regarding the technical aspects of copying.

## IV.    STATEMENT OF FACTS

### A.    Plaintiffs

f'real makes and sells self-service blenders and cups to make frozen beverages.  Ex. 1 ¶ 11.  f'real began in 1998 and has exclusively sold blenders and pre-filled cups.  *Id.*¶ 12.  In December 2012, Rich acquired f'real.  *Id.* ¶ 20.  f'real's primary business model is selling its blender and freezer equipment to retailers for an up-front fee of approximately ████, and separately selling its pre-filled cups to those retailers.  *Id.*¶ 122, Ex. 8a; *see also* Voges Dep. 158:1-2 (June 13, 2018) (**Exhibit 8**).  While f'real has considered alternative pricing models, it has rejected nearly every model, except in limited circumstances for select customers.  Ex. 1 ¶¶ 123-129.

### B.    Hamilton Beach

Hamilton Beach designs and distributes a variety of products.  *Id.* ¶ 23. Plaintiffs accuse four Hamilton Beach blenders infringement: the MIC2000, the BIC2000, the IMI2000, and the BIC3000-DQ.  *Id.* ¶ 58.  The BIC2000, IMI2000,

3

and BIC3000-DQ are sold to various commercial customers. *Id.* ¶¶ 66-74. The MIC2000 has been mainly sold to Hershey for its Shake Shop Express program. *Id.* ¶ 64.

### C. Hershey

Hershey manufactures, distributes, and sells a variety of ice cream products. *Id.* ¶ 25. Hershey developed the Shake Shop Express program that allows a consumer to use a self-serve blender with a pre-filled cup to mix a milkshake. *Id.* ¶ 27. Around May 2013, Hershey began buying MIC2000 blenders from Hamilton Beach for this program. *Id.* ¶ 28. Hershey initially charged a ▆ monthly rental fee for use of the MIC2000 and freezers. *Id.* ¶ 131. Hershey quickly transitioned to a ▆ upcharge on each cup to cover the equipment costs. *Id.* ¶ 133. Hershey's customers are primarily on the East coast. *Id.* ¶ 140.

### D. Dr. Akemann's Damages Opinions

Dr. Akemann opines that Plaintiffs are entitled to $3,617,322 in lost profits to account for profits that Plaintiffs would have made in the but-for world by capturing 74% of Hershey's customers, and an additional $210,000 in reasonable royalty damages for the remaining sales. *Id.* ¶ 324, Ex. 1.

#### 1. Lost Profits

Dr. Akemann uses the *Panduit* factors to analyze lost profits for sales of the MIC2000 blenders used in the Shake Shop Express program. *Id.* ¶ 172-173. Dr.

Akemann finds that there is demand for the patented product, and that Plaintiffs would have had the capacity to exploit the demand. *Id.* ¶¶ 174-218. Dr. Akemann then determines that there is no evidence that Defendants would have been able to develop an acceptable non-infringing substitute. *Id.* ¶ 222. When attempting to account for other non-infringing substitutes , Dr. Akemann analyzes market share, including f'real and "non-blender based milkshake products[s]." *Id.* ¶ 223-224. Dr. Akemann then estimates the market share of three entities—f'real, Archibald, and Cold Cow—and opines that f'real had 80% market share in 2013/2014. *Id.* Ex. 10a.

Most of Dr. Akemann's analysis pertains to the fourth *Panduit* factor— calculating the additional profit Plaintiffs would have made in the but-for world where Hershey's Shake Shop Express did not exist. *Id.* ¶ 229. Dr. Akemann looks at the number of blenders and cups deployed or sold by Hershey, and analyzes whether those sales were part of the rental or upcharge model. *Id.* ¶ 231. Dr. Akemann finds that 7% of Hershey's sales channels were not a good fit for f'real. *Id.* ¶ 232, Ex. 9. Applying his 80% market share to the remaining 93% of sales channels, Dr. Akemann opines that f'real would have made 74% of Hershey's sales (both in blenders and cups) in the but-for world. *Id.* ¶ 233, Exs. 2a, 2b (line [B]).

Next, Dr. Akemann calculates the average number of cups sold daily by both f'real and Hershey for April 2017-March 2018, and finds that f'real sells ▮▮▮ more cups daily per blender. *Id.* Ex. 7. Thus, he assumes f'real would have sold ▮▮

5

times more cups than Hershey actually sold, and determines the cup revenues based on that multiplier.  *Id.* ¶ 235, Exs. 2a (lines [G], [H]), 2b (lines [J], [K]).

