IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| F'REAL FOODS, LLC and | ) | |
| RICH PRODUCTS CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-41 (CFC) |
| | ) | CONSOLIDATED |
| HAMILTON BEACH BRANDS, | ) | |
| INC., HERSHEY CREAMERY | ) | **PUBLIC VERSION** |
| COMPANY and PAUL MILLS d/b/a | ) | |
| MILLS BROTHERS MARKETS, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. MICHAEL P. AKEMANN AND DANIEL MAYNES, Ph.D.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
Taylor Haga (#6549)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
rsmith@mnat.com
OF COUNSEL:                                        mflynn@mnat.com
                                                   thaga@mnat.com
Guy W. Chambers
Ellen P. Liu                                       *Attorneys for Plaintiffs f'real Foods, LLC*
SIDEMAN & BANCROFT LLP                             *and Rich Products Corporation*
One Embarcadero Center, 22nd Floor
San Francisco, CA 94111
(415) 392-1960

**Confidential Version Filed: January 11, 2019**

**Public Version Filed: January 18, 2019**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ..........................................................................................1

II.   SUMMARY OF ARGUMENT ....................................................................2

III.  ARGUMENT..................................................................................................4

      A.    Legal Standard.....................................................................................4

      B.    Dr. Akemann's Damages Theories are Based on Sound Legal and
            Economic Principles and are Tied to the Facts of this Case ................6

            1.    Dr. Akemann's Lost Profits Analysis is Based on Sufficient
                  Factual Evidence in the Record and Accepted
                  Methodologies...........................................................................8

            2.    Dr. Akemann's Reasonable Royalty Analysis Properly
                  Accounts for the Value of the Patents. ....................................16

      C.    Dr. Maynes's Opinions are Proper Expert Testimony .......................21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964)..............................................................................................11

*AstraZeneca UK Ltd. v. Watson Labs., Inc. (NV)*,
   C.A. No. 10-915-LPS, 2012 WL 5900686 (D. Del. Nov. 14, 2012)..................22

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   C.A. No. 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018) ............17, 21

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*,
   809 F.3d 1295 (Fed. Cir. 2015) ..........................................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).................................................................................1, 2, 4, 5

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) .................................................................................4

*Ericsson, Inc. v. Harris Corp.*,
   352 F.3d 1369 (Fed. Cir. 2004) ......................................................................8, 15

*Gen. Motors Corp. v. Devex Corp.*,
   461 U.S. 648 (1983)...............................................................................................7

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) .....................................................................6

*GlaxoSmithKline LLC v. Teva Pharmas. USA, Inc.*,
   C.A. No. 14-878-LPS, D.I. 379 (D. Del. May 25, 2017) ...................................22

*Grain Processing Corp. v. Am. Maize–Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ............................................................................8

*Hologic, Inc. v. Minerva Surgical, Inc.*,
   2018 WL 3348998 (D. Del. July 9, 2018) ..........................................................23

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .........................................................................1, 5

*IBM Corp. v. Priceline Group, Inc.*,
   271 F. Supp. 3d 667 (D. Del. 2017)...............................................................4, 21

*In re Hayes Microcomputer Products, Inc. Patent Litig.*,
   982 F.2d 1527 (Fed. Cir. 1992) ...........................................................................25

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ...................................................................................5

*Intel Corp. v. Future Link Sys., LLC*,
   2017 WL 2482881 (D. Del. June 1, 2017) ..........................................................17

*Intellectual Ventures I LLC v. Xilinx, Inc.*,
   2014 WL 1814384 (D. Del. Apr. 14, 2014) .........................................................16

*Kannakeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3rd Cir. 1997) ..................................................................................4

*Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*,
   232 F. Supp. 3d 632 (D. Del. 2017).........................................................................5

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ................................................................................20

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
   851 F. 3d 1275 (Fed. Cir. 2017) .........................................................................6, 8

*Metaswitch Networks Ltd. v. Genband US LLC*,
   2016 WL 874734 (E.D. Tex. Mar. 7, 2016) .........................................................24

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) .........................................................................1, 15

*Monsanto Co. v. McFarling*,
   488 F.3d 973 (Fed. Cir. 2007) .............................................................................16

*Pall Corp. v. Micron Separations, Inc.*,
   66 F. 3d 1211 (Fed. Cir. 1995) ............................................................................11

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
   575 F.2d 1152 (6th Cir. 1978) .......................................................................6, 8, 9

*Plastic Omnium Advanced v. Donghee America, Inc.*,
    C.A. No. 16-187-LPS, 2018 WL 2316637 (D. Del. May 22, 2018) ..................21

