1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4

5    F'REAL FOODS, LLC and RICH    :   CIVIL ACTION
     PRODUCTS CORPORATION,         :
                                   :
6                  Plaintiffs,     :
                                   :
7        vs.                       :
                                   :
8    HAMILTON BEACH BRANDS,        :
     INC., HERSHEY CREAMERY        :
9    COMPANY and PAUL MILLS        :
     d/b/a MILLS BROTHERS          :
10   MARKETS,                      :
                                   :   NO. 16-41 (CFC)
11                 Defendants.     :   CONSOLIDATED

12

13                          - - -

14                          Wilmington, Delaware
                            Thursday, April 11, 2018
                            1:06 o'clock, p.m.
15
                            - - -
16

17   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                          - - -

19   APPEARANCES:

20          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
            BY:  RODGER D, SMITH II, ESQ. and
21               MICHAEL J. FLYNN, ESQ.

22                      -and-

23

24                          Valerie J. Gunning
25                          Official Court Reporter

```
1    APPEARANCES (Continued):

2
               SIDEMAN & BANCROFT LLP
3              BY:  GUY W. CHAMBERS, ESQ.
                    (San Francisco, California)
4

5                   Counsel for Plaintiffs
                    f'real Foods, LLC and Rich Products
6                   Corporation

7


8              DRINKER BIDDLE & REATH LLP
               BY:  FRANCIS DiGIOVANNI, ESQ. and
9                   THATCHER A. RAHMEIER, ESQ.

10
                         -and-
11

12             DRINKER BIDDLE & REATH LLP
               BY:  WILLIAM S. FOSTER, JR., ESQ.
13                  BRIANNA L. SILVERSTEIN, ESQ.
                    (Washington, D.C.)
14

15                  Counsel for Defendants

16
                         -  -  -
17

18

19

20

21

22

23

24

25
```

1                   **P R O C E E D I N G S**

2

3                   **(Proceedings commenced in the courtroom at 1:06**

4   **p.m.)**

5

6                   **THE COURT:  All right.  Good afternoon.  Please**

7   **be seated.**

8                   **Mr. Smith or Mr. Flynn.  Sorry.**

9                   **MR. FLYNN:  Good afternoon, Your Honor.  Michael**

10  **Flynn from Morris Nichols.  With me, my partner, Rodger**

11  **Smith, and Guy Chambers from Sideman & Bancroft in San**

12  **Francisco.**

13                  **THE COURT:  All right.  Thank you.**

14                  **Mr. DiGiovanni?**

15                  **MR. DiGIOVANNI:  Good afternoon, Your Honor.**

16  **It's Frank DiGiovanni from Drinker Biddle & Reath.**

17                  **With me today is Bill Foster, also from Drinker,**

18  **Biddle & Reath in our D.C. office, Thatcher Rahmeier, he's**

19  **from our Wilmington office and Brianna Silverstein from the**

20  **D.C.  office.**

21                  **THE COURT:  All right.  Thank you.**

22                  **All right.  A couple housekeeping things I will**

23  **just inform you.  I am going to put willfulness back into**

24  **the case-in-chief.  There was a misunderstanding.  I wasn't**

25  **going to bifurcate.  I mean, to the extent I used that word,**

1    what I meant was, I was going to try infringement and then

2    after the verdict go right into willfulness if there had

3    been a finding of infringement.  But I've decided, and

4    frankly, it has to do with now I'm much more familiar with

5    the case, to the issue of copying, and I felt it would be --

6    I'm probably informed by some of the tactics I've seen in

7    the litigation, but, in any event, I'm going to put

8    infringement -- we're going to just try it all together.  It

9    seems to me it would be more efficient.  And obviously

10   that's just a fact-finding issue because the question of

11   enhanced damages is left to the Court, and I will make the

12   ultimate decision if there were finding of liability as to

13   whether to award damages under 284.

14          But under the Third Circuit case law as I

15   understand it, willfulness has to go to the jury, so that's

16   fact-finding, and so I've decided all in all, and this is

17   something left completely to the Court's discretion, I think

18   we should go ahead and do the willfulness before we have a

19   verdict.  All right?

20          MR. DiGIOVANNI:  Your Honor, may I just say --

21   we will ask to file an amendment to the pretrial order

22   because we did not put all of our willfulness witnesses on

23   there.

24          We had understood it was not part of the --

25          THE COURT:  Well, that was going to happen

1    anyway.  But I was startled to see, and I can't remember

2    the exact wording, I was -- in my mind, it was pretty clear

3    what we were going to do, which is we were going to try the

4    case, and then if there was a finding of infringement, we

5    were going right to willfulness.  What was your

6    understanding?

7            MR. SMITH:  Your Honor, I didn't have an

8    understanding as to the timing.

9            THE COURT:  All right.

10            MR. SMITH:  I understood it was separated to be

11    determined.

12            THE COURT:  Well, so that's just unfortunate,

13    but I wasn't going to bring a jury back.  It never was in my

14    mind that we would have a break and then bring a jury back

15    in at some later date.  So I guess we can address that.  I

16    mean, we'll have to -- but I think both sides it sounds like

17    did not have a definitive view, or maybe you had a

18    definitive view, but it was clear to me as soon as I read

19    the papers that I was going to have to address this.

20            MR. SMITH:  I agree with Mr. DiGiovanni.  I

21    think we will have to take a look at the existing pretrial

22    order to make sure that any wilfulness specific witnesses,

23    and we should be able to do that in pretty short order, Your

24    Honor.

25            THE COURT:  Well, that's the thing.  It

1    shouldn't be that long the way I see it.  But I think I used

2    the word bifurcate, which, you know, although I thought then

3    in the followup order -- in any event, that's just the way

4    it is.

5              I thought there was some misunderstanding when I

6    saw the pretrial order and the way you both identified it as

7    an issue to be dealt with and when we were going to do it.

8    When I issued it initially, the idea was, as I say, to do it

9    in two stages, but in light of I decided everything else

10   I've read, I actually think we should just do it in one

11   stage in this case.  And I'm not going to do that in every

12   case, but I think this case is the right case to not

13   separate it out.

14             MR. DiGIOVANNI:  In terms of, we're scheduled

15   for a five-day trial.  Does that change at all?

16             THE COURT:  I was going to give you 10 hours, so

17   you all asked for 14, and I don't think you should get 14.

18   And so, and I talked to my judges, colleagues, and they tell

19   me a five-day trial is typically 10 to 12, and my sense of

20   the technology and the facts and partly informed by the

21   redundancy of a lot of briefing, you guys can do it quicker

22   than if you had a time limitation, and I think ten hours

23   would be appropriate.  I think I will add an eleventh hour

24   for wilfulness.  You can have 11 hours.

25             MR. SMITH:  Your Honor, I apologize.  I'm not

1    familiar with whether you count the openings and closings in

2    that time frame.

3              THE COURT:  I do.  I count everything except for

4    the initial selection of the jury, except I will count

5    peremptory selection.  Your clock will start ticking when we

6    get to peremptories.

7              MR. SMITH:  Thank you, Your Honor.

8              THE COURT:  And so no voir dire, you know,

9    nothing like that, but your clock will start ticking when we

10   get to peremptories, which I've had four trials since

11   January.  It's amazing how fast peremptories move when

12   people are on the clock, so that doesn't take much time.  It

13   will include openings, closings.  It will include arguments

14   during the trial, and it will not include the jury charge

15   conference.  I will separate that out.  And so it will be

16   11 hours each.

17             MR. SMITH:  Sorry, Your Honor.  Your expectation

18   would    be the jury would get the case Thursday or Friday

19   then?

20             THE COURT:  Yes.  So I just had a trial that I

21   saw Mr. DiGiovanni in the audience.  That case I gave 11,

22   and I thought at the time, I thought I should have reduced

23   it.  I regretted I didn't.  Now, one side expanded it, but

24   unnecessarily, and took almost all 11.  The other side was

25   three-and-a-half hours short and yet that was the side that

1   said they needed the 11 in that case.  We tried it, started

2   Monday morning and we had it in the jury's hands Thursday

3   afternoon.

4              MR. SMITH:  Thank you, Your Honor.

5              THE COURT:  And I think this -- I mean, that

6   case was a very complicated drug case.  You know, this is

7   pretty easy technology it seems to me.

8              MR. SMITH:  Thank you.

9              MR. DiGIOVANNI:  I would say, Your Honor,

10  obviously, we have four patents here and each patent has its

11  own issues as you know.

12             We did put in our pretrial order under "other"

13  an issue of perhaps further limiting the number of claims

14  that are asserted, and I think in view of your Honor's

15  ruling regarding time, that becomes even more important in

16  our view.

17             THE COURT:  And I mean, I think the plaintiffs

18  would be insane to try -- if they didn't narrow their case.

19  And I kind of thought I should just leave it to you all, you

20  know.

21             I think what I could do, what I would be happy

22  to do is put a time limitation.  They've got to tell you on

23  a date certain what it is, and if they aren't going to

24  narrow it and think they are going to try it, I mean, I'm

25  going to hold them to the time.  And I mean good luck if

1    you try to try that not having a directed verdict on some

2    stuff.  I can't envision they would want to do that.  I

3    mean, how do you want to proceed?

4              I would rather not tell them they have X number

5    and you have X number.  I would rather, you know, you guys

6    all figure it out knowing the time constraints.

7              MR. DiGIOVANNI:  I would say this.  We have

8    asked them.  We've had a discussions about further limiting

9    it, and in our view, especially in view of the time

10   limitation now, we think it is imperative that they reduce

11   the number of claims, and we think it does impact us

12   perhaps.

13             THE COURT:  Sure.  I know it does, but I mean,

14   you're really going to try all of these patents, all of

15   these asserted claims?

16             MR. CHAMBERS:  Your Honor, we have summary

17   judgment motions today, so perhaps after we get that sorted

18   out, we'll definitely take another look in view of Your

19   Honor's comments.  And, yes, we will take those to heart and

20   to look at reducing again.

21             THE COURT:  I mean, have you tried patent cases

22   before?

23             MR. CHAMBERS:  Yes.

24             THE COURT:  And you're going to try this many

25   claims?  Let's say I deny all the summary judgment.  You are

1    going to put in front of a jury all of these claims and

2    limitations?

3              MR. CHAMBERS:  I think it could be done, Your

4    Honor.  I've done a two-day, full two-day patent trial.

5    Things can be done in two days, but let me work with

6    co-counsel, and in view of Your Honor's express points, and

7    we have reduced it before and we're open to looking at

8    reducing it again.

9              THE COURT:  Okay.  So why don't we wait and see

10   again where we are on that.

11             MR. DiGIOVANNI:  Okay.  Your Honor, one point of

12   clarification.  I think you already said this and I

13   apologize.  Will the verdict form have willfulness, the

14   single verdict form have willfulness, or are we going to

15   have an original verdict without willfulness and then bring

16   the jury back?

17             THE COURT:  No.  We're going to go ahead and

18   just put it in front of them.  I mean, you know, we've got

19   copying allegations.  Right?  I mean, to me, and I read the

20   stuff and I thought, this is not -- I mean, I had thought

21   initially this is the way to do it.

22             As you know, I'm just getting started.  And I

23   mean, it was an open court.  In the case I tried that I saw

24   you, I actually debated whether to even send willfulness to

25   the jury and made a number of comments.  Now, it turns out

1    there was a finding of noninfringement, so it became a moot

2    point.

3              But my sense of this case is that it will

4    inevitably spill into some of the willfulness evidence.  It

5    would be very hard to really, to definitively segregate it,

6    and so then we're going to have to retry it and I can see

7    the overlap.  And I know this overlap argument was made on

8    the phone when I originally ruled and, you know, I know it

9    can always be made, and I was skeptical about it and I said

10   I think we can work it out.  I don't think we really can in

11   this case in a really helpful way.  So I just think we ought

12   to go ahead and put it in front of the jury.

13             MR. DiGIOVANNI:  One thing I will say.  The

14   pretrial order, because it didn't include willfulness, it

15   didn't include things like opinions of counsel and other

16   items that are going to now have to be part of this first

17   trial.

18             THE COURT:  Well, and I mean, I recognize that.

19   I mean, look.  I was surprised when I read your papers that

20   it was clear to me you were at least contemplating we were

21   going to have a different -- I don't think it was going to

22   be a different jury, are we going to bring them back a month

23   later.  That was never intended by my comments when I said

24   we would separate or bifurcate or do it.

25             And I thought -- does somebody have my order?  I

1    think I used the word separate intentionally because at

2    least it was not this case, or another case, where somebody

3    said to me bifurcate in their mind meant two complete -- not

4    only separate proceedings, but that it would be in discovery

5    bifurcated and that was not my intent.

6                 And I guess we can discuss, if you can't be

7    ready for trial on April 26th because of this, but it seems

8    to me it's not that much -- I mean, more work for me.

9                 MR. DiGIOVANNI:  Because we have additional

10   witnesses who we have not lined up to appear, you know,

11   that's one wild card.  I expect there are others, too, that

12   we have not thought about just standing here.

13                MR. CHAMBERS:  Your Honor, they've designated

14   one witness as their opinion of counsel witness.

15                THE COURT:  And how is that helpful?

16                MR. CHAMBERS:  I think the trial can still go

17   ahead as scheduled on the 29th.  There's not that much more

18   that needs to be done.

19                THE COURT:  So do you know who their willfulness

20   witness is going to be?

21                MR. CHAMBERS:  Yes.  I'm trying to remember the

22   name of the attorney.  Was that Raring?  I think his name

23   was Alex Raring.  That's the only witness that I'm aware of

24   that they would have on advice of counsel.

25                THE COURT:  Well, I'm not sure how helpful that

1    comment was.  I think Mr. DiGiovanni just was making the

2    point there might be other witnesses that he would need to

3    consult with in terms of scheduling, and that seems to me to

4    be a fair point, especially when it looks like your side as

5    it turns out didn't have the understanding I had either.  So

6    reasonable minds can have different interpretations of what

7    my words meant.

8              I thought it was pretty clear.  It wasn't.

9    Reasonable people at counsel table, they had a different

10   view.  So I think we would all be better off to try to just

11   have helpful comments for the remainder of the day.

12             All right.  That's where we are on willfulness.

13   We'll have to revisit the scheduling thing when we get to

14   the end of the day.

15             You all saw that I issued opinions on, very

16   short on the motion in limine that could affect a summary

17   judgment argument or I guess some of the other arguments

18   today.  Did you both --

19             MR. SMITH:  We saw the estoppel opinion

20   yesterday and this morning I think it was a Daubert order we

21   saw.

22             THE COURT:  Correct.  All right.  Let me just

23   make a comment to everybody.  I mean, you may not even know

24   this because I don't know how you guys do the briefing and

25   how it gets to us, but it's really hard to get through, you

1    know, a document this thick without tabs, so I'm going to

2    revise my order, my form order, hopefully tomorrow if not

3    next week.  But I guess it's a good adage just to think

4    about if you want -- I mean, the page numbers are not even

5    chronological because we're talking multiple exhibits, and

6    so when we have 32 exhibits, I think it would be a good idea

7    to have tabs so I can get to them, but anyway I'm going to

8    make that rule now.

9              I'm going to end up with a scheduling order

10   25 pages long because of all the little rules I thought were

11   pretty obvious.  I know lawyers don't necessarily know what

12   paralegals are doing to get the documents in front of us.

13   So keep that in mind as you go through oral argument today.

14   It's hard to just flip to a document and try to find

15   something.

16             MR. SMITH:  Your Honor, if there's any

17   replacement copies you would like, I would be happy to.  I

18   know it's after the fact.

19             THE COURT:  Yes.  I think at this point, it's

20   probably --

21             MR. SMITH:  Understood.

22             THE COURT:  Yes.  I'm amending my order, but

23   just in case this order doesn't go out until next week and

24   you all have another case in front of me, it can be just

25   used as.

1        All right.  Now, let's go through what would be

2   beneficial.  Do you all agree that some of the motion in

3   limines could affect the summary judgment arguments?

4        MR. DiGIOVANNI:  Certainly, Your Honor.

5        THE COURT:  Yes.  I mean, so maybe we should do

6   those first and then hit the summary judgment.

7        MR. DiGIOVANNI:  Sure, Your Honor, we can do

8   that.

9        MR. CHAMBERS:  Actually, Your Honor, I'm trying

10  to be helpful, but I thought that it would actually be the

11  opposite, that if the issues get narrowed down on summary

12  judgment, I think there's one the motions in limine that, or

13  some of the motions in limine could become moot if we narrow

14  the case down on summary judgment.

15        THE COURT:  I thought there was some -- well,

16  let's take, like, Sato.

17        MR. CHAMBERS:  Yes.

18        THE COURT:  It wouldn't be good to deal with

19  that in the motion in limine first?

20        MR. CHAMBERS:  Fine, Your Honor.

21        THE COURT:  I don't know.  I'm just asking and

22  thinking out loud here.

23        Why don't we go through this.  I want to go

24  through the motion in limines first actually.  I just think

25  it's going to be beneficial, so let's do that.

1               All right.  So let's start with, and let's just

2     do them in order.  So let's start with plaintiffs' motion in

3     limine one to preclude Japanese Utility Model Publication

4     No. 1992-136787 as prior art, and this is, of course, the

5     Sato prior art reference.  All right?

6               Mr. Flynn, are you arguing this?

7               MR. FLYNN:  Good afternoon, Your Honor.

8               THE COURT:  All right.

9               MR. FLYNN:  Michael Flynn, to address our motion

10    in limine.  It was Exhibit 13 of the pretrial order.

11              Your Honor, I think in light of your order

12    yesterday on the motion in limine on IPR estoppel, the Court

13    recognizes that the defendants have explicitly,

14    unequivocally told the Court that a skilled searcher doing a

15    diligent search could not find Sato and they couldn't do it

16    in 2014 and 2015 using the very best databases, the most

17    skilled researchers, and using the very same databases that

18    the Patent and Trademark Office uses that the Patent Office

19    says contain every foreign patent that has been publicly

20    disseminated.

21              The declarations they filed in opposition to the

22    prior motion in limine make it very clear that even with the

23    Sato reference number, a skilled searcher couldn't find the

24    Sato reference.

25              Now, defendants have the burden of proof of

coming forward with evidence --

THE COURT:  Can I just ask you, though.  This is what I find happens all the time in patent cases.  I think you guys are -- you seem to have no problem taking both sides of the same issue.  Didn't you take the flip side in the collateral estoppel argument?

MR. FLYNN:  Your Honor, we did.  We said that in 2017, or 2016, their searchers said they couldn't find it.  Right.  Their burden is to show that at the relevant time period in 2002, 2003, prior to the filing of the '150 patent, it was publicly accessible.  Those are two different issues.

Now, the fact that their searcher did find it in 2017 in Japan and their searchers searching all the English language databases, everything the PTO has couldn't find it, may mean that in 2017, it was available in Japan.  But their burden is to show that it was publicly accessible to a person of ordinary skill in the art doing a reasonable search in 2002 and 2003, before the priority date of the '150 patent.

They have not shown that at all.  The only evidence they've put in is the MPET procedures, which are the recent MPET procedures, which say that all foreign patent applications that have been publicly disseminated are in the PTO databases that their searchers said they did an

1    exhaustive search on.

2              They put in the 2006 version of the Japan

3    Utility Act, but that's irrelevant because, first, Exhibit B

4    to their opposition, I couldn't find anything in there that

5    discusses publication requirements.  But it's irrelevant

6    because it's from 2006 and not the version when -- not even

7    the version from 2003, but it would have been, the relevant

8    version of that would be in 1992, when Sato would have been

9    published if it had been published in a patent gazette in

10   Japan.

11             Their own searchers say there was no way to find

12   this, and the Federal Circuit case law is pretty clear that

13   the -- I mean, I think the SRI case says that the touchstone

14   of whether it's printed publication is public accessibility,

15   and it's public accessibility to someone of ordinary skill

16   in the art doing a reasonably diligent search who is

17   interested in the art.

18             THE COURT:  Let me ask you:  What's the burden

19   of proof?

20             MR. FLYNN:  The burden of proof on them is to

21   demonstrate by clear and convincing evidence that it is a

22   printed publication under Section 102.

23             THE COURT:  And what do you cite?  So I looked

24   at your -- you cite Federal Rule of Evidence 803, 901 and

25   902 in support of that proposition.  Where in those rules

1    does it say that -- and actually, I will read the sentence

2    from your pretrial order section.  "Defendants have the

3    burden under the Federal Rules of Evidence to show by clear

4    and convincing evidence that the documents they intend to

5    assert as prior art are authentic, admissible, and/or

6    publicly available before the relevant date to qualify as

7    prior art under 35 U.S.C., Section 102," and then your cited

8    support is Federal Rule of Evidence 803, 901 and 102.

9            Where in those rules is there support for that

10   proposition that there's a clear and convincing standard of

11   proof?

12           MR. FLYNN:  Your Honor, in those rules, there's

13   not.  Those are the authentic rules.

14           THE COURT:  And, in fact, those rules are lower.

15   Right?  901, it's not even a preponderance.

16           MR. FLYNN:  Right.

17           THE COURT:  So that's just a mistake on your

18   part citing --

19           MR. FLYNN:  For the authenticity of the

20   document.

21           THE COURT:  Wait.  Can you point me to any

22   authority that says to show authenticity, you need to have a

23   clear and convincing showing?

24           MR. FLYNN:  Your Honor, that's not what I'm

25   saying.  To demonstrate authenticity, the burden is lower.

1    To demonstrate that it is a printed publication under

2    Section 802, the burden is clear and convincing evidence.

3    In our reply brief, we cite the Federal Circuit -- I'm

4    sorry, the Supreme Court case Microsoft versus i4i Limited

5    Partnership, the concurring opinion by Justices Breyer,

6    Scalia and Alito, where they say that the accused infringer

7    has a burden of clear and convincing evidence.

8              THE COURT:  Can I ask you about that?  So you've

9    got three justices that are in that opinion, Scalia, Alito

10   and Breyer.  You've got four justices that didn't sign onto

11   that opinion who concurred in the judgment and signed onto

12   the lead opinion.

13             Doesn't that tell me that the majority of the

14   Court, the plurality of the Supreme Court doesn't agree with

15   you?

16             MR. FLYNN:  Your Honor, I'm not sure there's a

17   dispute about whether they have to demonstrate by clear and

18   convincing evidence that something is prior art.

19             THE COURT:  Okay.

20             MR. FLYNN:  I mean, their burden is to prove by

21   clear and convincing evidence that a printed publication is

22   prior art to the patents-in-suit.  I'm not sure that's even

23   an issue.  What they are arguing is that by, you know,

24   purely by the rule that somehow a publication that they've

25   said wasn't publicly accessible somehow becomes a printed

1    publication when the standard set by the Federal Circuit

2    says that's not the case.  I mean, you know, we're not the

3    ones who said it couldn't have been found.  They said it,

4    not with one but two declarations, that using the best

5    databases, the same ones the PTO uses --

6              THE COURT:  You said it could have been found.

7              MR. FLYNN:  We said it could have been found

8    with respect to filing the IPR in 2016.

9              THE COURT:  So why could it be found in 2016 --

10    wait.  Just so we're all clear, what's the relevant date

11    that they have to show public accessible?

12              MR. FLYNN:  It would certainly -- I mean, we

13    can say that it's the filing date of the patents,

14    November 2003.

15              THE COURT:  Well, what do you want to say?

16              MR. FLYNN:  More likely, let's say it's the

17    priority date of November of 2002.  That's when they would

18    have to show that it was publicly accessible to a person of

19    reasonable skill in the art.

20              THE COURT:  All right.

21              MR. FLYNN:  Now --

22              THE COURT:  Anything else?

23              MR. FLYNN:  I'm happy to respond to any

24    questions or hear what the defendants have to say.

25              THE COURT:  All right.

1          MR. FLYNN:  Thank you, Your Honor.

2          MS. SILVERSTEIN:  Good afternoon, Your Honor.

3    Brianna Silverstein for defendants.

4          It's clear that what the plaintiffs are doing

5    here is trying to conflate two different standards.  The

6    estoppel standard that we've met is that a reasonable

7    searcher couldn't have found it in a diligent search when we

8    were doing the IPR search.  One important distinction there

9    is that we were searching, our searchers were searching in

10   English only and the Sato publication wasn't actually

11   translated into English.

12         And the public accessibility standard is

13   different, and I would like to address your point on what

14   the burden is.  Under SRI International, that's 511 F3d.

15   1186, the Federal Circuit said that you just have to make a

16   satisfactory showing.

17         THE COURT:  What does that mean?

18         MS. SILVERSTEIN:  We have to show that the

19   document would have been disseminated or otherwise made

20   available to persons interested and ordinarily skilled in

21   the art.

22         THE COURT:  But that begs the question, by what

23   standard.  So what is satisfied?  It seems to me it's kind

24   of circular or redundant.  Actually, I'm familiar with the

25   language.  I'm trying to figure out how it's helpful.  What

1   does it mean to have a satisfied showing?  That's putting

2   the cart before the horse, isn't it?

3               MS. SILVERSTEIN:  You could say that.  I'm just

4   quoting what the Federal Circuit said.

5               THE COURT:  So what's your best guess as to what

6   the Federal Circuit means when it comes to making a

7   satisfying showing?

8               MS. SILVERSTEIN:  I think in this case, there's

9   no doubt that we've shown.  I mean, it's a public --

10              THE COURT:  Let's see some words.  What words

11  should I look at?  Preponderance of the evidence?  Clear and

12  convincing standard?  I mean, Justice Breyer was very

13  explicit, it should be clear and convincing to show the

14  existence of the prior art.  Right?

15              MS. SILVERSTEIN:  Sure.  Yes.

16              THE COURT:  Should I just blow off Justice

17  Breyer?

18              MS. SILVERSTEIN:  No.  As you noted, that was a

19  concurrent thing.  It wasn't the full Supreme Court.

20              THE COURT:  All right.  So give me some language

21  I can use to help me understand what satisfying means.

22              MS. SILVERSTEIN:  I suppose we would argue that

23  it's closer to a preponderance of the evidence than the

24  clear and convincing standard, but I think in any case for

25  this particular document, there's no doubt that we meet both

```
1    of those standards.

2              THE COURT:  Okay.  So let me ask you this:  Say

3    the standards are different and I will say I found, it

4    struck me that if I were writing the law from scratch, it

5    might make sense to distinguish 315 from 102.  315 seems to

6    be concerned about process, judicial efficiency.  102 seems

7    to be concerned about substantive, validity of patents.  I

8    can see that.

9              But my problem having said that is, as I look at

10   Jazz Pharmaceuticals, Inc. against Amneal Pharmaceuticals

11   LLC, 895 F.3d, 1347, a Federal Circuit case, it says, "A

12   reference is considered publicly acceptable upon a showing

13   that such document has been disseminated or otherwise made

14   available to the extent that persons interested and

15   ordinarily skilled in the subject matter or art exercising

16   reasonable diligence can locate it."  That's exactly what

17   Mr. Flynn said.  That seems to be the exact same standard

18   that's at issue with '315.

19             MS. SILVERSTEIN:  We agree with you, that's the

20   standard for whether it's publicly available, but we

21   disagree that it's the same as the '315.  As a practical

22   matter, it can't be the same, because then an IPR petitioner

23   that is unsuccessful in the IPR would be completely

24   estopped.

25             THE COURT:  Okay.  But then you do agree that
```

1    what I ought to look to is, could a person interested in the

2    ordinary field, the subject matter or art exercising

3    reasonable diligence have located Sato.  Right?  You agree

4    that's the standard?

5              MS. SILVERSTEIN:  Yes.

6              THE COURT:  Okay.  So real quick, like

7    30 seconds.  Given the declaration of your two experts, how

8    do you possibly win it?

9              MS. SILVERSTEIN:  Because their experts were

10   only searching within the English language and the public

11   accessibility standard is not limited to English language.

12             THE COURT:  Do you know of any case law that

13   says when I should look at 315 versus 102, one ought to be

14   English only, one ought to be other languages?

15             MS. SILVERSTEIN:  No, Your Honor, I don't, but

16   you've already ruled on our 315 motion and found that we met

17   the standard for 315.  So we're just talking, I'm just

18   talking right now about the 102 standard, and I mean,

19   clearly, if you look at the Hoag case that we cited, that

20   was a German thesis that was only available in one library

21   in Germany, but because it was indexed, it was found to be

22   publicly accessible.  And I think we would all agree that if

23   that piece of art wasn't found through a diligent search to

24   do for an IPR, that you wouldn't -- a petitioner wouldn't be

25   estopped from using it in the future.

1              I mean, one of the things that Mr. Flynn didn't

2      mention in his talk about our evidence is the actual Sato

3      publication itself.  It says date of publication on it.  And

4      they have not -- they have not pointed to any evidence of

5      any kind when a foreign patent publication, especially from

6      the Japanese Patent Office, was found to not be publicly

7      accessible.

8              THE COURT:  All right.  Okay.  Thank you.

9              MR. FLYNN:  Your Honor, do you want to hear

10     anything further?

11             THE COURT:  No.  Thank you.

12             All right.  So we're looking then just to

13     summarize plaintiffs' motion in limine number one to

14     preclude the use of the Sato reference at trial because it

15     fails to meet the printed publication requirement, Section

16     102,            and I agree with the plaintiffs on this.  I

17     just don't see how the defendants can satisfy the standard

18     articulated in the Jazz Pharmaceuticals case that I read and

19     quoted from.  And the standard is that a reference is

20     considered publicly accessible upon the showing that such

21     document has been disseminated or otherwise made available

22     to the extent that persons interested and ordinarily skilled

23     in the subject matter or art exercising reasonable diligence

24     can reasonably locate it and the sworn declaration of the

25     defendant's experts show that exercising reasonable

1    diligence, you would not be able to locate the Sato

2    reference, and therefore I think it didn't satisfy the

3    printed publication requirement.

4              Do you have a question?

5              MR. CHAMBERS:  Are you ready for number two,

6    Your Honor?

7              MR. FOSTER:  Your Honor, just for the record,

8    this is the first time that an official publication from a

9    foreign Patent Office has been declared publicly

10   inaccessible.

11             If you look at the cases of the Patent Office in

12   Australia that we cited --

13             THE COURT:  Thank you very much.  I've read your

14   papers and you made your argument.

15             MR. FOSTER:  Yes, Your Honor.

16             THE COURT:  And you submitted two sworn

17   declarations from patent experts that swore that they had,

18   and I relied upon it in ruling in your favor in a prior

19   motion, and your experts detailed the comprehensive and

20   diligent search that they say their companies executed or

21   performed to locate the Sato reference and that they said

22   they were unable to locate it, and they said that a person

23   of ordinary skill in the art could not locate it or be

24   expected to locate it with a diligent search.  So you can

25   take your affidavits up the to Federal Circuit.  All right.

