IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| F'REAL FOODS, LLC and RICH PRODUCTS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>HAMILTON BEACH BRANDS, INC., HERSHEY CREAMERY COMPANY and PAUL MILLS d/b/a MILLS BROTHERS MARKETS,<br><br>Defendants. | C.A. No. 16-41 (CFC)<br>CONSOLIDATED<br><br>REDACTED - PUBLIC VERSION<br><br>Original Filing Date: September 10, 2019<br>Redacted Filing Date: September 19, 2019 |

**DECLARATION OF DINSH GUZDAR IN
SUPPORT OF PLAINTIFFS' MOTION FOR A
PERMANENT INJUNCTION**

I, Dinsh Guzdar, declare as follows:

1. I am President of f'real Foods, LLC ("f'real"), a plaintiff in this action. As f'real's President, I supervise marketing, sales, strategic planning, finance, and engineering activities at f'real. I also interface extensively with f'real's parent company, Rich Products Corporation ("Rich"), a co-plaintiff in this action. Prior to becoming President of f'real, I worked for Rich. My work at Rich included due diligence investigation of f'real prior to Rich's acquisition of f'real. This declaration is made on my personal knowledge and belief, and I could and would testify competently as to the contents if called as a witness.

1

2. When Rich acquired f'real in December 2012, f'real's business was primarily focused on providing self-serve frozen milkshake, smoothie and cappuccino products to convenience stores, universities, colleges and military bases in the United States and Canada. Due to f'real's invention and development of commercial self-cleaning blenders, f'real's frozen milkshake products could be prepared by the consumer in f'real's patented self-cleaning blenders with little or no involvement by the staff at the retailers.

3. f'real's three U.S. self-cleaning blender patents at issue in this case, U.S. Patent Nos. 7,144,150; 7,520,662 and 7,520,658, were a major factor in Rich's decision to pay a premium price to acquire f'real. It was Rich's assessment that f'real's self-cleaning blender patents gave f'real the legal right to exclude competitors from using f'real's patented technology to compete unfairly.

4. As I testified at trial, Defendants' infringing conduct has seriously and irreparably damaged f'real in many ways. *See* Trial Tr. 401:16 – 402:3. First, f'real has lost some of its existing retailer customers to Hamilton Beach and Hershey. Moreover, by selling into convenience stores and other retailers that would be natural fits for f'real's program, Hamilton Beach and Hershey have cost f'real important business opportunities. In other words, Hamilton Beach and Hershey have blocked f'real from building the convenience store network of relationships it would have been able to build in the absence of

their infringing competition. It is important to understand that unlike most products, a retailer would not choose to have both the f'real program and the Hershey "Shake Shop Express" program in their stores. For that reason, every store that has the Hershey program is a store that will not buy from f'real.

5. Hamilton Beach and Hershey have also eroded the prices f'real is able to charge for its program of providing blenders and frozen beverages by charging nothing upfront for the infringing blenders. f'real's primary business model is analogous to the proverbial "razor/razor blade" model. Typically, f'real will sell blenders to its retail customers and then provide them with frozen milkshakes for use with the blenders. Most of f'real's revenue comes from the sale of frozen milkshakes and smoothies. *See* Trial Tr. 394:2-7.

6. As I understand its model from trial testimony, Hershey adopted a money-losing program of providing the infringing blenders to retail customers (rather than selling such blenders) in an effort to grab as much market share from f'real as possible. In order to counter this strategy, f'real has had to modify its business model with alternative programs such as low financing rates or recouping blender costs through upcharges to the frozen beverage cup price. *See* Trial Tr. 387:19–388:11; 389:16–390:5. It has been a substantial financial hardship to f'real not only to compete against its own patented technology but to do so against a company who did not invent and develop the technology and is

3

apparently willing to engage in infringing conduct and to lose money in order to unfairly target f'real's core business.

7. f'real has developed a replacement program specifically for retailers who are currently using the infringing MIC2000 blender as part of Hershey's Shake Shop Express program. f'real is offering discounted pricing and special financing on its blenders and freezers to these retailers to allow them to continue offering self-serve milkshakes and smoothies to their customers with as little disruption to their business as possible.

8. A key strategy for f'real's growth is to expand beyond the self-serve beverage market and provide blending solutions that are used by retailers and foodservice operators behind-the-counter. For example, as I testified at trial, f'real has developed a portable, inexpensive blender, referred to as the B7 blender, which is well-suited for behind the counter food service applications in the United States and abroad. *See* Trial Tr. at 383-384; PTX-376. f'real also developed a less expensive version of its self-cleaning blenders, referred to as the LT blender, which is a scaled-down, lower-priced version of its B6 blender, with the same blending capabilities and patented self-cleaning technology. The LT blender can be used as either a self-serve blender with f'real's prepared beverage cups, or a behind-the-counter blender for use with a foodservice operator's own milkshake or smoothie ingredients.

4

9. I understand that Hamilton Beach is selling infringing blenders to Dairy Queen franchisees to use for preparation of "Blizzard" milkshakes. f'real's B7 behind the counter blender or the LT blender would be an excellent option for franchisees such as Dairy Queen, but f'real's ability to sell the B7 Blender and/or the LT blender for behind-the-counter use is significantly harmed by Hamilton Beach's promotion and sale of the infringing BIC3000-DQ blender.

10. Moreover, when a consumer is in the mood for a frozen milkshake, smoothie or ice cream product, they can satisfy their desire either by going to Dairy Queen to purchase a Blizzard or going to a nearby convenience store to purchase a f'real milkshake or smoothie. In this sense, by selling infringing BIC-3000DQ blenders to Dairy Queen so Blizzards can be prepared more quickly and with less labor, Hamilton Beach is directly causing lost sales of f'real milkshakes and smoothies. The lost opportunity to work with Dairy Queen (who has been a customer of Rich for many years) to prepare Blizzards coupled with lost sales of f'real milkshakes and smoothies is causing f'real substantial harm that is not readily calculable.

11. Finally, I understand that in May 2010, f'real entered into a patent license with Hamilton Beach which allowed Hamilton Beach to use f'real's patented self-cleaning blender technology for behind-the-counter settings but not for the self-serve retail market where f'real was active. I further understand that

the patent license could be unilaterally terminated, and Hamilton Beach terminated the license in August 2011 after it began working with Hershey. Because the self-cleaning technology is so critical to f'real's success in the market and f'real is expanding into behind-the-counter settings, f'real would not consider licensing its patents to Hamilton Beach or Hershey today.  *See* Trial Tr. 402:4-403:7.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 10 day of September, 2019 in Emeryville, California.

*/s/ Dinsh Guzdar*
Dinsh Guzdar
