# EXHIBIT B

```
 1                     - VOLUME 1 -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                          - - -

 5
    F'REAL FOODS, LLC and RICH    :   CIVIL ACTION
 6  PRODUCTS CORPORATION,         :
                                  :
 7             Plaintiffs,        :
                                  :
 8        vs.                     :
                                  :
 9  HAMILTON BEACH BRANDS,        :
    INC., HERSHEY CREAMERY        :
10  COMPANY and PAUL MILLS        :
    d/b/a MILLS BROTHERS          :
11  MARKETS,                      :
                                  :   NO. 16-41 (CFC)
12             Defendants.        :   CONSOLIDATED

13
                            - - -
14
                           Wilmington, Delaware
15                         Monday, April 29, 2019
                           9:08 o'clock, a.m.
16
                            - - -
17
    BEFORE:   HONORABLE COLM F. CONNOLLY, U.S.D.C.J., and a jury
18
                            - - -
19
    APPEARANCES:
20

21         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
           BY:  RODGER D, SMITH II, ESQ.,
22              MICHAEL J. FLYNN, ESQ. and
                TAYLOR HUGA, ESQ.
23

24                    -and-

25
                                       Valerie J. Gunning
                                       Official Court Reporter
```

```
 1     APPEARANCES (Continued):

 2
               SIDEMAN & BANCROFT LLP
 3             BY:   GUY W. CHAMBERS, ESQ. and
                     PETER COLOSI, ESQ.
 4                   (San Francisco, California)

 5
                     Counsel for Plaintiffs
 6                   f'real Foods, LLC and Rich Products
                     Corporation
 7

 8
               DRINKER BIDDLE & REATH LLP
 9             BY:   FRANCIS DiGIOVANNI, ESQ. and
                     THATCHER A. RAHMEIER, ESQ.
10

11                       -and-

12
               DRINKER BIDDLE & REATH LLP
13             BY:   WILLIAM S. FOSTER, JR., ESQ.,
                     BRIANNA L. SILVERSTEIN, ESQ. and.
14                   REEYA THAKRAR, ESQ.
                     (Washington, D.C.)
15

16                   Counsel for Defendants

17                         -  -  -

18

19

20

21

22

23

24

25
```

```
1   Q.    Some does.  And if I left the cup there in the cup
2   holder, those doors were also prevent the rinse water from
3   getting to the cup as well; is that right?
4   A.    Yes.
5   Q.    Yes, it would?
6   A.    Yes.
7   Q.    So those doors kind of shield the area where that cup
8   holder and the cup is, correct, from the rinse fluid?
9   A.    Yes.
10  Q.    Could I have Figure 2 and 3 of the patent.
11              And Figure 2 and 3 of the patent, is that the
12  same disc blade that we saw in the B2 blender on the table
13  here?
14  A.    It's very similar.
15  Q.    It's very similar?
16  A.    There's some differences.
17  Q.    Does the B4 also use the flat disc like the B2?
18  A.    Yes.  It's almost the same.
19  Q.    Almost the same.
20              And can I ask you to take a look in your binder
21  at Defense Exhibit 391.
22  A.    Okay.
23  Q.    Mr. Farrell, do you recognize what Defense Exhibit 391
24  is?
25  A.    Yes.  It's a drawing of a version of this kind of a
```

1     So here is the question I have for you all.
2  Complicated, as so many issues are in this case because it's
3  an inherited case, and it's a case of the doctrine we all
4  know called law of the case.  There are standards for
5  reconsideration.  And then there is, as I understand it,
6  case law, and in particular, I'm thinking about a decision
7  by Judge Bryson, which talks about that claim construction
8  may have to be revisited at any point in the trial.  It's
9  the obligation of the Court because it is a question of law
10  to instruct on construction.
11     So the first question I have is:  The jury books
12  that have been provided to the jury, do they have already as
13  an exhibit the claim construction?
14     MR. FLYNN:  They do, Your Honor.
15     THE COURT:  I'm going to have them removed this
16  evening from the jury's part.
17     And then the second question I have for you all
18  is, and I will invite you to brief it if you want by
19  submitting no more than a 750-word letter in 14-point font
20  by close of business tomorrow that would address this issue,
21  which is, what if during the course of the trial when I hear
22  evidence and it makes me think that there is an erroneous
23  claim construction, what is it I'm supposed to do under
24  Federal Circuit law?  In other words, do I reconstrue the
25  term?  Do I just let it go?  What are my obligations under

1   the law?