Dr. Akemann concedes that "it would likely not be appropriate in this case to assume that 100% of Hershey's upcharge customers . . .  would have adopted f'real's primary sales model with up-front equipment costs of ███████████."  *Id.* ¶ 236. Dr. Akemann therefore assumes that in the but-for world, with no competitive pressure from Hershey, f'real would have employed both upcharge and rental models exclusively for Hershey's real world customers.  *Id.* ¶ 237.  Specifically, Dr. Akemann assumes that f'real would have adopted Hershey's ████ rental program, and a ██ upcharge model based on an internal 2013 presentation.  *Id.* ¶¶ 237-238. These models were never implemented, and were specifically rejected, by f'real in the real world.  *See infra.*  Dr. Akemann acknowledges that f'real's cups would cost more than Hershey's cups, but contends that retailers in a but-for world would have paid that higher price knowing that f'real's program was more profitable than Hershey's program (that doesn't exist in the but-for world).  *Id.* ¶ 238 n.359.  Thus, Dr. Akemann does not adjust for price elasticity of demand.  *Id.*  Dr. Akemann uses the fictitious f'real business models and cup sales to determine the revenue.  *Id.* Exs. 2a (line [L]), 2b (line [N]).  He then subtracts the incremental costs to determine the lost profits for each business model.  *Id.* Exs. 2a (line [W]), 2b (line [Y]).

6

### 2.      Reasonable Royalty

Dr. Akemann's reasonable royalty analysis starts with a discussion of a license between Hamilton Beach and f'real for the '150 patent family. *Id.* ¶ 252. Dr. Akemann recognizes that a reasonable royalty must apportion value between the patented and unpatented features, however, he only addresses apportionment in one paragraph. *Id.* ¶ 250.  He states, "my application of the comparables approach in this case, which focuses on the price that Hamilton Beach agreed to pay for three of f'real's Patents in Suit in a prior arm's-length license agreement, by construction apportions between patented and unpatented features of the products at issue." *Id.*

Dr. Akemann then discusses the *Georgia Pacific* factors to determine that the appropriate royalty rate for the units not included in the lost profits calculation, and not in convenience stores,[5] is the greater of $200 per unit and $35,000 annually. *Id.* ¶ 321.  Dr. Akemann testified that it is his opinion that the annual royalty rate is $35,000 regardless of the number of units. Ex. 5 299:19-300:1.

---

[5] Dr. Akemann did not calculate a reasonable royalty for sales to convenience stores because he assumes that an injunction will be granted in that sales channel. *Id.* ¶ 322.  Hamilton Beach opposes any supplement to Dr. Akemann's damages report to include a royalty rate for such sales as untimely on the basis that it should have been included in his original report.  Fed. R. Civ. P. 37(c)(1).

7

## V.    ARGUMENT

### A.    Legal Standard

Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Rule 702(a) requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Thus, expert testimony is only admissible if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741-46 (3d Cir. 2000). The proponent of the proposed testimony has the burden of demonstrating it is admissible by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 & n.10.

### B.    Dr. Akemann's Damages Testimony Must Be Excluded

#### 1.    Dr. Akemann's lost profits opinion is not based on sufficient facts, and Dr. Akemann has not reliably applied the principles and methods to the facts of the case.

Lost profits requires a "but-for" analysis, or "a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would have made." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (internal quotations omitted). "To prevent the

hypothetical from lapsing into pure speculation, [the Federal Circuit] requires sound economic proof of the nature of the market and likely outcomes with infringement out of the picture." *Id.* Courts routinely exclude experts' lost profits opinions prusuant to Rule 702 when they are speculative and not based in sound economic proof. *See, e.g., DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-1452-RGA, 2018 WL 4691047, at *6 (D. Del. Sept. 28, 2018); *EZ Dock, Inc. v. Schafer Sys., Inc.*, No. Civ. 98-2364(PHK/AJB), 2003 WL 1610781, at *6 (D. Minn. Mar. 8, 2003).