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F. 2d 1573 (Fed. Cir. 1989) ...........................................................................9

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
    802 F.3d 1283 (Fed. Cir. 2015) ...........................................................................6

*Trio Process Corp. v. L. Goldstein's Sons, Inc.*,
    612 F.2d 1353 (3d Cir. 1980) .............................................................................16

*U.S. v. Phung*,
    2005 WL 844607 (3d Cir. Apr. 13, 2005) ...........................................................4

*United States v. Williams*,
    235 F. App'x 925 (3d Cir. 2007) .........................................................................5

**Rules and Statutes**

35 U.S.C. § 284 ...........................................................................................................6

Fed. R. Evid. 702 ..............................................................................................1, 4, 5

## I.        INTRODUCTION

Defendants seek "to exclude the entire damages testimony of Dr. Michael P. Akemann," Plaintiffs' damages expert, and portions of the testimony of Plaintiffs' technical expert, Dr. Maynes through their *Daubert* motion.  Defendants do not, however, challenge the knowledge, training, or experience of these experts, or the facts underlying their opinions.  Instead, Defendants simply disagree with certain facts the experts relied on, and certain opinions they offered, and attempt to use Fed. R. Evid. 702 to exclude those opinions.  That is not a proper *Daubert* motion.

As the Federal Circuit has explained, "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis . . . on 'sufficient facts or data' [in Fed. R. Evid. 702] is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court [or the defendant] believes one version of the facts and not the other." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003);  *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) ("The existence of other facts, however, does not mean that the facts used [by the expert] failed to meet the minimum standards of relevance or reliability.  Under Rule 702, the question is whether the expert relied on facts sufficiently related to the disputed issue. . . . [I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.") (internal citation omitted).

The proper course is not the exclusion of the expert testimony, but rather the use of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, [which] are the traditional and appropriate means" for a party to challenge an opposing expert's opinion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).  As the Court recognized at the status conference when Defendants first disclosed their potential *Daubert* motion, their objections to f'real's experts' testimony goes to the weight, not the admissibility, of the experts' opinions.  11/8/18 Tr. at 19:23-20:2.

## II.   SUMMARY OF ARGUMENT

1.   Dr. Akemann's opinions regarding lost profit damages are based on factual evidence in the record that accounts for Defendants' infringing use of f'real's patents.   Dr. Akemann applies well-accepted methodologies for demonstrating that there was a reasonable probability that, but for Defendants' infringement, f'real would have made some of the infringing sales.  Dr. Akemann's approach to calculating lost profits took into account, *inter alia*, the sales actually made by Defendants, the relevant market, relative market shares, and the historical sales performance of f'real's products in the real world. He applied sound economic principles in reaching his conclusions.  Defendants' antitrust expert opined that there were only two suppliers in the market offering self-serve frozen beverage programs that use blenders during the infringement period, f'real and

Hershey, and that f'real has a market share of 85%.  In such circumstances, there is more than sufficient evidence to support a conclusion that f'real would have made most or all of the infringing sales in the but-for world.

2.  Dr. Akemann's reasonable royalty analysis is premised primarily on an actual license to some of the patents-in-suit, negotiated between Hamilton Beach and f'real, and covering products that are specifically accused of infringement in this case.  In light of that real-world evidence of a comparable license, further apportionment of the value of the patented and unpatented features of the accused products is unnecessary because the actual arms-length negotiations by the parties already accounted for apportionment.  Indeed, Defendants' damages expert used the same royalty rates from the same license to estimate a reasonable royalty without the application of any additional apportionment factor.

3. Defendants' objections to Dr. Maynes's testimony are unfounded.  There is nothing improper about an expert reviewing documents and testimony in the case and evaluating that evidence in the context of a person of ordinary skill in the art and how such a person would understand the evidence.  The very purpose of an expert is to consider such evidence and provide an opinion that is helpful to the trier of fact.  Dr. Maynes is not providing any testimony related to "Defendants' state of mind."  Finally, contrary to Defendants' assertions, Dr. Maynes's opinion related to copying is not comparing the asserted claims to the accused products.

Rather, his expert reports detail Hamilton Beach's copying of f'real's commercial blenders, citing to evidence such as photos of the inside of f'real blenders taken by Hamilton Beach and Hershey, and Defendants' internal e-mails.