1           Let's go with motion in limine number 2.

2           MR. CHAMBERS:  Thank you, Your Honor.  This is

3    to exclude entering into evidence of Hamilton Beach's

4    patents, and it's a bedrock principle of patent law that a

5    patent gives a right to exclude others, but it doesn't give

6    a right to use what's described in the patent yourself.  Put

7    another way, simply because you get a patent, it doesn't

8    give you a free license to use everybody else's patented

9    technology.

10          If you get a patent for a little fastener clip,

11   that doesn't give you the right to make all sorts of other

12   inventions and then say that I have a patent.

13          THE COURT:  All right.  I tend to agree with

14   you.  I think we'll save time if I hear from the defendants

15   first.

16          MR. RAHMEIER:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MR. RAHMEIER:  Thatcher Rahmeier for the

19   defendants.

20          Just to be clear, I don't know what the motion

21   was, but we're really just talking about one patent here,

22   and it's Hamilton Beach's, what we call the '823 patent.

23          THE COURT:  Right.

24          MR. RAHMEIER:  So --

25          THE COURT:  So how about this.  Can you tell me,

1    I'm looking at page 2 of your motion in limine response.

2    You say the patent is inextricably linked to Hamilton

3    Beach's work on the accused product.

4              Actually, can I stop you there.  Just so I

5    understand, because this is going to come up in other

6    contexts.  There are two defendants.  Right?

7              MR. RAHMEIER:  There are two defendants.

8    There's Hershey and there's Hamilton Beach.

9              THE COURT:  Okay.  So on this one, this

10   particular issue is only relevant to Hamilton Beach.  Is

11   that right?

12             MR. RAHMEIER:  Well, yes.  It's Hamilton Beach's

13   patent.  It's about their design work and it relates to the

14   accused products that Hamilton Beach made.  Hershey's is a

15   customer.

16             THE COURT:  All right.  So then going back to

17   the language in your brief, you say the patent is

18   inextricably linked to Hamilton Beach's work on the accused

19   product.  It illustrates the pertinent feature of the

20   product and it demonstrates the steps.  And let's stop

21   there.

22             I think you have to agree, introducing

23   unnecessarily a patent to the jury could lead to confusion.

24   Do you agree with that?

25             MR. RAHMEIER:  We agree that a limiting

1    instruction is appropriate.

2            THE COURT:  I get that.  But to answer my

3    question is, so you do agree, the fact that you were willing

4    to go with a limiting instruction, it could lead to

5    confusion?

6            MR. RAHMEIER:  It could.

7            THE COURT:  Now, it could arguably be corrected

8    or avoided with a limiting instruction.  But given that, how

9    does it help the jury, how is it probative to show how the

10   features of a product were to have a patent?

11           MR. RAHMEIER:  So you're asking me just about

12   the features?

13           THE COURT:  I'm going to go through them

14   individually.  Let's just talk about the features.

15           MR. RAHMEIER:  Yes.  This patent is the result

16   of basically the research and development of these accused

17   products, not just similar products, but the products at

18   issue in this case.

19           THE COURT:  But I mean, look, if you got the

20   accused product, you could introduce testimony, somebody who

21   worked.  You could show plans, designing of the product.

22   You could show pictures of it.  Why do you need to have a

23   the patent to explain to the jury what the features are of

24   the product?  Just help me out with that.

25           MR. RAHMEIER:  Sure.  In this case particularly,

1      the patent itself was used extensively in the depositions of

2      Hamilton Beach witnesses by the plaintiff, and, in fact,

3      that testimony --

4                THE COURT:  Are they going to introduce that in

5      their case-in-chief for sure?

6                MR. RAHMEIER:  For sure, I can't say.

7                THE COURT:  Okay.  All right.  What's your name,

8      sir?

9                MR. CHAMBERS:  No.

10               THE COURT:  What's your name, sir?

11               MR. CHAMBERS:  Excuse me.  Sorry.

12               THE COURT:  No, no.  What is your name?  I just

13     want to know what your name is.

14               MR. CHAMBERS:  Sorry, Your Honor.

15               THE COURT:  No, no.

16               MR. CHAMBERS:  Guy Chambers.

17               THE COURT:  All right.  So, Mr. Chambers, sorry.

18               MR. CHAMBERS:  No.

19               THE COURT:  Mr. Chambers, do you intend to use

20     it in your case-in-chief?

21               MR. CHAMBERS:  Absolutely not.

22               THE COURT:  Okay.  Thanks.  All right.

23               So since they are not going to use it, let's get

24     that off the table.  I think my guess is they designated it

25     probably just to rebut something in case it came up.

1                        Assuming they are not going to use it, why is it

2       helpful to introduce the patent to show the features of the

3       product?

4                        MR. RAHMEIER:  Just for the features?

5                        THE COURT:  That's all I'm getting at.

6                        MR. RAHMEIER:  Okay.  Again, I think, yes, we

7       may have the machine there.  The machine may go back to the

8       jury.

9                        THE COURT:  I assume.

10                       MR. RAHMEIER:  And, but, again, I think the

11      design work that was done and that resulted in this patent,

12      the patent illustrates and shows, you know, different

13      aspects and things not accused of infringement of the

14      accused products.

15                       THE COURT:  Is there something in the patent

16      that would tell the jury how the product works in a more

17      probative way than having the product in front of them and

18      scientists or somebody explaining how it works?

19                       MR. RAHMEIER:  I can't answer that.

20                       THE COURT:  All right.  Let's go onto the next

21      topic then.  Then you say the patent would show the timeline

22      of the development.  Help me out with that.

23                       MR. RAHMEIER:  Yes.  So that goes back to one of

24      my, one of the arguments here, which is, the patent is, in

25      our view, very important to the story and the background,

1    the features, the development that went into the development

2    of the accused product.

3              THE COURT:  Flesh that out.

4              MR. RAHMEIER:  The timeline would be evidence by

5    when a patent was filed, when it was issued.  In this case,

6    the patent actually issued over the plaintiffs' patent.  So

7    plaintiffs' allegations --

8              THE COURT:  So it issued after the plaintiff's

9    patent?

10             MR. RAHMEIER:  It did, but it issued over,

11   meaning there's something else there, meaning Hamilton Beach

12   innovated and the Patent Office found innovation and issued

13   a patent.

14             So --

15             THE COURT:  Was the plaintiffs' patent part of

16   the prosecution history of the '823 patent?

17             MR. RAHMEIER:  Yes.  Again, the timeline part,

18   it would show in the timeline of the development and

19   research and development, when Hamilton Beach decided to go

20   to the Patent Office and try to --

21             THE COURT:  So it was specifically discussed,

22   the patent-in-suit during the course of the prosecution

23   history?

24             MR. RAHMEIER:  You mean actually argued and

25   discussed in the prosecution history?

```
 1                    THE COURT:  Yes.

 2                    MR. RAHMEIER:  It's cited to the face.  I don't

 3      think it was.

 4                    THE COURT:  But it's cited on the face of the

 5      patent?

 6                    MR. RAHMEIER:  That's correct.

 7                    THE COURT:  All right.

 8                    MR. RAHMEIER:  Okay.

 9                    THE COURT:  All right.  And then you say, next,

10      you say, the '823 patent is so intertwined that the

11      plaintiffs used the '823 patent to prove its infringement

12      case.

13                    Can you show me where that is because I had a

14      hard time finding it.

15                    MR. RAHMEIER:  It is the '377 patent, claim 27,

16      the expert report.  It's cited right there at 79.

17                    THE COURT:  Yes.  So help me out with that.

18                    MR. RAHMEIER:  Yes.

19                    THE COURT:  I was looking at it.  I didn't

20      really see this.

21                    MR. RAHMEIER:  Okay.

22                    THE COURT:  So this is tab 18, paragraph 79,

23      page 45.  I'm looking at paragraph 79.

24                    MR. RAHMEIER:  I'm looking at page 79.

25                    THE COURT:  Okay.
```

1          MR. CHAMBERS:  Your Honor, this is Guy Chambers

2   again.

3          Very quickly, that's a typo.  That's the only

4   page we had that typo in the report.

5          THE COURT:  Wait.  This is his motion, but you

6   know -- sorry.

7          MR. CHAMBERS:  I just want to see if I can speed

8   things along.

9          THE COURT:  Okay.

10          MR. CHAMBERS:  We did have a typo.  We removed

11   every other reference we could find to the '823.  We have no

12   intention of relying on it.  We tried to get them all out on

13   this one.

14          THE COURT:  Okay.  I don't even see '823 in

15   paragraph 79.

16          MR. RAHMEIER:  Your Honor, that's because it's

17   not paragraph 79.

18          THE COURT:  Okay.

19          MR. RAHMEIER:  It's page 79.

20          THE COURT:  All right.

21          MR. RAHMEIER:  Two columns.  On the right

22   column, the second box from the bottom.

23          THE COURT:  Oh, okay.

24          MR. RAHMEIER:  So the '823 patent is being

25   referenced to prove that a cup support mounted in the

 1   housing limitation is met.

 2                THE COURT:  Okay.  Hold on a second now.

 3                Mr. Chambers, you're telling me that reference

 4   to the '823 on page 79 of your expert report, you're saying

 5   is a typo?

 6                MR. CHAMBERS:  Yes.

 7                THE COURT:  What should it be?

 8                MR. CHAMBERS:  Excuse me?

 9                THE COURT:  What should it be?  '823, what

10   should it be?

11                MR. CHAMBERS:  We tried to remove any reference

12   to the '823 in putting together the expert report because we

13   don't intend to rely on it.

14                THE COURT:  Okay.  So you are not going to rely

15   on it at trial?

16                MR. CHAMBERS:  Exactly.

17                THE COURT:  All right.  Thank you.

18                All right.  So, all right.  So that dispenses

19   with that.  Right?

20                So let's go with the next one.  You've got the

21   '823 patent is also relevant to secondary considerations of

22   obviousness and then namely, that the defendants copied.  So

23   flesh that out for me.  I didn't really understand that.

24                MR. RAHMEIER:  I would be happy to.  I would

25   also like to start with, this is probably more important now

1        with willfulness being back in the case.

2                Okay.  So I'm sure as Your Honor noticed, the

3        plaintiffs' papers are rife with allegations that defendants

4        are unscrupulous copyists I believe is the phrase they used.

5        And by extension, that we don't innovate, that we ride on

6        the coattails of others, including the plaintiffs think

7        that's what we did here with them.

8                So that simply is not true, and Hamilton Beach

9        should be permitted to present the whole picture of their

10       research and development process and what happened here in

11       this case.  Again, it's for the accused products.  It's not

12       just somewhere in the patent here.

13               So therefore we should be able to show to rebut

14       these allegations of us being copyists, and unscrupulous

15       copyists that is, that we do innovate.

16               THE COURT:  Is there anything other than an

17       unscrupulous copyist?

18               MR. RAHMEIER:  That's a good question.

19               THE COURT:  All right.

20               MR. RAHMEIER:  We think a blanket exclusion of

21       us being permitted, to basically have this part of our whole

22       story before the jury would be unfair and, in fact, unfairly

23       advantage to them.

24               THE COURT:  Okay.  All right.  Thank you.

25               Mr. Chambers, if you wish to respond, I will

1     give you a chance.

2                    MR. CHAMBERS:  Well, I will be very quick, Your

3     Honor.

4                    I think Your Honor brought up key points, which

5     is that there's other technical documents that can prove

6     the, what the structure of it is, and what they described is

7     exactly the reason why these things need to be excluded.

8     They said it was issued over plaintiffs' patent.  There's

9     bad law out there, which the Federal Circuit in its Atlas

10    case made sure to get rid of, that says simply because you

11    get a patent doesn't mean that it's a defense to

12    noninfringement.  This is highly prejudicial.

13                   THE COURT:  Let me ask you this:  Especially

14    since willfulness is in, but even before with copying, but

15    now it's in.

16                   So why shouldn't they be allowed to bring this

17    in to show that they had a legitimate effort to come up with

18    their mixer, they were not afraid to present it to the PTO,

19    they even cited your patent in their patent.  They honestly

20    believed they didn't infringe.

21                   MR. CHAMBERS:  Well, what they can do, they can

22    come in and try to show that they designed it in a different

23    way, that they had their opinion of counsel.  That's all

24    relevant evidence.

25                   THE COURT:  Well, why isn't what I just said

```
 1    relevant?

 2                 MR. CHAMBERS:  What?

 3                 THE COURT:  What about what I just said?

 4                 MR. CHAMBERS:  Okay.  And, but I think that's

 5    very marginal.  I don't think it's really relevant at all.

 6    You would need to get into drawing a connection between

 7    their product and the patent, and then you --

 8                 THE COURT:  Wait.  The standard is for

 9    willfulness.  Right?  It's actually knew or should have

10    known they were infringing.

11                 MR. CHAMBERS:  Right.

12                 THE COURT:  Wouldn't it be inconsistent with

13    somebody that had knowledge that they were infringing the

14    patent to cite it in a patent application to the PTO?

15    You're drawing attention to the fact there's another patent

16    out there.

17                 MR. CHAMBERS:  Not at all, and this gets into a

18    whole complicated explanation you need to give the jury of

19    pioneering patents versus improvement patents.

20                 I will be very brief about this, but the example

21    I give people is Shockley in 1954, Bell Labs came up with a

22    very crude transistor, solid state transistor, the first one

23    ever, and that spawned the whole Silicon Valley.  That

24    spawned transistors, DRAMs, microprocessors, so that it

25    created a huge industry, but Shockley was the one who
```

1    started it all.

2                     So as long as Shockley has a patent,

3    everybody has to pay homage to Shockley and cite in the

4    Patent Office the fact that, you know, Shockley's patents,

5    so the examiner can consider it.  So they have to pay homage

6    to Shockley.  The fact that they developed a microprocessor,

7    you know, 15 years later is completely irrelevant to whether

8    they're infringing Shockley's patent, and it would be very

9    prejudicial if Texas Instruments could come in and say, you

10   know, we have 1500 microprocessor patents.  How could we

11   possibly be infringing Shockley?

12                     THE COURT:  Well, I can understand, I mean, and

13   I think that you would agree, Mr. --

14                     MR. CHAMBERS:  Chambers.

15                     MR. RAHMEIER:  Rahmeier.

16                     THE COURT:  Mr. Rahmeier.  Correct?  I've got

17   Chambers now.

18                     Mr. Rahmeier, you'd agree that there has to be a

19   limiting instruction.  We can't have the jury think that

20   because you have a patent, that means you don't infringe

21   their patent?  Correct?

22                     MR. RAHMEIER:  We do agree with that.  That's

23   very typical in cases we provided to Your Honor in our

24   briefing.

25                     THE COURT:  All right.  I'm going to deny the

1    motion.  I think it's -- I'm sorry.  You're rolling your

2    eyes, Mr. Chambers.

3              MR. CHAMBERS:  Well, can I ask that we -- let me

4    let you finish, Your Honor.  Let me let you finish.  I'm

5    sorry.  I apologize.

6              THE COURT:  I'm going to deny the motion.  I

7    think that, however, I do think it's appropriate to have a

8    limiting instruction because of the danger of unfair

9    prejudice to the plaintiff and confusion to the jury that

10   the fact that there's an existing patent on, and the

11   defendants say it covers the accused products, is not

12   probative of whether or not the plaintiffs' patent is

13   infringed by the accused product, and we need to make that

14   clear to the jury in an instruction.  But I do think that

15   the existence of the patent and the fact that it cites the

16   plaintiffs' patent is relevant to willfulness or lack of

17   willfulness, and it's relevant to the development, there's

18   an allegation of copying, and it's relevant to that issue as

19   to whether there was copying or whether there was an

20   understanding that, no, this was something different.

21             MR. CHAMBERS:  Your Honor, could I mention that

22   one of the things they are asking in their jury instructions

23   is design-around, so what they're going to try to tell the

24   jury, which could be extremely prejudicial, is that we,

25   we're entitled to design around the patent, we're encouraged

1    to design around the patent.  And here we've gotten our own

2    patent, and this is evidence that we successfully designed

3    around the patent and that it's hugely misleading to the

4    jury for us, and that we're going to have to get into a

5    pretty complicated analysis of the fact that what's in that

6    '823 patent has nothing to do with the patents that are

7    being enforced, which are, of course, self-cleaning blender

8    and for reconstituting a frozen milkshake, that '823 patent

9    is for moving a carriage up and down.

10         So it really has nothing to do with what's at

11   issue here, and that's why everything can get so garbled and

12   confused for the jury.

13         THE COURT:  All right.  So we'll have to make

14   sure we have a good limiting instruction to make sure the

15   jury is properly informed under the law.

16         MR. CHAMBERS:  Okay.  Would we be entitled to

17   put on witnesses then to explain to the jury that their

18   patent has nothing to do with, and you would almost need a

19   patent attorney to get on the stand and explain why the

20   claims of their patent have nothing to do with the claims

21   that are at issue in the patents-in-suit?

22         THE COURT:  I think they're going to be

23   instructed and it is has been stipulated, it sounds like,

24   they'll be instructed that whether or not the accused

25   products read on the '823 patent is irrelevant to whether or

1    not they read on the patent-in-suit.

2              MR. CHAMBERS:  Well, first of all, in order

3    for it to have any relevance, they would -- and I think

4    this could be best handled, you know, once we get into the

5    trial.

6              They have to show a nexus between their '823

7    patent and their products even to show --

8              THE COURT:  I'm denying the motion in limine.

9    There may be objections during the trial that a proffer

10   they make with respect to the '823 patent may be completely

11   irrelevant.  I wouldn't permit inquiry into it.  I'm just

12   not granting the motion in limine saying they can't bring

13   it in for those reasons.  For instance, to me, I'm not going

14   to let them bring in the patent to show what the features

15   of the accused products are.  That's redundant, it's

16   wasteful.  That could mislead the jury.  It's not coming in

17   for that.

18             I discussed the limited purposes I could see it

19   being relevant to.  It was offered for those limited

20   purposes, and coupled with a limiting instruction, I'm

21   denying the motion in limine.

22             MR. CHAMBERS:  All right.  Thank you, Your

23   Honor.  That helps.

24             THE COURT:  All right.  Next.  Oh, and by the

25   way, to make it really clear to the Federal Circuit, so I

1    based my analysis on that last ruling under Rule 403, and I

2    think that the probative value of the existence of the '823

3    patent is, with respect to the limited issues I discussed,

4    namely, willfulness, copying, and the development of the

5    products, is sufficiently probative that I'm not going to

6    preclude it from being put before the jury.  That said, I do

7    think that the potential of misleading the jury, causing

8    confusion among the jury, would outweigh substantially the

9    probative value of that evidence with respect to what are

10   the features of the accused product, and certainly whether

11   the accused product infringes the patent-in-suit.

12            So we're denying the motion in limine with the

13   understanding that the evidence could be proffered for a

14   limited bases and that we'll address whether the relevance

15   of it as it comes up.

16            Next?

17            MR. FLYNN:  Your Honor, our third motion in

18   limine is related to some evidence and testimony regarding

19   defendants' positions that were not timely disclosed during

20   the fact discovery period.

21            THE COURT:  Okay.

22            MR. FLYNN:  And we address a couple.  Let me

23   focus on sort of the two big ones, and they relate to their

24   noninfringement contentions and their invalidity positions.

25            THE COURT:  All right.  Actually, here's my

1    problem, Mr. Flynn, and I do want you to really spend time,

2    but as far as I'm concerned, I think the only one of the

3    five that you address was beyond sales.  Did you discuss any

4    of the others in your motion?

5                MR. FLYNN:  We do talk about the noninfringement

6    positions.

7                THE COURT:  Okay.

8                MR. FLYNN:  Your Honor, I mean, sort of the

9    overarching thing, and I think this is addressed in some of

10   their motions as well, is that defendants have just failed

11   to provide disclosures during the course of fact discovery.

12   I mean, through the end -- fact discovery closed in July of

13   2018 in a case that was originally filed in 2014.  There was

14   plenty of time here.

15               THE COURT:  So, look.  I want you to walk me

16   through this slowly, because I have to say from just my

17   reading of the document, I came away with a similar

18   conclusion.

19               MR. FLYNN:  Sure.

20               THE COURT:  So I wanted you to go through the

21   timeline.

22               MR. FLYNN:  Sure.

23               THE COURT:  And then I will let them go through

24   the timeline.

25               MR. FLYNN:  So let's start with noninfringement.

1    So we served contention interrogatories in 2015.

2                    THE COURT:  So January of 2015.  Right?

3                    MR. FLYNN:  I think that's right, Your Honor.

4    I want to make sure I have the date right.  I believe that

5    was our first -- I belive that was our first set of

6    interrogatories.

7                    THE COURT:  All right.

8                    MR. FLYNN:  I don't have them with me.

9                    They responded to those as often happens kind of

10   punting the ball.  The only substantive responses we got

11   back to our contention interrogatories on their

12   noninfringement positions and their invalidity positions

13   were in their supplemental interrogatory responses that they

14   served on January 5th, 2016, more than two-and-a-half years

15   before fact discovery closed.  And even in those responses,

16   for noninfringement they pointed to a handful of documents

17   and reference a collection of documents from, that they cite

18   in another interrogatory response.  And for their invalidity

19   position, that was our Interrogatory No. 8, they just

20   incorporate by reference their May 22, 2015, invalidity

21   contentions.

22                   That's it.  That's the only responses they gave

23   us on their defense, for example, on the on-sale bar or

24   public use.  The May 15th responses that they sent us say,

25   at this time, Hamilton Beach does not have any disclosures

1    under U.S., 35 U.S.C., Sections 102(a) or 102(b) with

2    respect to items for sale or publicly known.  That is the

3    last update they gave to our interrogatory which would have

4    gone to their on sale or public use defenses.

5              THE COURT:  All right.  So I want these exhibits

6    just to make sure I got it right.

7              MR. FLYNN:  Hopefully, we tabbed this one, Your

8    Honor.

9              THE COURT:  Okay.  I'm sorry, it wasn't tabbed.

10   The only thing that was tabbed was Exhibit 15, which is the

11   motion.  So let's go through it.

12             You got attached to it as Exhibit A, it looks

13   like the responses to the interrogatories.

14             MR. FLYNN:  Correct.

15             THE COURT:  And they are dated, as you said,

16   January 16th, so I'm seeing then at page 14, and the

17   supplemental response to Interrogatory No. Eight is on 15.

18   All right.

19             MR. FLYNN:  Correct.

20             THE COURT:  And they reference the invalidity

21   contention are served on May 22nd, 2015.

22             MR. FLYNN:  Correct.

23             THE COURT:  Where are they?  They're in here,

24   too.  Correct?  They appear to be Exhibit B.

25             MR. FLYNN:  They are Exhibit B, Your Honor.

```
 1              THE COURT:  All right.

 2              MR. FLYNN:  If you look at page 11.

 3              THE COURT:  Okay.  Hold up.  Yes.

 4              MR. FLYNN:  Under the chart, under heading C.

 5   The first sentence makes clear, they have no disclosures

 6   about items for sale were publicly known.

 7              THE COURT:  All right.  I've got you there.

 8              MR. FLYNN:  Okay.

 9              THE COURT:  Yes.

10              MR. FLYNN:  They do update those?

11              THE COURT:  Take me there.

12              MR. FLYNN:  These are the final contentions that

13   are Exhibit E.

14              THE COURT:  Okay.

15              MR. FLYNN:  These were served February 12th,

16   2018.

17              THE COURT:  All right.  I'm looking at page 13

18   and 14.  Is that right?

19              MR. FLYNN:  12 and 13, Your Honor.  I believe 12

20   has the chart and then begins with items offered for sale or

21   publicly known.

22              THE COURT:  Okay.  Hold up then.  Okay.  I see

23   12 and 13, but just help me out before I get there.  Let's

24   go back.  What's Exhibit D?

25              MR. FLYNN:  Exhibit D, Your Honor, was an
```

1    opinion from Judge Robinson on a similar issue.

2                    THE COURT:  Okay.  I see it.  Sorry.

3                    All right.  So just so I've got them all right

4    here, I've got Exhibit A are the responses from Hamilton

5    Beach.  Now, this is just Hamilton Beach, so help me out.

6                    MR. FLYNN:  Correct.

7                    THE COURT:  Help me out with this.  What's the

8    analysis with respect to Hershey?  Why weren't they served,

9    and if they were, what was their response?

10                   MR. FLYNN:  So Hershey never served separate

11   invalidity responses, invalidity contentions, Your Honor, so

12   they just presumably adopted what Hamilton Beach --

13                   THE COURT:  You say presumably, so that -- did

14   they or did they not?

15                   MR. FLYNN:  They definitely did not serve their

16   own.  I don't know that they joined in --

17                   THE COURT:  Did you serve discovery on them?

18                   MR. FLYNN:  We did serve discovery on them.

19                   THE COURT:  Did you serve the identical

20   discovery on them?

21                   MR. CHAMBERS:  Your Honor, the defendants can

22   verify that.  Hershey was handling the trademark part of the

23   case, and Hamilton Beach was handling the patent part of the

24   case, so they divided it up, so all the stuff that was on

25   patents came from Hamilton Beach and all the stuff that was

1    on trademark came from Hershey.

2              THE COURT:  All right.  See, I'm reading these

3    papers and, you know, what I'm stuck on is, as I mentioned

4    at the beginning, and I will hear it from the defendants,

5    but I think there's a pretty -- you know, plaintiffs have

6    understandably frustrated feelings when it comes to Hamilton

7    Beach's discovery responses, but I've got a motion in limine

8    that is directed at both defendants, and I don't see any

9    discovery with respect to Hershey.  And so before I do -- do

10   I have to even decide this, because isn't Hershey going to

11   say, we get to bring it all in?

12             MR. FLYNN:  Your Honor, I don't believe that

13   Hershey has a defense or counterclaim that's related to an

14   on-sale bar.  That was asserted in Hamilton Beach's answer

15   and counterclaims.

16             THE COURT:  But you've got five things.  The

17   on-sale bar is just one of five things.

18             MR. FLYNN:  Right.

19             THE COURT:  What about all the other things?

20             MR. FLYNN:  Your Honor, at some point

21   defendants, Hamilton Beach and Hershey, were basically --

22   actually, through the whole case with respect to the patent

23   case, they're being, Hamilton Beach's attorneys have been

24   handling that side of the case for both defendants.

25             I believe, and I can be happy to supplement if

1    Your Honor would like, but I believe that Hershey's

2    responses are similarly deficient in that, if anything, they

3    only pointed to the same invalidity contentions, for

4    example, that were served on Hamilton Beach and they never

5    provided separate noninfringement contentions.

6              THE COURT:  And do you know for sure you served

7    the identical discovery on Hershey?

8              MR. FLYNN:  I don't know for sure, Your Honor.

9    I know that to the extent there is anything in the record

10   about noninfringement contentions or invalidity contentions,

11   Hershey was adopting what Hamilton Beach was providing

12   because Hamilton Beach makes the products.  Hershey doesn't

13   know about the way the products operate.

14             THE COURT:  Okay.  Well, maybe we'll just put

15   that on the back burner.

16             So we've got Exhibit A, the defendant Hamilton

17   Beach Brands' first supplemental responses.  Right?

18             MR. FLYNN:  That's correct.

19             THE COURT:  All right.  And you point me there

20   to pages 14 and 15.

21             MR. FLYNN:  Correct.

22             THE COURT:  And Exhibit B is defendant Hamilton

23   Beach Brands' initial invalidity contentions, and you point

24   me there to page 11.

25             MR. FLYNN:  Correct.

1           THE COURT:  All right.  And let's see.  You

2    point me to paragraph C, which is offer for sale.

3           MR. FLYNN:  Right.

4           THE COURT:  And you point me to paragraph --

5    what else?  Anything else there?

6           MR. FLYNN:  No, Your Honor.

7           THE COURT:  All right.

8           MR. FLYNN:  Not specifically.

9           THE COURT:  Just on-sale?

10          MR. FLYNN:  Just on-sale.

11          THE COURT:  Okay.

12          MR. FLYNN:  I will say, Your Honor, that one of

13   our frustrations is that to this day we don't know exactly

14   which issues they're raising as defenses.  For example,

15   you'll see that they have a derivation defense in these

16   contentions.  We don't know whether that's in the case or

17   not.

18          They've raised a public use defense in their

19   later contentions.  We don't know -- they didn't oppose our

20   summary judgment motion on it, so we don't know whether

21   that's still in the case or not.  They accused Mr. Cramer of

22   being a co-inventor, but I think they've dropped that, too,

23   but we don't know.  And this is part of the problem, is that

24   we can't vet these things in discovery when they don't tell

25   us what they are.

1               And so, you know, the on-sale bar we're pretty

2     sure is still in the case, but the only disclosure they've

3     ever given us, even in their final invalidity contentions,

4     is go back and look at our answer and counterclaims we filed

5     at the very beginning of this case.

6               THE COURT:  Well, wait.  The on-sale bar,

7     don't they point that out in their final invalidity

8     contentions?

9               MR. FLYNN:  So that's Exhibit E, Your Honor.

10              THE COURT:  Right.

11              MR. FLYNN:  And if you look at page 12 --

12              THE COURT:  Yes.  Page 13.  Mr. Farrell offered

13    to sell blenders to certain gas station changes such as

14    QuikTrip.

15              MR. FLYNN:  At the NACS show.

16              THE COURT:  Yes.

17              MR. FLYNN:  And what do they cite?  They cite

18    their answer and counterclaims as support for that.

19              THE COURT:  But I mean, they put you on notice.

20    I mean, they could have them come in and they've got -- I

21    mean, what else do you need?

22              MR. FLYNN:  Well, Your Honor, this company they

23    reference here isn't the one that they're claiming is, there

24    was an offer for sale for now.  This Kwik Trip with a "K" is

25    a completely different company than the QuikTrip that

1    they're asserting now.  They're no longer asserting, I don't

2    believe, that the sale was made at the NACS show in October

3    of 2002, which is what they plead in their answer and

4    counterclaims.

5              But the point is that they had the benefit of

6    fact discovery and they never supplemented it.  They never

7    put us on notice that, okay.  We've been through discovery.

8    We've deposed Mr. Farrell.  We've deposed Mr. Geford.  We've

9    looked at everything.  Here's what our contentions are now

10   in July of 2018, before we move into expert discovery.

11             THE COURT:  All right.  So this is the on-sale

12   bar.  What else?  Let's talk about the other four things

13   that your --

14             MR. FLYNN:  Sure.

15             THE COURT:  That your motion covers.

16             MR. FLYNN:  So two of these, Your Honor --

17             THE COURT:  Hold on.  Let me go back to your

18   motion.

19             MR. FLYNN:  Sure.  And I think I can go through

20   these pretty quickly, because I think they --

21             THE COURT:  All right.  So the number one is the

22   new on-sale defense.