2              All right.  Any questions?

3              MR. SMITH:  Your Honor, at the risk of being

4   held in contempt, are there particular terms you have in

5   mind that may be helpful to build into that question?

6              THE COURT:  No, there aren't.  In fact, I know

7   it's a loaded question potentially.

8              MR. SMITH:  Right.

9              THE COURT:  I can imagine you sitting there, but

10  it occurs to me, it's a great example of one of the problems

11  with claim construction, right, is that you are making the

12  decision, to some extent, in a vacuum.  Certainly, you're

13  making it without being fully informed of the background

14  facts and how the invention supposedly works, and that is

15  compounded here because there were constructions made before

16  I had any familiarity with the case, and you all asked me to

17  reconsider Judge Sleet's constructions, which I'm pretty

18  much inclined to do.

19             And in making that determination, you look to

20  law of the case, you look to the standards for

21  reconsideration, and yet the irony is, it's de novo review

22  of a matter of law, and so, you know, you all try this case

23  oftentimes, these types of cases, essentially to make your

24  pitches to the Federal Circuit.

25             So I do not, have not made a decision to

```
 1    from getting --
 2    Q.    Isn't it true that doors 36 shield the access
 3    location?
 4    A.    Yes, they definitely help.  So does the front door.
 5    Q.    Thank you?
 6          MR. FOSTER:  Let's go to the '662 patent,
 7    please, and go to claim 1 of the '662 patent.
 8    BY MR. FOSTER:
 9    Q.    And do you see here, this is a similar limitation we
10    just discussed, but it has the word isolating instead of the
11    word shielding?
12          Do you see that?
13    A.    Yes, I do.
14    Q.    And, again, those doors 36 help isolate the cup holder
15    from the rinsing fluid during rinsing, don't they?
16    A.    They help, yes.
17    Q.    Okay.
18    A.    They are not the only thing doing it, but they help.
19    Q.    And then let's take a look at claim 18, please.
20          And, again, claim 18 says, the directing step
21    includes allowance rinse fluid flowing off of the splash
22    shield to contact the door and then flow down the slope
23    and off the door into a receiving channel and into a
24    drain?
25          Do you see that language highlighted on a
```

1  Q.   Yesterday you said you can see the bulk of stuff
2  without reading the patent.
3  A.   Sorry. I didn't understand what you said. I'm
4  trying to read it. Un-shielding the vessel opening and
5  directing rinsing fluid onto the splash shield. Okay. So I
6  see it.
7  Q.   All right. And so, Mr. Farrell, those doors 36 help
8  isolate the vessel 14 below from the rinsing fluid, don't
9  they?
10 A.   Yes, they help.
11 Q.   All right. Mr. Farrell, can we just talk real quick
12 about f'real's business model when you were present in the
13 company.
14       When you were running f'real, you sold blenders
15 to your customers?
16 A.   Yes, we did.
17 Q.   And, Mr. Farrell, wasn't it pretty key to your
18 business that f'real was able to recoup the cost of its
19 blenders?
20 A.   Sure. That would be true for any business.
21 Q.   And, Mr. Farrell, isn't it also true that having your
22 customers buy the blender would provide them with additional
23 motivation to sell as many cups as they could in order to
24 recoup their blender costs?
25 A.   I mean, they're in business to sell milkshakes, so I'm

1           **CROSS-EXAMINATION**

2   **BY MS. SILVERSTEIN:**

3   Q.    Good morning, Dr. Akemann.

4   A.    Good morning.

5   Q.    I want to first start by going over some of your lost
6   profits opinion that you shared with the jury yesterday.
7   It's true that in June of 2014, which was a few months
8   before the lawsuit was filed, that f'real had a blender in
9   approximately 12,600 locations; is that correct?

10  A.    That sounds approximately correct, yes.

11  Q.    And as of that date, they had blenders in all 50
12  states; is that correct?

13  A.    I believe that's correct.

14  Q.    And Mr. Guzdar testified yesterday that they currently
15  have over 18,000 blenders as of today; is that correct?

16  A.    I think that's correct.

17  Q.    So since the lawsuit started, f'real has gained 6,000
18  locations; is that correct?

19  A.    Approximately.

20  Q.    Okay. And at its peak, according to your analysis,
21  Hershey's had only 800 locations for its Shake Shop Express
22  program; is that correct?

23  A.    That's approximately correct, yes.

24  Q.    Okay. Now I would like to turn to the make up of the
25  f'real and Shake Shop Express customers.