Dr. Akemann's lost profits opinion fails to provide sound economic and factual predicates in three areas. First, Dr. Akemann's lost profits calculation is based on the speculative assumption that in the but-for world, without any competition from Hershey, f'real would have adopted upcharge and rental models that f'real expressly rejected. Second, Dr. Akemann employs an unreliable methodology to include lost profits for ███████ more cups than actually sold by Hershey. Third, Dr. Akemann's calculation of the percentage of Hershey's customers that would have chosen f'real is not based upon sufficient facts or data because Dr. Akemann's market share figure is speculative and he fails to account for elasticity of demand. Each of these reasons alone would be enough to exclude Dr. Akemann's lost profits opinion. Taken together, they show that Dr. Akemann consistently used unsupported assumptions to artificially increase his lost profits

calculation. Therefore, Dr. Akemann's lost profits opinion is neither reliable nor helpful to the jury.

> **a.  Dr. Akemann's assumption that f'real would have adopted either a ▮▮ upcharge or ▮▮ monthly rental is both speculative and unsupported by evidence.**

The crux of Dr. Akemann's analysis is his speculation that in a but-for world, f'real would have forgone high profits on blender sales in the real world, and instead would have adopted a business model that it expressly rejected.  This testimony must be excluded because it is completely speculative and unsupported by the facts of this case.

The basis for Dr. Akemann's assumption for the ▮▮ upcharge model is a f'real 2013 draft presentation for ▮▮▮▮, a chain that was larger than any f'real customer.  Ex. 1 ¶¶ 124, 238; FREAL_008030 (**Exhibit 9**) at 2.  However, Dr. Akemann readily admits that he is not aware of any evidence that f'real has actually offered any customer, including ▮▮▮▮, to pay a ▮▮ upcharge in lieu of paying the upfront cost of a blender. Ex. 5 139:23-140:1, 179:16-19; *see also* Ex. 8 125:13-22. Dr. Akemann's only cited evidence is his alleged discussions with Don Pryor,[6] f'real's VP of Finance, and invoices from 2011-2012 (prior to the beginning of the

---

[6] Mr. Pryor was never previously identified by Plaintiffs  as a witness upon whom they would rely to prove their case.  Defendants did not learn that Plaintiffs may rely upon Mr. Pryor's testimony until receiving Dr. Akemann's damages report, well after the close of fact discovery.  If the Court does not exclude Dr. Akemann's lost profits testimony, Defendants will seek to exclude Mr. Pryor from testifying at trial.

alleged infringement) noting "Full Warranty – Upcharge" with no details about the program. Ex. 1 ¶ 125 & n.203 (citing various documents which are included as **Exhibit 10**). However, Dr. Akemann admits that he does not know any of the specifics regarding the alleged upcharge programs he discussed with Mr. Pryor or purportedly evidenced by the invoices, including the upcharge amount. Ex. 5 172:8- 173:15, 231:11-17.

Dr. Akemann's testimony opining that f'real would have offered a ███ per month rental program like Hershey is equally speculative. Dr. Akemann provides no support for his assumption that f'real would have adopted Hershey's model in the but-for world. Ex. 1 ¶ 237.

The Third Circuit has held that expert testimony regarding lost profits models that deviate from the real world without any support in the record are unduly speculative and should be excluded. In *Elcock v. Kmart Corp.*, the district court admitted expert testimony that a plaintiff, who had made less than $6,000 the year before her injury, would have made over $12,000 after her injury without proof the plaintiff was capable of making over $12,000 before her injury. *Elcock*, 233 F.3d at 755. The Third Circuit found that the expert's "economic damages model relied on several empirical assumptions that were not supported in the record" and held that the district court abused its discretion by admitting the testimony. *Id.* at 756; *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) (holding

11

that expert's opinion assuming that plaintiff's husband would have chosen a more lucrative career path had he not passed away, based on conversations with the plaintiff and the fact that the husband once attempted that career path, should have been excluded); *Three Crown Ltd. P'ship v. Salomon Bros.*, 906 F. Supp. 876, 894 (S.D.N.Y. 1995) (excluding expert testimony that premised lost profits opinion on assumption that investment group would have entered a new line of trading).

Dr. Akemann's testimony is even more speculative than the testimony rejected in *Elcock* because his assumption that f'real would have adopted either the ▮ upcharge or the ▮ monthly rental model in the but-for world is not merely speculative, but is contradicted by the evidence. The ▮ presentation contains a "Sensitivity Table" showing that a ▮ upcharge on 9 cups daily (the lowest number on the table) would result in payback of f'real's blender investment in 6.2 years. Ex. 9 at 15; Ex. 5 232:11-21. Even using Dr. Akemann's inadmissible cup multiplier, f'real would have been averaging 7 cups daily at best. Ex. 1 at Exs. 7, 8b. Decreasing the number of cups sold daily from 9 to 7 would result in a delayed payback that would likely exceed the 7-year life of the blender assumed by Dr. Akemann. Ex. 5 117:6-7, 232:22-233:4.