## III.   ARGUMENT

### A.   Legal Standard

"There are three distinct requirements for admissible expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts." *IBM Corp. v. Priceline Group, Inc.*, 271 F. Supp. 3d 667, 675 (D. Del. 2017), citing *Elcock v. Kmart Corp.*, 233 F.3d 734, 741-46 (3d Cir. 2000).   The Supreme Court in *Daubert* recognized the role of the trial judge, under Fed. R. Evid. 702, in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."   *Daubert*, 509 U.S. at 597.   The Third Circuit has stated that this "reliability requirement does not set a high bar for the admissibility of expert testimony."   *U.S. v. Phung*, 2005 WL 844607, at *3 (3d Cir. Apr. 13, 2005).   Nor does *Daubert* "require a district court to look at whether a proposed expert could have performed his or her analysis in a better manner."   *Id.*;   *see also Kannakeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3rd Cir. 1997) ("*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology.").   In examining whether the reliability factor has been

met, a court's focus must be on "principles and methodology" rather than the conclusions generated by the expert. *Daubert*, 509 U.S. at 595. "Questions about what facts [underlying an expert's testimony] are most relevant or reliable to calculating [damages] are for the jury." *i4i Ltd.*, 598 F.3d at 856; *see also In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) ("[I]t is for the trier of fact to determine the [expert's] credibility.").

Generally, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd.*, 598 F.3d at 852. Thus, a *Daubert* motion should be denied when the movant's arguments "go to the weight to be accorded" the expert's testimony "rather than its admissibility." *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017). "The overriding consideration . . . is that expert testimony should be admitted if it will assist the trier of fact." *United States v. Williams*, 235 F. App'x 925, 927 (3d Cir. 2007); *see also* Fed. R. Evid. 702 Advisory Committee Notes (2000) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.").

**B.    Dr. Akemann's Damages Theories are Based on Sound Legal and Economic Principles and are Tied to the Facts of this Case**

Dr. Akemann's damages opinions are the result of his careful, thorough analysis of the well-established factors and methodologies set forth in *Panduit*[1] and *Georgia-Pacific*[2] as applied to the facts of this case.  Defendants' objections are to the factual *inputs* that Dr. Akemann used in his calculations, not the methodologies he employed.  At best, such concerns go to the weight, not the admissibility, of his opinions.  *See, e.g., Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[T]he question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court.").

Defendants' criticisms of Dr. Akemann's damages opinions are based merely on Defendants' disagreement with his application of the facts in evidence to well-accepted methods of computing damages.  Whether determined by a lost profits analysis or a reasonable royalty, the proper measure of damages is an amount "adequate to compensate for the infringement."  35 U.S.C. § 284.  "Under the statute, 'damages adequate to compensate' means 'full compensation for any damages' [the patent owner] suffered as a result of the infringement."  *Mentor*

---

[1]    *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978).
[2]    *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

*Graphics Corp. v. EVE-USA, Inc.*, 851 F. 3d 1275, 1283 (Fed. Cir. 2017), quoting

*Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654-55 (1983).

  With respect to the accused MIC2000, there can be no dispute that the bulk of the financial harm to f'real from Defendants' infringement lies in the lost sales and related profits that f'real would have made from sales of the frozen milkshake cups sold for use in the blenders.  Although Hershey has placed fewer than ▮ of the infringing MIC2000 blenders with retailers, it has sold more than ▮▮▮▮ cups for use in those blenders, realizing more than ▮▮▮▮ in gross profit. Ex. 3,[3] Peterson Exs. HRS-110, HRS-310.  Recognizing the magnitude of damages due f'real from these lost sales, Defendants are desperate to have Dr. Akemann's lost profit analysis excluded from consideration by the jury.  Where Dr. Akemann has determined that lost profits may not be available for certain infringing sales under accepted methodologies, he has calculated a reasonable royalty for those products based primarily on the actual prior license agreement negotiated between Hamilton Beach and f'real, which Hamilton Beach unilaterally terminated in 2011.

---

[3]   "Ex. __ " refers to the exhibits attached to the concurrently filed "Declaration of Michael J. Flynn in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Testimony of Dr. Michael P. Akemann and Daniel Maynes, Ph.D."

### 1. Dr. Akemann's Lost Profits Analysis is Based on Sufficient Factual Evidence in the Record and Accepted Methodologies.

Dr. Akemann concluded that f'real should be awarded $███████ in lost profits damages and $██████ in reasonable royalty damages. Ex. 1 ("Akemann Rpt.") at Akemann Ex. 1. Defendants' damages expert, Mark Peterson, has opined that lost profits are not available at all to f'real, and reasonable royalty damages for sales of the infringing blenders and cups total ██████. Ex. 3 ("Peterson Rpt.") at 70.