23             MR. FLYNN:  Right.

24             THE COURT:  And that's because apparently -- how

25   do you know what their new on-sale defense is?

1    MR. FLYNN:  Well, Your Honor, when we moved for

2  summary judgment, we kind of had to guess because we didn't

3  know exactly what their contentions were on this.  The same

4  with their public use defense, that I'm still not sure

5  whether they're still asserting it or not.

6    But --

7    THE COURT:  But I mean, you know, here's the

8  thing.  It's just from your summary judgment brief.

9    So incidentally, on your summary judgment -- so

10  let's go to page 3 of your motion.  Right?  Plainly,

11  defendants failed to identify their new on-sale invalidity

12  defense in response to plaintiffs' interrogatories.

13  Defendants concocted their new on-sale defense late in the

14  case, after it was unequivocally proven that defendants'

15  public use allegation never happened.  And then you say see

16  DI 169, and that's your motion.  Right?

17    MR. FLYNN:  I believe that's correct.

18    THE COURT:  This is a typo.  Really, I think you

19  were referring to your brief, which is DI 170, 37 to 40.

20  I'm assuming that, because isn't it your argument that you

21  made such a powerful summary judgment argument, that they

22  had to abandon their initial defenses and switch gears.

23  Right?

24    MR. FLYNN:  The public use and switch.

25    THE COURT:  But here's the problem.  So I go to

1    page 37 of your brief.  Defendants have also asserted that

2    the '150, '658 and 662 patents are invalid or unenforceable

3    because Mr. Farrell publicly disclosed or offered to sell

4    a blender containing the invention.  It sounds like you're

5    on notice.  I mean, you're prepping for it.  You're on

6    notice.

7              MR. FLYNN:  Your Honor, we're on notice, but

8    that's not the standard after all of the discovery has

9    closed.  The only thing we knew was what they had alleged in

10   their answer and counterclaims four years ago.  Right?  And

11   that was based on a display of a video that Mr. Farrell

12   allegedly made at a trade show that they've now admitted

13   never happened.

14             So when we're briefing the summary judgment, I

15   mean, I don't even know what we could have briefed because

16   they never told us, here's our contentions.  They never

17   supplemented and said, we've deposed Mr. Farrell, here's all

18   the evidence about what he allegedly said that makes us

19   still believe that we have an affirmative defense based on

20   an on-sale bar.

21             So all we're left with is the exact same one

22   line they had on information and belief in their answer and

23   counterclaims that they carried through to their invalidity

24   contentions that we had to somehow sort of discern what

25   their case may be on this when we don't think there's any

1    evidence.

2              There's not a shred of documents that evidence

3    any on sale.  There's not an invoice, there's not an e-mail,

4    there's no correspondence.  There's nothing that supports

5    their on-sale defense, but their own theory that he must

6    have offered it for sale before November of 2002 because

7    QuikTrip made a purchase of them in July of 2003 and it

8    couldn't possibly have happened otherwise.  They don't have

9    a single piece of evidence to support this.

10             THE COURT:  Let's go onto the next one.

11             MR. FLYNN:  Sure.

12             THE COURT:  So where are you on that?  The next

13   one is they have to provide visual evidence of grinding,

14   shaving, of the f'real patent.

15             MR. FLYNN:  Sure.  To kind of lump these

16   together, because these are all part of their

17   noninfringement positions, is that because we didn't know

18   what their noninfringement contentions were even though we

19   had served initial and final infringement contentions, they

20   never came back and said, this is missing in your

21   infringement contentions.

22             THE COURT:  Let me ask this:  If I let in the

23   January 2019 testing by your expert, do you need this motion

24   in limine?

25             MR. FLYNN:  We don't need it on the technical

1    issue related to the grinding and shaving.

2              THE COURT:  Okay.

3              MR. FLYNN:  I think that Mr. Maynes had to do

4    that extra testing to rebut what Mr. Slocum had in his

5    rebuttal report to which we did not get a reply.

6              THE COURT:  All right.  How about number three,

7    the unrestrained splash shield for sufficient mass.

8              MR. FLYNN:  So, Your Honor, again, because we

9    didn't know what their noninfringement positions were with

10   respect to those, we get them in Dr. Slocum's rebuttal

11   report where he says it doesn't meet this limitation and now

12   they are using indefiniteness issues as well.

13             THE COURT:  But is there --

14             MR. FLYNN:  But there's no prior disclosure to

15   us.  They never said in response to our contention asking,

16   tell us why you don't infringe based on our infringement

17   contentions, they never said, here's why, here's why.  It's

18   because we don't need this unrestrained limitation.

19             THE COURT:  How about divided infringement?

20   They point to a 2017 oral argument where somebody on your

21   side made a pitch to Judge Sleet about the divided

22   infringement argument.

23             MR. FLYNN:  Your Honor, we raised it because we

24   were concerned the claim construction could push that

25   argument one way or the other.  What we argue in claim

1      construction has nothing to do with what they're asserting

2      as their position.

3                    THE COURT:  And I think they say that though you

4      guys never revealed at some late date, I can't remember what

5      the date was, that, in fact, you were going to say that more

6      than one person.

7                    MR. FLYNN:  Your Honor, from the beginning of

8      the case, we've had inducement arguments, which makes it

9      clear that there's a third party doing the infringement.  So

10     I'm not sure exactly what they are referring to, but we've

11     always said that the consumers and the retailers have to

12     commit direct infringement for an inducement claim.  That's

13     not surprising to them.  The issue is whether there's true

14     divided infringement where they are providing a piece of

15     equipment and somebody else is completing the steps, and I

16     think we've briefed this separately in terms of, you know,

17     the Federal Circuit's limelight decisions.

18                   THE COURT:  Okay.  All right.  Anything else?

19                   MR. FLYNN:  No, Your Honor.  I think that covers

20     it.

21                   THE COURT:  All right.  Who is going to argue?

22                   MR. FOSTER:  Your Honor, it's Bill Foster on

23     behalf of the defendants.

24                   THE COURT:  All right.

25                   MR. FOSTER:  Your Honor, first of all, just to

1   kind of get this out of the way.  The rule that they cite is

2   a requirement to supplement the additional or corrected

3   information has not otherwise been made known to the other

4   parties during the discovery process.

5          There has been many times in this case where

6   different arguments or different positions were made known

7   to them, the raising of the interrogatory responses above

8   all.

9          So, for example, in the opening part, they don't

10  even mention the final invalidity contentions where we talk

11  about Kwik Trip.  Granted, there's a typo, it's K instead of

12  Q, but we have always had the same position that there was

13  some sort of prior sale to QuikTrip.  We can go through that

14  documentation later.  In fact, in the IPR, they talk about

15  negotiations with QuikTrip starting in 2001, and we weren't

16  able to depose Mr. Vogus, who made those statements until

17  after the final infringement contentions.

18         This is all their evidence.  I mean, we weren't

19  in control of any of it.  The same thing with talking to

20  Mr. Farrell.  We didn't get to depose him until a few months

21  after that.  One thing that's a little weird in this case.

22  They talk about four years ago.  This case was filed.  There

23  was discovery they didn't actually own the patents and it

24  was kind of restarted.

25         So when that happened, based on some of the

1     discovery that was done before, that's when the prior sale

2     or public use was put into the document.  We weren't sure

3     where the evidence was going to lead us because we didn't

4     have it, we didn't talk to anyone about it yet.

5            Over the course of discovery, we have always

6     said it was a sale to QuikTrip.  They put it in the

7     declaration to support their IPR position.  They said

8     themselves, negotiations started in 2001.  We have the

9     video.  We know they had it at the NACS show.  We know he

10    was trying to show it based on his deposition.  Again, that

11    is all of their evidence, so we're not sure how they didn't

12    have notice of the public use given it was pled.  It was

13    mentioned in the final invalidity contentions, and then the

14    evidence was further developed during discovery.

15           And, again, there's many times in this case,

16    like just to get it out of the way real quick, the divided

17    infringement issue.  Your Honor, we had discussions about

18    what the claim construction should be, and during those

19    discussions we had a whole discussion about the claim

20    construction of providing a mixing machine.  We had a meet

21    and confer.  We had to talk about those things.  They knew

22    full well that we were going to bring up this trickster

23    stuff type of argument.  They knew we were going to raise a

24    divided infringement argument.  And they've said inducement

25    has always been part of this case.  That's a different

1    issue.  And remember, the divided infringement argument

2    isn't directed to all the machines.  It's only directed to

3    specific machines that are operated in Hershey Express Shake

4    Shop Express program.

5              So we're saying something about if Hamilton

6    Beach sells a machine and Dairy Queen uses it, for example.

7    That's not really an issue.  And if you look at their final

8    infringement contentions, they never say who performs the

9    different method steps.  That's not in their infringement

10   contentions whatsoever.  Until we got Dr. Maynes' report, we

11   didn't know who was performing the different method steps,

12   and that's brought up in our summary judgment motion later

13   today.

14             So they were on full notice that we -- they were

15   on full notice of the divided infringement potential as

16   demonstrated by the statement in the Markman hearing a long

17   time ago.  Again, when they fully put forth who was

18   performing which of the steps, it's only, like I said, a

19   subset, a subset of the total infringement that we're saying

20   is governed by the divided infringement.

21             Real quick, there's many issues they didn't

22   actually address in their papers.  I think the prior sale

23   one we just talked about a little bit, but they don't get

24   into the meat of a lot of these things.  But they had

25   opportunities to talk about all of these issues.

1          If you look at our, if you look at our responses

2     to our interrogatories, we say straight up, all the products

3     are missing at least one.  Many of your interrogatories are

4     really calling for expert testimony.  And the people that

5     have the most knowledge are Brian Williams and Ted Branson.

6     Go talk to them.  And over the course of the discovery, they

7     learned a lot of these things.

8          Looking at Exhibit P to the summary judgment

9     brief, in many different questions about Brian Williams, the

10    splash shield.  He talks about it.  He goes, all right.

11    This is Exhibit P of the summary judgment motion.  All

12    right.

13         So there was consideration for instead of the

14    guidewire weight, putting kind of a big screen to make sure

15    that the top of the cup shield was pressed down and held on

16    top of the cup.  Right?

17         And the Answer:  To perform the same function as

18    the weights.

19         The weight was most cost-effective.  Brian

20    Williams testified about the sufficiency of the weight.

21    Brian Williams also testified about whether or not the blade

22    ground.  This was brought up.  There's another thing that's

23    also mentioned in the summary judgment briefing about Ben

24    Branson.  They tried to ask him whether or not shaves, or

25    shaves chocolate chips.  Ben Branson simply denied, it

1      doesn't shave anything.

2                THE COURT:  Can you point to, attached to your

3      motion in limine response Exhibit D, you cite for the

4      proposition that there was a disclosure about unrestrained.

5                MR. FOSTER:  Yes Your Honor.

6                THE COURT:  Page 121, 25.

7                MR. FOSTER:  Your Honor, Exhibit F.  Exhibit F

8      is the strongest.

9                THE COURT:  Wait.  Let's go through Exhibit D.

10               MR. FOSTER:  All right.

11               THE COURT:  Exhibit D, page 121, starting at

12     line 25.  Tell me, where is the unrestrained stuff here?

13               MR. FOSTER:  Your Honor, which page?

14               THE COURT:  Well, according to yours, I'm on

15     page 2 of your response to the motion in limine.  On page 2

16     under unrestrained splash, you cite Exhibit D as 121:25

17     through 122:19.  Help me out.  Where is this discussion

18     about unrestrained there?

19               MR. FOSTER:  Your Honor, this is a discussion

20     about the lid weight that's part of the splash field

21     assembly in the product.  He asked about the specific weight

22     of it.

23               THE COURT:  Has that got something to do with

24     being unrestrained?  You cite it for the proposition, it has

25     a parenthetical, unrestrained.  I am trying to find out

1    where there's something about unrestrained.

2              MR. FOSTER:  Well, Your Honor, the witness says

3    the addition of the weight makes this entire assembly

4    heavier, and that extra weight is something that would

5    further restrain the lid.

6              THE COURT:  You're telling me that goes to

7    unrestrained?

8              MR. FOSTER:  Your Honor, that's not directly on

9    point.

10             THE COURT:  Well, you cited it, so you help me.

11             MR. FOSTER:  Right, Your Honor.  Your Honor,

12   right now, the claim limitation is the splash shield is

13   unrestrained.  That specifically says that the weight is

14   further applying restraint to the flash shield.

15             THE COURT:  All right.  You're saying it's

16   probative under unrestrained.  All right.

17             MR. FOSTER:  Well, Your Honor, there's two

18   things that are in these depositions that we talked about

19   that provide the restraint that's in their noninfringement

20   contentions.  There's two things.  One, a separate lid

21   weight, and, two, there's mechanical contact at the spindle

22   seal and the bushings that provide friction, that mechanical

23   contact.  Those are the two things and they're discussed in

24   the portions of the deposition that we cite.

25             THE COURT:  So I'm trying to understand it.

1              MR. FOSTER:  Yes, Your Honor.

2              THE COURT:  All right.  I haven't bean dealing

3    with this case for four-and-a-half years.  A pretty simple

4    question:  So you're telling me the weight is relevant or

5    probative of whether it's unrestrained.  That's all I'm

6    trying to figure out.

7              MR. FOSTER:  Yes.

8              THE COURT:  It sounds like the answer is yes.

9              MR. FOSTER:  Yes, Your Honor.

10             THE COURT:  All right.  So I saw friction in the

11   next one.  Line 20, you say this goes to sufficient mass.

12   Now we're back to discussing the cast iron weight.

13             MR. FOSTER:  And, Your Honor, page 150.

14             THE COURT:  Okay.  At the end you say, any small

15   amount of weight will help, but it's not sufficient, so it

16   goes to sufficiency.

17             MR. FOSTER:  Yes, Your Honor.

18             THE COURT:  All right.  Got it.

19             MR. FOSTER:  Your Honor, I think more clear,

20   again, the rule allows us to provide any sort of update in

21   writing, and I think the letter, the letter of January 30th,

22   2017, we wrote them and we told them what our

23   noninfringement position is for all of these patents.  We

24   talk about the rinse chamber in the '150.  We talk about the

25   splash shield that's restrained by a separate weight.  We

1    talk about the -- the way it would read on any, it would

2    read on any rinsing blender.

3              So, Your Honor, we were communicating.  We were

4    telling them our positions.

5              THE COURT:  All right.

6              MR. FOSTER:  And, most importantly, Your Honor,

7    I'm still not sure what type of discovery that they were

8    denied of.

9              THE COURT:  Look, here's the thing.  You know

10   what, there's a technical reading of the rule, and I think

11   you are correct.  The rule refers to otherwise disclosed in

12   discovery process or in writing, but in my mind, it's not

13   the right way to practice civil litigation.  That the rules,

14   they contemplate that you will be more forthcoming in

15   responding to discovery, and I don't think you guys were.

16             Now, you technically meet it, that at least the

17   second half of the rule, so, Mr. Flynn, I'm going to deny

18   your motion.  I'm going to make sure that plaintiffs aren't

19   prejudiced and they get to present the evidence, and an

20   example would be, just off the top of my head, the

21   January 2019 testing.

22             So you, you know, you're going to win your

23   battle in this particular motion.  Do I think it's a way to

24   practice civil litigation?  I don't, and I think it's

25   unfortunate that lawyers do it, because they require parties

1   to expend resources unnecessarily, and they require courts

2   to have to expend, for instance, just in preparing for this,

3   to dive into the details I had to when if people would have

4   been just more, frankly, cooperative and candid we wouldn't

5   be here.  So we're done on this motion.  Let's go to the

6   next motion.

7            Mr. Flynn, do you understand the basis of my

8   ruling?  You're okay with it?

9            MR. FLYNN:  I do, Your Honor.  I just -- to

10  close the loop on it, we served the same interrogatories on

11  Hershey.  They basically pointed to Hamilton Beach's

12  invalidity contentions and they just said we don't infringe.

13           THE COURT:  Basically, I'm very sympathetic

14  where plaintiffs are coming from on this, but the bottom

15  line is the way you read the rule, it has the otherwise

16  language at the end.  I think there are enough disclosures

17  in the written communications.

18           It sounds like on the divided infringement,

19  there must have been some kind of disclosure or

20  understanding, and as I say, what it ends up doing, we're

21  going to allow more evidence in and I may have to extend the

22  time limitations because of that.

23           MR. FLYNN:  I understand, Your Honor.  Thank

24  you.

25           THE COURT:  All right.  Let's go to the next

1    motion.  I think we're on the defense number one.

2              MR. FOSTER:  Your Honor, I don't think there's

3    any real dispute about the admissibility of the IPRs.  I

4    think the defendants, sorry, the plaintiffs have agreed that

5    it's more prejudicial than probative, so I think we're only

6    going to talk about a couple of issues.  The use of certain

7    testimony as a -- for cross-examination purposes, and then

8    whether or not certain prior art was considered by the PTO

9    during the IPRs.

10             THE COURT:  All right.  So let's talk about the

11   latter first, because I think it can probably be done

12   quickly.  I mean, you want to preclude them -- I mean,

13   in cross-examination, if they're cross-examining somebody

14   let's say maybe before the PTAB, can't they just call it

15   another matter and that resolves the problem of

16   cross-examination?

17             MR. FOSTER:  If it's truly an inconsistent

18   statement.  As we note in our briefing, it's a different

19   standard.  It may not be the same combination.

20             THE COURT:  How is that relevant?  It's only for

21   purposes of showing an inconsistent statement.  Right?

22             MR. FOSTER:  Yes, Your Honor.

23             THE COURT:  So the plaintiffs, who is going to

24   argue this for the plaintiffs?

25             MR. FLYNN:  Mr. Chambers.

1          THE COURT:  Mr. Chambers, are you okay with that

2    cross-examination?

3          MR. CHAMBERS:  Yes.

4          THE COURT:  So let's make it clear then.  They

5    cannot, if they want to cross-examine a witness based on a

6    declaration, statement made before the PTAB for impeachment

7    purposes only and it's a prior inconsistent statement, it

8    clearly has to meet that threshold, they can do it, but they

9    cannot make any reference to what the specific matter was or

10   before whom the statement was made.  They can just say, did

11   you swear under oath in another matter, blank.

12         MR. FOSTER:  Your Honor, I think we agreed to

13   that.

14         THE COURT:  That's what I'm getting at.

15         MR. FOSTER:  Yes.

16         THE COURT:  I think we've got agreement on the

17   second part.

18         MR. FOSTER:  The only part, we were going to ask

19   for a review of the document before it started.

20         THE COURT:  So, I mean, you know, how does that

21   work mechanically?

22         MR. FOSTER:  Your Honor, I'm not sure.  I'm not

23   sure what documents they're going to use.  For example, they

24   talk about the Miller combination from prior art.  Again,

25   the '662, I don't have an invalidity defense now because

1    you said that Sato wasn't -- isn't prior art, so I don't

2    know --

3              THE COURT:  I said it's not publicly accessible.

4    I mean, if I were writing the law, I would let you have it.

5    They say publicly accessible is determined by reasonable

6    diligence.  We don't have to revisit that.

7              MR. FOSTER:  But, yes, that's not an issue in

8    the trial anymore, so that shouldn't come in.  The other

9    thing was an indefiniteness issue.  Again, that's a

10   different proceedings.  112 can't be challenged at the PTAB

11   and that's for the Court anyway.

12             I don't know what documents they plan to use.

13   That's why we have that caveat.  But we agreed generally.

14   Of course, they can cross-examine.  And the courts are

15   pretty consistent in terms of not letting it in because it's

16   too prejudicial, but at the same time trying to work with

17   the evidence that was created this those cases.

18             THE COURT:  All right.  So I'm not going to

19   require -- you know, if they're going to use it properly

20   under the ruse to impeach a prior inconsistent statement,

21   they're going to have to establish first that they got a

22   statement, that it isn't consistent.

23             I have to say at the last patent trial I had, I

24   had a patent attorney literally try to impeach a witness

25   with a prior consistent statement, and that was news to me,

1    but I don't think I will ever see that again, hopefully, and

2    it certainly wasn't in the lawyer's interest.  So I think

3    we're good.

4             Mr. Chambers, you understand, it has to be a

5    prior inconsistent statement.  Right?

6             MR. CHAMBERS:  I do, Your Honor.

7             THE COURT:  All right.

8             MR. CHAMBERS:  I understand what you are saying.

9             THE COURT:  All right.  That dispenses with

10   that.

11            MR. FOSTER:  Yes, Your Honor.

12            THE COURT:  So let's turn to the other one.

13   This one I'm going to need some education on.

14            MR. FOSTER:  Yes, Your Honor.  And we've agreed

15   to a jury instruction.  I think jury instruction 5, 4, it

16   doesn't matter.  The point is, there is a principle of law,

17   if a reference was considered during prosecution of the

18   patent, there's a suggestion, it's harder to overcome the

19   clear and convincing, the clear and convincing standard.

20            And so what the plaintiffs want to say is that

21   references that were before the PTAB should get that same

22   benefit.  We say that it would be highly prejudicial because

23   they weren't in front of the examiner during prosecution.

24            And just to cut this short, in our reply brief

25   of March 29th, the Federal Circuit actually commented on

1    this issue.  Footnote 1 of the Tech Global case, which

2    doesn't have a publication number yet, but the Westlaw

3    number is 2019 WL1412538.  And in that decision, the

4    footnote said, we do know, however, that caution is

5    advisable for purposes of retrial.  The District Court

6    appears to allow Tech to present evidence to the jury

7    concerning a noninfringement.  Institution decision by the

8    PTAB solely because SSI informed the jury that the examiner

9    did not have access to a particular prior art reference when

10   he allowed the asserted patent.

11          The jury here was certainly allowed to consider

12   evidence that the PTO had no opportunity to evaluate before

13   granting to the patent.  Proper limits to the contention the

14   of pre-issuance examination does not by itself necessarily

15   suggest, warrant or invite introduction of evidence

16   concerning a related noninfringement institution decision.

17          So the Federal Circuit has spoken on this issue.

18   I mean, we can't say it wasn't before the PTO.  We would

19   just have to say that this combination wasn't before the

20   examiner during the original prosecution, and that's all

21   there is to say on that.

22          THE COURT:  Okay.  So I'm on the same page you

23   are.  Okay.

24          Who is going to argue this?  Mr. Chambers?

25          So, Mr. Chambers, you quote on page 2 from the

1    Supreme Court's decision in Microsoft, and we're dealing, I

2    think, now with the first prong.  I mean, isn't the Supreme

3    Court talking there about a situation where the prior art

4    was presented to the examiner during the prosecution of the

5    patent?

6              MR. CHAMBERS:  I think in that limited factual

7    situation.  What really bothers me about this whole thing,

8    Your Honor, is that the parties have put a tremendous amount

9    of energy and money, and this case has been delayed for over

10   a year because of challenges to all four of the patents.

11   They made --

12             THE COURT:  I know it bothers you.  It would

13   bother me, too.

14             MR. CHAMBERS:  Right.

15             THE COURT:  Why is it relevant?

16             MR. CHAMBERS:  Your Honor, these are very good

17   judges.  I think we submitted the opinions to you, but

18   they --

19             THE COURT:  So why is it relevant?

20             MR. CHAMBERS:  Because the patent, the Patent

21   Office did take a look at these references and did evaluate

22   them.

23             THE COURT:  But are you saying -- I mean, you

24   are not making an estoppel argument, are you?

25             MR. CHAMBERS:  I'm making, tying into the

1    Supreme Court i4i point, which is that, you know, counsel

2    was correct, that if the Patent Office has already looked at

3    the references and found that they're not invalidating, then

4    it is harder to sustain the clear and convincing, and in

5    this case you have the top level judges at the Patent

6    Office, the very cream of the Patent Office take a look at

7    these references.

8              You know, this is --

9              THE COURT:  That sounds to me just exactly why

10   it shouldn't come in, I mean, because what you are doing is,

11   you're trying to suggest that some judge opined on an issue

12   that the jury is supposed to determine.  Therefore, you

13   ought to give it special weight.  I mean, that seems to me

14   to be exactly why it should be precluded from being brought

15   in.

16             MR. CHAMBERS:  All right.

17             THE COURT:  Wait.

18             MR. CHAMBERS:  Go ahead, Your Honor.

19             THE COURT:  I mean, this quote that you've got

20   from the Microsoft case is actually a quote that the Supreme

21   Court is quoting Judge Rich, and who knows what context they

22   are quoting him in.  Do you know it's from the America Hoist

23   decision?  I mean, again, if I go back to -- does this have

24   anything to do with patents other than, sorry, anything to

25   do with anything before the PTO accepts in the context of a

1     prosecution of the patent.  Right?

2             MR. CHAMBERS:  This was unquestionably before

3     the PTO.

4             THE COURT:  In the context of a patent

5     prosecution.  Right?

6             MR. CHAMBERS:  Well, this is all part of the

7     Patent Office record.  That's for sure, Your Honor.

8             THE COURT:  That's the only question.

9             MR. CHAMBERS:  All right.  If you are going to

10    say original, it wasn't part of the original patent

11    prosecution.

12            This is the point I would make to try to get to

13    the heart of this.  If they opened the door and they suggest

14    that the Patent Office never looked at these references,

15    that is hugely misleading to the jury, and we ought to be

16    able to impeach them.

17            THE COURT:  Well, wait.  It's only relevant if

18    they, if it was looked at during the prosecution of the

19    patent.

20            MR. CHAMBERS:  And this is --

21            THE COURT:  And let me just ask.

22            MR. CHAMBERS:  I will let you finish.

23            THE COURT:  Do you agree with that?

24            MR. CHAMBERS:  I really don't, Your Honor.

25            THE COURT:  Okay.  Do you agree with that,

 1    Mr. Foster?

 2              MR. FOSTER:  Your Honor, it is limited to when

 3    the examiner --

 4              THE COURT:  Why would it be relevant after the

 5    fact?

 6              MR. CHAMBERS:  Okay.  You know, we do have a

 7    re-examination proceeding involving one of the

 8    patents-in-suit, and defendants agree that that is part

 9    of the prosecution history, the re-examination proceeding --

10              THE COURT:  All right.  Stop for a second.  Do

11    you agree with that?

12              MR. FOSTER:  Your Honor, we moved for a motion

13    in limine on a re-examination because it's different than an

14    IPR.  It's actually agreed by the examiner.

15              THE COURT:  Which is part of the prosecution.

16              MR. FOSTER:  Yes, Your Honor.

17              THE COURT:  I mean, that seems very reasonable.

18              MR. CHAMBERS:  I guess the part I'm struggling

19    with, Your Honor, is that you have the very best judges in

20    the Patent Office writing very good opinions and you're

21    saying those are worth nothing.  Those are completely

22    worthless, and then you have an entry level examiner doing

23    the initial evaluation of the application.  Oh, that counts

24    for a lot.

25              So the entry level examiner, you know, counts

1  for a lot before the jury, and what the top, top cream of

2  the crop at the Patent Office, the top judges, they count

3  for nothing.  They're worthless.  That just doesn't make

4  sense to me.

5          THE COURT:  Well, what you are saying makes no

6  sense to me, I have to say, so I am going to grant the

7  motion in limine insofar as that there will be no reference

8  to the IPR or what was presented to the PTO, I should

9  say, except insofar as what occurred during prosecution of

10 the patent.

11         Does that satisfy the defense?

12         MR. FOSTER:  Your Honor, no reference that

13 whatever prior art we have, if it wasn't before the office

14 during prosecution.  If it was before the office during

15 prosecution, of course, it falls under the...

16         THE COURT:  So let me just make sure.  You

17 want -- okay.  Here's what I'm going to do.  I've heard

18 argument.  I've heard nothing from the plaintiff as to why

19 it would be relevant or probative for the jury to hear

20 anything about the decision in connection with the inter

21 partes review of the '150, '658 and '662 patents or why the

22 final written decision of the PTAB or the Federal Circuit

23 opinion for the '662 patent would be relevant under the

24 rules or probative of anything that is relevant for the

25 jury.  The only thing I understand plaintiff is making is

1    that the specialized knowledge and expertise of the PTAB

2    folks and those that sit on the Federal Circuit somehow

3    would be, ought to influence the jury, and it seems to me

4    that the Rules of Evidence call for exactly the opposite to

5    occur, that they should not be so influenced that it would

6    be misleading.  It would be very unfair and prejudicial to

7    the defense, and so therefore I don't think it should come

8    into evidence.

9             So I'm going to grant the defendants' motion to

10   preclude from offering any testimony, evidence, argument or

11   reference related to any inter partes reviews of the

12   asserted patents.  There is one caveat.  That to the extent

13   that there are -- that the plaintiffs wish to cross-examine

14   somebody who testified or offered a declaration before the

15   PTAB, the plaintiffs will be permitted to use that

16   declaration to impeach the prior inconsistent statement

17   statements.  However, there should be absolutely no

18   reference made to the IPR, to the PTAB or to the agency, or

19   the nature of the proceeding, and instead any reference to

20   the prior declaration should make clear that it was in the

21   context of "another matter."  All right?

22            MR. CHAMBERS:  Your Honor, I would also ask that

23   you consider if they open the door and they tell the jury

24   that the Patent Office did not look at this reference and

25   then try to persuade the jury that it's easier to carry the

1    burden of proof because the Patent Office did not look at

2    it, I would ask Your Honor to keep an open mind at that

3    point about whether that opens the door, because that's a

4    false or misleading statement in my opinion.

5              THE COURT:  I guess we'll have to visit that if

6    it comes up at trial.  I mean --

7              MR. CHAMBERS:  That's what I'm asking.

8              THE COURT:  On the other hand, if the defense

9    points out that a piece of prior art was not put before

10   the Patent Examiner, that I think would be relevant

11   potentially.

12             MR. CHAMBERS:  Your Honor, I think we should

13   visit this at trial, but I would consider it highly

14   misleading because the Patent Office did look at these

15   references.

16             THE COURT:  Mr. Foster, do you have anything on

17   that?

18             MR. FOSTER:  Your Honor, just point to the

19   footnote in Global Tech.  They distinguish between before

20   the office and non-instituted PTAB decisions.  That's not

21   really an issue.

22             THE COURT:  That's a demarcation I'm going to be

23   drawing.  So it would be, I have no problem with the defense

24   putting before a jury what was given during the prosecution

25   of the patent.  That's a separate, very distinct thing.

1              MR. CHAMBERS:  But I think it's appropriate to

2    draw the line of not representing to the jury that the

3    Patent Office has never seen these things before, because

4    that's not true.  They have seen the things before.

5              THE COURT:  All I have to add then is the words

6    during the prosecution.  Right?

7              MR. CHAMBERS:  Well, in my opinion, that's

8    misleading.