Further evidence that f'real would not have offered a ▮ upcharge in the but-for world is an analysis by Danny Kulka, f'real's Manager of Strategy and Business Development, describing why f'real did not offer an upcharge model in 2014.

FREAL_128051 (**Exhibit 11**).  Mr. Kulka discussed exploring a "creative financing option" with one of its customers that was averaging ▮ cups daily per blender.  *Id.*  Mr. Kulka noted that an upcharge program of ▮ per cup "would be fairly risky" at ▮ cups daily because "[t]he payback on this model is beyond ▮ years."  *Id.*  Dr. Akemann cites to Mr. Kulka's analysis, Ex. 1 ¶ 129, but fails to account for f'real's real world rejection of an upcharge model that would allow for payback of the blender in more than four years.

Mr. Kulka's analysis also shows that f'real rejected a ▮ monthly rental model.  Mr. Kulka acknowledged that Hershey rents its units for ▮ monthly, and stated "[h]owever, given the differences between the programs and our added costs, we believe our number would be higher."  Ex. 11 at 2.  Mr. Kulka then settled on a ▮ monthly fee[7] that allows for payback of the blender in less than 3 years, consistent with his earlier statement that the payback under the upcharge model would have to be less than 4 years.  *Id.*  Once again, Dr. Akemann fails to account for f'real's actual real world rejection of the ▮ monthly rental model.

Dr. Akemann also fails to account for the decreased pressure on f'real to adopt alternative models in the but-for world absent Hershey's competition.  Consistent with Mr. Kulka's references to Hershey, Dr. Akemann opines that it is likely

---

[7] Dr. Akemann admits there is no evidence of f'real offering the ▮ monthly rental model described by Mr. Kulka.  Ex. 5 144:23-145:2; *see also* Guzdar Dep. 160:23-161:4 (Aug. 2, 2018) (**Exhibit 12**).

Hershey "put substantial downward pressure on f'real's blender prices." Ex. 1 ¶ 220 n.340. However, he fails to explain why f'real would offer alternative pricing, such as an upcharge or rental model, in a but-for world *without* Hershey's competition, when f'real never adopted a ███ upcharge or ███ monthly rental model in the real world *with* competitive pressure from Hershey.

Finally, Dr. Akemann's analysis fails to account for the effect that offering alternative pricing would have had on the profits that f'real generated from its real world customers. f'real feared a "slippery slope" by offering alternative pricing to one set of customers. Specifically, f'real was worried that its existing and new customers may request the same pricing options, which are less profitable for f'real than its primary model of selling blenders. Ex. 9 at 12. Not only does Dr. Akemann dismiss this concern in determining whether f'real would have offered the alternative options in the but-for world, but he also fails to account for the fact that some of f'real's real-world customers would have chosen the less expensive upcharge or rental model and reduced f'real's overall profits. If Dr. Akemann is going to speculate that f'real would have changed its business model for Hershey's customers in the but-for world, then he must consider that f'real would have done so for all of its customers.

14

> **b.** **Dr. Akemann used an unreliable methodology to opine that f'real should be compensated for lost profits on sales that Hershey never made.**

Dr. Akemann uses an improper methodology to conclude that f'real would have sold ████ more cups in the but-for world as Hershey did in the real world.[8] Dr. Akemann calculates the average number of cups sold per blender daily between April 2017 and March 2018 by both f'real and Hershey, and determines that f'real averages approximately ██ times more cups pre blender daily than Hershey.  Ex. 1 at Ex. 7; Ex. 5 217:14-22.  Based on this calculation, Dr. Akemann then adopts a methodology for the but-for world assuming that every f'real blender replacing a Hershey blender would have sold ██ times more cups.  Ex. 1 ¶ 234.  Dr. Akemann does not adjust for any variables, such as the differences between the locations of the Hershey and f'real customers in the real world.  Ex. 5 214:12-18.  Instead, Dr. Akemann's flawed methodology is based on the false premise that the type of blender alone dictates how many cups daily a location will sell.