To be awarded lost profits for infringement, a "patentee must show 'a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2004) (citations omitted). This is done by determining what profits the patentee would have made absent the infringing product, supported by "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.* (citing *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999)). The *Panduit* test is a well-accepted method to establish entitlement to lost profits. *Mentor Graphics*, 851 F.3d at 1284. Under *Panduit*, a patentee is entitled to lost profits if it can establish:

(1) demand for the patented product;

8

(2) absence of acceptable non-infringing alternatives;

(3) manufacturing and marketing capability to exploit the demand; and

(4) the amount of profit it would have made.

*Panduit*, 575 F.2d at 1156.  Defendants' expert, Mr. Peterson, acknowledges that the first element, demand for the patented product, is met.  Ex. 3, Peterson Rpt. at 12 ("In the legal sense, with the over 15,000 mixers sold by f'real and over ███ sold by Hamilton Beach it appears that there is demand for the product.").  He also does not dispute that elements 2 (absence of non-infringing alternatives) and 3 (capability to meet demand) are met.  *Id.* at 21-22.  Defendants' sole disagreement with Dr. Akemann's lost profits analysis is therefore over the last element, his calculation of the amount of profit f'real would have made.

In a two-supplier market like the one here,[4] "it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F. 2d 1573, 1578 (Fed. Cir. 1989).  "In these instances, the *Panduit* test is usually straightforward and dispositive." *Id.*

---

[4]     Defendants' antitrust expert, Dr. Wu, testified that "[t]here are only two firms that currently manufacture commercial self-serve frozen beverage mixers in the U.S., Hamilton Beach and f'real" (Ex. 5, Wu Rpt. ¶ 54) and "[t]here are two sellers of [self-serve frozen beverage] programs that use mixers, and they are f'real and Hershey" (*id.* ¶ 72).  Dr. Wu also acknowledges "[t]he fact that f'real and Hershey are close competitors" who "compete head-to-head for the same opportunities." *Id.* ¶ 97.

9

Dr. Akemann does not assume, however, that f'real would have made 100% of the sales that Hershey made.  To be conservative, he first reduces Hershey's sales by 7% to account for market segments Hershey serves that may not be a good fit for f'real. Akemann Rpt. ¶¶ 230-35 and Akemann Ex. 9.  Next, Dr. Akemann reduces the remaining Hershey's sales by 20% to account for other non-blender based milkshake products in the market based on f'real's estimated market share. *Id.* at ¶ 233 and Akemann Ex. 10a.  The result of those deductions is Dr. Akemann's conclusion that but for Defendants' infringement, f'real would have made only 74% of the sales that Hershey actually made.  *Id.* at Ex. 2a, 2b.

Defendants also argue (incorrectly) that Dr. Akemann "makes no adjustment for price elasticity of demand."  Br. at 21-22.  As both parties' experts acknowledge, retailers' demand for cups is ultimately derived from the end consumer, and the demand for the f'real system by retailers is driven by the overall profits that the retailer can expect, not simply the wholesale price of the cups.  *See, e.g.,* Peterson Rpt., p. 46.  Because retailers would sell *more* f'real cups, and thus make *more* total profits (as compared to the Hershey system), retailers would have *higher* demand for the f'real system and be willing to accept a higher wholesale cup price in exchange for not paying the upfront cost of the f'real system. Akemann Rpt., ¶¶ 164-66 and Exs. 8a-b.

The primary complicating factor in the lost profits analysis is that Hershey and f'real have generally used different sales models.  Traditionally, f'real's model has been to sell its blender and freezer outright to retailers.  Hershey started its program by charging retailers ▉▉▉ per month for the blender and freezer, and a wholesale cost for the cups.  Subsequently, Hershey began providing retailers the blenders and freezer at no upfront cost, and charging an additional ▉▉▉ "upcharge' on every cup sold to the retailer.  The result, of course, is that the upfront cost for f'real retailers has often been higher than under Hershey's program.  For purposes of determining lost profits, however, these different sales models should not matter. *See Pall Corp. v. Micron Separations, Inc.*, 66 F. 3d 1211, 1223 (Fed. Cir. 1995) ("In general, an infringer's sales at a lower price do not defeat the patentee's recovery of its losses at the patentee's price, for the principle of patent damages is to return the patentee to the pecuniary position it would have been in but for the infringement."), citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964).

Again, to be conservative, Dr. Akemann does not assume that all Hershey retailers would have accepted the f'real sales model of higher upfront charges. Akemann Rpt. ¶¶ 236-37.  Instead, he calculates f'real's lost profits based on sales models that f'real developed and deployed that are similar to the Hershey sales models.  *Id.* at 237-38, 240 and Akemann Exs. 2a, 2b.  To account for the two

11

different Hershey sales models, Dr. Akemann calculates the lost profits separately for those periods for which Hershey retailers operated under the rental model and the upcharge model.  Akemann Rpt. ¶¶ 236-38.  Dr. Akemann then subtracts the incremental costs that f'real would have incurred under each type of program.