9              THE COURT:  All right.  Well, I'm going to allow

10   it.  So Mr. Foster, if you could just make it a point, just

11   add the word during prosecution, I think we'll have no

12   problem.

13             MR. FOSTER:  Yes, Your Honor.

14             THE COURT:  Thanks.  All right.

15             Next.  Motion in limine number two, plaintiff

16   should be precluded from providing any testimony, arguments

17   regarding defendants' alleged infringement under the

18   doctrine of equivalents.

19             MR. RAHMEIER:  Yes, Your Honor.  Thatcher

20   Rahmeier for defendants.  I will be discussing this one.

21   And this is the first one that gets into our slides, so I'd

22   like to hand up some slides.  And how many copies do you

23   require?

24             THE COURT:  Two would be great to have.

25             MR. RAHMEIER:  Two?  There are a couple loose

1    slides in the front where they're corrected.   There was

2    something that couldn't be seen after we bound them.

3              THE COURT:   All right.   Thank you.

4              MR. CHAMBERS:   Do you have a copy for us?

5              MR. RAHMEIER:   Yes.

6         So the way we're doing the presentation today,

7    Your Honor, we act actually had a DOE discussion planned for

8    when we're talking about noninfringement of the '658 patent,

9    so with your permission, I will handle kind of the

10   background of the other three patents and Mr. DiGiovanni

11   will address the '658.

12             THE COURT:   Sure.

13             MR. RAHMEIER:   Okay.   So this is, as you know,

14   Exhibit 17 in the pretrial order, and there are two parts to

15   this motion in limine from the defendants.   One, that

16   there's an inadequate expert analysis and disclosure by the

17   plaintiffs' expert for infringement, Dr. Maynes, and, two,

18   that the doctrine of equivalents, a patent doctrine, is

19   actually legally unavailable for specific limitations of the

20   four patents-in-suit based on what happened during

21   prosecution.   Namely, what's called prosecution history

22   estoppel.

23        So the first part is about Dr. Maynes, and that

24   his burden report for infringement included only conclusory

25   opinions at the end of each section on each patent for

infringement, which cannot sustain their burden to prove

infringement of specific limitations under the doctrine of

equivalents.  So we cited a case that clearly supports this

from Delaware.  I think it is enlightening enough, which is

the MKS Instruments case.

So if you look at his report that we attached,

it's clear that Dr. Maynes, he doesn't analyze and apply the

doctrine of equivalents on an element-by-element basis and

merely concludes at the end that it's met.  And that's

insufficient for him to come to trial and then present

testimony supporting application of the doctrine of

equivalents before the jury.  Therefore, we ask that he be

precluded from providing any testimony regarding

infringement under that doctrine.

Just a couple points.  Plaintiffs try to fault I

think defendants in their briefing and the fact is that

plaintiffs knew all along that it was their burden to prove

infringement.  They pled infringement using the doctrine of

equivalents, so they had to include the analysis in their

expert report if they wanted their expert to support it, and

they failed here.

The second part of the motion, Your Honor, is

that for certain limitations of the asserted claims of the

asserted patent, as a matter of law for your determination,

Your Honor, the doctrine of equivalents is just not

1        available to be invoked or to prove infringement beyond the

2        literal scope of those limitations at issue, which I will

3        discuss.

4                So here on slide 99, it's the seminal Supreme

5        Court case Festo from around 2002, and in a nutshell, the

6        Court laid out a framework that the Courts are to apply

7        regarding prosecution history estoppel, and basically, once

8        a patentee amends his claims for purposes of patentability,

9        then they presumptively have surrendered all scope beyond

10       the literal language of the claim.  It's a rebuttable

11       presumption, Your Honor, but after the, after it has been

12       shown that they've made amendments and it can actually be

13       argued, but in this case it's actually written amendments to

14       the claim language, giving up scope, narrowing an amendment

15       for the purposes of patentability, then it is presumed that

16       they have surrendered all scope beyond the literal language

17       of the claims, and therefore the doctrine of equivalents

18       cannot be met.

19               And that's a determination, as I said, for Your

20       Honor, and I think it's important that when we're addressing

21       this now, because it will affect the trial presentation, it

22       will affect the verdict form, it will affect the jury

23       instructions, and, in fact, the presentation to the jury of

24       what must be shown to prove infringement in this case.  So

25       it's very important it's done pretrial.

1          So I will just go through the three patents that

2     I mentioned and Mr. DiGiovanni will address the last one.

3     The first here is the '150 patent.  I said I'm going to walk

4     through kind of specific amendments that occurred during

5     prosecution that's relevant to our motion and show why

6     estoppel presumptively applies and it has not been rebutted

7     by the plaintiffs.

8          So, first, the '150 patent, and so the rinse

9     chamber limitation.  This is a specific limitation in the

10    asserted claims of the '150 patent, and as can be shown here

11    on the left, the rinse chamber was added during prosecution,

12    which narrows the claim, and it was argued on the right that

13    it was claim 10 as amended was therefore patentable over

14    Nielson in view of Levine.

15         So it was amended, narrowed, and argued that it

16    is now patentable based on that amendment.  That is what

17    gives rise to prosecution history estoppel.  So therefore,

18    there's a presumption that the scope of all equivalence

19    has been surrendered beyond the literal language of the

20    claim.

21              THE COURT:  All right.  Let's just stop for a

22    second.

23         Who is going to argue this?  Mr. Chambers, are

24    you going to argue doctrine of equivalents with respect to

25    rinse chamber?

```
 1                    MR. CHAMBERS:  Your Honor, I don't think we need
 2      to.  As --
 3                    THE COURT:  I just want to know if you are.
 4                    MR. CHAMBERS:  Well, we're reserving the right
 5      to.  Yes, Your Honor.
 6                    THE COURT:  All right.
 7                    MR. CHAMBERS:  Do you want to hear anything else
 8      from me?
 9                    THE COURT:  No.
10                    MR. RAHMEIER:  And just to clarify why this
11      matters, it's because we do have a disputed instruction in
12      the jury, I'm sorry, in the final instructions that would
13      instruct the jury when they cannot apply the doctrine of
14      equivalents.  So it would apply to certain limitations.
15                    THE COURT:  All right.
16                    MR. RAHMEIER:  In this case.
17                    THE COURT:  And your point is that they narrowed
18      the scope of the patent to avoid -- so that this limitation
19      could go forward?
20                    MR. RAHMEIER:  Yes.  Narrowed the scope of the
21      highlighted language on the left.
22                    THE COURT:  Mr. Chambers, sorry.  Do you agree
23      that -- well, why aren't you estopped from arguing doctrine
24      of equivalents with respect to rinse chamber?
25                    MR. CHAMBERS:  So counsel has omitted one part
```

1    of the analysis, which is first you look and determine

2    whether there has been a claim amendment.  We concede there

3    has been a claim amendment here, Your Honor.

4             Then you look at the purpose of the claim

5    amendment.  Well, in this case, the purpose of the claim

6    amendment is you had open prior art, Levine in particular,

7    that didn't have any sort of enclosure whatsoever.  It

8    was just open.  It was unsuitable for rinsing.  The rinse

9    water would just be spraying all over the place, so the

10   amendment was to say we have an enclosure.  All right.  So

11   that's the second part of the analysis, why was the

12   amendment made.

13            The third part of the analysis is you look at

14   the accused product and are you trying to recapture the same

15   thing with the accused product that you gave up, which is

16   not permitted.

17            So the accused product, and this is the summary

18   judgment and why it was mentioned earlier, the summary

19   judgment might go first.  All right.  But the accused

20   product has an enclosure.  It looks -- it has exactly the

21   enclosure that is specified in the claim.  That's why we

22   believe there is literal infringement, but there is an

23   enclosure, and so what the claim amendment has and what it

24   was distinguishing has nothing to do with the issue with the

25   accused product because the accused product has an enclosure

1    also.

2              The issue with the accused product, which we'll

3    get to on summary judgment, is they are saying that, okay.

4    We're going to add an extra piece in here which is a

5    partition inside and so we avoid infringement because we

6    have a partition inside, and so that's a completely

7    different issue than this amendment was submitted to

8    address.  And as we'll get to on summary judgment, the law

9    says that adding an extra element doesn't avoid

10   infringement.

11             So it's the third part of the analysis is what

12   is a distinction over the accused device which is missing

13   here, and on that basis, there would be equivalents.

14             THE COURT:  Okay.  All right.

15             MR. RAHMEIER:  Your Honor, if I could.

16             THE COURT:  You're welcome to rebut that.

17             MR. RAHMEIER:  Yes.

18             THE COURT:  We're going to come back to summary

19   judgment.

20             MR. RAHMEIER:  That's not how this doctrine

21   works at all.  In fact, you don't look at the accused

22   product.  You look at the claim language and you look at

23   what happened during prosecution.

24             It would make no sense to look ten years later

25   at the accused product.  He's talking about an infringement

1    analysis.   I'm talking about the legal determination that

2    infringements are not available for this limitation that was

3    added for the purposes of patentability.   They have not

4    rebutted that.   And, Your Honor, I was looking at this just

5    the other day.   In fact, there's a good quote from a

6    Delaware case I can cite.

7                    THE COURT:  Yes, please do.

8                    MR. RAHMEIER:   There is no principle of patent

9    law that the scope of a surrender of subject matter during

10   prosecution is limited to what is absolutely necessary to

11   avoid a prior art reference that was the basis for the

12   examiner's rejection, which is what we just tried to assert

13   today, that they narrowed it for a certain reason about

14   Levine or Nielson or whatever it was.

15                   First of all, there's no evidence of that.

16   There's only what we see here, and the public is entitled to

17   rely on the public record here.   And that case cite, Your

18   Honor --

19                   THE COURT:  Yes, please.

20                   MR. RAHMEIER:   Innovative Patents LLC versus

21   Brain-Pad, Inc., 719 F. Supp 2d., 379 at pages 34 to 86, and

22   that's the District of Delaware from 2010.

23                   THE COURT:  Who was the judge?

24                   MR. RAHMEIER:   Judge Thynge issued that opinion.

25                   THE COURT:  All right.

```
 1              MR. RAHMEIER:  So I think that addresses what is
 2   a misstatement of the law here.
 3              So, again, there is a rebuttable presumption.
 4   It is a very hard presumption to rebut and they have not
 5   even come close.
 6              THE COURT:  Okay.
 7              MR. RAHMEIER:  Okay.  I m going to continue on
 8   here.
 9              MR. CHAMBERS:  Your Honor, do you want me to
10   respond to that point?
11              THE COURT:  No.
12              MR. RAHMEIER:  The '662 patent, Your Honor.
13   Here, reporting on the left is one of the relevant, but the
14   main one, limitation that's added during prosecution.  In
15   fact, this was actually added to a parent of the '662, which
16   is the '150 patent.
17              So the '150 had a continuation patent that
18   flowed from it, which became the '662.  And the limitation
19   on the left, you're seeing the limit of adding the temporal
20   limitation while was added during prosecution, and then it
21   was argued that that led to the patentability and therefore
22   it should issue.
23              So this is -- again, it triggers the presumption
24   that all of the claim scope past the literal language of the
25   claim everybody surrendered and the doctrine of equivalents
```

1    for an infringement analysis is simply not available as a

2    legal matter for the while limitation.  Again, if you look

3    to the right, it says they argued around the Nielson and

4    Levine reference, again, that we heard about.  So this is an

5    unmistakable surrender that disclaims the equivalents as a

6    matter of law.

7              Again, plaintiffs have failed to rebut the

8    presumption.  They do argue that it was -- that the claims

9    at issue were originally presented.  I think what they mean

10   there is it was originally presented in a continuation.  The

11   law is clear that you look at the claims issuing from your

12   continuation to the original claims in the originally filed

13   patent and they're clearly narrowed.  They clearly have the

14   while language.

15             THE COURT:  All right.

16             MR. RAHMEIER:  It's kind of misleading to talk

17   about the originally filed limitation because you have to

18   look at the '105 parent.

19             THE COURT:  Got you.  Mr. Chambers?

20             MR. CHAMBERS:  Your Honor, I think this is a

21   particularly egregious example of why this motion lacks

22   merit, particularly in the context of a motion in limine.

23   This is a claim of another patent, and it's not even the

24   same wording as the claim of the '662.

25             If you look on the left, it says, while

1   shielding the access location from the rinsing fluid.  The

2   claim language is about shielding the vessel from the

3   rinsing fluid.  This is a completely different patent,

4   completely different claim limitation.  It just has nothing

5   to do with the '662 patent, and as a matter of fact, the

6   claim of the '662 patent that is being asserted was

7   originally claim 51, and from my review of the '662

8   prosecution history, that was never amended.

9           So we don't even get past the first step here

10  because there's no amendment.  This has to do with another

11  patent and a different limitation.

12          THE COURT:  All right.  Mr. Rahmeier, let me ask

13  you this.  I've consulted with the other judges about this

14  issue of generally, you know, what to do when motions in

15  limine come up.  It came up in my last patent case.  One

16  piece of advice I got, it's really just premature.  You

17  have to see how this unfolds at trial.  What do you say to

18  that?

19          MR. RAHMEIER:  Yes.  I think we wouldn't agree

20  with that, and the reason is, like claim construction, this

21  requires a legal analysis of the intrinsic record in detail,

22  really, which is why I hope this presentation kind of helps

23  our motion in limine a little bit, to show, show you where,

24  maybe you didn't get tabs, where this amendment occurred and

25  what was said to the Patent Office, and these are minutia

1    that is more akin to claim construction, which does not go

2    to the jury.

3            The jury doesn't need to dig into the record

4    here and hear arguments about, first of all, it's a pretty

5    complex legal doctrine.  It's a legal determination, so I

6    think it streamlines the case for trial if Your Honor would

7    look at this and apply the Festo framework.  And I think the

8    Supreme Court purposely made it in a way a simple-to-apply

9    doctrine where if there's a narrowing amendment during

10   prosecution for purposes of patentability, and that's very

11   broad, it could be for 112 purposes, it could be for

12   narrowing of the claim.  It could even be by argument is my

13   understanding.  But once that triggers, it's all scope past

14   literal is surrendered unless it can be rebutted by the

15   patentee, and it's a very hard thing to rebut.

16           There's barely any cases that I know of where it

17   is successfully rebutted, and I don't think we have any

18   rebuttal here in the briefing.  It's really just a rehash of

19   their infringement contentions or even a discussion like you

20   heard a second ago about the accused products.  But I mean

21   as a matter of common sense, prosecution history estoppel

22   can't be about what is going to be accused of infringement

23   ten years down the rode.  You have to look at the record and

24   public notice that the prosecution history provides to

25   apply, and I think it's very valuable to apply it before

1    trial.  It will frame the questions for the jury.  It will

2    frame the jury instructions, and it's just not appropriate

3    for the jury to make the determination anyway.

4                    THE COURT:  All right.  Keep going.

5                    MR. RAHMEIER:   Okay.  There's kind of another

6    flavor of this.  It's called the rule against claim

7    vitiation.  There's case law that we cited.  In fact, the

8    Supreme Court discusses it in the Warner-Jenkins decision

9    there, which you want to be capable about.  If you ever do

10   apply the doctrine of equivalents, you don't want to

11   basically allow equivalence that would basically swallow the

12   literal language of the claim or make it -- vitiate it.  So

13   our position is while can have, for instance, an equivalent

14   language because that means solely after, while has to mean

15   at the same time.  I think we'll get into this more in our

16   noninfringement.  We'll take it a little bit out of order.

17   I will keep moving.  It's cited in our papers, as I'm sure

18   Your Honor saw.

19                    And, finally, the patent I will be addressing

20   the last is the '377 patent.  Again, there are three

21   limitations at issue that we have argued and shown that the

22   presumption applies that there can be no doctrine of

23   equivalents, infringement under the doctrine.  And aeration

24   means a rotatable blade assembly.

25                    So the first one.  As you'll see here, aeration

means, at the bottom, aeration means language was there.
Two words were there.  But there's an amendment that's
narrowing and clarifying exactly what is meant by aeration
means.  So it's limiting what could meet this limitation of
aeration means.

So while the words, again, the two words
aeration means may have already been there and
means-plus-function, as Your Honor knows, is kind of a
special way to claim things in patent law, so what is being
clarified here and narrowed is the function, is the means
function.

So that is a narrowing amendment.  In fact,
Festo, the Supreme Court case, was a 112 case, so Festo does
apply to 112 limitations.  And, again, on the right-hand
side is the argument that shows that it was made for
purposes of patentability.

The same for the next one.  Rotatable blade is
there, and then there's extensive limitation and detail and
narrowing made to the claims during prosecution, the
underlying portion clarifying what's meant.  And so, in
fact, this one -- I mean, the narrowing is quite extensive.
The rotatable blade now includes shaving element, aeration
element and all the stuff that's underlined.  And, again, on
the right-hand side, they argue, this is all related to
getting the claims allowed.  So the presumption applies.

1    And, finally, similar.  This limitation is

2    almost exactly the same as the one we just discussed, but it

3    was added in a new claim.  But there is case law and we

4    cited it, I believe we cited it, but I have the cite, if

5    not, that new claims with basically the same limitation

6    would also be subject to estoppel.  You can't avoid estoppel

7    by canceling a claim and then just adding a new one during

8    prosecution.  That wouldn't avoid estoppel.

9    THE COURT:  Okay.

10   MR. RAHMEIER:  Okay.  And if there's no

11   questions, Mr. DiGiovanni.

12   THE COURT:  All right.  Thank you.

13   MR. DiGIOVANNI:  Your Honor, we split this up

14   because it was part of the --

15   THE COURT:  Summary judgment.  I realize that.

16   I may have erred in doing it this way.  Very hard to figure

17   out how to plow through this.  Do what you can, I mean.  I

18   will allow you to come back to it if we have enough time.

19   MR. DiGIOVANNI:  Okay.  I appreciate that, Your

20   Honor.  So Mr. Rahmeier actually said it set forth the law.

21   I'm not going to repeat anything regarding the law.

22   So for the '658 patent, we have two limitations

23   that I'm going to talk about that have the preclusion of

24   doctrine of equivalents, and the first one is unrestrained.

25   The second one would be sufficient mass limitation.

1            So for unrestrained, we actually have three

2    separate doctrines that preclude the doctrine of

3    equivalents, prosecution history estoppel, claim vitiation,

4    both of which you've heard about, and there's also

5    the disclosure-dedication rule, and they're addressed in

6    both our summary judgment motion and the MIL or perhaps

7    just one of the doctrines maybe is discussed just in one of

8    them.

9            But let me talk about for unrestrained, starting

10   with the prosecution history estoppel, skipping over the

11   law.  This one is straightforward.  It's a classic or

12   quintessential type of doctrine of equivalents argument

13   similar to the first one that Mr. Rahmeier addressed.

14           So the unrestrained limitation was just

15   expressly added.  It didn't exist in the claim and it was

16   added during prosecution, and you can see it here in both of

17   the asserted claims.  These are during prosecution you have

18   different claim numbers.

19           So 18 ends up becoming claim 1, and 26, Your

20   Honor, ends up becoming claim 6.  Those are the two

21   independent claims that are asserted.  So we have them side

22   by side here.  And you can see, in the prosecution, the

23   unrestrained was added, underlined, the entire phrase and

24   being unrestrained against sliding movement on the shaft in

25   a direction away from the opening.

1          THE COURT:  And do you agree that I should not

2    be taking into consideration anything about the accused

3    products, that this is purely, I can look at the prosecution

4    history and make this call?

5          MR. DiGIOVANNI:  Yes, Your Honor.  As

6    Mr. Rahmeier said, that's very similar to the claim

7    construction in that regard.  Claim construction -- think

8    about what claim construction does.  You're binding the

9    patent owner to things that they said to the Patent Office,

10   exactly what we are doing here.

11         THE COURT:  Okay.

12         MR. DiGIOVANNI:  You're binding them to what

13   they did in terms of their amendments, their changes that

14   they did to get the patent admitted.  And also off topic a

15   bit, you had asked should it be decided, and I understand

16   you conferred with the judges.  We think absolutely, because

17   we think from day one we would otherwise be hearing about

18   doctrine of equivalents, and we think that would be to try

19   to then determine later that it should be precluded.

20         THE COURT:  Well, part of it is in the context

21   of it was a biological product.  Well, sometimes very

22   difficult to get an appreciation up front as to what the

23   difference is.

24         MR. DiGIOVANNI:  I understand that.

25         THE COURT:  I didn't mean to suggest that my

1      colleagues think we should never, ever --

2                   MR. DiGIOVANNI:  No.  I didn't mean to suggest

3      that either.  And I guess I would say here, these are

4      mechanical, relatively simple, I think it's understandable.

5      So anyway, again, sort of quintessential prosecution history

6      estoppel.

7                   And the bottom right you can see where they

8      actually explain why they did it, and it's this Harr

9      reference that was cited.  Claim 18 through 21 and 21

10     through 26 have been rejected as anticipated by Harr.  They

11     say the Harr cover is not unrestrained against movement.

12     They so explain very expressly why they added the

13     unrestrained, and under Festo, it's prosecution history

14     estoppel.

15                  Moving onto the second doctrine that prevents

16     DOE for unrestrained, and that would be this rule against

17     claim vitiation.  I don't even talk about the law, although

18     the second case is interesting because sort of the classic

19     claim vitiation is when you have the opposite.

20                  So Mirror Worlds versus Apple, the Federal

21     Circuit said, reading the limitation out of the claim

22     improperly vitiates claim language by allowing the exact

23     opposite of what is required.  Well, that's what you have

24     here.  You actually have any kind of doctrine of equivalents

25     that you're going to have for unrestrained, it's actually

1      going to make it restrained.  So you can't do that.  The

2      doctrine of claim differentiation, that's the most express

3      strain of that, and it tells us you can't do that.

4               And the third doctrine is the

5      disclosure-dedication rule.  I know we cited three different

6      doctrines not because we're grabbing for straws.  They were

7      just our three doctrines that apply expressly, and in this

8      one, what the cases say, and the Johnson and Johnston case

9      from the Federal Circuit, an en banc case that gets cited

10     quite a bit.

11              They are talking about the patent specification.

12     Here it is a little different.  We're talking about the

13     provisional application.  Okay.  So I will tell you that's a

14     little different than what you typically see in the

15     disclosure-dedication doctrine, but it's the same concept.

16     If you disclose something yet you don't claim it, then it's

17     dedicated.  That's what the cases say and all the cases

18     following it say that.

19              And in this case, here's the disclosure in the

20     provisional application.  They say -- the provisional

21     application is very short and we attach it.  This isn't the

22     entirety of it.  This states when they are talking about how

23     to hold down that lid on top of the cup when you are making

24     the milkshake or when you are blending whatever beverages,

25     they talk about it can be held on by a spring and to secure

1    the cup in contact with it with the holder holding the cup.

2    They say another approach to this is to use a heavy weight

3    to hold the shield and cup in place.

4         So the inventor contemplated and disclosed to

5    the world this other potential way to hold down the shield

6    on top of the cup as a lid so you don't get the spillage.

7    He says, let's use a heavy weight to hold it down.

8         Well, now, fast-forward to the claim.  They

9    never claim that.  They claim a lid.  They don't claim a lid

10   assembly connected to a weight or anything like that.  So

11   they've disclosed it, and by not claiming it, they've

12   dedicated it to the public.

13        And I did want to point out that this was a

14   provisional because I couldn't find the case.  I can't say I

15   looked.  I did look pretty hard, Your Honor, but I don't

16   know that I looked comprehensively.

17        THE COURT:  An exercise of diligence of the

18   person of skill as an attorney.

19        MR. DiGIOVANNI:  I looked for a case where we

20   had a provisional application and then the doctrine was

21   supplied.  I didn't see it, but I don't see a difference in

22   it, especially in view of the fact that the provisional

23   application is something that the plaintiff, patentee is

24   relying on for two things.  The earlier date, okay.  So they

25   want the date from it, and they are allowed to do that, and

1    it's referenced in the patent's provisional.  And they also

2    need some of the disclosure in there to try to get that

3    earlier date.

4              So they are relying on the date and they're

5    relying on what's in there.  I saw no reason why the

6    disclosure-dedication doctrine would not apply to a

7    provisional application.

8              THE COURT:  Well, if I were in a Markman, that

9    application would count as intrinsic evidence.  Right?

10             MR. DiGIOVANNI:  It would, Your Honor.

11             THE COURT:  Yes.

12             MR. DiGIOVANNI:  Yes.  So that's the

13   unrestrained, I believe that's the last slide I have on

14   unrestrained.

15             Now we go to sufficient mass.  A little bit more

16   complicated, but I will go through this.

17             So, again, we're looking at claim 1 and claim 6,

18   and this is just the claims as issued just to show you the

19   context because we have not talked about those.

20             So the sufficient mass as issued.  Those

21   limitations in claim 1 and claim 6 say that the mass of the

22   splash shield, and that has been defined as the lid, just

23   the lid, that's also relevant to what I was talking about

24   before when you add a weight and a lid, that's different.

25             So the splash shield is just the lid, the lid

for the cup opening.  So the limitations end up being the

splash shield has sufficient mass -- let me read it from the

right.  It's as simple as it gets.  The mass of the splash

shield prevents separation of the holder and the vessel

during translation.

So what that means is, Your Honor, the holder is

the cup holder in this milkshake machine.  The vessel is the

cup.  The user takes the cup, puts it in the holder.  Okay.

And then the blade comes down.  The spindle, and the blade

comes down with the lid.  Okay.  Now, the lid is on it.  The

mass of the lid has to prevent separation of the holder and

the vessel.  It keeps the cup in place.  Okay.  That's what

the -- the mass has to be sufficient to keep that cup in

place in the holder.  Okay.  That's the claim as issued.

That's just a little background because we hadn't gotten to

that yet.

So now let me get to the claim, which is the

limitation on DOE.  So start with prosecution history

estoppel.  I need to flip ahead.

Okay.  So prosecution history estoppel.  Not as

straightforward as the other one because you don't just have

that limitation being added in here.  Okay.  What you have

is, you have the limitation being -- you have language being

amended that's important to that limitation to the point

where that limitation ought to be bound by -- they should

1    not have a doctrine of equivalents.

2              So in this one -- let me just catch up here with

3    my notes.

4              So in this one, in the last -- this is claim 18,

5    dependent claim 1.  Toward the bottom, the splash -- I'm

6    sorry.  It says, the splash shield having sufficient mass to

7    retain the vessel within the holder during the relative

8    axial movement of the mixing element and vessel from the

9    first position to the second position.

10             So what's happening here is, there was some

11   prior art cited that apparently had some kind of other type

12   of movement other than axial movement, so they narrowed the

13   claim to require that the mass prevent axial movement,

14   meaning exactly what it ends up being in the as issued

15   claim, axial movement meaning the up and down with the cup

16   in the holder.  Prior to that, it was broader than that.  It

17   allowed any kind -- it precluded any kind of movement, and

18   now they've limited it to axial movement.

19             So that's the type of narrowing limitation that

20   ought to be, they ought to be precluded from the doctrine of

21   equivalents.

22             THE COURT:  Okay.

23             MR. DiGIOVANNI:  It's a bit more complicated

24   than on --

25             THE COURT:  Axial is up and down movement?  I

1    would have thought it was more like rotating.

2            MR. DiGIOVANNI:  No.  They -- I think they

3    explained it somewhere else, but it is along the axis.

4    Because the claim is written I won't say from the

5    perspective of the blade, but the axis.

6            THE COURT:  Along the axis?

7            MR. DiGIOVANNI:  Yes, yes.

8            Claim 6 -- okay.  Yes.  So prosecution claim

9    26, which ends up being claim 6.  Let me catch up on my

10   notes.

11           So this one is a whole different situation, but

12   the key here is that prior to this amendment -- so this is

13   an amendment that happened during prosecution.  If you see

14   prior to the amendment here --

15           THE COURT:  So just help me out.  Mr. Rahmeier,

16   you had sufficient mass as well.  Right?  No?  Am I getting

17   confused?

18           MR. RAHMEIER:  No.

19           THE COURT:  Okay.  I'm getting confused.  All

20   right.  A long day.  All right.

21           MR. DiGIOVANNI:  Yes.  So what happens here is,

22   there's an amendment -- actually, that's very significant,

23   this amendment, because prior to this amendment -- and what

24   they change is, they change the word splash shield to

25   holder.

1              So prior to this amendment, the way the claim

2     read was, the mass of the splash shield prevented separation

3     of the splash shield, that's the lid and the vessel.  But

4     here now it's preventing -- which was very different than

5     what it ends up being in the final claim, and what it ends

6     up being here is, the mass prevents separation of the cup

7     holder and the vessel.  So it's keeping the cup in the

8     holder.  So it's a significant difference in terms of how

9     sufficient that mass must be.  So it goes directly to the

10    phrase sufficient mass in this prosecution history.

11             THE COURT:  How is this going to come up?  What

12    do you anticipate?

13             MR. DiGIOVANNI:  Okay.

14             THE COURT:  Take this particular term.

15             MR. DiGIOVANNI:  Okay.

16             THE COURT:  How is it going to come up at trial

17    if I deny the motion?

18             MR. DiGIOVANNI:  Can I get a prop, Your Honor --

19             THE COURT:  Yes.

20             MR. DiGIOVANNI:  -- that I think would be quite

21    useful?  We have our lid.  Okay.  This is part of the

22    machine, the accused machine.

23             THE COURT:  Okay.

24             MR. DiGIOVANNI:  Some of the accused machines.

25    The other ones are different, but not in a material way for

1    this point.

2              So literally, okay.  The lid -- remember, the

3    shield has to be as defined as the lid.  Literally, the

4    shield cannot be restrained.  I will address both of those

5    points if you don't mind.

6              THE COURT:  Okay.

7              MR. DiGIOVANNI:  Literally, this cannot be

8    restrained, the lid can't be restrained.  It has to by

9    itself be sufficient to -- it can't be restrained at all,

10   period.  It can't be restrained, and it has to be

11   sufficient, the lid, to do what it says in the claim

12   language.  That is, to keep that, keep that cup, the

13   milkshake cup, into the holder.

14             THE COURT:  All right.

15             MR. DiGIOVANNI:  So two different limitations.

16             They are saying, oh, we have an equivalent.

17   Okay.  This thing.  There's a doctrine of equivalents that

18   allows us to use the assembly or a rod and this, and they

19   are saying, that's an equivalent, and we're saying, no.  If

20   you didn't have a process for estoppel or vitiation or a

21   third doctrine, okay.  Maybe you could argue doctrine of

22   equivalents, but you don't get it here because of what you

23   did in the prosecution.

24             So that's where it comes up is, from the get-go

25   they're going to be arguing that's an equivalent, and we say

1    you don't get equivalent.  They still get to argue literal.