The flaws inherent in this methodology are proven by both Dr. Akemann and Jens Voges, f'real's former COO and corporate designee in this case.  Dr. Akemann testified that different retailers that offer the same blender sell a different number of cups daily depending on various factors, such as "the geographic location, the

---

[8] Defendants are assuming, for the purposes of this Motion only, that Plaintiffs can properly recover lost profits for the cups.

demographics of the area in which the particular retailer … are located, the type of retail outlet," the foot traffic, "where the product is placed, and how heavily it's promoted by the retailer."  Ex. 5 210:19-211:4.  Dr. Akemann continued, "I think there are a lot of factors that can influence cup sales per day and cause it to vary across retail outlet locations." *Id.* 211:5-7.  Mr. Voges agrees, stating, "[I]t's not just a matter of the blender producing cup sales.  It's a matter of location.  It's a matter of what the store operators do in terms of promoting the product.  There's a lot of factors that go into what ultimately drives cup sales."  Ex. 8 30:24-31:6.

Despite strong evidence that f'real's cup sales average was driven by various factors that are unique to particular locations, Dr. Akemann fails to account for these factors in his methodology.  f'real sells its blenders and cups nationwide, including in perennially warm-weather states out West and in Hawaii with higher cup sales, whereas Hershey's blenders are located mainly in the colder-weather Northeast states.  Ex. 1 ¶¶ 138, 140.  Dr. Akemann admitted that geography and seasonality affect the number of cups sold per blender.  Ex. 5 211:9-18.  For example, f'real had multiple stores in Hawaii averaging over ■■ cups daily in 2013, one of which sold over ■■ cups in a single day.  FREAL-123381 (**Exhibit 13**) at 2.   Hershey has no stores in Hawaii and no stores that have come close to selling ■■ cups daily.  Dr. Akemann's cup multiplier calculation includes f'real's real world cup sales in states that do not include a Hershey blender, such as California and Hawaii.  Ex. 5 214:12-

16

18, 215:6-9.  Dr. Akemann never explains how the daily cup sales for those stores are relevant to the cup sales that f'real would make in the but-for world.

Dr. Akemann also fails to consider the effect that the business model may have on the number of cups sold daily.  A vast majority, if not all, of f'real's real world sales are under its primary business model where the retailer purchases the machine upfront.  By contrast, Hershey's real world sales (and according to Dr. Akemann, f'real's but-for sales) all occurred under either the upcharge or rental program.  f'real acknowledged that retailers that pay substantial upfront costs have more "skin in the game" for selling cups, and have a "vested interest in the program and emphasize proper execution" to recover that investment.  Ex. 9 at 12.  However, Dr. Akemann fails to account for this fact when comparing f'real's cup sales using the upfront cost model with Hershey's cup sales using the upcharge and rental models to determine the f'real sales in the but-for world.

Dr. Akemann also fails to account for the effect in the but-for world of the addition of ▮ f'real blenders per year on cup sales.  Dr. Akemann acknowledges that there is a "simultaneous pattern of increasing blender locations and generally declining cup sales per day."  Ex. 5 220:2-9.  However, he makes no adjustment for this factor in calculating the average cup sales or in applying that calculation to the but-for world.

17

Dr. Akemann's opinion based on his cup multiplier model, which assumes that each individual store's sales would increase in proportion to the difference between f'real's and Hershey's average real world sales without accounting for other known factors that would adversely affect the but-for sales, is speculative and should be excluded.  *See Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (finding model that disregarded factors that may affect the distribution of lost sales contained "too many assumptions and simplifications that are not supported by real-world evidence")

In addition, Dr. Akemann fails to provide any explanation of where the demand for approximately ███████ extra cups would come from in the but-for world.  Would these sales be new sales from new customers or are they sales that would have come from existing f'real customers, and, thus, would not be a "lost profit" for Plaintiffs?  Dr. Akemann never addresses this issue, but given his admission that an increase in blender locations means a decrease in average cups sold daily, Ex. 5 220:7-9, it is reasonable to assume that at least some, if not all, of these ███████ cup sales would not be a "lost profit" to f'real.  Rather, these extra sales would have shifted from a real world f'real retailer to a but-for world f'real retailer.  This is another example of Dr. Akemann using his speculations and assumptions only for the benefit of Plaintiffs.

c.   **Dr. Akemann's calculation of the percentage of customers that would have chosen f'real in the but-for world is speculative.**

Dr. Akemann's determination that 74% of Hershey's customers would have chosen f'real in the but-for world is based on unverified assumptions, and should be excluded.