Contrary to Defendants' suggestion, there is ample evidence in the record demonstrating that f'real has used upcharge and rental models with some retailers that were concerned about upfront costs since.  Akemann Rpt. ¶¶ 122-29 and cited documents, interviews, and testimony.  Defendants' expert, Dr. Wu, acknowledged f'real's alternative pricing models in his report (*e.g.,* Ex. 5, Wu Rpt. ¶ 102) and in his deposition testimony (Ex. 4, Wu Tr. at 163:4-8 ("**Q.** But you understand that f'real also has a program where it charges nothing upfront, or I think a shipping charge for the equipment, and a price per cup from 35 cents to 50 cents a cup? **A.** Yes, I do.")).

The fact that Hershey was able to compete with its infringing blenders only by giving away the equipment should not work to f'real's detriment in determining the amount of lost profits damages.  There are multiple examples in the record of Hershey and f'real competing head-to-head for retailers, including large retailers with many locations, with Hershey winning those retailers based on its willingness to take a loss on the equipment.  *See, e.g.*, Ex. 5*,* Wu Rpt. ¶ 97.  As Defendants'

12

damages expert acknowledged at his deposition, Hershey's upcharge model was a "very bad decision":

> Q. What's your understanding of the upcharge that Hershey added to the cups to replace the monthly fee?
>
> A. . . . I think that was a very bad decision on their part in terms of their own profitability but it maybe saved some of their customers, in their sense, from, you know, not dropping the machines.

Ex. 2, Peterson Tr. 75:6-19.

Defendants also take issue with Dr. Akemann's calculation of the number of cups that f'real would have sold absent infringement.  There is no dispute that the average f'real retailer sells significantly more cups per day than the average Hershey retailer.  *See* Akemann Rpt. at Akemann Ex. 7; Ex. 3 at Peterson Ex. HRS-500.  Based on the best available data, Dr. Akemann calculated that, on average, Hershey sells ▮▮cups per day per blender, and f'real sells ▮▮ cups per day per blender, a difference of approximately ▮▮%.  Akemann Rpt. at Akemann Ex. 7.  Defendants' expert Mr. Peterson calculated that Hershey sells ▮▮ cups per day per blender, and f'real sells between ▮▮▮▮ cups per day per blender.[5] Ex. 3 at Peterson Exs. HRS-500, FRL-100.  The minor differences come from the

---

[5] Defendants' other expert, Dr. Wu, calculated that "f'real's retail customers on average sell ▮▮frozen beverages a year, Hershey's retail customers on average sell ▮▮ a year," indicating that f'real retailers sell ▮▮% more cups than Hershey retailers, far higher than Dr. Akemann's conservative calculation of ▮▮ Ex. 5, Wu Rpt. ¶ 49.

experts' estimates of the number of f'real and Hershey blenders in the market at any given time, a number which can change on a daily basis.  To control for the changes in the number of blender placements, Dr. Akemann's calculation of the relative cup sales volumes across the two suppliers were based on relative cup sales for the period from April 2017 to April 2018, where there was more reliable data.  Akemann Rpt. at Akemann Ex. 7.  Although Mr. Peterson calculated slightly different results, he did not dispute Dr. Akemann's sales numbers and, in fact, relied upon them.  *See id.* (noting Dr. Akemann's analysis as his source).  There is evidence in the record that in locations that switched from the f'real program to the Hershey program, year-over-year same-store sales "decreased [by] more than half."   Akemann Rpt. ¶ 161 (citing HCC_022804).   Contrary to Defendants' suggestion (Br. at 15), Dr. Akemann then controlled for Hershey's actual retailers and store locations by applying his estimated ▮▮▮▮ multiplier to the actual Hershey's cup sales over time from those retailers and locations.

Defendants' complaint boils down to a disagreement with Dr. Akemann over the estimated number of additional cups that f'real would have sold but for the infringement.  Defendants cite such things as the relative geography of the Hershey retailers, the weather,[6] foot traffic in individual locations, and the fact that f'real

---

[6]     Defendants cite an email touting f'real high sales over a single 10-day period in Hawaii (Br. at 16), but ignore that f'real has about the same number of retailers

retailers may "have more skin in the game"[7] to dispute Dr. Akemann's opinions.[8] These are not proper bases to exclude his testimony.  Defendants are free to cross-examine Dr. Akemann at trial about the bases of his opinions, and introduce evidence that attempts to demonstrate that Dr. Akemann's analysis is flawed or somehow inconsistent with other facts in the case. *Micro Chem., Inc.*, 317 F.3d at 1392 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").   Notably, while Defendants criticize Dr. Akemann, their own damages expert did no contrary analysis and his own calculations of relative cup sales (noted above) generally support Dr. Akemann's conclusions.