2    Okay.  That's a different story.  We do have a motion for

3    summary judgment on that, but they, under the law, because

4    of what they did in the prosecution, and they had to do that

5    to get around the prior art, or maybe if they didn't have to

6    do it, they did it.  The law says, even if they didn't have

7    to do it, they did it.

8              THE COURT:  All right.

9              MR. DiGIOVANNI:  So they don't get an

10   equivalent.  All right.  That's process history estoppel for

11   sufficient mass.

12             We also have -- Your Honor, I want to make sure

13   of something.  We didn't argue vitiation on this.  I have it

14   in the slide because sufficient and insufficient are

15   different.  That wasn't in our brief I noticed.  I would say

16   this.  In a way, it's a strand of these other doctrines, so

17   I don't know that I had to --

18             THE COURT:  If it's not in your brief, let's

19   move on then.

20             MR. DiGIOVANNI:  Okay.  We did argue dedication

21   disclosure.

22             THE COURT:  Right.

23             MR. DiGIOVANNI:  The same statement here.

24   Another approach where they say, another approach is to use

25   a heavy weight to hold the shield.  We say, okay.  The same

1   argument.  I don't need to make it again.

2               THE COURT:  All right.

3               MR. DiGIOVANNI:  I'm sorry.  This is now --

4   that's my -- that concludes my argument as to why DOE

5   doesn't apply.

6               THE COURT:  All right.

7               MR. DiGIOVANNI:  There was one additional point.

8   One of the pieces of prosecution history was Exhibit T to my

9   declaration.  My declaration stated the right Bates number,

10  but the correct Bates number was not attached.  So may I

11  approach, Your Honor?

12              THE COURT:  Yes.

13              MR. DiGIOVANNI:  We provided this at the outset

14  of the day to plaintiffs' counsel (handing documents to the

15  Court.)

16              THE COURT:  So your declaration was --

17              MR. DiGIOVANNI:  I have two declarations.  The

18  one I'm talking about is the one in support of --

19              THE COURT:  So do I just replace this Exhibit T

20  with what's in the pretrial order?

21              MR. RAHMEIER:  It's in the summary judgment.

22              THE COURT:  Summary judgment?

23              MR. RAHMEIER:  We can file a corrected copy.

24              THE COURT:  Well, I will leave it to you what

25  you want to do.

```
 1                    MR. DiGIOVANNI:  I think we'll file a corrected
 2     copy.
 3                    THE COURT:  Please file a corrected copy.
 4                    MR. DiGIOVANNI:  We will do that.
 5                    THE COURT:  Okay.
 6                    MR. DiGIOVANNI:  Yes.
 7                    THE COURT:  All right.
 8                    MR. DiGIOVANNI:  One additional point.
 9     Mr. Rahmeier made the argument about Dr. Maynes.  The DOE
10     was not in their infringement contentions I'm told.  That
11     was the first -- that was my argument.
12                    THE COURT:  All right.  Mr. Chambers?
13                    MR. CHAMBERS:  I've got a lot of ground to cover
14     here.
15                    THE COURT:  I'm sorry.  What?
16                    MR. CHAMBERS:  I've got a lot of ground to cover
17     here.
18                    THE COURT:  No, and I know someone is going to
19     come back again on the summary judgment issue, so I get
20     that.
21                    MR. CHAMBERS:  Well, let me start with
22     disclosure-dedication.  That's not even mentioned in their
23     in limine motion, so --
24                    MR. RAHMEIER:  Yes, it is, Your Honor.
25                    MR. CHAMBERS:  In your in limine motion?
```

1              MR. RAHMEIER:  Yes.

2              MR. CHAMBERS:  Where is that in your in limine?

3              THE COURT:  Well, you know what --

4              MR. RAHMEIER:  Page 2.

5              MR. CHAMBERS:  All right.

6              MR. RAHMEIER:  The en banc case is cited.

7              MR. CHAMBERS:  I will have to retract that.  I

8    didn't see a heading for disclosure-dedication.

9              So let's talk about disclosure- dedication.

10   While I mentioned it, they said -- they mentioned it right

11   here on the slide, the heavy weight.  They said, oh, that

12   was never claimed, and then they say, oh, sufficient mass.

13   We're going to limit that.

14             Sufficient mass is the heavy weight.  It was

15   claimed.  That's exactly -- so I don't understand what their

16   point is on the disclosure-dedication doctrine.  But let me

17   get to some basic principles so Your Honor can understand

18   exactly what is at issue here.

19             In the prior technology, and this is the Harr

20   they were talking about, they had a spring to kind of hold

21   down the splash shield, and the problem with the spring is

22   if you push it up as your cup is going up to mix, it gets

23   greater tension and it creates a lot of binding, and then as

24   you go down, it has lower tension.  So that created all

25   sorts of headaches from an engineering perspective.  And

1   they also had motors, which is the Nielson, to raise the

2   splash shield up and down, and that created lots of

3   headaches, too.

4            So the invention here in the '658 patent, which

5   is actually very elegant, is to get rid of the springs, get

6   rid of the motor, and have a heavy weight of a splash

7   shield, which has sufficient mass, to hold the lid down on

8   the cup as it's moving up and down, and you want to do that

9   in an unrestrained or free-floating way.  So that's what the

10  invention is, a weighted splash shield that moves up and

11  down in a free-floating way.

12           So if they don't mind, I would like to borrow

13  their prop.

14           So this is what they did.  They had a splash

15  shield, and we talked earlier about their '823 patent, and,

16  you know, I was mentioning that, you know, somebody needs to

17  connect it up.  But there was no -- no weight shown in the

18  '823 patent.

19           So it doesn't correspond with their commercial

20  product, but they decided after being aware of f'real's

21  invention in the '658 patent and the technology, that they

22  were having problems of holding down the cup, and so they

23  decided, okay.  We need to have a weighted splash shield,

24  and so they put this heavy weight on the splash shield to

25  hold down, which is exactly Mr. Farrell's invention, and

1    they have this kind of moving up and down with not binding.

2    They say in their technical instructions that this needs to

3    move up and down freely and essentially they say it has to

4    move up and down unrestrained.  So they have the two

5    elements of the invention here, which is the weight and

6    moving up and down in an unrestrained manner.

7                 THE COURT:  Why do you need doctrine of

8    equivalents?

9                 MR. CHAMBERS:  I don't think we need to.

10                THE COURT:  So why are we arguing about this?

11                MR. CHAMBERS:  I will tell you why.

12                THE COURT:  Okay.

13                MR. CHAMBERS:  So they are saying that, yes, we

14   added the weight, but we moved the weight up eight inches.

15   So your patent only covers when you put the weight down on

16   the lower cover, so we avoid your patent because we moved

17   the weight up eight inches.  That's their noninfringement

18   argument.

19                And then their noninfringement argument for

20   unrestrained is, yes, this moves up and down, and we say in

21   our technical specifications that it has to be freely

22   moving, but they say we're hiring an MIT professor as our

23   expert, and that there's a theoretical possibility that

24   there could be an incidental de minimis amount of friction

25   here, so because there theoretically could be from friction

1    even though it's supposed to be unrestrained, that's our

2    noninfringement defense.

3            So this is what we're dealing with on their

4    infringement defenses, both of them petty and insubstantial

5    in our view.

6            So let's get back to the prosecution history

7    estoppel.  As we cite in our opposition, when you make the

8    amendment, you must look at the scope of the estoppel must

9    fit the nature of the narrowing amendment.  And we cite

10   Intervet citing Festo.  There is no reason why a narrowing

11   amendment should be deemed to relinquish equivalents beyond

12   a fair interpretation of what was surrendered.

13           So what was being -- to the extent there was an

14   amendment on sufficient mass, for instance, it was to get

15   around the spring, which is hard, and pushing it up and down

16   and all the compression.  That's what the amendment was all

17   about.  It was not taking the invention, which is adding a

18   heavy weight and raising it up 12 inches.

19           So you have to consider, you know, what is the

20   issue for the doctrine of equivalents.  The issue is not

21   putting on a spring which is Harr.  That is what was

22   surrendered.  We're not disputing we surrendered the spring

23   of Harr, but we're saying if you do the same invention of a

24   heavy weight but decide to move it up a few inches, that's

25   different, and that should be an equivalent.  Similarly,

1    with unrestrained, that was again Harr, and you had the

2    spring there, which was pushing it down and restraining

3    it.

4             But here, you have it designed to be freely

5    moving up and down.  That's what their technical

6    specification says.  It freely moves up and down.  So that's

7    not what was surrendered.  What was surrendered was the

8    spring, and their argument is, well, there's a theoretical

9    possibility of friction.  Completely different issue, so

10   that's why it's equivalent.

11            And then with respect to aeration means, that's

12   means-plus-function, so you do get equivalents under the

13   statute.  That's statutorily required.  And then for their

14   vitiation, what they quote is if it's exactly the opposite

15   of what the claim is.

16            Okay.  Well, is putting a heavy weight so you

17   can have a weighted splash shield, is that the opposite of a

18   weighted splash shield?  Well, I think the answer is no.

19            THE COURT:  What about restrained?

20            MR. CHAMBERS:  What?

21            THE COURT:  What about restrained?

22            MR. CHAMBERS:  Yes.  What about restrained?  Is

23   moving this up and down an unrestrained way the opposite of

24   unrestrained?  I would say no.  So I think that answers that

25   one.

1          THE COURT:  All right.

2          MR. CHAMBERS:  Thank you, Your Honor.

3          THE COURT:  All right.  I'm going to reserve

4    judgment on this motion in limine.  I mean, you know, in

5    retrospect, I should have had this pretrial conference weeks

6    and weeks ahead of time before the trial, just do what I can

7    to get stuff out to you as fast as I can.

8          I think the good news is I don't think that my

9    determination of this motion really affects the presentation

10   that much at trial, and I think that you can quickly move,

11   it sounds like, to address it.

12         All right.  I think we have one more motion in

13   limine.  Is that correct?

14         MR. CHAMBERS:  Very quickly, Your Honor.  Could

15   I ask them to bring that to trial?

16         MR. DiGIOVANNI:  It's on our exhibit list, Your

17   Honor.

18         MS. SILVERSTEIN:  Good afternoon.  Brianna

19   Silverstein again.

20         So our motion in limine number three is to

21   preclude plaintiffs' expert from offering to, and

22   plaintiffs, sorry, from offering evidence, argument or

23   reference related to their expert's untimely disclosure and

24   improper reliance on two different sets of testing.

25         And I know Your Honor made reference to some of

this earlier, but I would like to go through each part
that's in the 2019 testing report because I do think some of
it is completely irrelevant to plaintiffs' claims that they
were prejudiced because they weren't put on notice.

So I want to start with the 2019 testing, and
just as a quick reminder, the fact discovery deadline was
July 2018 and expert discovery ended on November 2nd, 2018.
We filed our motion for summary judgment on December 14th,
and then on January 11th the plaintiffs filed a declaration
from Dr. Maynes that included a new testing report that was
dated January 7th.  And the new testing addressed -- had
five different questions in it.

So the first one was the weight of the splash
shield assembly.  And in this one, Dr. Maynes weighed what
we were just looking at, that whole thing, and this deals
with claim 5 of the '658 patent, which specifically requires
that the weight of the lid be five pounds.  And in his
original report, Dr. Maynes stated that the weight was
3.74 pounds.  So it's unclear why he needed to revise his
report, to put in a new weight, or how, you know, it was
somehow our, you know, our burden to show that it wasn't
five pounds, or that 3.74 isn't five pounds.  I think that's
what we argued in our summary judgment motion.  So that is
that first question.

The second one is whether the splash shield

1   moves freely or is affected by friction, which that's what

2   Mr. Chambers was just talking about.

3              This is, again, about the '658 patent, and in

4   his original report, Dr. Maynes acknowledged that there was

5   friction, and the only thing he is doing in this new report

6   is now coming up with some way of measuring it and trying to

7   say that it's not a lot of friction, but as Mr. Chambers

8   acknowledged, the plaintiffs have known that that is one of

9   our arguments.  In fact, our engineers commented that there

10  was friction.

11             The third one is the MIC2000 cutting blade has a

12  slim cross-sectional profile.  This deals with the '377

13  patent and the means, the grinding means, which Judge Sleet

14  said would include a blade with a thin cross-sectional

15  profile.

16             Now, again, Dr. Maynes, he had addressed this in

17  his original report.  In that report he looked at the prior

18  art and just did a visual comparison, and now all of a

19  sudden in 2019, he comes up with some new equation that he

20  wants to do to show that it's a thin cross-sectional

21  profile.  Again, unclear how that was at all affected by

22  anything that defendants did or did not disclose.

23             And then I'm going to skip the next point and go

24  right to the aeration.  And this kind of actually ties into

25  the 2015 testing, where basically Dr. Maynes kind of

1    consulted again with one of the f'real employees who did the

2    testing, and then he's confirming it.

3              THE COURT:  Your first slide, I thought we were

4    just talking about the testing.  Your motion is to get, you

5    know, to exclude his January 2019 testing and f'real's

6    withheld 2015 testing.

7              MS. SILVERSTEIN:  Yes.  This was all in the

8    testing report.  This exhibit was Exhibit A to his new

9    declaration.  All of these points were in his testing

10   report.  It wasn't just the new grinding testing.  It

11   included all of these even though, again, on summary

12   judgment, that some of these, such as the last point,

13   aeration, wasn't even related to our summary judgment

14   motion.  That wasn't even related, but he still put in a new

15   report about that.

16             So unless you have more questions about 2019, I

17   can go onto the 2015 testing.

18             THE COURT:  All right.

19             MS. SILVERSTEIN:  Again, during discovery --

20   this is in our papers.  During discovery defendants

21   requested any testing that supported f'real's infringement

22   claims, and there was a specific, a specific interrogatory

23   related to aeration.

24             f'real didn't produce anything during discovery,

25   and then on August -- in August 2018 in their opening

1    report, the plaintiffs produced for the first time two sets

2    of testing that were performed in 2015 by f'real employees.

3    The first one was testing performed by Curtis Tom and

4    documents by Jen Voges.  And the second set is a set of

5    testing that did not have any name associated with it, and

6    that we found out at Dr. Maynes' deposition in October were

7    performed by an employee named Mike Partsuf.  His name had

8    been completely absent from the record in the case.  He was

9    never mentioned in any deposition, interrogatory request,

10   was not even mentioned in their document production at all.

11   And that was the second set.  And that's actually the set

12   that Dr. Maynes admitted at his deposition that he relied

13   upon.

14            THE COURT:  Okay.  But in December of 2015, in

15   response to interrogatory number 10, f'real referenced,

16   right, f'real's experiments indicate that air is initially

17   removed.  Now, that sounds like aeration testing to me.

18   Right?

19            MS. SILVERSTEIN:  Yes.

20            THE COURT:  So they disclosed it to you in

21   December of 2015.  Did you make a request to follow up on

22   this interrogatory?  Did you do anything to ask for the test

23   results?

24            MS. SILVERSTEIN:  We had outstanding discovery

25   that would have asked for the testing results.

1          THE COURT:  Did you follow up on it?  This is

2     December of 2015.  When did discovery close?

3          MS. SILVERSTEIN:  July of 2018.

4          THE COURT:  Did you go to the Court and say, you

5     know, that we know they've got this testing out there.

6     They've not turned it over.  They are not hiding it.  They

7     say it.

8          MS. SILVERSTEIN:  No, we did not, Your Honor,

9     but as they said in their opposition here, that would

10    have not mattered because they are now claiming there was

11    some sort of work product privilege over it and that, you

12    know, that's why they said they didn't produce it to begin

13    with.

14         THE COURT:  Well, they didn't produce it to

15    begin with because if you are an attorney and you ask

16    somebody to run something, and I don't know that it has been

17    tested, but as I understand it, they represented that these

18    two folks who did this test were directed to do it

19    by attorneys.  They did it.  They didn't make the decision

20    to disclose it until a later date, and it sounds like it's

21    in response to specific allegations of noninfringement

22    raised by you all.

23         MS. SILVERSTEIN:  This was in his opening

24    report.

25         THE COURT:  So this one is not?

1      MS. SILVERSTEIN:  Right.  This is in his

2  infringement analysis.

3      THE COURT:  Anyway, so I don't even know what

4  the harm is here.  You've got it in the initial disclosure

5  report.  It was referenced in December of 2015 in a response

6  to an interrogatory.  You did nothing to follow up on it.

7  I'm trying to understand why there's a problem.

8      MS. SILVERSTEIN:  Well, the harm is that at

9  least as to the second set of testing that was performed by

10  Mike Partsuf, we had no idea that existed.  We found out

11  from Mr. Voges at his deposition that he had performed some

12  testing, and there was no work product privilege objection

13  made at that time, and we actually don't think that they

14  have met their burden of showing work product.

15      There's nothing on these documents that says

16  that it was, that the testing was at the request of counsel,

17  and they didn't put any testimony in from either of the, or

18  any of the f'real employees saying that they only ran it at

19  the request of counsel.

20      Like I said, at the deposition -- now, we didn't

21  have the report at the deposition, so we were asking the

22  question blindly at that point.  But at the deposition --

23      THE COURT:  What is it that they didn't respond

24  to?  They didn't produce these to?

25      MS. SILVERSTEIN:  Well, we had a specific

1    interrogatory.

2              THE COURT:  Right.  The number 10, the one I

3    read to you.  Right?

4              MS. SILVERSTEIN:  I'm sorry.  We had a specific

5    request for production that asked for -- hold on one second.

6    That asked for, I believe, all documents relating to the

7    allegations of infringement, something to that effect.

8              THE COURT:  So I mean, here's what's cited as

9    far as I can tell.  It's a request for production number 10

10   and 43.  Is that right?

11             MS. SILVERSTEIN:  Yes.

12             THE COURT:  Okay.  So, and number ten is all

13   documents and things concerning their contention that

14   Hamilton Beach is infringing any claim of the

15   patents-in-suit, and they respond to this in February of

16   2015.  They say, impermissibly seeks attorney/client

17   privilege and attorney work product.  And then that would

18   be -- all right.  So then you learn about it when?

19             MS. SILVERSTEIN:  So we didn't get the testing

20   until August, and it's in the second report, the one --

21             THE COURT:  And did they supplement this

22   response?

23             MS. SILVERSTEIN:  No.  They never.

24             THE COURT:  So they never supplemented the

25   response?

1          MS. SILVERSTEIN:  No.  And the report on the

2   right, as you can see, which is the one that Dr. Maynes

3   relies on and that he redid in 2019 again, apparently

4   because Dr. Slocum responded to it in his rebuttal report,

5   although that was the first time that Dr. Slocum could have

6   responded to it, because we didn't have it until August.  It

7   doesn't have a name, a date, anything on it.

8          THE COURT:  All right.

9          MS. SILVERSTEIN:  We couldn't learn any of that

10   until we talked to Dr. Maynes about it.

11          THE COURT:  All right.  Now, how are you

12   prejudiced?

13          MS. SILVERSTEIN:  So as to the 2015 testing, we

14   were specifically prejudiced because we never had a chance,

15   especially like it says to the second report there that Mike

16   Partsuf did, we never had a chance to talk to Mr. Partsuf.

17          Dr. Maynes did not observe the test and he had

18   had some conversations, but there were a bunch of things

19   that he didn't know when we asked him at his deposition

20   about how the tests were conducted or anything like that.

21          THE COURT:  Okay.

22          MS. SILVERSTEIN:  And --

23          THE COURT:  Now, before we go on --

24          MS. SILVERSTEIN:  Yes.

25          THE COURT:  Mr. Chambers, who is doing this on

1    your side?

2                    MR. CHAMBERS:  I am.

3                    THE COURT:  Are you trying to introduce the 2015

4    test in front of the jury?

5                    MR. CHAMBERS:  What she has up on the screen,

6    the answer is no.

7                    THE COURT:  We can agree on it.  I don't have to

8    rule on it.  It's not coming in.

9                    MR. CHAMBERS:  One on A.  Now, there is another

10   test B that we plan to put in as well as the retests which

11   were done --

12                    THE COURT:  By May of 2019?

13                    MR. CHAMBERS:  In 2019.

14                    THE COURT:  That's not my question.  My question

15   is 2015.  Let's just deal with 2015.  Are you trying to

16   bring that in?  And the answer is no.

17                    MR. CHAMBERS:  Right.  If we get 2019, we don't

18   need 2015.

19                    THE COURT:  Okay.  So then let's talk about

20   that.  So it sounds like 2015 is off the table.

21                    MS. SILVERSTEIN:  Okay.

22                    THE COURT:  All right.

23                    MS. SILVERSTEIN:  So the only reason I had to do

24   2019, this -- to the aeration point specifically.  The only

25   reason that they say in their opposition they had to do the

1    2019 report was because the first time that Dr. Slocum

2    addressed it was in his rebuttal report.

3                 THE COURT:  Right.  And he said that there's no

4    visual, that nobody saw any grinding or -- right?

5                 MS. SILVERSTEIN:  No.  This is completely

6    separate from there.

7                 THE COURT:  All right.

8                 MS. SILVERSTEIN:  We did not bring summary

9    judgment on this.  This is not part of the summary judgment.

10                THE COURT:  Okay.

11                MS. SILVERSTEIN:  This is an aeration issue.  If

12   you can go back, I can show you.

13                THE COURT:  Hold on.

14                MS. SILVERSTEIN:  If you look at the 2019

15   testing, as I said, he does five different tests.  Only one

16   of those relate to the grinding, which is the visual

17   evidence of grinding.

18                THE COURT:  All right.  Slow down for just a

19   second.

20                MS. SILVERSTEIN:  Sure.

21                THE COURT:  Sorry.

22                MR. CHAMBERS:  Your Honor, I think I can help

23   get to the heart of this.

24                THE COURT:  Well, just stop for a second.  So

25   I'm looking at your motion.

1              MS. SILVERSTEIN:  Yes.

2              THE COURT:  And you say, in January of 2019,

3    long after fact and expert discovery closed, plaintiffs

4    support their opposition with a declaration of their

5    technical expert, Dr. Maynes, that included brand-new

6    grinding and shaving testing.

7              MS. SILVERSTEIN:  Yes, but the testing -- I

8    guess this --

9              THE COURT:  So, you know, when I read your

10   motion, that's what I'm looking at.  And now I'm hearing

11   about aeration testing.

12             I mean, is it mentioned in your motion in

13   limine?  Can you show me anywhere in your motion in limine

14   where you mention aeration testing?

15             MS. SILVERSTEIN:  Well, we talk about the -- I'm

16   sorry for the confusion, Your Honor.  In limine -- we had a

17   separate section on testing and grinding just in the summary

18   judgment portion.  I understand.

19             THE COURT:  Do you mention aeration in here?

20   You know, we're coming up on three hours on this oral

21   argument.  You know, we have 500 cases each here in this

22   Court.  I'm spending time.  I just read all of these

23   motions.  Where is it about aeration?

24             MS. SILVERSTEIN:  I'm sorry, Your Honor.  It

25   doesn't.  It's not included in here specifically.  This was

1    supposed to cover his whole test, his whole new testing

2    report.

3              THE COURT:  So you've waived it as far as I'm

4    concerned.  You had an opportunity.  You waived it.  You

5    asked to preclude his testing for grinding and shaving, and

6    now it sounds like --

7              MS. SILVERSTEIN:  Oh, I will note that in the

8    opposition, they do address the aeration testing, so I think

9    it was --

10             THE COURT:  I'm going by what your motion is.

11   This is the first I'm hearing of aeration as you're talking

12   about it today, which is why I got confused.

13             MS. SILVERSTEIN:  Okay.  I'm sorry, Your Honor.

14   It was supposed to cover the entire new report.

15             THE COURT:  Yes.  Well, I'm sorry, too, but

16   you waived it.  I'm going to let the grinding and testing

17   in.

18             So I'm going to deny the motion in limine to

19   preclude the grinding and testing of 2019.  It sounds like I

20   don't need to deny the 2015 because it's rendered moot

21   because I understand, and I will have Mr. Chambers confirm,

22   there will be no attempt to bring in 2015 testing.  Is that

23   correct?

24             MR. CHAMBERS:  Correct, Your Honor.  We'll go

25   with 2019.  Yes.

1          THE COURT:  All right.

2          MS. SILVERSTEIN:  Oh, I will mention that the

3   2019 testing refers to the 2015 testing.

4          THE COURT:  All right.  I mean, I would imagine

5   you could excise any references to the 2019 testing.  Sorry.

6   In the discussion at trial of the 2019, can't you just

7   excise or redact any reference to the 2015 testing.

8          MR. CHAMBERS:  I can, Your Honor.  Let me --

9          THE COURT:  You can or you cannot?

10          MR. CHAMBERS:  We can do that, definitely.

11          THE COURT:  All right.  That takes care of that

12   then.  It's moot, but I'm going to grant the motion in

13   limine insofar as it seeks to exclude the 2015 testing.  I'm

14   going to deny it to the extent it seeks to, as it did,

15   requested the exclusion of the grinding and testing,

16   grinding and --

17          MR. DiGIOVANNI:  Shaving, Your Honor.

18          THE COURT:  Shaving.  Thank you.  Testing done

19   in 2019.  I think that was a fair response to inadequate

20   disclosures, and I think it was appropriate, as I mentioned

21   earlier.  There was no motion in limine to exclude other

22   parts of the report, and it's too late.  We have to have

23   rules, and we have to -- so...

24          MR. CHAMBERS:  Just so we're clear, Your Honor.

25   The subject matter in Dr. Maynes' January 2019 summary

1    judgment responsive declaration, that can be admitted into

2    evidence?

3                 THE COURT:  No.  He's going to testify.

4                 MR. CHAMBERS:  Yes, he's going to testify.

5                 THE COURT:  So we're not going to admit a

6    declaration.

7                 MR. CHAMBERS:  Right.

8                 THE COURT:  The --

9                 MR. CHAMBERS:  The subject matter.

10                THE COURT:  The subject matter, the answer is

11   yes.

12                Now, are we all clear?  We're all on the same

13   page?  Mr. DiGiovanni?

14                MR. DiGIOVANNI:  I guess the one thing I would

15   say, I mean, the Federal Rules say if it's not in someone's

16   expert report, then at trial, we would -- normally, we would

17   object and maybe have a sidebar and say, hey, this is not in

18   his expert report.  Does your ruling affect that?  Are we

19   considering that part of his expert report because that

20   testing was certainly not in his expert report, not subject

21   to his deposition.

22                THE COURT:  Well, but, you know, this goes back

23   to what I think are inadequate disclosures.  Now, you've

24   just pointed out, the other side's disclosures could be

25   severely criticized it seems to me as well.  But I mean,

1    you're going to get to argue that -- I guess you can argue,

2    well, you didn't see any grinding or testing, and then he

3    comes back and says -- I'm sure what he's going to say is, I

4    wasn't looking for it.  We've been litigating this case for

5    a long time.  I didn't think this was an issue.  I didn't

6    look for it.  You raised it.  I went and I looked for it and

7    I proved it.  I mean, that seems fair.

8                    MR. DiGIOVANNI:  Okay.

9                    THE COURT:  All right.

10                   MR. DiGIOVANNI:  The one point of unfairness I

11   would raise --

12                   THE COURT:  Okay.

13                   MR. DiGIOVANNI:  -- we now have this whole group

14   of testing that he put in.

15                   THE COURT:  Right.  But you didn't move in

16   limine for it.

17                   MR. DiGIOVANNI:  No, no.  I mean, technically,

18   Your Honor, we don't even have to because if it's not in his

19   original report, if it's not in his original report --

20                   THE COURT:  What is the purpose of a limine?  I

21   guess you help me out because the Court has been doing this

22   for a long time.

23                   You raised, they got four, you got three.

24   Actually, I mean, I thought the whole purpose of having

25   motions in limine was so that you would tee up these

1    issues.

2             MR. DiGIOVANNI:  It is, Your Honor, and we

3    think it helps the Court, and I sometimes struggle with the

4    fact that the Courts limit us to do that, because to me it's

5    helpful to the Court, even if we did 15 of them.  It seems

6    like that would be helpful.  If we only get three, let's say

7    we have those other 12, what are we going to do?  We're

8    going to object at trial and then we'll have to deal with it

9    then.  That's neither here nor there, Your Honor.  But what

10   I would say is, anything in anybody's expert report, the

11   expert has to be bound by their expert report.

12             We didn't move on, hey, they shouldn't be able

13   to talk about issue five that maybe they'll raise, or maybe

14   they won't.  No.  We're just going to use the expert report

15   as our motion in limine at trial.  You know, as our

16   evidentiary.

17             THE COURT:  Yes.  That's okay.  That's fair

18   enough.

19             MR. DiGIOVANNI:  Yes.  That was my point, Your

20   Honor.  I guess I will suggest this, Your Honor.

21             THE COURT:  No.  Actually, it's a fair point.

22   Frankly, I thought about the plaintiff got four motions in

23   limine, you got three, and I mean, frankly, you could raise

24   it at trial, and so maybe I ought to decide it now when I

25   have some time, I suppose, as opposed to on the fly in front

1    of the jury.  But I mean, on the other hand, if you are

2    going to file a motion in limine, why not -- all right.

3              So then let's deal with this aeration issue.

4    Mr. Chambers?

5              MR. CHAMBERS:  This is how I think I can

6    shortcut it, Your Honor.  The 2015 aeration was in Dr.

7    Maynes' opening report, so that addresses that question.

8              They came back and they said, oh, this is

9    unprofessional of you because you were not personally there

10   to witness the experiment.  You just took the experiment and

11   looked at it.

12             THE COURT:  Right.  I got it.

13             MR. CHAMBERS:  Okay.  So as long as we were

14   doing all the visual stuff, we reran the experiment in

15   January, and he was personally there and reran the exact

16   same experiment and got exactly the same results, period.

17             THE COURT:  All right.

18             MR. CHAMBERS:  That's all there is to it.

19             THE COURT:  Now, so let's continue with Mr.

20   Chambers for a minute if you don't mind.

21             When did you disclose the 2015 testing?  The

22   first time was in the expert report.  Right?

23             MR. CHAMBERS:  In his expert report.

24             THE COURT:  What took you so long?

25             MR. CHAMBERS:  By the way, we did have the bogus

testimony which they refer to and the, I guess it's the

interrogatory response where we alluded to it.  I considered

it attorney work product until I showed it to Dr. Maynes

before his opening report and said, take a look at this.  Do

you think it ought to be included in your opening report,

and it's only when he looked at it and said, yes, I think it

should be included in my opening report.

And I will mention one other thing, and this is,

you know, here's a letter that they wrote to us, and this is

actually the reason we -- the reason we did the test.  But

they said that their expert, Dr. Slocum, which is 2015, had

done his own aeration test, and that they had found no

aeration.

I don't think we've ever gotten a copy of those

reports, but we're not making a big stink about that.