Dr. Akemann correctly determines that the market is not a two-person market and submits market share-based proof to determine the but-for sales.  Ex. 1 ¶ 233, Ex. 10a.  Reconstruction of a market "requires sound economic proof."  *Grain Processing Corp.*, 185 F.3d at 1350.  Dr. Akemann's market share approach fails to meet this standard for multiple reasons.

First, Dr. Akemann's market share "calculation" is entirely derived from an email by Mr. Voges identifying five direct competitors other than Hershey, and cites to anecdotal evidence regarding each competitors' market share in different years.  Ex. 1 at Ex. 10 (citing FREAL_134246 (**Exhibit 14**)).  This is not the type of evidence that supports an opinion that is the product of reliable principles and methods.  *See Abbott Biotech. Ltd. v. Centocor Ortho Biotech, Inc.*, 2014 WL 7330777, at *12-13 (D. Mass. Dec. 19, 2014) (finding that comparing data that is not measured in the same way is unreliable).

Mr. Voges confirmed that he did not know f'real's market share and that it would be difficult to ascertain.  Mr. Voges stated, "███████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████" Ex. 8 138:20-23.  When

asked about his email that Dr. Akemann relies upon, Mr. Voges confirmed that: █

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████.  *Id.* 143:15-144:7.  Thus, Mr. Voges admits his email is unreliable

evidence of market share.

Dr. Akemann's market share analysis also fails because it does not include all

competitors.  Dr. Akemann limits his analysis to competitors that sell self-serve

milkshake options.  However, f'real competes with a wide range of food and

beverage options.  Mr. Voges testified, "███ is a competitor, ██████ is a competitor.

You know, even ██████ks on some levels are competitors."  *Id.* 136:10-13;

*see also id.* 132:24-133:9 (convenience stores offer their own milkshake program in

lieu of f'real).  This is confirmed by Dr. Akemann's antitrust testimony that if the

Hershey program was unavailable (as in the but-for world), then f'real "would still

face substantial competition from all of the other market participants, both at the

retailer and consumer level."  Ex. 6 68:17-21; *see also id.* 92:14-17 (testifying that

if Hershey was eliminated "f'real would continue to face substantial competitive

pressure from all the entities we discussed previously with respect to supply to

retailers"); Ex. 2 § 4.2.  Dr. Akemann's failure to account for the "substantial

20

competition" that f'real would continue to face means that "there is simply too great an analytical gap between the data and the opinion proffered," and his lost profits analysis must be excluded. *See EZ Dock*, 2003 WL 1610781, at *5-6 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Dr. Akemann's lost profits opinion must also be excluded because he failed to adjust the market share percentage to account for price elasticity of demand. "In a credible economic analysis, the patentee cannot show entitlement to a higher price divorced from the effect of that higher price on demand for the product." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). An expert's testimony that fails to account for price elasticity of demand should be excluded as unreliable. *Linear Tech. Corp. v. Micrel, Inc.*, No. C-94-1633 MHP, 2006 WL 8425047, at *85-86 (N.D. Cal. June 9, 2006).

Dr. Akemann admits that f'real's cups would have cost about ███ more than Hershey's cups under the upcharge model. Ex. 1 ¶ 238 n.359. Dr. Akemann recognizes that charging a higher price means there will be less demand, but makes no adjustment for price elasticity of demand because he assumes that the f'real model would be more profitable based upon speculation that f'real's retailers sell twice as many cups as Hershey's retailers. *Id.* Dr. Akemann cites to Exhibit 8b of his damages report, where he modeled the profitability between the f'real but-for

upcharge model (using the f'real real world average cup sales) and the Hershey real world upcharge model (using the Hershey real world average cup sales).

Dr. Akemann's profitability analysis fails to show that the demand would not be affected by the price increase.  First, it is premised on the faulty assumption that a Hershey retailer would sell twice as many cups if it had a f'real machine.  Second, the profitability analysis presumes that a retailer in the but-for world would be choosing between f'real's program and Hershey's program, which does not exist in the but-for world.  Instead, the retailer would be choosing between f'real's higher cost program and all of the other offerings in the but-for world, such as an Icee, Slushy, or fountain drinks.  Dr. Akemann even admitted that his profitability analysis is not applicable in a but-for world.  Ex. 5 229:3-11.  Thus, Dr. Akemann provided no reliable evidence to show why he disregarded price elasticity of demand, and his lost profits opinion should be excluded.