Dr. Akemann used the available facts and evidence, together with accepted methodologies, to develop his lost profits analysis.  All of Defendants' arguments relate to their own interpretation and relative weight of the relevant evidence, or a misunderstanding or mischaracterization of Dr. Akemann's analysis, not the admissibility of it.  "It [is] ultimately up to the jury . . .  to weigh the credibility of the parties' opposing theories and evidence." *Ericsson*, 352 F.3d at 1378.

---

in Alaska as it does in Hawaii and, like Hershey, its largest concentration of retailers is in the "colder-weather Northeast states."  Ex. 18 (FREAL_236407).

[7]   Defendants' damages expert refuted this at his deposition, stating that there is no evidence to prove that point. *See* Ex. 2 (Peterson Dep.) at 57:18-23.

[8]   Defendants also complain that Dr. Akemann fails to account for the "addition of ■■ f'real blenders" in the market.  Br. at 17.  Those additional blenders are inherently accounted for in the Hershey blenders that were in the market and the lost sales to f'real.

The Court should deny Defendants' motion to preclude Dr. Akemann from presenting his lost profits analysis at trial.

### 2. Dr. Akemann's Reasonable Royalty Analysis Properly Accounts for the Value of the Patents.

Defendants complain that Dr. Akemann did not apportion the royalty base to account for the patented and unpatented features of the infringing blenders. Defendants ignore, however, that Dr. Akemann's reasonable royalty analysis is based primarily on the actual royalty rates (expressed on a per blender basis) from prior license agreement for three of the patents-in-suit, negotiated at arm's length by Hamilton Beach and f'real prior to the infringement.  When "an established royalty exists, it 'is usually the best measure of a 'reasonable' royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree.'"  *Intellectual Ventures I LLC v. Xilinx, Inc.*, 2014 WL 1814384, at *2 (D. Del. Apr. 14, 2014), quoting *Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007). "[A]bsent [] extenuating circumstances, 'the actual license rate [between the patentee and alleged infringer] is an important factor in the determination of a reasonable royalty,' especially when the 'license rate agreed upon ... was arrived at in free and open negotiations and conducted prior to any infringing activity.'"  *Id.*, quoting *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 1358-59 (3d Cir. 1980).

Where the license agreement relied on by the expert applies to the same patents and the same accused products, further apportionment is unnecessary. The case relied upon by Defendants, *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, makes this very point: "As a methodology, I see no problem with using comparable licenses to establish a reasonable royalty rate, without performing a separate apportionment analysis, where there is a logical basis for doing so." C.A. No. 15-1452-RGA, 2018 WL 4691047, at *8 (D. Del. Sept. 28, 2018), citing *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*, 809 F.3d 1295, 1302-03 (Fed. Cir. 2015) (finding district court's analysis of the reasonable royalty based on prior negotiation between the parties "already built in apportionment" without analysis of the smallest salable unit), and *Intel Corp. v. Future Link Sys., LLC*, 2017 WL 2482881, at *1-2 (D. Del. June 1, 2017) (finding an expert's reasonable royalty opinion based on comparable licensing negotiations without a separate apportionment analysis consistent with the Federal Circuit's approved methodology). The license relied upon by Dr. Akemann here was for three of the four patents-in-suit, for the same blending technology in all accused products, and involved the same parties as this case. Defendants' damages expert relied on the same license agreement and did not perform any further apportionment.

Here, Hamilton Beach sought out that prior limited license from f'real – which included the '150, '658, and '662 patents – to provide the self-cleaning

technology Hamilton Beach intended to use in one of the accused products, the IMI2000, which was the predecessor of all the accused products.   During development of that blender, Hamilton Beach recognized that f'real's self-cleaning technology was critical to the success of any blend-in-cup blender it would make, and that it could not develop such a solution on its own.   *See* Ex. 8 at HBBF0171458 (Hamilton Beach Business Case Summary for IMI2000) ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ ).

Hamilton Beach then incorporated the same f'real self-cleaning technology from the IMI2000 into the other infringing products, even after it had unilaterally terminated the license agreement.   *See* Ex. 6 at HBBF0013114 (MIC2000 Business Case Summary); Ex. 7 at HBBF0013039 (BIC2000 Business Case Summary). Development documents for the MIC2000, for example, ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ at HBBF0013113; *see also id.* ("███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████.").  Because all of the infringing products are based on the IMI2000's blender module that was the very purpose of the original license agreement, Defendants' criticisms regarding later-developed products is without merit.