Actually, if we can go ahead and put in our evidence, we're

not going to try to do another in limine motion on that

stuff.

THE COURT:  All right.  So would the defense

prefer -- I mean, look.  You may come up.

So don't parties all the time make a decision

after they retain the expert, towards the end of discovery,

whether they want to go and rely on certain testing,

and it's at that point they would have to disclose it.

Right?

1    MS. SILVERSTEIN:  I would disagree.  I mean, we

2    just, we had our expert do his own test and we disclosed it.

3    We didn't have --

4            THE COURT:  You disclosed every single test

5    that you guys -- what is the date of the letter, Mr.

6    Chambers?

7            MR. CHAMBERS:  Yes, Your Honor.  The letter is

8    from Mr. Schlitz at the Baker Botts firm, June 17, 2015.

9            THE COURT:  All right.  There must have been

10   testing done prior to that.  Has that been disclosed?

11           MS. SILVERSTEIN:  No, because we're not relying

12   on it.

13           THE COURT:  Okay.  And that's fair.  And I think

14   the point was the plaintiffs weren't going to rely on it.

15   They didn't make the decision to rely on it until they went

16   forward with their expert report.

17           MS. SILVERSTEIN:  I would argue that that is an

18   improper use of privileged material, a sword and a shield.

19   I mean, it's just like, for instance, with willfulness.  We

20   had to make a decision during fact discovery if we were

21   going to rely on opinions of counsel.

22           THE COURT:  You agree that they at least

23   reference, they asserted the attorney/client privilege and

24   work product in response to interrogatory number 10.  Is

25   that correct?

1        MS. SILVERSTEIN:  Correct.

2        THE COURT:  All right.  Did you file a motion to

3   compel?

4        MS. SILVERSTEIN:  No, we didn't.

5        THE COURT:  Did you ask to get a privilege log

6   for it?

7        MS. SILVERSTEIN:  No.

8        THE COURT:  Okay.  So under those circumstances,

9   even where we are and the fact that it's 4:00 o'clock, I

10  have to make discretionary decisions.  What I'm going to do

11  is -- would you prefer to have the 2015 test on aeration or

12  the 2019 test on aeration?

13       MR. DiGIOVANNI:  Do we have to make that

14  decision today, Your Honor?

15       THE COURT:  No.

16       MR. DiGIOVANNI:  Okay.

17       THE COURT:  But then what I'm going to do is,

18  I'm going to let them choose.  Okay?  They are going to get

19  to pick -- the 2019 grinding and shaving test comes in

20  because of inadequate disclosures by the defendants in

21  response through the course of discovery such that it was

22  fair, it seems to me, to allow Dr. Maynes to conduct the

23  January 2019 test.  All right.

24       As far as the 2015 test for grinding and shaving

25  or anything else, it's not admissible.  On aeration, the

1    defendants will get to choose whether to bring in the 2015

2    test conducted by the employees, relied upon by Dr. Maynes,

3    or Dr. Maynes' 2019 test.  Is that fair?

4            MS. SILVERSTEIN:  I just want to -- just

5    clarification.  Did you say everything other than aeration

6    and the grinding and shaving is out, or --

7            MR. CHAMBERS:  No.

8            THE COURT:  No, no, no.

9            MS. SILVERSTEIN:  Okay.

10           THE COURT:  So they get to bring in -- how do

11   you want to characterize it?  We've got the grinding and

12   shaving and then we have the aeration.

13           MR. CHAMBERS:  I think we described it earlier

14   is what was in his declaration.  He also responded to Dr.

15   Slocum, where he said there's no cross-sectional profile for

16   the first time in the rebuttal and summary judgment.

17           THE COURT:  All right.  So I don't remember this

18   from the papers, but you didn't move --

19           MR. CHAMBERS:  Right.

20           THE COURT:  Is that true?  Did Slocum raise for

21   the first time some things he's responding to?

22           MS. SILVERSTEIN:  That was Dr. Slocum's first

23   report, so he wouldn't have had a chance to raise it before

24   then.

25           THE COURT:  I guess Judge Sleet didn't allow a

1    reply report.  What happened?  Is that what it is?

2         MS. SILVERSTEIN:  Yes.  There was an opening

3    report and a rebuttal report.

4         THE COURT:  This is the challenges of inheriting

5    a case, so --

6         MS. SILVERSTEIN:  These three things are

7    infringement issues that Dr. Maynes did address in his first

8    report.  I mean, the weight of splash shield, he said the

9    splash shield assembly is 3.74 pounds in his first report.

10   Now he does a second report months later and finds that it's

11   heavier and closer to five pounds.

12        THE COURT:  Aren't you going to just decimate

13   him on cross-examination at that point?

14        MS. SILVERSTEIN:  We could, but we would prefer

15   to get summary judgment of noninfringement.

16        THE COURT:  We're talking about a motion in

17   limine for trial.

18        MS. SILVERSTEIN:  Right.  But this is one of our

19   summary judgment points as well.

20        THE COURT:  When we get to summary judgment,

21   we'll deal with it.

22        MS. SILVERSTEIN:  Okay.

23        THE COURT:  We're just talking about the motion

24   in limine right now.

25        MS. SILVERSTEIN:  Well, to the second point

1    about friction, the first time in his report he acknowledges

2    there's friction, and in 2019, he all of a sudden has some

3    sort of calculation he's performing to determine the amount

4    of friction and whether it's negligible or not.  The same

5    thing on cross-sectional profile.  He references it in his

6    report because it's part of the infringement report, it has

7    to be, but in that report, he's just doing a visual

8    comparison of prior art, and then all of a sudden 2019 comes

9    around and now he has a self-deletion.

10             MR. CHAMBERS:  Your Honor, as counsel has

11   mentioned a number of times, what Dr. Maynes is doing in

12   addition to being responsive to new issues raised is

13   elaborating on positions he has already taken, and to the

14   extent he mentions infringement, I can get the part in his

15   expert report, but he says that that's not a basis for

16   noninfringement.  And then he actually pulled the -- their

17   prop up and down and then dropped it, and therefore he felt

18   discernible friction.  This is all consistent with what

19   they've been on notice of since his opening report.  There's

20   no surprises, no prejudice.

21             MS. SILVERSTEIN:  We weren't able to depose him

22   about these new calculations he has.  Those were not part of

23   his first report.

24             THE COURT:  Mr. Smith, how did Judge Sleet

25   handle the situations when new -- because he did not allow

1    for reply briefs as a general rule.  Is that correct?

2           MR. SMITH:  Your Honor, he would typically get

3    to a question of prejudice and how to best alleviate the

4    prejudice.  It would come up in front of Judge Robinson as

5    well.

6           One solution here that I would have seen Judge

7    Robinson handle would be to treat the 2019 declaration as a

8    supplemental expert report, a reply report, if you will,

9    however you wanted to think of it in trying to meld the two

10    scheduling order-type regime and alleviate the prejudice

11    with a short deposition of Dr. Maynes, if appropriate, and

12    go forward that way.

13           Indeed, at some point Judge Robinson eliminated

14    all Daubert motions.  You couldn't file a Daubert motion

15    unless you came and talked to her in part because she

16    understood that a lot of this was just about prejudice and

17    about how to alleviate the prejudice, not what to strike and

18    what not to strike.

19           So I think -- I don't know if I've answered your

20    question, Your Honor, but I think it's a question of

21    alleviating the prejudice.  They've been on notice now for

22    three months of this testing.  It has been vetted through

23    the summary judgment process, and if there's some issue

24    about not having cross-examined the expert, a short hour or

25    two deposition in advance of trial may cure whatever

1   prejudice might remain.

2              THE COURT:  Mr. DiGiovanni?

3              MR. DiGIOVANNI:  I am not going to dispute

4   anything that Mr. Smith said except for the fact that we're

5   18 days from trial.  In the ordinary case, if Dr. Maynes or

6   plaintiffs had seen something in Dr. Slocum's

7   noninfringement report or elsewhere at that point, that's

8   when you move for supplemental -- a meet and confer.  We

9   want to file a short supplemental expert report or maybe

10  move if we say no --

11             THE COURT:  That didn't happen here.

12             MR. DiGIOVANNI:  Didn't happen here.

13             THE COURT:  Why?

14             MR. DiGIOVANNI:  They didn't ask to have Mr.

15  Maynes do additional testing.  They didn't do that.  They

16  didn't do that.

17             THE COURT:  Wait.  You found out about it?

18             MR. DiGIOVANNI:  Summary judgment.  I'm talking

19  about the 2019 testing.  So, you know, Dr. Maynes has this

20  test report that he did really three months ago, or four

21  months ago, in January -- three months ago, where he says,

22  it looks like a scientific report.  It says, here are the

23  experiments I conducted.  Number one, is the weight of

24  splash shield -- he has five different points that should

25  have been done during expert discovery.

1             If their point is, hey, we didn't know Dr.

2   Slocum was going to raise these things, you asked for a

3   supplemental expert report at that time, and if we say no,

4   he moves the Court, or perhaps you would have said you could

5   do a short one.  Whatever, that would have been the time to

6   do this, and he could have been deposed on it.

7             Now we're 18 days from trial.  We've got these

8   tests.  Perhaps it would be good cross at trial if we were

9   prepared for it, but we're now 18 days from trial and this

10  is what we have.

11            THE COURT:  Right.  You have to understand,

12  right, I came into this hearing reading up on grinding

13  and shaving, so now the problem is, we've got 18 days and

14  I'm just being bombarded by all of this information right

15  now.

16            MR. DiGIOVANNI:  Understood.

17            THE COURT:  I have no idea how it all fits in.

18            MR. CHAMBERS:  Your Honor, I will mention very

19  quickly, they did submit an expert declaration with their

20  summary judgment motion.  We have not tried to exclude that,

21  but what's fair for fish is fair for foul, and it seems

22  unfair, I will try to put it mildly, for them to say, okay.

23  We can get to submit a new expert declaration after all the

24  reports with lots of stuff for our case, but you don't get

25  to respond to it in your opposition.

1                    MR. DiGIOVANNI:  Your Honor, I would challenge

2       them to tell me anything in that new expert declaration by

3       Dr. Slocum that's not in his expert report.

4                    We did what you are supposed to do.  We confined

5       his summary judgment declaration to what was in his expert

6       report, things that he was deposed on.  We did not go beyond

7       that.

8                    MR. CHAMBERS:  Why do you need a declaration in

9       the first place?

10                   THE COURT:  Okay.  Mr. Chambers --

11                   MR. CHAMBERS:  Okay.

12                   THE COURT:  Just direct your comments to me

13      instead of to other counsel.

14                   So what is the question that you would like

15      maybe me to put to counsel or at least to consider?

16                   MR. CHAMBERS:  Thank you, Your Honor.  I will

17      try not to belabor this, but they are saying, oh, it was the

18      same thing in the expert report.  We didn't say anything

19      further.  That was one sentence where he said, yes, I

20      reaffirmed my expert report, and then he goes on for another

21      15 pages.  So the comment doesn't make any sense.

22                   THE COURT:  Do you know one fact or one opinion

23      that he puts forth in his declaration that's not within the

24      scope of his expert report?

25                   MR. CHAMBERS:  Yes.  Could I have a few minutes

1    to look through it?

2                THE COURT:  Yes.  All right.  We've been doing

3    this for three hours.  Why don't we take a 15-minute break.

4    We'll come back at 4:25.  The pretrial was supposed to start

5    at 4:00.  Correct?

6                MR. DiGIOVANNI:  According to the docket, yes.

7                THE COURT:  We're short on time.  All right.

8                (Short recess taken.)

9                          -  -  -

10               (Proceedings resumed after the short recess.)

11               THE COURT:  All right.  Please be seated.

12               All right.  Does anyone want to say anything

13   else about the last motion?

14               MR. CHAMBERS:  Your Honor, very quickly.  I

15   don't have Dr. Slocum's rebuttal report, so I was not able

16   to do the comparison.

17               MR. DiGIOVANNI:  In the event Your Honor is

18   considering a supplemental deposition as suggested by --

19               THE COURT:  Here's what I'm going to do.  I'm

20   going to -- just whoever has this before the Federal

21   Circuit, please reference this.  I inherited this case.  It

22   has been going on for years.  I inherited the scheduling

23   order.  I inherited the procedures and the parties briefed

24   this last motion.

25               They didn't mention anything in the motion other

1    than grinding and shaving with respect to the 2019 test, and

2    so that was the issue before me.  So I've already explained

3    that I do think -- I think both sides here did not represent

4    the best in our profession in terms of their disclosures

5    during discovery, and that's unfortunate, and that I also

6    inherited that situation.

7              And so in light of all of those circumstances,

8    what I'm going to do is, I'm going to grant the motion --

9    sorry.  I'm going to deny the motion in limine with respect

10   to the 2019 testing on grinding and shaving.  That's the

11   scope of the motion, and as I've explained, I think that

12   there were inadequate disclosures during the course of

13   discovery that necessitated from the plaintiffs' perspective

14   the need to conduct this testing.  I am going to, however,

15   grant the motion with respect to the 2015 testing, and it

16   sounds like, to a certain extent, the motion has been

17   rendered moot anyway on that.

18             And then as far as the other aspects of the 2019

19   report, we'll just take it as it arises at trial.  We'll

20   have to address it.

21             So that's the world I inherit and that's the

22   world I'm going to give.  All right.

23             Now, I guess we should go to summary judgment

24   then.  Mr. Smith?

25             MR. SMITH:  Your Honor, Mr. DiGiovanni and I

1    spoke at the break.  We're obviously here at your disposal

2    to present argument on whatever motions you think are most

3    appropriate or necessary for Your Honor to consider today,

4    so we leave it to your discretion both as how long you would

5    like us to present argument and if there are particular

6    issues on which you would prefer.

7              THE COURT:  All right.  Thanks.  I appreciate

8    that.

9              So one of the -- you know, I did not get through

10   the summary judgment briefing as much as I would otherwise

11   like, but I think I will point out why.

12             You can have a seat, Mr. Smith.

13             I know you're one of the first cases, in fact, I

14   think you are the first that adopted the procedures I put in

15   place about summary judgment.  The concise statement of

16   facts in this case was not what I had envisioned, and other

17   parties actually have briefed these summary judgments along

18   the way I did, and so let's walk through that.  And the

19   reason why I say that is because that may influence kind of

20   how we do the argument.  All right.

21             So let's start with the plaintiffs' motion and

22   let's look at the concise statement of facts.

23             The whole point of having this concise statement

24   of facts was because, the idea was I would get right to the

25   heart of the dispute and find out whether we had to dive

1    into the legal issues.

2             Now, the plaintiffs' concise statement of facts

3    is basically just a recitation of the elements of the

4    patent.  So, you know, for instance, fact number -- well,

5    let me just pull up the plaintiffs' response and we'll go

6    through it.  Sorry.  One minute.

7             Okay.  So I'm comparing now 171, DI 171, and

8    then I guess we could just go right to DI 197.

9             Mr. DiGiovanni?

10            MR. DiGIOVANNI:  We corrected one statement.  We

11   noticed an error.

12            THE COURT:  Okay.

13            MR. DiGIOVANNI:  It was our response to

14   plaintiffs' statement of fact number 18.

15            THE COURT:  Okay.  Well, we'll get to that.

16   Good to know.

17            MR. DiGIOVANNI:  All right.

18            THE COURT:  All right.  So just then, especially

19   for those who appear before me in the future and for the

20   number of people who will a lot, what I envisioned with this

21   was the facts not, any legal argument.  So, and -- or legal

22   conclusions, in other words, another way of stating it.

23            So fact number one is a fact.  Hamilton Beach

24   demonstrated the accused and then the four products -- I'm

25   not even sure what that means.  It demonstrated the accused

1    products in the United States.  That's right.  So it

2    demonstrated them.  Okay.  And that's admitted.  That's

3    good.

4             All right.  The next fact.  Hamilton Beach

5    engineers testified that demonstrations of the accused

6    products by Hamilton Beach included performing, and then the

7    following steps are going to follow.  To me, the fact is

8    that they demonstrated it, not that they testified at trial,

9    and then you would put in to support it the testimony in the

10   record.  And then the flip side would be then, the

11   respondent would put in the record citations facts that

12   contradicted that if it was disputed.

13            So here, I'm not really sure how to read this

14   box, but -- and then the numbers get off.  If I look at box

15   number, what's labeled box number two is a method for

16   rinsing a splash shield.

17            Now, how does that line up with what the

18   plaintiffs have?  In other words, what's going on is the

19   plaintiffs -- there's an unnumbered box that is in the

20   plaintiffs' concise statement, but I think that the

21   defendants, their box number two was responding to that

22   unnumbered box.  Is that right?

23            MR. SMITH:  That's how I would read it, Your

24   Honor.

25            THE COURT:  All right.

1        MR. FOSTER:  It appears so, Your Honor.

2        THE COURT:  All right.  Anyway, that seems okay.

3   I'm all right with it.

4        So then I will go to plaintiffs' box number

5   three -- sorry, plaintiffs' box number two, which is a

6   method for rinsing a splash shield on a mixing machine.

7        And do I understand correctly that the defendant

8   admits that?

9        MR. FOSTER:  I do see where the numbering is

10  off, Your Honor, so just give me a second.

11        THE COURT:  Yes.  I just want to make sure, so

12  that's why I'm asking.

13        MR. FOSTER:  Right.  Okay.  It appears, Your

14  Honor, we took their unnumbered boxes, kind of a preamble

15  that applied to 2, 3, 4, 6 and 7, and then our numbers do

16  match up.  So our two matches with their number two.  That

17  un-numbered one we took to apply to all of the --

18        THE COURT:  Okay.  So then you just skipped over

19  their unnumbered box.  So your number two you're saying,

20  which reads, disputed.  No Hamilton Beach engineers

21  testified that any accused products perform each and every

22  step.

23        You are saying that's in response to box number

24  two by plaintiffs, that the engineers testified that the

25  demonstrations included a method for rinsing a splash shield

1    on a mixing machine?

2         MR. FOSTER:  Yes.  Structurally, that is

3    correct, Your Honor.

4         THE COURT:  Well, how is it responsive to say

5    it's disputed that no Hamilton engineer testified that each

6    and every claim, each and every step is even in the -- is

7    performed?

8         MR. FOSTER:  Okay.  I misspoke then, Your Honor.

9    Our two response is their unnumbered plus two.  So they

10   didn't number it 1A or 1B, whatever you call it.  We didn't

11   respond to that except that our box 2 is intended to respond

12   to their box 2 and what is above it, in 1A.

13        THE COURT:  Okay.  All right.  So you admit that

14   their demonstration included performing or concluded --

15   included providing a vessel containing material to be mixed,

16   the vessel having an opening?

17        MR. FOSTER:  That's correct.

18        THE COURT:  That's admitted?

19        MR. FOSTER:  Correct, Your Honor.

20        THE COURT:  Okay.  Now I got it.  And then you

21   admit 4, that it provides a mixing machine having a holder

22   for receiving the vessel.  You admit that, too.

23        MR. FOSTER:  That is correct, Your Honor.  And,

24   again, this is for the demonstration only, not for

25   customers.  That's what the preamble box talks about, the

1    demonstration.

2              THE COURT:  Right.  I mean, that's the thing.

3    And actually, it really is just that their engineers

4    testified that the demonstrations involved it.

5              MR. FOSTER:  That's the way it reads.

6              THE COURT:  Yes.  I mean, because it was set up

7    like this, I don't even know if it's helpful for me to go

8    through these facts.

9              MR. CHAMBERS:  Your Honor, I think we can get

10   right to the bottom line very quickly.  There's only one

11   element that is in dispute and defendants can say otherwise

12   if they want to.

13             I think the only issue is the word "while" in

14   this claim, which, and we'll put up a slide on this if you

15   would like, which in our view is a claim construction issue.

16   There's no dispute about what the device does.

17             THE COURT:  So this is the problem, you see, and

18   this is why I want you to know.  That's why I have not

19   delved into your briefs, because the whole system that I

20   have instituted is set up that we have these concise

21   statements of facts, and I'm only getting to the briefs if

22   there's undisputed facts as demonstrated by the concise

23   statement of facts.

24             Do you get that?

25             MR. CHAMBERS:  I do.

1              THE COURT:  All right.

2              MR. CHAMBERS:  I get that.

3              THE COURT:  And one thing I could do is, I could

4    just strike everything and say it didn't comply with the

5    rules.  I don't want to waste people's time, but you

6    understand this is what I've been going through, trying to

7    figure out what all of this means.

8              I mean, if what you say is true, your concise

9    statement of facts should say that BIC2000 has or involves

10   when it's used a method for rinsing a splash shield, and

11   then they would tell me whether that's disputed or not and I

12   would know that.

13             MR. CHAMBERS:  I think we didn't format it as

14   well as we could have, Your Honor, but the issue is a very

15   simple one.  There's no factual dispute about how it works

16   and the structural components.  The issue is claim

17   construction, and that's not an issue that should go to the

18   jury.

19             THE COURT:  Well, I'm going to guess the

20   defendants don't agree with that, or maybe they do.

21             MR. FOSTER:  Most certainly don't agree.  I will

22   say this, Your Honor.  When we were formulating these, I

23   don't think -- at least I didn't understand it was kind of a

24   gateway.  We understood it was important.  Your order said

25   to focus on it, so we did.  We did go find what we did in

1    the District of Hawaii to see how they did it.

2              THE COURT:  I'm not reading a summary judgment

3    brief unless I get through the concise statement of facts

4    which demonstrate there's undisputed facts, because that's

5    the whole point of it.  And I get, you know.  I didn't give

6    an exposition when I implemented it, but that is the whole

7    point of the procedure, and it has worked in other cases

8    incidentally.  So, you know, I'm not used to having oral

9    argument when I'm not prepped.  And so to your point,

10   Mr. Smith, I'm just trying to figure out what's the best

11   thing to do.

12             MR. SMITH:  Your Honor, I don't know how much

13   time you're interested in devoting.  There may be certain

14   issues like this while issue that would be discrete.  I'm

15   not sure that's one we would pick necessarily.

16             THE COURT:  Right.

17             MR. SMITH:  Pick at least one motion or two

18   motions that we think you would most benefit from.  I don't

19   think, but I don't mean to speak for Your Honor, obviously.

20   I don't know the 12 issues or whatever there are embedded in

21   the summary judgment motion practice here that's going to

22   benefit everybody, especially for Your Honor to march motion

23   by motion.

24             THE COURT:  I said I didn't read them, but I did

25   skim.  It struck me on the plaintiffs' side at least, the

1    first two are the most potentially fruitful for the

2    plaintiff if I bought it, if I bought their arguments,

3    rather, which is basically, as I understand it, those are

4    the two arguments where the defense is trying to relitigate

5    claim construction.

6            All right.  So why don't we at least deal with

7    those two issues.  Can you do your argument in about ten

8    minutes on that?

9            MR. CHAMBERS:  I think I can.  I should be able

10   to do another one in 30 seconds.

11           THE COURT:  All right.

12           MR. CHAMBERS:  Which is the public use.  They

13   said that there was a showing of an animation at a trade

14   show.

15           THE COURT:  All right.  Do those quickly.  Let's

16   go.

17           MR. CHAMBERS:  Okay.  Well, is there any dispute

18   about that anymore that the animation was not shown at the

19   trade show?  I think the answer is no.

20           THE COURT:  Mr. Chambers --

21           MR. CHAMBERS:  Sorry, Your Honor.

22           THE COURT:  You can ask me and I will ask them.

23           MR. CHAMBERS:  Your Honor, I would like to find

24   out from defendants if there was any dispute about the

25   public use on the animation.

1          THE COURT:  Mr. DiGiovanni or Mr. Foster?

2          MR. FOSTER:  Yes, Your Honor.  There's a video

3    that was created.  He testified that he had intended to show

4    it to customers.  There was a dispute about whether or not

5    Fed-Ex went to him at the trade show, but our public use

6    isn't limited to that particular fact.  And Mr. Farrell's

7    testimony will see where that goes and the jury can balance

8    his credibility.

9          MR. CHAMBERS:  Okay.

10          THE COURT:  I don't even understand.  Sorry.

11    Sorry.

12          MR. FOSTER:  Your Honor, Mr. Farrell paid to

13    have a video created by the design company that helped them

14    develop the blender.  This video he was creating with an eye

15    of showing it at a convenience store trade show about a year

16    and a month before the filing date of the '150 patent

17    family.

18          There's some testimony that shows that a Fed-Ex

19    package with a video didn't get to Mr. Farrell, but he

20    admitted he had the video before, before the priority date,

21    and he was trying to show it to customers.  So that's the

22    evidence right now.

23          So I don't know if it was at the NACS show or

24    where, and we had evidence that he was in discussions with

25    QuikTrip, which ultimately led to a sale.

1          THE COURT:  What is the difference in what Mr.

2     Chambers is saying?  He's asking whether there was a

3     demonstration at a trade show?

4          MR. FOSTER:  Yes.  He's asking if we're

5     asserting there was a demonstration specifically at a trade

6     show in Orlando October 6th, 2002, and I think our

7     allegation is he was trying to show the video.

8          THE COURT:  Not that he actually did show it?

9          MR. FOSTER:  It's not clear.

10          THE COURT:  Okay.

11          MR. FLYNN:  Your Honor, if I may, I mean, this

12     is one of those where I think there's a fact here.  If you

13     look at our number 32 on the undisputed facts, we say, an

14     animated video of a blender created by Kablooe was not shown

15     to anyone at the NACS show in October 2002.  Their response,

16     admitted.

17          THE COURT:  Yes.

18          MR. FLYNN:  That's the entirety of their public

19     use defense.

20          THE COURT:  This is part of the problem.  I

21     didn't know whether that meant 32 or 33, although I guess 33

22     is admitted, too.

23          MR. FLYNN:  They admitted all of our facts.

24          THE COURT:  Okay.

25          MR. FLYNN:  They didn't respond.  In the summary

1    judgment, they offered no opposition on the public use.

2              THE COURT:  Well, I will hear brief argument on

3    it although, Mr. Foster, it sounds like you did admit it in

4    your paper.

5              MR. FOSTER:  Your Honor, specifically we didn't

6    have the evidence to counter that it was specifically shown

7    at the NACS show.  I think our papers, we don't talk about

8    it.

9              THE COURT:  All right.  Well, then, if you

10   didn't talk about it, plaintiffs will win on summary

11   judgment.

12             MR. FOSTER:  At least that particular part of

13   it.

14             THE COURT:  Both sides, let's just cut to the

15   heart of things.  I should grant summary judgment on that.

16   Right?

17             MR. CHAMBERS:  Bingo.

18             MR. FOSTER:  No, Your Honor.  The record shows

19   Mr. Farrell was in constant discussions with QuikTrip from

20   2001 on about a self-rinsing blender, and we would argue

21   even though there was some sort of offer for sale or public

22   use during discussions, they even had mockups done of the

23   proposed blenders put in the store in 2002.

24             THE COURT:  Is that in your brief?

25             MR. FOSTER:  Yes.

1           THE COURT:  Okay.  Sorry.

2           MR. FOSTER:  So it's different than --

3           MR. FLYNN:  Your Honor, I didn't see any

4    opposition to our public use summary judgment in their

5    opposition.

6           THE COURT:  I will look for it.  I will look for

7    it.

8           MR. FLYNN:  Again, this goes back to the

9    contentions.  The only contention they ever had about public

10   use, Mr. Farrell showed a video at the NACS conference in

11   2002.  That's it.  That's all we ever knew.  That comes from

12   their counterclaims, comes from their invalidity

13   contentions.  That's all that was explored in discovery even

14   if we could cobble what we're supposed to understand what

15   their contentions to be from depositions.  Now we do a

16   summary judgment on it.  They admit, yes, video never shown,

17   never arrived.  Mr. Farrell couldn't have shown it to

18   anybody.  They didn't oppose and now we don't get summary

19   judgment on their public use defense?

20          THE COURT:  Well, look, if it's as you say,

21   you're going to get it.  I'll go read it.

22          MR. FLYNN:  Your Honor, can I hand up copies?

23          THE COURT:  Yes, please.

24          (Mr. Flynn handed slides to the Court.)

25          MR. CHAMBERS:  All right, Your Honor.  Let me go

1   to infringement, summary judgment, which we submit are both

2   claim construction issues.

3            So one of them is this claim 21 of the '662

4   patent.  That's the claim that went all the way through the

5   trial at the PTAB and then all the way to the Federal

6   Circuit, so that has been thoroughly vetted on validity.

7            Here is the claim --

8            THE COURT:  You are like a dog with a bone.

9   Okay.

10           MR. CHAMBERS:  Yes.  I enjoy saying that.

11           Here's all the elements of the claim, and the --

12   I think Dr. Slocum on the admissions, Dr. Slocum admitted to

13   everything.  The only one they address in their opposition

14   that they're disputing is the last element here, directing

15   rinsing fluid onto the splash shield using the nozzle while

16   isolating the vessel from the rinsing fluid.  So this is the

17   only one that they are disputing that I could see.

18           And so how does it work?  There's no factual

19   dispute about how they operate.  The cup must be removed

20   from the blender before rinse fluid is directed onto the

21   splash shield.  So while the cup is isolated from the rinse

22   fluid, rinse fluid is directed onto the splash shield using

23   the rinse nozzle.  Dr. Slocum said at his deposition, so I

24   guess you could call that it's isolated because there's no

25   way the water is going to get to the cup, because it's in my

1    hand.

2              So it's undisputed that is how it works.   In

3    other words, everybody agrees, the traffic light is red.   So

4    what do you do about it with the law?

5              Okay.   The only dispute is the reargument of

6    this word while, and at the Markman hearing, defendants

7    argued, and they also argued in their Markman briefs that

8    while precludes physical removal of the cup from the

9    blender.   They said, the term, again, the term while is

10   there.   We said, at the same time, shielding the vessel

11   providing to the mixing machine to rinse from the fluid.

12   What the plaintiffs are trying to do is trying to read

13   the claim on to someone making their drink, taking the cup,

14   walking into their car, and then rinsing occurs.   That is

15   right.   That's exactly the way the claim reads.   Okay.

16             So this was the Markman presentation to Judge

17   Sleet and this is what they argued in their briefs and at

18   the hearing.   So this is what Judge Sleet decided.

19             He rejected their interpretation and pointed to

20   the specification and said, the cup may then be removed from

21   the drink machine in his claim interpretation after blending

22   as a way of isolating it from the rinsing fluid.

23             So he went for the -- our proposed construction,

24   and cited to this, and said, no.   I reject your while

25   argument.   Look in the specification.   That supports

1    taking the cup in your hand and removing it from the drink

2    machine.  So we have a claim construction dispute that has

3    been resolved by Judge Sleet and that is all there is to it,

4    really.  It's pretty simple.

5              THE COURT:  All right.  You're done.  That's

6    good.  Let's hear from the defense.