### 2.   Dr. Akemann's reasonable royalty should be excluded because of his failure to account for apportionment.

The Federal Circuit has held that a reasonable royalty "must be based on the incremental value that the patented invention adds to the end product."  *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2014).  When the royalty base includes a product with both patented and unpatented features, an expert must "apportion value between the patented features and the vast number of non-patented featured contained in the accused products."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767

F.3d 1308, 1329 (Fed. Cir. 2014). If an expert fails to do so, the reasonable royalty opinion should be excluded. *Id.*

It is undisputed that the accused blenders include both patented and unpatented features. Dr. Akemann's only basis for apportionment is the comparables approach, which focuses on the amount that Hamilton Beach agreed to pay f'real for a license to three of the four patents-in-suit. He contends this approach "by construction apportions between the patented and unpatented features of the products at issue." Ex. 1 ¶ 250. However, Dr. Akemann fails to discuss how the value of the asserted claims is apportioned from the value of the non-asserted claims that were also covered by the license. He also fails to account for the products at issue, including the MIC2000, not being fully developed until well after the license was signed in May 2010. Ex. 1 ¶¶ 65, 69, 74, 260. Thus, it is unclear how the license could have properly apportioned value to the various features in the non-existent accused products. Courts in this district have found that allowing such a "cursory analysis to circumvent the apportionment requirement would effectively gut the doctrine," and have excluded such opinions. *Bio-Rad Labs.*, 2018 WL 4691047, at *8. Dr. Akemann's reasonable royalty analysis should likewise be excluded.[9]

---

[9] Dr. Akemann's testimony on reasonable royalty has been excluded twice before for failure to properly apportion. *See PersonalWeb Technologies, LLC v. IBM*, Case No. 16-cv-01266-EJD, D.I. 345, at 5-7 (N.D. Cal. July 26, 2017) (**Exhibit 15**); *BMC Software, Inc. v. ServiceNow, Inc.*, Case No. 2:14-cv-903-JRG, 2016 WL 379620, at *3 (E.D. Tex. Feb. 1, 2016).

### C. Portions of Dr. Maynes' Testimony Should Be Excluded

#### 1. Dr. Maynes' testimony regarding facts outside of his specialized knowledge, opining on Hamilton Beach's state of mind, and merely summarize evidence should be excluded.

To be qualified as an expert, one must have "specialized knowledge" in the area of testimony, and "at a minimum, a proffered expert witness . . . must possess skills or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741 (internal quotations omitted). Expert witnesses are not permitted to testify regarding "intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *Oxford Gene Tech., Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004). Additionally, "[a] party may not filter fact evidence and testimony through his expert merely to lend credence to the same nor may expert testimony be used merely to repeat or summarize what the jury independently has the ability to understand." *Leister v. Jewell Transport, Inc.*, C.A. No. 14-1411, 2016 WL 26070, at *3 (E.D. Pa. Jan. 4, 2016) (internal quotations omitted). The portions of Dr. Maynes' testimony cited below are outside of his specialized knowledge, opine on Hamilton Beach's state of mind, and are mere recitations of fact evidence and testimony. Thus, they should be excluded.

Paragraphs 115-119 of the Maynes Opening Report (Ex. 3) discuss evidence related to Plaintiffs' allegations that Defendants copied f'real's blenders. In paragraph 119, Dr. Maynes opines on Defendants' state of mind, stating, "it is

readily apparent that, given Hamilton Beach's and Hershey's objectives, Hamilton Beach's engineers concluded there were no suitable alternative non-infringing substitutes to copying f'real's patented technology." Such testimony must be excluded. *Oxford Gene Tech.*, 345 F. Supp. 2d at 443 & n.9.

Dr. Maynes also testifies in various paragraphs about Defendants' business dealings with customers. Ex. 3 ¶¶ 55-56, 60-65, 75-78, 80-81, 83. These paragraphs are merely a recitation of fact evidence, including areas completely outside of his expertise, such as Defendants' revenue. Dr. Maynes never ties these paragraphs to any technical opinions, and his only additions are his personal commentary on non-technical documents that can be interpreted by the jury. *See, e.g., id.* ¶ 64 ("Mr. O'Flynn then acknowledged f'real's pioneering work in overcoming those problems."). The only purpose of this testimony is for Dr. Maynes to repeat fact evidence. This is improper and should be excluded.