In his damages report, Dr. Akemann discussed the general requirement for apportioning between the patented and unpatented features, but concluded that apportionment was already accounted for in the prior license negotiations:

> From an economic perspective, *my application of the comparables approach in this case*, which focuses on the price that Hamilton Beach agreed to pay for three of f'real's Patents in Suit in a prior arm's-length license agreement, *by construction apportions between patented and unpatented features of the products at issue*. In negotiating such agreements, licensees will generally have strong economic incentives to pay no more than necessary, given the incremental value that the patented technology provides relative to available alternatives and given the value of unpatented features to the overall product.  Similarly, licensors will generally recognize that, in order to reach agreement in arm's-length negotiations, they must price their technologies to reflect the incremental value provided by the patented technology relative to alternatives and given the value of unpatented features.

Akemann Rpt. at ¶ 250 (emphasis added).  Here, the license agreement between f'real and Hamilton Beach defined the "Licensed Product" as a "████████████████

████████████████████████████████████████

████████████████████████████████████████

████████."  Ex. 9 at HBBF0000652.  Thus, the license relied on by Dr. Akemann

already accounted for any apportionment between patented and unpatented features.

Moreover, apportionment is unnecessary where "the presence of that [patented] functionality is what motivates consumers to buy [the multi-component product] in the first place." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012). Defendants' witnesses testified that their customers would be unlikely to purchase the accused blenders without the patented self-rinsing feature. Ex. 10, Williams Dep. at 183:19-21 ("████████████████

████████████████████████████████████████████████████████

████████████████████████████.."); Ex. 11, O'Flynn Dep at 114:9-15 ("Q. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.."); Ex. 12, Pryor Dep. at 88:9-20 ("Q. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.."); Ex. 13, Waite Dep. at 50:20-24

("████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████..").

In any event, Defendants' criticisms of Dr. Akemann's reasonable royalty analysis go to the weight accorded to his opinion – an issue for the jury to decide – not the admissibility of his testimony. *See, e.g., Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 5729732, at *3 (D. Del. Nov. 2, 2018) (damages expert's "opinion that apportionment was unnecessary raises a factual dispute, not a methodological issue. The soundness of the logic behind his conclusion is an issue for the jury."); *Plastic Omnium Advanced v. Donghee America, Inc.*, C.A. No. 16-187-LPS, 2018 WL 2316637, at *5 (D. Del. May 22, 2018) (Defendant's criticisms of expert's apportionment opinion "are adequately addressed through proper cross-examination and presentation of competing evidence."); *IBM*, 271 F. Supp. 3d at 693 (Defendant's "concerns with [the expert's reasonable royalty] methodology go to the weight and not the admissibility of his opinions.").

Because his reasonable royalty analysis is based on sufficient facts and evidence in the record, together with well-accepted methodologies, Dr. Akemann should not be precluded from presenting his opinions to the jury.

## C.   Dr. Maynes's Opinions are Proper Expert Testimony

Defendants request that the Court exclude certain testimony from f'real's technical expert, Dr. Maynes.  They criticize certain statements that Dr. Maynes makes in his two reports as "outside of his specialized knowledge," improper

opinions on "Hamilton Beach's state of mind," and mere summarizing of evidence. Br. at 24.  Contrary to Defendants' assertions, there is nothing improper about Dr. Maynes providing opinions based on evidence he has considered, as viewed through his role as a person of ordinary skill in the art.  *See GlaxoSmithKline LLC v. Teva Pharmas. USA, Inc.*, C.A. No. 14-878-LPS, D.I. 379 (D. Del. May 25, 2017) ("Expert testimony is appropriate to demonstrate how a person of skill in the art would understand [defendant's] actions and communications because those actions and communications include technical information that goes beyond the jury's knowledge.").

Dr. Maynes does not intend to testify regarding "Hamilton Beach's state of mind," as Defendants contend, but rather what a person of ordinary skill in the art would understand from the evidence in the case.  There is nothing improper about such testimony.  *See AstraZeneca UK Ltd. v. Watson Labs., Inc. (NV)*, C.A. No. 10-915-LPS, 2012 WL 5900686, *2 (D. Del. Nov. 14, 2012) ("So long as [plaintiff's expert's] focus is on what one of ordinary skill in the art would understand—and not on what the inventors or [defendant] knew or intended—[the expert's] testimony will be permitted.").