7              MR. DiGIOVANNI:  Looking for the clicker, Your

8    Honor Your Honor.  Sorry.

9              I have a series of slides, Your Honor.  You

10   know, I will tell you, to be honest, I have 18 slides, 17

11   slides.  Let me go to the one slide that does address very

12   directly claim construction.

13             So, Your Honor, I need to go to the claim.  So,

14   first of all, Judge sleet did not reject defendants'

15   arguments regarding the while.  That didn't happen.  Judge

16   Sleet ruled that it should be the plain and ordinary meaning

17   of the phrase direct rinsing fluid onto the splash shield

18   using the nozzle while isolating the vessel from the rinsing

19   fluid.

20             So for the term while in there, and that's a

21   necessary term, it's the plain and ordinary meaning of

22   while, which is at the same time.  Just as, this is a method

23   claim, every step --

24             THE COURT:  So, wait, wait.

25             MR. DiGIOVANNI:  Sure.

1          THE COURT:  Is Sleet's ruling in the appendix?

2          MR. DiGIOVANNI:  I have it in the slide.

3          THE COURT:  Okay.

4          MR. DiGIOVANNI:  The very next slide.  So here's

5    Judge Sleet's claim construction order.

6          THE COURT:  Okay.

7          MR. DiGIOVANNI:  The term while isolating the

8    vessel from the rinsing fluid is construed to have its plain

9    and ordinary meaning.

10          THE COURT:  Right.  What did you guys ask to

11   have it construed as?

12          MR. DiGIOVANNI:  What we asked for was that the

13   term be given a meaning that required shielding.  Okay.

14   That required an actual trap door mechanism or something

15   that actually physically shielded.

16          THE COURT:  All right.  Do you have what you

17   asked for up here?

18          MR. DiGIOVANNI:  I don't.

19          THE COURT:  Mr. Chambers, was it on your slide?

20          MR. CHAMBERS:  Well, you see the footnote there,

21   Your Honor, number five.

22          THE COURT:  Yes.

23          MR. CHAMBERS:  That's the other thing you need

24   to read.

25          THE COURT:  Okay.  All right.

1          MR. DiGIOVANNI:  But the judge does not address

2   in the claim construction the term while.  He recognizes

3   that we -- our construction would have had the word, would

4   have had the word while in it, but he doesn't address it.

5          THE COURT:  What is footnote five?  Can you

6   remind me?

7          MR. FLYNN:  If you switch back to plaintiff for

8   a second.

9          MR. DiGIOVANNI:  Sure.

10          THE COURT:  All right.

11          MR. CHAMBERS:  Here's a pertinent part --

12          THE COURT:  Mr. Chambers, you can have a seat.

13   All right.

14          So footnote five.  Do that begin with the Court

15   is guided by the following specification language?

16          MR. DiGIOVANNI:  That's not the entire footnote,

17   Your Honor.  I can read it, Your Honor.  It's DI 83.  The

18   Court says, the Court finds no need to define the term while

19   isolating the vessel from the rinsing fluid because the term

20   should be given its plain and ordinary meaning.

21          THE COURT:  Right.  I'm listening.

22          MR. DiGIOVANNI:  Okay.  And then it quotes

23   Phillips, the Phillips case.  I can skip that, I think.

24          And then the Court says, the Court is guided by

25   the following specification language.

1           THE COURT:  Right.

2           MR. DiGIOVANNI:  That's what we see up here.

3           THE COURT:  Okay.

4           MR. DiGIOVANNI:  Okay.  And then the Court says

5    after that, defendants' construction improperly introduces

6    the word shielding as a negative limitation by arguing that

7    a barrier or door must shield.  But the Court will not read

8    those into this term.

9           So as I said, the Court did not reject plain and

10   ordinary meaning.  In fact, adopted the plain and ordinary

11   meaning, but rejected this affirmative negative limitation

12   that we did ask for for a barrier or a door.  So we're left

13   with plain and ordinary meaning.  And what they are doing as

14   claim construction -- and I have a slide to show that, Your

15   Honor.  You know, it was No. 16.  16.

16          So this is an excerpt of their brief.  So this

17   is their summary judgment reply brief.  They really -- this

18   is a real tell here, Your Honor, because here's what they

19   say.  They say, defendants argue that the word while in the

20   isolating step requires that the initial action to isolate

21   the cup take place at the same time as the rinsing.

22          Yes, we're arguing plain and ordinary meaning.

23   We are arguing that the word while has its plain and

24   ordinary meaning, because that's what the judge told us to

25   do.  We have to do that.  But here's what they did.  Then

1    they go into the specification.  They say, oh, no, that's

2    not right.  Look what the specification says.

3              That's claim construction.  They're the ones who

4    are looking to, instead of import the plain and ordinary

5    meaning of while, which is at the same time, no one disputes

6    that that's the plain and ordinary meaning of the word

7    while.  They are the ones who are saying, oh, no.  You have

8    to go to the specification to really see what that means.

9    That's claim construction.  They are doing that.

10             We are going with plain and ordinary meaning.

11   You know, it's true that in Dr. Slocum's expert report, he

12   does provide some bases on alternative constructions,

13   because we had a motion for reconsideration pending, but

14   that's behind us.  He does, Dr. Slocum gives an opinion on

15   when he uses the plain and ordinary meaning of while, which

16   is at the same time, and he applies the claim to the accused

17   product and he says, yes.  It doesn't happen.  It requires

18   the rinsing step, active step to occur while this active

19   isolating step occurs.  And Dr. Slocum explains, that just

20   doesn't happen in our products.

21             And this is another tell here, Your Honor.  I

22   have a number of these that are tells.  Why don't we go back

23   to slide -- go to slide seven, please.

24             So this is from their brief.  You read their

25   paraphrase -- you read their paraphrase of the claim.

1    Instead of while, they have after.  That's not while.

2    That's the opposite of while.  So they're reading while out.

3    They are doing what they can to read while out of it.

4                    THE COURT:  All right.  You've made a valid

5    point.  Do you have anything else on it?

6                    MR. DiGIOVANNI:  I mean, yes.

7                    THE COURT:  Keep going.  I just want to hear

8    from the other side on this point, so go ahead.

9                    MR. DiGIOVANNI:  Your Honor, I don't know if

10   there's anything I could add other than, to the core point

11   here except that, you know, another way they sort of -- they

12   sort of avoid while is they use the phrase isolated, a past

13   tense thing.  Again, they're missing the point of rinsing or

14   isolating while rinsing.  Instead they either hide while,

15   they don't use it.  I don't mean to say that in the bad

16   sense of hiding it, but they avoid the word while.  They use

17   the word after, or they use the past tense isolated, and

18   they -- we are using the plain and ordinary meaning of

19   while.

20                    THE COURT:  Hold on.  Okay.

21                    MR. DiGIOVANNI:  Your Honor, those are the core

22   points.  Do you have anything else for me, Your Honor?

23                    THE COURT:  Well, why don't I just follow up.

24                    MR. DiGIOVANNI:  Sure.

25                    THE COURT:  So demonstrate to me, how are you --

```
 1    Judge Sleet rejected, what was your limitation you wanted?
 2              MR. DiGIOVANNI:  Shielding.
 3              THE COURT:  Right.
 4              MR. DiGIOVANNI:  There's another word, but
 5    shield.
 6              THE COURT:  How do you shield?
 7              MR. DiGIOVANNI:  I can tell you how the sole
 8    embodiment in their patent does it, right, is it has -- the
 9    milkshake goes up after mixing.  I'm sorry.  The lid goes
10    up.  The milkshake stays there.
11              MS. SILVERSTEIN:  No, no, no.
12              MR. FOSTER:  Mixing up there.
13              MR. DiGIOVANNI:  There's a chamber up top.
14    There's an open area on the bottom.  This is their machine.
15    This is the embodiment, too.  Select your milkshake, put
16    it in, you put it in the holder, press a button.  It goes
17    up into this chamber.  Goes through these secret trap doors.
18    Not secret, but they're trap doors.  Goes up in there.
19    The blending happens.  You don't see it, there's no window.
20    It comes down.  There's a milkshake.  Wow, all blended.
21    Okay.  Then, as soon as it does that, the lid goes back up
22    into that chamber through the trap doors.
23              MS. SILVERSTEIN:  No.
24              MR. DiGIOVANNI:  The lid never comes down.  I'm
25    sorry, Your Honor.  The lid never comes down.  So the
```

1    trap -- the door is used for the holder and the cup.   The

2    cup goes up, gets mixed.

3              THE COURT:   Okay.

4              MR. DiGIOVANNI:   So the lid stays up in the top

5    chamber.   The trap doors close and then the rinsing happens.

6    Okay.   Then the lid is now clean and ready to be used.

7              We had asked for a construction that required a

8    type of shielding door, so based on this whole embodiment.

9              THE COURT:   Okay.

10             MR. DiGIOVANNI:   The judge rejected that and

11   said, no.   We're going to use the plain and ordinary meaning

12   that has the word while in it.   It requires that rinsing

13   occur while the isolating step occurs.

14             THE COURT:   Okay.   Mr. Chambers?

15             MR. CHAMBERS:   Your Honor, I think I can be

16   really brief here.   First of all, I think we've established

17   that there's only one dispute on infringement of claim 21,

18   and that's the word while, period, just while.   And our

19   proposed claim construction was plain and ordinary meaning.

20   Theirs was that you need the trap door, and it's true in the

21   specification, the trap door is a preferred embodiment.   And

22   we said that, no, you don't have to have a trap door.   You

23   can also isolate it while you're doing the rinsing by

24   removing the cup from the drink machine.   We said there was

25   a second way of doing that in the specification.   So that

1      was our position.  You didn't need a trap door.  You could

2      satisfy the while by removing the cup from the drink

3      machine.

4                  And so Judge Sleet, and they argue, no, you

5      can't do a while by removing the cup from the -- from the

6      machine, and you can see what Judge Sleet determined.

7      That's essentially it.

8                  THE COURT:  All right.

9                  MR. DiGIOVANNI:  Can I point to just one more

10     slide, Your Honor?

11                 THE COURT:  Sure.

12                 MR. DiGIOVANNI:  I think it would be helpful.

13     They said this in their brief and Mr. Chambers said it just

14     now, that there's this second way to do it in their patent

15     that doesn't have a hinged door.  It's just not -- it's not

16     supported by the patent specification.

17                 The language they cited and that Judge Sleet

18     quoted is the part in yellow at the bottom where it says,

19     the cup may then be removed from the drink machine.  The

20     very next line is, next, the hinged doors are closed and

21     rinse fluid is directed.  So there's only one embodiment.

22                 THE COURT:  Why is that relevant to what's

23     before me though?

24                 MR. DiGIOVANNI:  It's not directly relevant.

25                 THE COURT:  Okay.

1          MR. DiGIOVANNI:  But it certainly corrects what

2    they said in their brief.

3          THE COURT:  All right.

4          MR. DiGIOVANNI:  And what they said right here.

5    And I think it reflects that the cup may then be removed

6    from the drink machine.  That statement itself, that's not

7    what isolating is all about.

8          THE COURT:  Okay.  Do you want to quickly hit

9    the next one?

10          MR. CHAMBERS:  Yes.  That would be the '150

11   patent.  And so the '150 patent, this is the one with the

12   rinse chamber, Your Honor.  And the prior art for that was

13   open, so if you tried to do rinse, it would splash all over

14   the place.

15          So we're asserting claim 15 of that patent, and

16   the only disputed claim limitation on this one that I know

17   of is the rinse chamber in the mixing machine.

18          So at the Markman hearing, Judge Sleet adopted

19   our proposed construction of rinse chamber to mean an

20   enclosure in which a rinse apparatus is positioned to

21   provide rinsing.

22          So if you look at their machine, the MIC2000,

23   the BIC3000, they both have an enclosure in which a rinse

24   apparatus is positioned to provide rinsing, and I put in

25   arrows on the slide to show what defines enclosure.  You

1    have the door there.  You have these side panels of the door

2    assembly.  At the bottom you have the wash chamber and

3    drain.  That's where the rinse nozzles are located.  They

4    come up from the bottom and they shoot upward towards the

5    splash shield, and that's actually a very key invention of

6    Mr. Farrell, is pre-positioning the rinse nozzle so they hit

7    the top, or, excuse me, the bottom surface of the splash

8    shield.

9            So the rinse nozzles are on the bottom, and then

10   on the top you have the splash shield defines enclosure.  So

11   they have the enclosure that meets the limitations of the

12   claim, which is that it has an entrance in the door moveable

13   to a closed position cover in the entrance.

14           So they have a structure in all of their accused

15   blenders that matches Judge Sleet's claim interpretation and

16   the requirements of the claim.

17           So what is their defense here?  Their defense is

18   that, well, we now added to our rinse chamber this

19   retractable partition that can go up and down.  We put

20   something else inside that can move up and down.  And so the

21   law is actually very clear on this, that if you have all of

22   the elements of the claim, in this case, the door, the side

23   panels forming the enclosure, simply by adding more

24   structure, that does not avoid infringement, and that's the

25   A.B. Dick case we cite.

1            So, again, what their argument is during the

2    claim construction, they argued that the enclosure must be

3    separate from the splash shield.  The rinse fluid must be

4    confined in the chamber, and so their argument is, well, we

5    put in this new retractable partition, and it wouldn't meet

6    these proposed claim limitations of ours, so -- and Judge

7    Sleet rejected it.  He said, no.  The claim is does not

8    require that.  So what they're doing, they are just trying

9    to reargue the point.

10            THE COURT:  Right.  I get it.  Anything else

11    specific?  No?  All right.

12            Defendants?

13            MR. DiGIOVANNI:  So, Your Honor, just as the 622

14    motion, we don't infringe because we don't do the rinsing

15    while the isolating step occurs.  Here, we do not have a

16    rinse chamber.

17            THE COURT:  You know, go back to the plain and

18    ordinary meaning.  Let's just go back to claim 21 for a

19    second.

20            MR. DiGIOVANNI:  Sure.

21            THE COURT:  The rinsing, when is the rinsing

22    taking place?

23            MR. DiGIOVANNI:  In the accused product?

24            THE COURT:  Yes.

25            MR. DiGIOVANNI:  In our accused product, the

1   rinsing -- I actually have a video I could play, but the

2   rinsing takes place after someone removes the cup from the

3   machine.

4                    THE COURT:  Right.

5                    MR. DiGIOVANNI:  It has to.  It's in the way.

6   The cup with the milkshake in it that has just been blended,

7   it's in the way of the whole rinse nozzle and the rinse

8   container.  You have to move it out of the way.

9                    THE COURT:  Isolate it.

10                   MR. DiGIOVANNI:  You have to do that.  You have

11  to --

12                   THE COURT:  It's occurring while you're

13  isolating.

14                   MR. DiGIOVANNI:  The rinsing?

15                   THE COURT:  Yes.

16                   MR. DiGIOVANNI:  No.  We would say no.  We

17  would say no, Your Honor.  The isolating, and I have a slide

18  where they -- what they point to is isolating, and they have

19  a -- they say in this case -- can you go to slide 10?  Thank

20  you.

21                   This is in response to our -- we cite case law

22  that says you have to have an active step and this is in

23  footnote three of their reply brief.  They say, defendants

24  argue that isolating must be construed as an active step,

25  and their response is, well, in this case, the user is

1    actively removing the cup with their hand from the accused

2    blenders to isolate it from there.  Well, if the active

3    removing is isolating, because the word is isolating in

4    there.  Rinsing isn't happening.  The rinsing is not

5    happening at that point.  The rinsing does not happen until

6    after the isolating occurs, not while it's being isolated.

7    While -- after -- I'm sorry.  The rinsing does not occur in

8    our product, in our blenders, all the blenders until after

9    this step of isolating occurs.  It does not happen while it

10   occurs.

11           THE COURT:  Is this in the briefing?  I mean, is

12   there a trigger mechanism when you remove the cup that

13   switches on the rinsing, if you know?

14           MR. DiGIOVANNI:  I know.  I just wonder if it's

15   in the briefing.  It's the safety door.  You can see the

16   handle on the right there.  There's little magnets.  You can

17   actually see them.  There are two different mechanisms,

18   safety mechanisms.  Open that door up, those magnets unclick

19   and now nothing can happen, so someone can reach their hand

20   in there and you are going to be safe.

21           Not only that, but there's a sensor behind where

22   the milkshake would be to sense if the milkshake is still

23   there, because if the milkshake gets somehow stuck into the

24   washer over here, you're going to make a big mess.  There's

25   a double sensor, double safety mechanism.  You pull that

1    milkshake out, okay, close the door.  The sensor senses

2    there's nothing there.  Then, only after that happens, after

3    that happens, not while, our wash chamber mechanism, the lid

4    on the wash chamber mechanism comes down over the nozzle and

5    then you see spraying.  Actually, you see the spraying going

6    on on the right.  So it's sequential in ours.  The isolating

7    step is not happening while the rinsing is happening.

8                  THE COURT:  All right.

9                  MR. DiGIOVANNI:  Okay.  Back to --

10                 THE COURT:  Yes.  Go back.

11                 MR. DiGIOVANNI:  Okay.  And I guess one last

12   thing, Your Honor, just before I leave the '662.  Remember,

13   this is all about a method for rinsing a splash shield on a

14   mixing machine, so if their contention is somehow somebody

15   takes this away and that counts as part of the isolating, we

16   disagree.  There needs to be that active step of isolating,

17   and that's our -- our argument does not hinge on that, but

18   that's additional reinforcement for that concept.

19                 THE COURT:  All right.

20                 MR. DiGIOVANNI:  If we can go back to slide 19.

21   Let's go to 19.

22                 Okay.  Yes.  So the accused products don't

23   infringe because we do not have a rinse chamber having a

24   door.  Okay.  Judge Sleet did defines rinse chamber and

25   we're abiding by that and there's no complaint about that

1   whatsoever.  But the rinse chamber has to have a door.

2   Okay.

3          The plaintiffs construct an ad hoc enclosure

4   that they point to.  They say, aha, that's your enclosure.

5   That's your rinse chamber.  But there's a problem with that,

6   three problems with that.  It's not an enclosure.  Okay.

7   It's not a rinse chamber having a door, and it's certainly

8   not suitable for rinsing.

9          Now, so just as a summary, the accused products

10  have a wash chamber without a door, and on the accused

11  products, the door assembly is immaterial to rinsing.

12         So let me get to these points quickly.  Claim

13  language we've already seen, requires that there be a rinse

14  chamber having an entrance and a door moveable to a closed

15  position covering the entrance.  Okay.  And there's no

16  dispute, whatever it is that's being pointed to as a rinse

17  chamber has to be, has to have a door.  And then Judge

18  Sleet's construction is below.  Rinse chamber is construed

19  to mean an enclosure in which a rinse apparatus is

20  positioned to provide rinsing.  Okay.

21         So that was my video.  I won't play the video to

22  save time unless Your Honor wants to see it.  Okay.

23         Here are stills of the video.  This is a view of

24  our wash chamber, I will call it, in which rinsing does

25  occur.  The safety doors are taken off here so you could see

1   it better.  So is the top sort of -- the control panel, so

2   you can see what's going on.

3           So our wash chamber is that cylinder with the

4   lid and the cylinder and it comes down and it comes down.

5   In the left position it's down, and you can see there's

6   water.  That's rinsing going on.

7           That would be the natural thing for them to

8   accuse, ah, there's your rinse chamber.  The problem is it

9   doesn't have a door, so they can't accuse that.  So they

10  don't accuse that as being the rinse chamber.  There's no

11  door.  That would clearly, absolutely not infringe, so they

12  don't even bother with that.  Instead they have to

13  construct, and this is where their expert says, I don't see

14  a door on that.  So there's no dispute there's no door on

15  our cylindrical wash chamber.

16          So, and, again, here is -- this is just -- this

17  is their brief talking about -- yes.  I think we can skip

18  over some of this, Your Honor.  I'm just looking to save

19  some time here.

20          THE COURT:  Yes.  This is repetitive.  You've

21  got a door.

22          MR. DiGIOVANNI:  Yes.  There's no door.

23          THE COURT:  I'm sorry.  Right.

24          MR. DiGIOVANNI:  That's right.  There is no

25  door.  That's right.  So what do they do?  They have to find

1    something in order to accuse us of infringing the door.

2    There's only one door on that machine and it's that safety

3    door.

4             So they say, okay.  That's your door, and then

5    once they do that, they have to then figure out, well, what

6    are we going to now accuse as the rinse chamber?  So they

7    kind of -- they construct one and this is both their opening

8    and reply brief and it actually says the same thing on the

9    slide we just saw from Mr. Chambers.  They say, the

10   enclosure is defined by the door, the door assembly side

11   panels, which are these clear panels that kind of look like

12   a door.  There's no handle and they don't open or close.

13   And then they say the wash chamber/drain.  Presumably,

14   that's the bottom of it.  And then the splash shield.  They

15   say, aha, that's your enclosure and that's your rinse

16   chamber.  That's what they say.

17            So that's their infringement contention.  They

18   say that, Hamilton Beach, that is your enclosure and that is

19   your rinse chamber.  But here's what looks like it if you

20   put it into graphical.  The enclosure is defined by -- the

21   left may be the most clear, Your Honor.  It's the door and

22   then you have the left and right clear panels, and then you

23   have the splash shield, which is defined as the lid, which

24   moves up and down, and then they say, the wash

25   chamber/drain, which is depressed a couple inches

1    underneath.

2              How is that an enclosure?  It's not, Your Honor.

3    That's sort of a mishmash of parts, makeshift, cobbled

4    together components, but in no way is that an enclosure let

5    alone a rinse chamber with a door.

6              So that is their allegation.  They say, that's

7    your enclosure, that's your rinse chamber.  We say, no, it's

8    not even an enclosure, and it's certainly not a rinse

9    chamber.

10             So --

11             THE COURT:  Can the mixing occur when the door

12   is open?

13             MR. DiGIOVANNI:  Oh, no, Your Honor.  Safety.

14             THE COURT:  Yes.

15             MR. DiGIOVANNI:  There's a two safety mechanism

16   lockout.  That cannot happen.  Once that door is open, I

17   understand it's an electrical lockout.  Nothing else can

18   happen.

19             But it's important to note sort of to understand

20   this functionally, and on the right this explains it.  The

21   safety door doesn't even catch water.  It doesn't get

22   splashed on and neither do the left and right panels,

23   because our rinsing is happening -- it's happening all in

24   that cylinder.  So that would be the natural thing to say,

25   hey, there's your rinse chamber, because that is our wash

1    chamber I will call it just to distinguish the two.   There's

2    no door on it.   So they had to scramble and they come up

3    with this sort of a makeshift -- makeshift chamber.   That's

4    not a chamber.   I mean, you have a disk on the left.   I

5    tried to make a PowerPoint.   That moves up and down.   That's

6    the top?   That doesn't make any sense.   That's not an

7    enclosure.

8                    THE COURT:   Okay.

9                    MR. DiGIOVANNI:   I think I said that.   This is

10   just showing you that it's not just me saying that.   Our

11   expert did the same thing, did the analysis and said, that's

12   not consistent with the structure and operation of the

13   accused product.   He points it out.   Comes up with, he says,

14   you know -- this is a different point.   But I mean, he says

15   that's not -- what they're accusing he said is not a rinse

16   chamber.

17                   THE COURT:   All right.

18                   MR. DiGIOVANNI:   Okay.   And this is sort of --

19   one of my final points is, you know, another reason that

20   last limitation talks about the nozzle being within the

21   chamber.   I mean, I'm not a hundred percent clear what

22   they're accusing is the chamber, because what they pointed

23   to is certainly not a chamber, but these are recessed pretty

24   significantly below that.   That wouldn't even be part of

25   some kind of chamber.

1          And as I stated already, you know, these outer

2      safety doors and pans, they have nothing to do with rinsing

3      in any event if we're talking about bigger picture about

4      what they are actually accusing just to demonstrate that, in

5      fact, their read is quite a stretch.  This goes to that

6      point, Your Honor.  Thank you.

7              THE COURT:  Thank you.

8              MR. CHAMBERS:  Your Honor, I can be real brief

9      here.  There's only one element in dispute for this claim,

10     which is the rinse chamber, and if you look at Judge Sleet's

11     construction, an enclosure in which a rinse apparatus is

12     positioned to provide rinsing.  It also in the claim

13     mentions a door moveable in an entrance.

14              THE COURT:  Can I ask you --

15              MR. CHAMBERS:  Go ahead.

16              THE COURT:  The rinse chamber in their product,

17     is it the cylinder?

18              MR. CHAMBERS:  That's added to the enclosure.

19     Now, remember, in the prior technology you just had it

20     opened where you didn't have any sort of enclosure

21     whatsoever, and the water would be splashing all over the

22     place.  So part of the invention was coming up with the idea

23     of having an enclosure so you don't have water splashing all

24     over the place with a door.

25              So this meets the literal -- the literal

1    language of the claim and also the concept, which is having

2    an enclosure within which to contain the water.

3            So let me give you an analogy here, which would

4    be a shower room.  So a shower room in Judge Sleet's

5    construction is an enclosure in which a rinse apparatus is

6    positioned to provide rinsing.  So you could describe a

7    shower room with that.

8            So what they've done is they put in shower

9    curtains in the shower room and they said, okay.  We no

10   longer have a shower room because we put a curtain in the

11   shower room to restrict the water.  Well, it still meets the

12   definition of shower room because you've still got an

13   enclosure with a rinse apparatus positioned to provide

14   rinsing.

15           So, again, the structure is not in dispute.  We

16   only have one claim element.  It really is getting back to a

17   claim construction dispute, but the Court can make its own

18   determination about whether they have a door and an

19   enclosure.

20           THE COURT:  Okay.  All right.  There was a third

21   thing you had real quick?  No.  Mr. Flynn, you were dealing

22   with that.  Did you already deal with that?

23           MR. FLYNN:  Your Honor, the only other one in

24   addition to the public use which we discussed is we did have

25   a final summary judgment on no invalidity of the '662 patent

1   based on any admissible prior art.  The Court has now struck

2   all of their prior art for the '662 patent, so we would ask

3   for summary judgment on that.

4            THE COURT:  Do you challenge that now that I've

5   ruled on Sato?

6            MR. FOSTER:  As far as prior art goes, that's

7   right, Your Honor.

8            THE COURT:  All right.  Then the defense, do you

9   want to present argument on your summary judgment motion at

10  all?

11           MR. DiGIOVANNI:  Yes Your Honor.  Thank you.

12           So this one, Your Honor, we've talked about a

13  bit earlier in the context, the '658 patent.  We've talked

14  about it in the context --

15           THE COURT:  Can I ask you incidentally --

16           MR. DiGIOVANNI:  Yes.

17           THE COURT:  -- how these patents work?  You

18  know, if one or two patents is taken out of the case, what

19  is do it really do?  What's the effect?

20           MR. DiGIOVANNI:  If one or two are taken out of

21  the case?

22           THE COURT:  Are taken out of the case, yes.

23           MR. DiGIOVANNI:  It's all case specific, but in

24  terms of this case, the '377 --

25           THE COURT:  I meant this case.

1       MR. DiGIOVANNI:  The '377 has expired, so I'm

2  not sure why it's in it.  I'm not the damages person in this

3  case, but as I understand it, there's no damages even being

4  alleged based on '377.

5       MS. SILVERSTEIN:  Well, it affects our damages

6  calculations.  Their expert has said that it has no value to

7  their damages case.

8       THE COURT:  Do you agree with that?

9       MR. CHAMBERS:  Do you want to address that?

10      MR. FLYNN:  Your Honor, I think both experts

11 analyzed the '377, but I agree that any damages implications

12 on the '377 are fairly minimal.

13      THE COURT:  Okay.

14      MR. DiGIOVANNI:  And it's expired, so there's no

15 injunction.

16      THE COURT:  Right.

17      MR. DiGIOVANNI:  So it seems not to have purpose

18 in this case.

19      THE COURT:  All right.

20      MR. DiGIOVANNI:  And another thing is, Your

21 Honor, as we had -- well, anyway, that one stands alone in

22 that it has a different priority date, a different

23 specification, and the other three stand, are together as a

24 group because they're all based on the '150.  So '377 does

25 stand out.  So I hope that addresses your question in terms

1    of what you do.

2                   THE COURT:  Okay.

3                   MR. DiGIOVANNI:  All right.

4                   THE COURT:  Go ahead.

5                   MR. DiGIOVANNI:  So '658, Your Honor.  The '658.

6    As you'll recall, that's the patent and this is our motion

7    for summary judgment of noninfringement on the '658.

8                   Okay.  So we're going to focus on for

9    noninfringement, but we thought we would focus on the two

10   limitations that we talked about in terms of no DOE, and

11   that would be the unrestrained limitations.  I say plural

12   because there are a couple of claims asserted, so they're

13   slightly different but not materially that it would affect

14   this motion.

15                  Unrestrained limitations and the sufficient mass

16   limitations.  A quick summary even again.  This all is about

17   the splash shield.  Okay.  And the splash shield, now that

18   we're getting familiar with the prop here, the splash

19   shield, agreed upon definition, is the lid.  Okay.  The

20   black part.  That's the lid.  We certainly say it's the

21   black part.  It's all about the splash shield, and it has to

22   do two things that are independent of each other.  The

23   splash shield has to be unrestrained against sliding

24   movement on the shaft away from the opening, so up and

25   down, axial.  And the splash shield has to have sufficient

1     mass to retain the cup within the cup holder.  We talked

2     about that.  I don't need to repeat that.

3               THE COURT:  All right.

4               MR. DiGIOVANNI:  Unrestrained, we'll go with

5     unrestrained first.  In both claims, they're precisely the

6     same because the parties have agreed upon a construction as

7     to what unrestrained means in both claims, both claims 1 and

8     6.  Those are the two independent claims.

9               Unrestrained means at the bottom without any

10    other mechanical means of restraining the upward sliding

11    movement of the splash shield on the shaft apart from the

12    mass or the weight of the splash shield itself.  Okay.

13              That construction is particularly important

14    because there's an implication within it that, in fact,

15    weight is a mechanical means.  Okay.  Without any other

16    mechanical means of restraining the upward sliding on the

17    shaft apart from the mass or weight of the splash shield

18    itself.  Okay.

19              Now, that comes up a little bit later when we

20    talk about what we -- this is going to the patent.  This is

21    the embodiment of the patent.  It's the floating splash

22    shield by itself.  No weights, no springs, nothing.  No

23    friction.  There's no bearings it's dealing with.  This is a

24    floating splash shield.  Okay.

25              In the accused product our lid is restrained two

1    different ways.  One by that additional weight, holding up

2    this for the record.  Restrained number one by the

3    additional weight.  And, number two, by the friction force,

4    friction that results between three different things.

5    You saw in some of those other videos -- let me just go to

6    one.