In paragraphs 70-73 of his Rebuttal Report, Dr. Maynes provides a description of the Hamilton Beach-f'real licensing negotiations. This testimony is inadmissible for various reasons. First, Dr. Maynes has admitted that he is not an expert in patent licensing, Ex. 7 46:5-15, thus, this topic is outside the scope of his specialized knowledge. Second, this section is again replete with opinions regarding Hamilton Beach's state of mind. *See, e.g.,* Ex. 4 ¶ 70 ("Hamilton Beach recognized that having a self-cleaning blender like the ones patented and commercialized by f'real would

25

enable it to enter into new markets"), 73 ("Knowing that f'real was not willing to license its cleaning patents to a company in direct competition with f'real, . . . ."). Third, this section is also a mere recitation of fact evidence.  Thus, this testimony should be excluded.

Finally, paragraphs 58-61, 69, and 184 of the Maynes Rebuttal Report includes testimony as to the non-technical aspects of commercial success, as well as a discussion regarding the first sales of f'real's self-rinsing blenders and Hamilton Beach's "greed."  Again, Dr. Maynes has provided testimony outside of his specialized knowledge and that is merely a recitation of fact evidence without any connection to any of his technical opinions.[10]  Thus, this testimony must also be excluded.

## 2.    Dr. Maynes' testimony equating infringement with copying should be excluded.

The Federal Circuit has encouraged trial courts to use their "gatekeeper authority" when parties proffer incorrect law.  *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996).  "Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."  *Id.*  This Court has excluded technical experts when they do not perform the requisite legal analysis.  *See Oxford*

---

[10] Technical experts are generally permitted to provide opinion testimony regarding the technical aspects of commercial success, such as tying that success to the asserted claims (*i.e.*, nexus).  However, Dr. Maynes admitted that he did not do that analysis. Ex. 7 75:2-16, 225:24-226:3.

*Gene*, 345 F. Supp. 2d at 436-37 (excluding expert's testimony on anticipation that did not include an element-by-element comparison of the claims to prior art). This Court should likewise exclude Dr. Maynes' testimony as to copying.

Dr. Maynes' only testimony regarding technical aspects of copying is in paragraphs 82-85 of his Rebuttal Report. Dr. Maynes merely alleges that the accused products practice all of the elements of the asserted claims, equating copying with infringement. However, the law is clear that "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (internal quotations omitted). "Rather, copying requires the replication of a specific product." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Because Dr. Maynes' purported "copying" testimony compares the *accused products* to the *asserted claims*, rather than a specific f'real product, it utilizes an improper legal standard and must be excluded.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' respectfully request that the Court grant their Motion, and exclude Dr. Akemann's damages testimony and the portions of Dr. Maynes' testimony discussed above.

Dated: December 14, 2018

*/s/ Francis DiGiovanni*

Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com

*Of Counsel*:

William S. Foster, Jr.
Kenneth M. Vorrasi
Brianna L. Silverstein
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005-1209
(202) 842-8800
william.foster@dbr.com
kenneth.vorrasi@dbr.com
brianna.silverstein@dbr.com

*Counsel for Defendants*

## <u>CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION</u>

The undersigned hereby certifies that this brief complies with the type-volume limitation of the Court's Supplemental and Amended Scheduling Order (D.I. 168). The brief contains 6,546 words, excluding the Cover Page, Table of Contents, Table of Authorities, Signature Block, Certification of Compliance with Word Limitation, and Certificate of Service.  The brief has been prepared in 14-point Times New roman or similar typeface.  As permitted by the Court's Supplemental and Amended Scheduling Order, the undersigned has relied upon the word count feature of the word processing system used to prepare the brief.


Dated:  December 14, 2018          */s/ Francis DiGiovanni*
                                   Francis DiGiovanni (#3189)
                                   DRINKER BIDDLE & REATH LLP
                                   222 Delaware Avenue, Suite 1410
                                   Wilmington, DE 19801
                                   Tel:  (302) 467-4200
                                   Fax:  (302) 467-4201
                                   francis.digiovanni@dbr.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 14, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF prior to 6:00 p.m. ET, which will send notification of such filing to all registered participants.   In addition, the foregoing will be served upon counsel of record via electronic mail.


Dated:  December 14, 2018          /s/ Francis DiGiovanni
                                   Francis DiGiovanni (#3189)
                                   DRINKER BIDDLE & REATH LLP
                                   222 Delaware Avenue, Suite 1410
                                   Wilmington, DE 19801
                                   Tel:  (302) 467-4200
                                   Fax:  (302) 467-4201
                                   francis.digiovanni@dbr.com