Nor is there anything improper about Dr. Maynes summarizing for the jury the voluminous documents he has considered in forming his opinions, including those related to his opinions about whether Defendants copied f'real's technology.

*See Hologic, Inc. v. Minerva Surgical, Inc.*, 2018 WL 3348998, at *2 (D. Del. July 9, 2018) (denying motion to exclude expert testimony, noting that "[w]hile it is the fact-finder's province to draw inferences on issues of intent, the facts demonstrating copying are buried in [defendant's] laboratory notebooks, core technical documents, and FDA submissions, the significance of which would not be apparent to a lay juror lacking [the expert's] technical expertise").

Defendants cite to certain paragraphs of Dr. Maynes's rebuttal report as offering opinions "outside the scope of his specialized knowledge."  Br. at 25 (citing ¶¶ 70-73 regarding the f'real/Hamilton Beach license), and at 26 (citing ¶¶ 58-61, 69, and 184 regarding commercial success of f'real's blenders).  With respect to ¶¶ 70-73, Dr. Maynes offers no opinions in these paragraphs regarding the license agreement, but merely states certain facts that are not in dispute.  *See* D.I. 176, Ex. 4.  Similarly, his discussion of commercial success in ¶¶ 58-61 are predicate facts to his opinions in the subsequent paragraphs (¶¶ 62-69 and 184) regarding the nexus between the f'real patents and the embodiments of the inventions in f'real's products that supports his technical assessment of commercial success as a secondary consideration of non-obviousness.

Finally, Defendants argue that Dr. Maynes "utilizes an improper legal standard" regarding copying, because he "compares the *accused products* to the *asserted claims*, rather than a specific f'real product."  Br. at 27.  Defendants are

wrong.   Paragraphs 82-85 are not Dr. Maynes's "only testimony regarding technical aspects of copying."   Dr. Maynes presents ample evidence from Defendants' documents demonstrating that "from the very beginning of their design efforts for the MIC2000, BIC2000, BIC3000-DQ and IMI2000 blenders, Hamilton Beach carefully studied f'real's patented blenders" and copied f'real's technology in those blenders.   D.I. 176, Ex. 4, ¶ 76.   Dr. Maynes discusses documents regarding ██████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████ (*id.* at ¶ 78 and Exs. 14-16), and ████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████ (*id.* at ¶ 79 and Ex. 17 (Williams16)).   Having previously shown that the f'real blenders embody the patented technology, Dr. Maynes includes claim charts in ¶¶ 82-85 demonstrating how Defendants copied f'real's patented technology embodied in the f'real blenders, in addition to copying other elements and features found in f'real's commercial blenders.   *See Metaswitch Networks Ltd. v. Genband US LLC*, 2016 WL 874734, at *2-3 (E.D. Tex. Mar. 7, 2016) (denying motion to strike technical expert's testimony of alleged copying and rejecting contention that a product had to be copied rather than copying the "invention" shown in the patent).

All of this is proper testimony from a technical expert demonstrating how Defendants had the motive and opportunity to copy both patented and unpatented features of f'real's blenders.  Such evidence is relevant to secondary considerations of non-obviousness, damages, and willful infringement.  *See In re Hayes Microcomputer Products, Inc. Patent Litig.*, 982 F.2d 1527, 1543 (Fed. Cir. 1992) ("Whether the infringer intentionally copied the ideas of another" is a relevant factor to a willfulness determination).

Not surprisingly, Defendants want to exclude the evidence of copying from being presented to the jury, especially through an expert who can analyze and discuss such evidence from the perspective of an engineer who possesses ordinary skill in the art.  Without the benefit of a technical expert who can discuss the relevant evidence to show how it relates to Defendants' copying of f'real's blenders, the jury would be left guessing at how meaningful Defendants' study of f'real's products was to developing the accused products.

Because Dr. Maynes's testimony will be helpful to the trier of fact, none of his opinions should be excluded from trial.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
Taylor Haga (#6549)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
mflynn@mnat.com
thaga@mnat.com

*Attorneys for Plaintiffs f'real Foods, LLC and Rich Products Corporation*

OF COUNSEL:

Guy W. Chambers
Ellen P. Liu
SIDEMAN & BANCROFT LLP
One Embarcadero Center
22nd Floor
San Francisco, CA  94111
(415) 392-1960

January 11, 2019

## **<u>CERTIFICATION</u>**

Plaintiffs' brief complies with the type and word limitation set forth in Paragraph 12(e) of the Supplemental and Amended Scheduling Order (D.I. 168) because it contains 5,975 words as determined by the Word Count feature of Microsoft Word.

*/s/ Michael J. Flynn*
Michael J. Flynn (#5333)

1