7                There are bearings that grasp the two rods that

8    are above the lid.  Okay.  And there's the -- the blade rod

9    goes through here, and this is called the spindled seal.

10   There's friction in all three of those locations resisting,

11   restraining.  Okay.  So those are the two restraints, means

12   of restraint, mechanisms of restraint, mechanical means of

13   restraint.

14               THE COURT:  If you go back to the drawing of

15   the, I'm going to call it the third or an embodiment.

16               MR. DiGIOVANNI:  Sure.

17               THE COURT:  Right.  How is that lid moving up

18   and down?  That is supposed to be unrestrained.  Isn't it

19   hitting friction on the axle or on something?  No?

20               MR. DiGIOVANNI:  The only thing that causes it

21   to move up and down, it has no -- nothing attached to it.

22   The only thing is the cup that's below it.  When the cup

23   moves up, the lid moves up.

24               THE COURT:  Well, so in rest, point of rest,

25   just down at the bottom there over the blade?

```
 1              MR. DiGIOVANNI:  Exactly.  I think that's
 2   correct.  You see that sort of trapezoidal portion there.
 3              THE COURT:  Yes.
 4              MR. DiGIOVANNI:  It gets caught on that.
 5              THE COURT:  All right.
 6              MR. DiGIOVANNI:  But when the cup is up there --
 7              THE COURT:  Right.
 8              MR. DiGIOVANNI:  When the cup elevator goes up
 9   and it will take it off of that trapezoidal point and lift
10   it up, you know, the side of the length of a cup.  Never
11   does the embodiment have anything else -- have anything else
12   restraining it other than the weight of itself.  It's like a
13   baseball donut or whatever you would call it that's heavy
14   enough to force that, the cup down so it's on the --
15              THE COURT:  Okay.
16              MR. DiGIOVANNI:  So looking at the two different
17   ways, our, the defendants' lid is restrained, the first one,
18   number one here.  It's restrained by the additional weight,
19   attached by rods.  The cast iron weight, you know, the
20   engineers say it's cast iron.  The addition of the weight
21   makes it heavier.  Their expert Maynes says to retain the
22   Hershey cup, that's the cup they use in the machine, in the
23   MIC2000, that's one of our models, the Hamilton Beach --
24   Hamilton Beach places a heavy cast iron guide rod weight on
25   top of its splash shield.  That's what they say.  And in
```

1    their opening brief they say, look, this heavy guide rod

2    weight pushes down on the cup and thermally holds the cup

3    firmly in the cup holder.  There's no doubt that guide rod

4    weight, which is elevated as you saw above the lid, and even

5    if it weren't elevated, the elevation is irrelevant.  It is

6    not the lid, and the construction makes clear that it needs

7    to be the lid, okay, that is unrestrained, and the lid that

8    has sufficient mass.

9              THE COURT:  Okay.

10             MR. DiGIOVANNI:  The same with unrestrained.

11   This is from plaintiffs' answering brief to the motion.

12             The defense, they're putting in is a DOE

13   defense -- not defense.  They're the plaintiff.  But the

14   allegation is not one that, hey, no, no, your lid is heavy

15   enough.  Your lid is unrestrained.  They are using DOE

16   language here.  They are saying, well, the guide rod weight,

17   that's an integrated functional part of it.  That's DOE

18   language.  They are saying, okay.  You don't have -- you

19   don't have the lid, but you've got something that kind of

20   acts like it.  That's DOE language and that's why the DOE is

21   very important to us.

22             THE COURT:  Okay.

23             MR. DiGIOVANNI:  And then this is their

24   answering brief.  Again, DOE language.  They call it a

25   splash shield assembly as a functional unit.  DOE word.

1    They are not even making the literal infringement argument.

2    It essentially, it is a DOE argument, and that's why we

3    argue that.

4              Okay.  Now we go to part two, and this is the

5    friction.  It's really the bushings and the spindle seal as

6    I pointed out.  Those are the three points where friction is

7    occurring.  Those are the three mechanical means that are

8    restraining it.

9              Okay.  Our engineer says, yes, there's several

10   things that would inhibit moving the lid upwards.  The

11   weight would be one.  You'd also have the friction inside

12   the bushings, and you'd have the friction inside the

13   spindle.  This is our engineer.

14             Another engineer says, friction?  Yes, there

15   will be friction.  It would restrict the upward movement.

16   And then we have their own expert.  He says, there

17   theoretically could be minor friction on the guide rods, and

18   he says it's possible that there could be friction in the

19   spindle.  This is his report.  Then at his deposition he

20   says, there's friction.  Of course, there's friction there.

21             And as a sort of footnote to this slide, you

22   know, one of Dr. Maynes', in response to the summary

23   judgment motion, one of his five points of testing in his

24   new report, he does some kind of technical friction test and

25   he says, the friction is tiny.  Therefore, you shouldn't

1    consider it.  I'm paraphrasing it.  I didn't study it to the

2    point where I know it is.  But, again, we have not had a

3    chance to depose Dr. Maynes.  It would be unfair to you.

4    I'm not going to reargue that point, Your Honor.  But at a

5    deposition he says, yes, there's friction.  Of course,

6    there's friction there.

7                 And --

8                 THE COURT:  So you're going to get to put in

9    front of a jury his earlier statement.  Right?

10                MR. DiGIOVANNI:  Yes.

11                THE COURT:  You don't dispute that.  Right, Mr.

12   Chambers?  They get to put in front of the jury --

13                MR. CHAMBERS:  Yes, they get to put in his

14   deposition testimony.

15                THE COURT:  No.  They get to put in his expert

16   report to the extent he had a prior inconsistent statement.

17   Right?

18                MR. CHAMBERS:  Yes, I would say so.

19                THE COURT:  All right.

20                MR. DiGIOVANNI:  The problem is he's going to

21   say, but, yeah, I tested it, and look, it's .0001 Newtons.

22   I'm not sure what it says exactly.

23                THE COURT:  Right.

24                MR. DiGIOVANNI:  But he's going to say that is

25   negligible, and the person -- a person of ordinary skill in

1    the art would consider that to be no restraint whatsoever.

2    It's very different than what we had when we had his

3    deposition in his original report.  All right.  I don't want

4    to belabor that point.

5          So this is something in their answering brief.

6    Not much to say about it except they say that the friction

7    argument is analogous to arguing that gravity is an other

8    mechanical means that restrains the splash field.  Gravity

9    is part of the weight.  Mass plus gravity is weight, so

10   actually gravity plus mass is another mechanical means.  We

11   wouldn't point to gravity, but if there's a mass like there

12   is, gravity acts on that and that is another mechanical

13   means.

14          More about the friction.  Their own Dr. Maynes

15   says before that new testing, but he says in his report,

16   nonetheless, these incidental frictional contacts, so he's

17   conceding there's frictional contacts.  These incidental

18   frictional contacts are not the type of mechanical means

19   that the patent, the patent was designed to avoid.  So he is

20   the one doing claim construction here once again.

21          THE COURT:  Let me just ask you.  I want to ask

22   Mr. Chambers, and I do not have an opinion on resolution of

23   this pending dispute, but for argument's sake, if I've got

24   Hamilton Beach's expert says the -- let me see.  Hamilton

25   Beach's position is the lid is restrained by friction.  Is

1    that correct?

2                MR. DiGIOVANNI:  As well as --

3                THE COURT:  As well as the weight.

4                MR. DiGIOVANNI:  As well as the weight, correct.

5                THE COURT:  And they've got an expert who

6    supports that he says.  And then I've got Maynes.  And I

7    look at Maynes' opening report and it's consistent entirely

8    with that.  And then I've got -- just hear me for argument's

9    sake.  I'm not saying I concluded that.  But if I accept his

10   expert and I say that's right, but then I've got Maynes

11   takes a subsequent different position, and let's say that

12   the subsequent position he takes is the only arguably

13   disputed factual assertion.  Can't I just grant summary

14   judgment for the defendant at that point because I've got

15   really undisputed fact that it's too late for him to make it

16   up?

17               MR. CHAMBERS:  Let me just read from his report.

18               THE COURT:  Just answer the question.  I'm

19   asking a hypothetical question.  I will let you argue all

20   you want.

21               MR. CHAMBERS:  Okay.  So the answer is he's now

22   taking a different position.  It's not the case.

23               THE COURT:  Okay.  All right.  Well, actually,

24   that's helpful.  So your position would be that I need to

25   interpret his subsequent report consistently with what his

1    opening report said?

2              MR. CHAMBERS:  Yes.  They're both consistent,

3    I'd agree with that.

4              THE COURT:  Okay.

5              MR. CHAMBERS:  Yes.

6              THE COURT:  All right.

7              MR. DiGIOVANNI:  Okay.

8              THE COURT:  Mr. DiGiovanni, if that's the case,

9    then do you really have to worry about his testimony?

10             MR. CHAMBERS:  Again --

11             THE COURT:  I was asking Mr. DiGiovanni a

12   question.

13             MR. DiGIOVANNI:  Do I have to worry about --

14             THE COURT:  In other words, he says he's going

15   to come in and put up these numbers, but he has an estimate

16   that's definitive there.

17             MR. DiGIOVANNI:  We absolutely have that, but he

18   is going to come in and say, yeah, since that time I've gone

19   out of the laboratory and I've done this and that.  Look at

20   these wires, look at my photos doing that, and I used this

21   calorimeter, whatever he used.  I mean, he comes up with

22   this testing protocol that, you know, we certainly don't

23   agree with.  We haven't had him tested on it.  We didn't

24   take his deposition.

25             THE COURT:  But your point, am I right that

1    you're saying this excerpt from Maynes' opening report

2    supports your summary judgment argument?

3              MR. DiGIOVANNI:  Yes, it does.

4              THE COURT:  All right.

5              MR. DiGIOVANNI:  Yes.

6              THE COURT:  And so if I find that, I'm being

7    told by Mr. Chambers that the subsequent report is entirely

8    consistent with this?

9              MR. DiGIOVANNI:  You are being told that and I'm

10   willing to accept that stipulation, but I'm worried about

11   him on the stand showing his --

12             THE COURT:  But I'm on summary judgment now.

13             MR. DiGIOVANNI:  Yes.

14             THE COURT:  All right.  Do you have anything

15   else you want to add?

16             MR. DiGIOVANNI:  I think there are a few more

17   Your Honor.  A few more slides that would be worthwhile.

18             So we were talking about friction.  I think we

19   end friction.  Oh, get to DOE.  I think maybe I don't have

20   any more, Your Honor.

21             THE COURT:  All right.

22             MR. DiGIOVANNI:  I'm sorry.  Can I just check

23   how I concluded that?  I didn't get to sufficient mass, Your

24   Honor.  I actually did not get to my sufficient mass slide.

25   I will start at 51, please.

1                      So I can go through this quick.  Just like we

2      don't have unrestrained, that lid by itself, which is what

3      the claim construction requires, claim construction calls

4      the splash shield is a lid, they have no proof, they've put

5      nothing forth to show that the splash shield is sufficient

6      to retain the cup into the cup holder.  Completely failed

7      proof on that.  So there's nothing that they have.

8                      THE COURT:  Because they have not isolated the

9      weight you would say?

10                     MR. DiGIOVANNI:  They have not done that, that's

11     correct, and they have not even suggested doing that.

12     Instead they are saying, I think they're still saying you

13     look at all of this stuff against the DOE argument.

14                     THE COURT:  All right.

15                     MR. DiGIOVANNI:  Yes.  They have not isolated it

16     or done the math.  I don't think he did it any new testing.

17     No, okay.

18                     THE COURT:  All right.  That's a pretty quick

19     argument.

20                     MR. DiGIOVANNI:  Yes.  See, here they point to

21     the assembly in sufficient mass.

22                     THE COURT:  All right.

23                     MR. DiGIOVANNI:  Then we go to DOE.  I think

24     that's it, Your Honor.

25                     THE COURT:  All right.

1           MR. DiGIOVANNI:  Except there is one last one,

2    slide 58.  This is five seconds.  There's also this other

3    claim 5.  I'm not sure whether you are still maintaining

4    that.  That's about the five pounds.  So I do have a slide

5    on that if Your Honor wants to see slide 58.  That is,

6    there's no material -- we can't possibly infringe this

7    claim that says the splash shield is approximately five

8    pounds.

9           Here is showing somebody weighing the thing and

10   it's 527 grams.  That's 1.6 pounds.  The Dairy Queen version

11   on the right is only half that weight.  It's only half a

12   pound, yet they are still alleging, they are still bringing

13   this claim against us that says the splash shield has to be

14   half a pound.  So we would urge --

15           THE COURT:  Okay.

16           MR. FOSTER:  We would urge noninfringement on

17   all of the '658 claims, Your Honor, based on sufficient mass

18   and unrestrained limitations.

19           THE COURT:  All right.  Thank you.

20           Mr. Chambers?

21           MR. CHAMBERS:  So here, let me go back to the

22   point I made earlier.  Remember, the prior art had springs

23   to keep the splash shield down or to have the motor to keep

24   it down.  So Mr. Farrell's invention was the idea of

25   weighted splash shield with free movement up and down.

1    That's the essence of his invention, and I think that is

2    shown.  Let's see.  Here we go.

3              Yes.  You can see it here.  And to answer Your

4    Honor's question, yes, there can be friction there also when

5    that splash shield is moved up and down.  If that gets

6    misaligned somehow, there is going to be friction against

7    the spindle.

8              So, you know, for one of ordinary skill in the

9    art, what mechanical means is in the context of this

10   invention is what was being distinguished when the

11   prosecution was made in Patent Office, which is, no, we're

12   not going to do springs, no, we're not going to do motors.

13   We have a different approach of a weighted splash shield

14   that moves freely up and down.  So that is the invention.

15             So let's go to the sufficient mass first.  So if

16   they're not going to do sufficient mass, why do you put a

17   heavy cast iron weight on top here?  That screams out and to

18   the jury right there, that's the big question for the jury.

19   If you are not using Mr. Farrell's patented invention, why

20   do you put this heavy weight on top -- and you can see from

21   the way I'm holding it, that this is an integrated unit,

22   that this is an integral structural part of this unit and a

23   very integral functional part.  That's something that the

24   jury can look at and they can decide whether this weight has

25   anything to do with keeping the splash shield down so that

1  the cup is not spinning around.  And when they say that,

2  well, they have not shown that it doesn't move around, well,

3  we actually have.  They showed it in their own videos, and I

4  think I may have that here also.

5            Yes.  Here it is.  In their videos, when they

6  put the, this cast iron weight on top, it solves the problem

7  that they were having earlier of the cup spinning around,

8  and you can see from the videos, and the jury will be able

9  to see, too, that the cup is not spinning around anymore

10  when you use Mr. Farrell's invention.

11            So, yes.  And then Dr. Maynes, as you can see,

12  put a gauge on the weight here, this unit that I'm holding,

13  and you can see it measured 4.5 pounds, which is

14  approximately five pounds.

15            So let's go to unrestrained.  Still, the key

16  point here is why do you put on this heavy weight if you are

17  not trying to take the invention?  Okay.  Unrestrained.  And

18  let's see.

19            Yes, we discussed the other mechanical means,

20  which were the springs and the motors and the nature of

21  his invention and the fact that there could be friction

22  there.

23            And so what about the Hamilton Beach device?

24  Let's work in the real world now instead of the theoretical

25  physics world.  Hamilton Beach technical specifications

said, the shield assembly must move freely up and down with no binding.  All right.  Move freely.  I can cross-examine Dr. Slocum on that.  Is moving freely restrained or unrestrained?

Two, Hamilton Beach's design engineer, Mr. Branson, testified that design for that assembly has always been for it to fall under its own weight.  Free movement, unrestrained.

Dr. Maynes, there he is right there in the picture.  He tested it and moved it up and then dropped it and he found no discernible friction.  This is the real world.  It's free moving in the real world.

And then so incidental friction.  Again, as Dr. Maynes testified in his declaration, one of skill in the art would not consider that an other mechanical means.  What was referred to there is what was the prior art before the Patent Office that was being distinguished.

And so let me read what Dr. Maynes said in his report because we keep referring to it, and this is on page 57 of his opening report.

He says, although there theoretically could be minor friction on the guide rods holding Hamilton Beach's cast iron weight that may inhibit unrestrained upward movement of Beach's splash shield during mixing, Hamilton Beach's engineers freely acknowledge that the purpose of the

splash shield design has always been for it to fall under

its own weight, citing Branson and Williams' deposition.  To

accomplish that objective, Hamilton Beach uses lubricious

materials from the seals and bushings coming in contact with

Hamilton Beach's spindle and guide rods.  It's also possible

there could be friction between f'real's rotatable spindle

and f'real's weighted splash shield that could inhibit the

unrestrained upward movement of f'real's waited splash

shield.  Nonetheless, these incidental frictional contacts

are not the type of mechanical means, e.g., springs, gear

assemblies, to hold down the splash shield that the weighted

f'real splash shield was designed to avoid.

            Within the context of the '658 patent disclosure

and the real world, Hamilton Beach has plainly appropriated

f'real's invention of a splash shield having sufficient mass

that is unrestrained as it moves upward during the mixing

process.

            THE COURT:  All right.  Thank you.

            All right.  Those were helpful.  I mean, I've

got to really do a deep dive now into the briefs and I will

just try to move as fast as I can.

            MR. DiGIOVANNI:  We did have one more

noninfringement motion, the '377 patent.  That's the

patent --

            THE COURT:  That expired.  Okay.  Go ahead.

1    Sorry.

2              MR. DiGIOVANNI:  I don't have to, Your Honor.  I

3    guess they withdraw it.  They withdraw their motion.

4              THE COURT:  Actually, what's the position on the

5    '337?

6              MR. CHAMBERS:  Yes.  We can put on a

7    presentation.  We obviously curtailed ours because this has

8    been going on for five hours now.

9              THE COURT:  Yes.  I think I've heard enough.

10             So on jury instructions and voir dire, you

11   submitted the Word versions.  Is that correct?

12             MR. FOSTER:  Yes, Your Honor.

13             THE COURT:  Both sides?

14             MR. FLYNN:  We had, Your Honor.  We submitted

15   joint instructions.  We're going to perhaps need to modify

16   those.

17             THE COURT:  I expect that.

18             MR. FLYNN:  As being part of the case.

19             THE COURT:  And, yes.  You know, we'll get to it

20   as soon as we can.

21             So the trial is scheduled to begin a week from

22   Monday.

23             MR. FLYNN:  Two weeks from Monday.

24             THE COURT:  Two weeks.  Well, that's good.  All

25   right.  So we're doing willfulness, so we'll plan on

1    eleven-and-a-half hours each side.  I think that's

2    sufficient.  And I've already explained how we'll move --

3    how we'll time it rather.

4              Anything else?

5              MR. DiGIOVANNI:  Just on that '377 patent.  Just

6    to let you know, there are slides in my deck.

7              THE COURT:  Oh, that's fair enough.  Frankly, I

8    will probably look at them.  In fact, Mr. Flynn, were you

9    going to do the '377 argument?

10             MR. FLYNN:  I'm sorry?

11             THE COURT:  Were you doing the '377 argument?

12             MR. FLYNN:  No.

13             MR. CHAMBERS:  No.  I hate to be a hog here,

14   Your Honor.  I was planning on doing it.  We do have slides

15   in our deck.

16             THE COURT:  Do you want to bring them up?

17             MR. FLYNN:  Yes.

18             MR. DiGIOVANNI:  Ours are part of our master

19   deck.  Slide 59 through the very, which is -- that is not

20   the very end.  Through 69.

21             THE COURT:  Okay.  We'll start picking the jury.

22   They come up at 9:30.  I get here at 9:00 on Monday morning.

23   I'm going to seat the jury and so far every jury has done

24   it.  They again at 8:30 and we cruise.

25             MR. FLYNN:  Your Honor, if I could just get one

1    clarification with respect to the Daubert motion with

2    respect to Dr. Maynes.

3                THE COURT:  Yes.

4                MR. FLYNN:  I understand that the evidence that

5    he cites, you want that coming in through a precipient fact

6    witness regarding commercial success.

7                THE COURT:  Yes.  I mean, I wouldn't mind

8    hearing where you're coming from on that.  I read that

9    affidavit.  I thought there were gratuitous, you know,

10   references to how greedy these people are.  I don't know how

11   anybody thought that would come in.  He's an infringement

12   guy.  Why is he talking about all of the sales revenue

13   numbers, and then even in the response brief you all

14   basically said, yes, he's reciting undisputed facts.  I

15   mean, it didn't seem necessary to his opinions.

16               MR. FLYNN:  Your Honor, I only ask --

17               THE COURT:  I'm inviting you if you want even

18   though I've already ruled to maybe tell me in 30 seconds,

19   what's the point?

20               MR. FLYNN:  Your Honor, it's relevant to the

21   secondary considerations of nonobviousness where he's

22   discussing the commercial success of the products.

23               THE COURT:  Right.  But he's a mechanical

24   engineer.  How does he offer opinions about that?  That

25   seems economic or it seems a factual issue.

1          MR. FLYNN:  I understand, Your Honor, but he's

2    also offering opinions about copying, which go to

3    willfulness, which we didn't really address because we

4    thought it was out.

5          THE COURT:  But I don't have a problem if he

6    says, I'm looking at this device and I compare this device

7    to the accused device and they're the same.  I get that.

8          MR. FLYNN:  Right.

9          THE COURT:  But his paragraphs in question went

10   to the state of mind and the intent to copy and that seems

11   to me clearly precluded by the law from coming in.  And so I

12   did not mean to suggest by the opinion that he can't look

13   at a device and compare it to another device.  I mean, he

14   can do that.  I don't think you would reject that.  Would

15   you?

16         MS. SILVERSTEIN:  I want to just note on the

17   record, he doesn't do that in his report.  We would object

18   to it on that basis.

19         THE COURT:  So if he didn't do it in his report,

20   then he can't do it.

21         MS. SILVERSTEIN:  Yes.  If he had in his report

22   something where he was comparing our machine to the f'real

23   machine, we would have no objection.  He has no opinion of

24   that in his report.  He compares to the claims.  That was

25   all briefed.

1        THE COURT:  Right.

2        MR. CHAMBERS:  Your Honor, let me mention, with

3    regard, he does testify on obviousness, which is important

4    on validity since they are challenging these patents on

5    obviousness.  And you have the Graham versus John Deere test

6    for the scope and content of the prior art, level of

7    ordinary skill in the art, the differences, and then the

8    fourth factor, which the Federal Circuit has said is often

9    the most probative, is secondary considerations, such as

10   commercial success and copying.

11       THE COURT:  But what's his specialized

12   knowledge?  I didn't see anything.  He's a mechanical

13   engineer.  Commercial success you need an economist or you

14   need -- and, frankly, you don't even need an expert.  You

15   can just introduce the sales figure and make a legal

16   argument.

17       MR. FLYNN:  Your Honor, the issue is we need

18   somebody to tie the f'real patents to the commercial,

19   f'real's commercial embodiment.  Somebody needs to do that

20   nexus analysis.  He discusses that in his report, that

21   they do embody the f'real commercial product, that they

22   copy, embody the f'real patents.  And you have to have that

23   nexus.

24       THE COURT:  Wait a second.  Go ahead.

25       MS. SILVERSTEIN:  I would dispute that.  He

1    specifically testified that in the deposition he did not

2    perform an analysis of whether the commercial success goes

3    to each claim, and that's the nexus that is required for

4    obviousness and he didn't do that.  He said during the

5    deposition, I did not look and see what success went to

6    claim 21 of the '662, what goes to these two.

7              THE COURT:  Right.  Here's where I am.  I

8    invited it.  I'm tired.  It's five of 6:00.  I appreciate

9    you, Mr. Flynn, making the arguments.  I'm going with my

10   ruling, but anyway.  So you want clarity?

11             MR. FLYNN:  Your Honor, all I wanted clarity was

12   he won't -- that evidence won't be introduced to him,

13   through him, but to the extent we have it introduced through

14   other witnesses, can he still say, I can rely on these

15   things to demonstrate their copying of the f'real product?

16             THE COURT:  I think copying is an intentional

17   thing.  He can say -- I mean, that to me goes to intent.

18   Unless you've got a case that tells me copying is something

19   else, copying is -- I look at this and I go and I make

20   something to copy this.  That's an intentional act it seems

21   to me, and if you want to -- unless you've got a case that

22   says, no, copying is something different, but it seems to me

23   that's state of mind.

24             MR. FLYNN:  But, Your Honor, it's one of the

25   secondary considerations.

1              THE COURT:  So you argue it.  It's called legal

2     argument.  You basically say -- I mean, the way I would do

3     it is I would have factual evidence that says, the accused

4     products copy f'real's products, and I've got evidence

5     through your inventor that says, I came up with this idea

6     and I made this product, which is one of the embodiments in

7     this patent, and then I sold it on the market, and either

8     through this witness or somebody else you say, you know,

9     within a year, it's astounding, a hundred million dollars in

10    sales, something like that.  Right?  You put that in there

11    and that's commercial success.

12              MR. FLYNN:  Okay.

13              THE COURT:  The lawyer makes the argument that

14    that is commercial success and that shows you.

15              MR. FLYNN:  Understood, Your Honor.  I just

16    wanted to make sure we weren't going to be required to have

17    an expert testify about the secondary considerations to the

18    extent that, you know, we needed to do it to show

19    nonobviousness.

20              THE COURT:  I don't think so.  Does the defense

21    think you need an expert to do that?

22              MS. SILVERSTEIN:  I mean, I would argue that

23    they need an expert to show nexus, which their expert hasn't

24    done.

25              THE COURT:  To show a nexus?

1            MS. SILVERSTEIN:  To show the nexus between the

2    commercial success and the claims of the patent that's

3    required under the law, and their expert didn't to that.

4            So at this point I would imagine that is

5    something we would ask for after they rest their case, that

6    they have not shown that burden, but, no, they don't need an

7    expert to show commercial success.

8            Mr. Farrell or whoever from their company can

9    get up and say the numbers of commercial success.  That

10   doesn't require --

11           THE COURT:  All right.

12           MR. FLYNN:  Understood, Your Honor.

13           THE COURT:  Then you're good, I think?

14           MR. FLYNN:  Yes.

15           THE COURT:  All right.

16           MR. DiGIOVANNI:  Just a couple housekeeping

17   matters.

18           THE COURT:  Yes.

19           MR. DiGIOVANNI:  When Your Honor made the ruling

20   on willfulness, witness availability is something we need to

21   check on and then the pretrial order.

22           I would say we'll meet and confer with these

23   guys about making sure we can get this all done.  If there's

24   any issues, we'll contact the Court.  That would be my

25   suggestion.

1          THE COURT:  I guess.  I mean, we're talking

2     though I think one witness.  A lawyer, probably?

3          MR. DiGIOVANNI:  There might be two.  I know

4     there would be at least one.  There may be a second witness

5     as I understand it.

6          THE COURT:  I mean, look, the plaintiffs are in

7     the same shoes.  We've had this trial.  There's a

8     misunderstanding.  I guess I could be more dictatorial and

9     say, I thought it was clear as a bell.  I thought it was

10    clear.  I clearly was wrong because there are reasonable

11    people here who interpreted it differently than I did.  I

12    don't think we want to be delaying trial because we can't

13    get these witnesses.

14         MR. DiGIOVANNI:  Understood, Your Honor.  I

15    wasn't asking for that.

16         THE COURT:  All right.

17         MR. DiGIOVANNI:  There are some things to do.

18         THE COURT:  Yes, there definitely are.  Please

19    work diligently to see if we can't get them done

20    cooperatively.

21         MR. DiGIOVANNI:  Will do.

22         THE COURT:  All right.

23         MR. DiGIOVANNI:  Inequitable conduct is off?

24         THE COURT:  Yes.  I've never done one of these,

25    but my understanding is that we'll probably be here like we

1    are right now.  We'll do the inequitable conduct testimony

2    in the evenings outside of the province of the jury, so if

3    you have a witness that is going to testify.  I mean, that's

4    my understanding how you all have done it in front of some

5    of the other judges.  No?

6              MR. SMITH:  There are many ways to do it.

7    Occasionally, it's done that way, but I think doing it that

8    way at this stage is going to create -- compound the

9    problem.

10              THE COURT:  Okay.  What's the alternative?

11              MR. SMITH:  It would be to wait and get a

12    verdict back.  It's a bench issue.

13              THE COURT:  Okay.

14              MR. SMITH:  Do a separate, maybe a one-day.

15              THE COURT:  Yes.  Because of the confusion over

16    willfulness, I think you are probably right, Mr. Smith.

17              What do you think, Mr. DiGiovanni?

18              MR. SMITH:  Your Honor, if I might elaborate.  I

19    think the same issues on witness availability, exhibits,

20    framing out the pretrial order, all of that would also have

21    to be done on the inequitable conduct, and just --

22              THE COURT:  Do you agree with that?

23              MR. DiGIOVANNI:  I would agree.  I think we

24    assumed it is not going to be done in the evenings.

25              THE COURT:  All right.  Lesson learned on my

1    part.  We'll do inequitable conduct at a date to be

2    determined.

3              MR. CHAMBERS:  Your Honor, let me give you

4    another answer to that question very briefly.

5              THE COURT:  What question?

6              MR. CHAMBERS:  I would respectfully request that

7    Your Honor take a look at our summary judgment brief.  Very

8    quickly, there were two prongs for their inequitable conduct

9    argument.  One was the alleged public use of this animation

10   at the trade show, and we've shown you the slide where

11   they've admitted that that animation never occurred.  So

12   scratch out one leg of their inequitable conduct.

13             The other leg of their inequitable conduct is

14   inventorship.

15             THE COURT:  Okay.  So I'm going to read the

16   briefs carefully.

17             MR. CHAMBERS:  Okay.  Could I -- 15 seconds?

18             THE COURT:  No.  I think we've had a lot of

19   argument today.

20             MR. CHAMBERS:  Okay.

21             THE COURT:  Let's just call it a day.  I read

22   the briefs carefully.  That's why I came in here saying, you

23   all threw me for a loop.  I think the Delaware counsel can

24   tell you, I normally come very prepared.  So a little bit

25   different on the summary judgment today.

1          **All right.  Anything else housekeeping?  No?**

2          **MR. DiGIOVANNI:  We raised earlier about**

3     **limiting the claims.**

4          **THE COURT:  That I'm going to leave to you.  You**

5     **know what the timing is and I will issue my orders as soon**

6     **as I can.  That may influence your decisions.  I don't know**

7     **how to, especially in this case, which I inherited.  All**

8     **right.  Thank you.**

9          **(Counsel respond, "Thank you, Your Honor.")**

10          **(Hearing concluded at 6:02 p.m.)**

11                          **-   -   -**

12

13

14

15

16

17

18

19

20

21

22

23

24

25