EXHIBIT 1

```
 1                        - VOLUME 3 -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                         - - -

 5
     F'REAL FOODS, LLC and RICH    :   CIVIL ACTION
 6   PRODUCTS CORPORATION,         :
                                   :
 7                  Plaintiffs,    :
                                   :
 8        vs.                      :
                                   :
 9   HAMILTON BEACH BRANDS,        :
     INC., HERSHEY CREAMERY        :
10   COMPANY and PAUL MILLS        :
     d/b/a MILLS BROTHERS          :
11   MARKETS,                      :
                                   :   NO. 16-41 (CFC)
12                  Defendants.    :   CONSOLIDATED

13
                            - - -
14
                         Wilmington, Delaware
15                       Wednesday, May 1, 2019
                         8:25 o'clock, a.m.
16
                            - - -
17
     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J., and a jury
18
                            - - -
19
     APPEARANCES:
20

21           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
             BY:  RODGER D, SMITH II, ESQ.,
22               MICHAEL J. FLYNN, ESQ. and
                 TAYLOR HUGA, ESQ.
23

24                      -and-

25                              Valerie J. Gunning
                                Official Court Reporter
```

1     APPEARANCES (Continued):

2

3                     SIDEMAN & BANCROFT LLP
                      BY:  GUY W. CHAMBERS, ESQ. and
                           PETER M. COLOSI, ESQ.
4                          (San Francisco, California)

5

6                      Counsel for Plaintiffs
                       f'real Foods, LLC and Rich Products
7                      Corporation

8

9                     DRINKER BIDDLE & REATH LLP
                      BY:  FRANCIS DiGIOVANNI, ESQ. and
                           THATCHER A. RAHMEIER, ESQ.
10

11                          -and-

12

13                    DRINKER BIDDLE & REATH LLP
                      BY:  WILLIAM S. FOSTER, JR., ESQ.,
                           BRIANNA L. SILVERSTEIN, ESQ.
14                         REEYA THAKRAR, ESQ. and.
                           CARRIE A. BEYER, ESQ.

15

16                     Counsel for Defendants

17

18                          -   -   -

19

20

21

22

23

24

25

Williams - cross

1    redacted.

2              MR. FOSTER:  Your Honor, this document was

3    produced originally with redactions.  We later produced an

4    unredacted version after we did the advice of counsel

5    defense.

6              THE COURT:  Okay.  So what's the point?  Let me

7    get my glasses.  Hold on.

8              MR. CHAMBERS:  This was our foam board at

9    opening.

10             THE COURT:  All right.  So, again, so we have a

11   clear record, what has been redacted from the document

12   that's being presented is, "the method by which the machine

13   cleans itself between cycles became a challenge during the

14   development phase.  This is being solved with a license

15   agreement between a company called f'real (who have IP in

16   this area that we intend using, and HBB), end of quote.

17             All right.  Now, I can see why you would want to

18   get this statement in, Mr. Chambers.  In fact, you put it up

19   in front of the jury during your opening statement.

20             My question though is:  Why are we doing this

21   through a redacted version of the document?  I mean, I don't

22   know the history because I didn't handle the discovery.  Was

23   there a determination that, by the Court that the redaction

24   was improperly made or --

25             MR. SMITH:  No, Your Honor.

1        THE COURT:  What's going on?

2        MR. FOSTER:  Your Honor, I produced the

3    document.  We ultimately decided to produce an unredacted

4    version just based on how discovery was proceeding, so we

5    supplemented our discovery and produced it.  It has already

6    been admitted.

7        THE COURT:  Why was it redacted in the first

8    place?

9        MR. FOSTER:  Because it was under the advice

10   of counsel.  It was a description counsel was providing.

11   Again --

12       THE COURT:  No.  So how do you redact this under

13   advice of counsel?

14       MR. FOSTER:  We thought it was based on analysis

15   of counsel.  We later learned, it wasn't, it was written by

16   Mr. O'Flynn.  B, if there was anything about the f'real

17   patents, we waived any privilege when we were, internally,

18   because we did the advice of counsel defense.

19       THE COURT:  You redacted it.  I'm going to let

20   the question go forward then.

21       (End of sidebar conference.)

22   BY MR. CHAMBERS:

23   Q.   Mr. Williams, I asked you about the redaction on

24   PTX-7, which was admitted into evidence.  I now ask you to

25   direct your attention to tab 2 of your notebook, which is

Williams - cross

1    PTX-8.  Isn't that the same business case summary of

2    Hamilton Beach without the redaction?

3    A.      Which page?

4    Q.      The redaction was on the second page by Phase 3

5    notable changes.

6    A.      Oh, okay.  Yes.  It looks like the same document

7    without the blackout.

8            MR. CHAMBERS:  I ask that PTX-8 be admitted into

9    evidence.

10           MR. FLYNN:  It's already in.

11           MR. CHAMBERS:  Okay.

12   BY MR. CHAMBERS:

13   Q.      So let's turn to the second page where it's redacted

14   on the right and it's unredacted on the left, so let's focus

15   on the first couple of sentences on the second page where it

16   is unredacted.

17           And it states there that the method by which the

18   machine cleans itself between cycles has become a challenge

19   during the development phase.  This is being solved with a

20   license agreement between a company called f'real (who have

21   IP in this area that we intend using) and HBB.

22           Do you see that?

23   A.      I see that, yes.

24   Q.      And as far as you know, you had no objection to this

25   document when you reviewed it; is that right?

1    testimony today, Mr. Geppert talked about how he and Jim and

2    how he had worked on certain things.  In fact, with respect

3    to the drain path, remember that whole discussion today

4    about working on the drain path.

5                  THE COURT:  Right.

6                  MR. FOSTER:  He's the one that came up with the

7    drain path.  He's the one that helped come up with the

8    overlapping doors.  There was a whole discussion about the

9    overlapping doors.

10                 THE COURT:  He said Jim.  He couldn't be

11   clearer.  He said Jim came up with this idea.  I helped him

12   develop it.

13                 MR. FOSTER:  Exactly.  An idea by itself is not

14   enough.  You actually have to figure out how to make it

15   work.  It's the complete operative invention.  Doors would

16   be nice.

17                 THE COURT:  You can have that in your brain.

18                 MR. FOSTER:  It has to be how it works as well.

19   It can't just be the idea.  It has to be more than just an

20   idea.  That's not complete conception.

21                 And then, finally, if you listen to the

22   testimony, there was a lot of things that Mr. Geppert did by

23   himself with respect to the restrained splash shield.  He

24   talked about it, how he did a lot of things on his own.  Jim

25   would have a certain idea.

1              Just like a boss if you hired an engineer to do

2    something and Mr. Geppert figured certain things out.  There

3    was testimony today where he talked about the things he did

4    on his own but at the direction of Jim.  Jim didn't know how

5    to do it.  Jim had an idea of what he wanted.  He didn't

6    have specifics.  It happens all the time.  You hire

7    engineering products.

8              The sales guys at Hamilton Beach put into real

9    life what the people want through marketing.  It doesn't

10   make the marketers inventors.  It's the guys like Brian

11   Williams.  And Geppert definitely played that role here

12   based on the testimony that we heard today, especially with

13   respect to the overlapping doors, definitely with respect to

14   the flow path going to the drain, which I argue linked to a

15   number of claims and definitely with respect to the splash

16   shield and finally, the rinse chamber, because those doors

17   are a key part of the rinse chamber.

18             Your Honor, if you look at the testimony, I

19   think there's sufficient evidence to go to a jury even under

20   the clear and convincing standard, especially in light of

21   the pre-litigation comments recognizing that Mr. Geppert

22   was, in fact, an inventor.

23             THE COURT:  Mr. Smith, if I agree with you, do

24   you want me to grant this motion or do you want to argue in

25   front of the jury that the defendants have put forth a

1   completely lame argument?  Really, do you want me to grant

2   the motion?

3            MR. SMITH:  We do, Your Honor.

4            THE COURT:  I will grant the motion.  I don't

5   think there's any affirmative evidence of inaccurate

6   inventorship.  I think Farrell's testimony is clear.  I

7   think again Peterson's testimony is clear.  I don't think

8   the, whatever inadequacies in the provisional application

9   provide affirmative evidence that anyone else invented,

10  conceived an operational form of the patented invention, so

11  I'm going to grant the motion.

12            I do not believe a reasonable juror based on

13  that evidence could conclude by clear and convincing

14  evidence that Jim Farrell was not the only inventor.  I

15  think essentially what the defense wants to do is they want

16  us to essentially believe that Farrell and Geppert are

17  dishonest folks and just to be skeptical.  There's no

18  positive.  It's just essentially an attack on them.  And

19  we've already discussed employment agreements.  That doesn't

20  provide affirmative evidence.

21            And I don't think the assignments said it

22  either.  I'm going to grant the motion.  All right.

23            MR. SMITH:  Your Honor, the only -- Rule 50 is

24  always the bane of a trial lawyer's existence to make sure

25  you preserved all your arguments at the Rule 50 stage.  I've

1  heard people say even on non burden issues, you need to move

2  on Rule 50.  I would like to lodge Rule 55 on infringement

3  and damages.  I understand Your Honor has already ruled on

4  the defendants' counter-motions and --

5          THE COURT:  Oh, you mean you want to continue

6  with your argument?

7          MR. SMITH:  No.  I just want to make clear to

8  the extent I have a burden under Rule 50 to lodge a

9  non-burden issues on a Rule 50 motion now -- I'm sorry.

10  Not non-burden issues.  The issues on which I have the

11  burden.  Sorry.  To the extent I have a Rule 50 burden, to

12  move for JMOL on infringement and damages, my affirmative

13  issues.

14          THE COURT:  I see.  You want to do those as

15  well?

16          MR. SMITH:  Yes.

17          THE COURT:  I'm denying those.

18          MR. SMITH:  Thank you, Your Honor.  That's all I

19  needed.

20          THE COURT:  All right.  We still have a pending

21  issue, which is any evidence -- and I'm denying the JMOL

22  with respect to obviousness or nonobviousness with respect

23  to the '150 and '377, but what evidence from the defense has

24  been put forward such that a reasonable juror could conclude

25  that the '658 was invalid as obvious?

EXHIBIT 2



One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

**Guy W. Chambers**
gchambers@sideman.com
(415) 733-3950

December 2, 2015

*VIA E-MAIL*

William S. Foster Jr., Esq.
Mark Zhai, Esq.
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington D.C. 20004-2400
william.foster@bakerbotts.com
mark.zhai@bakerbotts.com

Re:   *f'real Foods, LLC v. Hamilton Beach Brands, Inc. et al.*
      Civil Action No. 1:14-cv-1270-GMS

Dear Bill and Mark:

We have reviewed and investigated the proposed version of "Hamilton Beach's Second Amended Answer And Counterclaims" attached to your November 18, 2015 e-mail and, for the reasons explained in this letter, have determined that the inequitable conduct charges you propose adding to Hamilton Beach's answer are without merit. As such, f'real will not agree that Hamilton Beach is entitled to amend its answer and counterclaims in the manner you propose.

As you should be aware, inequitable conduct or "fraud on the Patent Office" is a very serious charge. As the U.S. Court of Appeals for the Federal Circuit has stated on numerous occasions, "the habit of charging inequitable conduct in almost every major patent case has become an *absolute plague*. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps." *Therasense Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276, 1289 (Fed.Cir. 2011)(citing *Burlington Indus. Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir. 1988)). "A patent litigant should be made to feel, therefore, that an unsupported charge of 'inequitable conduct in the Patent Office' is a negative contribution to the rightful administration of justice." *Burlington Indus.,* 849 F.2d at 1422.

In an effort to discourage all but the most compelling inequitable conduct charges, the Federal Circuit has made the burden of proving inequitable conduct exceptionally high. To

William S. Foster Jr., Esq.
December 2, 2015
Page 2

prevail on a claim of inequitable conduct, the accused infringer must prove by clear and convincing evidence that the patentee acted with specific intent to deceive Patent Office. *Therasense, supra.* The evidence must be so powerful as to *require* a finding of deceitful intent. When there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. Moreover, in addition to deceitful intent, "but-for materiality" must also be proven. In other words, it must be proven by clear and convincing evidence that the Patent Office would not have allowed a claim had it been aware of the undisclosed prior art. It is against these very high standards that we will address your inequitable conduct allegations.

For the '377 patent, you allege that Mr. Farrell committed inequitable conduct by stating in his application that the frozen substance preferably has no air incorporated and then later stating in his claim construction declaration that, at the molecular level, all frozen milkshakes will have some amount of air in them. While you argue that this is a huge contradiction, those of skill in the ice cream field, such as co-defendant Hershey Creamery, immediately recognize that there is no contradiction at all. Mr. Farrell's statement in his '377 patent refers to preferably avoiding the *intentional* incorporation of air in the freezing process. As discussed at the Hershey custodian of records deposition, this is described in the ice cream field as "zero overrun." The Hershey witness then acknowledged the obvious – that even with a "zero overrun" product there is still a small amount of air that is *unintentionally* incorporated into the frozen product. This is what Mr. Farrell was referring to in his claim construction declaration. With respect to the prior art Tomlinson patent, f'real distinguished the Tomlinson patent because, unlike Mr. Farrell's invention, it fails to disclose a rotatable blade for *intentionally* whipping air into the frozen product to create an old-fashioned milkshake texture. As you can see, there is no contradiction in any of the relevant documents. Your efforts to create a semantic argument otherwise are frivolous.

For f'real's '150, '658 and '662 sanitation patents, you allege that Mr. Farrell had no involvement in the invention of the claimed subject matter because Tom Kramer and Andy Geppert at the Kablooe design firm worked with Mr. Farrell on building a commercial version of the inventions. As support for your argument that Messrs. Kramer and Geppert were the only inventors of the claimed subject matter, you rely on selected notes taken by Mr. Geppert, various sketches and various Kablooe time records. I have spoken at length with Messrs. Farrell, Kramer and Geppert about your allegations and they are unanimous in their disagreement with them. Prior to being retained by Mr. Farrell, Kablooe had never done any work on blenders. By contrast, Mr. Farrell had already built blenders and had blender patents to his name.

All agree that the Kablooe work started with a series of meetings in which Mr. Farrell spelled out his ideas and requirements for the new blender. Andy Geppert took notes of Mr. Farrell's directives and typed them up. One set of these notes are the April 12, 2002 notes you include as proposed Exhibit "C". As can be seen from these notes, Mr. Farrell was already relaying to Kablooe his concepts of a splash "shield that rides with cup", "clean shield between runs by spraying with hot water" and "have shield also function to hold cup down in holder..." In Andy Geppert's enclosed April 30, 2002 notes, which you selectively chose not to include with your proposed amended answer, Mr. Farrell's conception became even more specific: "cup

William S. Foster Jr., Esq.
December 2, 2015
Page 3

moves up and down – mixer blade stays put", "shields are cleaned between runs to maintain high
level of cleanliness", "shield should hold cup in place, and lock it into position" and "opening
should be covered to protect from fingers being inserted."

    As you should know, inventorship is determined by who conceived the invention as
claimed.  Once the invention is conceived, the inventor is entitled, without forfeiting his
inventorship, to work with others, such as design firms, to actually build it.  In this case, after
providing the conception of the invention as claimed, Mr. Farrell continued to work closely with
Mr. Geppert on CAD drawings to construct a commercial embodiment of his invention. Neither
Mr. Geppert nor Mr. Kramer dispute that Mr. Farrell is correctly named as the sole inventor of
f'real's sanitation patents.  Moreover, even if it could be shown that either Mr. Geppert or Mr.
Kramer helped with the concept of some aspect of one of the claimed inventions, the
inventorship could readily be changed to add Messrs. Geppert and/or Kramer as co-inventors,
particularly since it has been Kablooe's standard practice to assign its invention rights to its
clients (i.e., f'real).  Again, your inequitable conduct allegations are frivolous.

    Finally, you argue that Mr. Farrell committed inequitable conduct on the Patent Office by
failing to treat his provisional patent application, U.S. Provisional Application No. 60/426,622
filed November 15, 2002, as a nullity which would then supposedly require the disclosure of an
animation whose contents you cannot even accurately describe. Starting with the provisional
patent application, it coherently describes the features of f'real's claimed sanitation inventions:
"directing a water spray at the shield", "another approach to this is to use a heavy weight to hold
the shield and cup in place" and "the shield is placed so that it travels up with the cup as the cup
moves up past the mixing blade around which the shield is placed." Moreover, in issuing f'real's
sanitation patents, the Patent Office agreed that f'real's provisional patent application described
the features of f'real's claimed sanitation inventions.  After spending the money and putting in
the effort to file f'real's provisional patent application using reputable patent attorneys, it is
preposterous to argue that Mr. Farrell somehow knew his provisional patent application was
legally worthless. As the Federal Circuit stated in *Therasense*, when there are multiple
reasonable inferences that may be drawn, intent to deceive cannot be found. Plainly, it was
reasonable for Mr. Farrell to infer that his reputable patent attorneys had filed a valid provisional
patent application. Moreover, to run off to court with a "fraud on the Patent Office" allegation
without even seeing the alleged animation rises to the level of sanctionable conduct.  While you
are quick to nitpick f'real's provisional patent application, you have no idea whether the alleged
animation discloses the claimed inventions or not.

    For the reasons set forth in this letter, if Hamilton Beach chooses to proceed with its
inequitable conduct and antitrust allegations as proposed, f'real intends to seek appropriate Rule
11 sanctions and the award of attorney's fees when Hamilton Beach's allegations are shown to
be groundless. In the words of the Federal Circuit, moving forward with "Hamilton Beach's
Second Amended Answer And Counterclaims" in the form proposed is "is a negative
contribution to the rightful administration of justice."

William S. Foster Jr., Esq.
December 2, 2015
Page 4

Very truly yours,

Guy W. Chambers

8455-35\2698200v1

# EXHIBIT 3

```
 1                        - VOLUME 1 -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                          - - -

 5
     F'REAL FOODS, LLC and RICH    :   CIVIL ACTION
 6   PRODUCTS CORPORATION,         :
                                   :
 7                    Plaintiffs,  :
                                   :
 8        vs.                      :
                                   :
 9   HAMILTON BEACH BRANDS,        :
     INC., HERSHEY CREAMERY        :
10   COMPANY and PAUL MILLS        :
     d/b/a MILLS BROTHERS          :
11   MARKETS,                      :
                                   :   NO. 16-41 (CFC)
12                    Defendants.  :   CONSOLIDATED

13
                               - - -
14
                          Wilmington, Delaware
15                        Monday, April 29, 2019
                          9:08 o'clock, a.m.
16
                               - - -
17
     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J., and a jury
18
                               - - -
19
     APPEARANCES:
20

21              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                BY:  RODGER D, SMITH II, ESQ.,
22                   MICHAEL J. FLYNN, ESQ. and
                     TAYLOR HUGA, ESQ.
23

24                       -and-

25                                  Valerie J. Gunning
                                    Official Court Reporter
```

```
 1    APPEARANCES (Continued):

 2
                 SIDEMAN & BANCROFT LLP
 3               BY:  GUY W. CHAMBERS, ESQ. and
                     PETER COLOSI, ESQ.
 4                   (San Francisco, California)

 5
                     Counsel for Plaintiffs
 6                   f'real Foods, LLC and Rich Products
                     Corporation
 7

 8
                 DRINKER BIDDLE & REATH LLP
 9               BY:  FRANCIS DiGIOVANNI, ESQ. and
                     THATCHER A. RAHMEIER, ESQ.
10

11                       -and-

12
                 DRINKER BIDDLE & REATH LLP
13               BY:  WILLIAM S. FOSTER, JR., ESQ.,
                     BRIANNA L. SILVERSTEIN, ESQ. and.
14                   REEYA THAKRAR, ESQ.
                     (Washington, D.C.)
15

16                   Counsel for Defendants

17
                         -   -   -
18

19

20

21

22

23

24

25
```

1    in a Hershey Shake Shop Express kiosk.

2              There's one step that's called providing a

3    mixing machine.  That's done by the proprietor of the store.

4    There's a step called isolating the vessel from the rinsing

5    fluid, the vessel with the milkshake.  That's done by the

6    customer.  It can't be done by a single actor, so there's

7    going to be infringement of that claim with regard to the

8    Hershey Shake Shop Express.  I'm sorry.  Noninfringement.

9    There will be noninfringement because the steps cannot be

10   met by a single actor.

11             Now, I do want to talk a little bit about

12   invalidity.  All right.  Going back to the Federal Judicial

13   Center video that you saw earlier, what happens, as Judge

14   Fogel explained in the video, is that the patent prosecution

15   before the Patent Office occurs in private.  We, Hamilton

16   Beach and Hershey, were not in the room during the

17   prosecution, but we're in the room now.  We're in this

18   courtroom with you to take a look at invalidity.  You will

19   be the first people to see this evidence that's not in the

20   private examination by the Patent Office.

21             You also heard from the video from Judge Fogel

22   that patents sometimes get issued by the U.S. Patent Office

23   even though they should not have because of invalidity based

24   on prior art or invalidity based on other requirements of

25   the law.  The evidence will show that this happened here.

1          One of the requirements of the law is that

2    proper inventors must be named on U.S. patents.  **The**

3    **evidence will show that Andy Geppert of Kablooe spent more**

4    **than 2,000 hours working on f'real's machine.**  He spent more

5    than 2,000 hours working on the invention that Mr. Farrell

6    has taken sole credit for.  Andy Geppert should have been

7    named as an inventor alongside Mr. Farrell.  We're not

8    saying he shouldn't be named as an inventor, but Geppert

9    should have been named also.

10          The evidence will include statements and time

11    slips and other documents.  The evidence will show that

12    Mr. Geppert helped invent important elements that are in the

13    claims of the patent.  These are things that the Patent

14    Office did not see, so this is our opportunity to show you

15    these things that the Patent Office didn't get a chance to

16    see.

17          You also heard on the patent video that an

18    invention must not be obvious to one of ordinary skill in

19    the art in order for it to be patentable, and Dr. Slocum

20    will be here and he will explain how a number of the patent

21    claims were obvious to a person of ordinary skill in the

22    art.  He will explain it in detail using drawings, figures,

23    documents and language from patents that came before

24    f'real's patents.

25          For the '150 patent, Dr. Slocum will analyze

1    patents that were issued long before f'real's patents in

2    certain circumstances, including the Nielson patent and the

3    Kelly patent, and he'll explain how a person of ordinary

4    skill in the art would have known to combine these

5    teachings.

6              For the '377 patent, remember, that's the patent

7    that requires the wavelike feature on the blade, Dr. Slocum

8    will explain that if a simple twist can be considered

9    infringing, then this was known long ago in other patents,

10   including the Tomlinson patent from 1967 and in combination

11   with the Linscott patent from 1997.

12             Another thing that I want to discuss briefly is

13   willfulness or willful infringement, something that the

14   plaintiffs have alleged in this case.

15             You'll be instructed at the end of this case

16   about willfulness, about the allegation of willful

17   infringement, and that it requires, among other things, that

18   plaintiffs prove that defendants knew or should have known

19   that its conduct amounted to infringement of valid patents.

20             The evidence you're going to hear in the form of

21   both documents and testimony will show that Hamilton Beach

22   and Hershey had a good faith belief that they did not

23   infringe any valid patent claim.

24             As you listen and as you see the evidence, ask

25   yourself whether a company that received and relies on an

EXHIBIT 4



FIND
A STORE

More ⌄

← All Posts

# Weâ€™re Shakinâ€™ Things Up!

SHARE  

Posted: December 29, 2017



https://www.yogurt-land.com/blog_posts/view/39/we-re-shakin-things-up




FIND
A STORE



In addition to our award winning frozen yogurt and our new ice cream line up, we're excited to announce that we are now serving shakes! (Currently available at participating locations in Southern California. Please see list at the bottom of this post)

Give your sweet tooth a reason to indulge with our cold brew coffee and vanilla shakes. ==The new serve yourself shakes can be dispensed directly from our beloved frozen yogurt machines== and poured straight into a 12oz cup for a promotional price of only $2.49.

Why shakes?

Why not? Here at Yogurtland, we are constantly innovating. We aim to give you an experience as unique as you are. Our flavorologists are continually hand crafting irresistible flavors and now you can enjoy them in the convenience of a drink! Shake up your treat with 3 new delicious and decadent drink flavors.

Our first flavor is the Vanilla Shake. If you love our Creamy Vanilla ice cream or any of our vanilla frozen yogurt flavors, you'll love this creamy new drink. As you sip, imagine being at a diner sipping your favorite old-fashioned vanilla milkshake. This shake contains real vanilla and real milk from the happy cows of California so not only are you getting a truly indulgent treat, but you're also getting the real deal with no artificial flavors or ingredients.

Raise your hands if you're a coffee fan! Then you'll love our frozen Cold Brew Coffee shake. Perk up your day with our dark, rich coffee flavored shake that is made with real cold brew coffee. Our coffee is a delightful blend from some of the best farms in Columbia, steeped in cold water and never heated for a super-smooth and sweet flavor. This refreshing and uplifting treat will be sure to kickstart your day.

And then there's a third but secret flavor. Shhh! We call this one our Java Shake. Pull the *middle handle* to create a truly unforgettable blend of our vanilla and coffee, combined. Sure to replace your daily habit and save you a few bucks, you can now visit Yogurtland for your afternoon pick-me-up treat.

Our custom shakes can be topped off at our world-famous toppings bars with over 60 fruit, candy, cereal, nut and cookie combinations to make a truly enticing masterpiece that is all our own and unique to you and your taste buds. You won't be able to find this experience anywhere else so top it to make it your own and share your creation with us!

How will you shake things up? Share your creations with us on the following channels: Facebook, Instagram, and Twitter using the hashtag #YogurtlandShakes. We can't wait to see what you come up with!



| Dessert | Yogurtland | real California milk | shakes | drinks |

« WE ALL SCREAM FOR ICE CREAM

YOGURTLAND EXPANDS ITS INTERNATIONAL PRESENCE »



https://www.yogurt-land.com/blog_posts/view/39/we-re-shakin-things-up

EXHIBIT 5



HBBF0172884_HIGHLY_CONFIDENTILAL_HBB Sales Information as of 8.19.xlsx

BIC2100YL

BIC2100YL

# EXHIBIT 6



EXHIBIT
Williams
12-13-17 RT
tabbies®

# HBB Business Case Summary
## Phase 3

| | | |
|---|---|---|
| Project Name: | Blend in Cup – Cornelius | Business Case #: BC09230 |
| Initiator: | Brian O'Flynn | Date Initiated: 03/27/2009 |
| Product Category: | Commercial Blender | Product Manager: Terry Copenhaver |
| Category Retail $: | $5,000,000 | Category Growth: 10.0%  HBPS $ Share: 0.0% |

| | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|
| Projected Completion Date : | 10/01/2010 | 10/01/2010 | 10/01/2010 |
| Supplier: | Main Power Electrical Factory, Ltd. | Main Power Electrical Factory, Ltd. | Main Power Electrical Factory, Ltd. |

## Financial Summary

| | Phase 1 | | | | Phase 2 | | | | Phase 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Total | Year 1 | Year 2 | Year 3 | Total | Year 1 | Year 2 | Year 3 | Total |
| Unit Sales: | 2,950 | 3,050 | 3,200 | 9,200 | 5,400 | 5,400 | 5,400 | 16,200 | 10,800 | 10,800 | 10,800 | 32,400 |
| NetSales$: | $2,704,555 | $2,804,495 | $2,954,405 | $8,463,455 | $5,635,980 | $5,635,980 | $5,635,980 | $16,907,940 | $12,404,448 | $12,404,448 | $12,404,448 | $37,213,344 |
| SMS: | $1,229,555 | $1,279,495 | $1,354,405 | $3,863,455 | $2,698,380 | $2,698,380 | $2,698,380 | $8,095,140 | $4,693,248 | $4,693,248 | $4,693,248 | $14,079,744 |
| SM%: | 45.5% | 45.6% | 45.8% | 45.6% | 47.9% | 47.9% | 47.9% | 47.9% | 37.8% | 37.8% | 37.8% | 37.8% |
| NPV: | | | | $494,218 | | | | $1,117,814 | | | | $275,201 |
| ROI: | | | | 51.1% | | | | 63.8% | | | | 22.6% |
| Payback: | | | | 2.2 | | | | 2.3 | | | | 3.7 |

## Capital & Project Expenses

| | Phase 1 | | | | Phase 2 | | | Phase 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 0 | Year 1 | Year 2 | Total | Year 0 | Year 1 | Year 2 | Year 0 | Year 1 | Year 2 |
| | | | | | | | | | | Total |
| Capital $: | $275,000 | $0 | $0 | $275,000 | $126,500 | $0 | $0 | $192,500 | $0 | $0  $192,500 |
| Packaging $: | | | | $5,000 | | | | $0 | | | $0 |
| Agency $: | | | | $20,000 | | | | $20,000 | | | $20,000 |
| Sample $: | | | | $25,000 | | | | $283,800 | | | $283,800 |
| OH Variance $: | | | | $0 | | | | $0 | | | $0 |
| Other Project Expense $: | | | | $100,000 | | | | $21,000 | | | $21,000 |
| Commissions/Royalty: | | | | 0.0% | | | | 0.0% | | | 0.0% |

Fraal Foods, LLC, et al. v.
Hamilton Beach Brands, Inc., et al.

PTX 7
C.A. No. 16-41 (CFC)

HIGHLY CONFIDENTIAL

**Other Selling Expenses %:**  0.0%  0.0%  0.0%

**Phase 2 Notable Changes:**

Cornelius now wants to put two of our blender modules per machine which greatly increases our volume and NPV. They also want to get a greater number of prototypes which greatly increases our expenses. The quote for electronics development is higher than earlier estimated ($20K versus $10K using our earlier internal estimate). The delivery date for us to deliver two blender module prototypes is now July 23rd (initially Cornelius wanted to send a complete machine to Taco Bell on 7/1, this date is now 8/1). The sample expenses are included assuming that all prototypes before tool start are purchased from a local model shop versus utilizing Asian or other lower cost options.

SG&A has been changed to 12.4% (excludes sales but includes admin, engineering & marketing). Note: template NPV cannot be changed in BC at this time ...however, the 5 and 3 year financials with 12.4% SG&A are as follows:

5 Year: NPV $3,044,354, ROI 172.4%, Payback 1.07 years.
3 Year: NPV $1,853,414, ROI 110.4%, Payback 1.59 years.

The HBH2000 stand alone module (that would be sold under the HBC brand) has been eliminated from BC2 for several reasons: all resources at this time are focused on Cornelius, the stand alone module would require additional tooling, agency and expense costs. We would prefer the Cornelius project stand on its own and then follow up with a new BC (or a derivative of this BC) for the stand alone unit.

**Phase 3 Notable Changes:**

Engineering have improved the design greatly from the initial concept, and now only one large identified issue is unresolved. Taco Bell want to blend in very fragile PP cups. The equipment we (Cornelius and HBB) are competing with for the Taco Bell business is made by Enodis / Manitowoc. We have been told by Pepsi that their machine does not break cups, so our challenge is to also not break cups while delivering a better blended drink.

We believe this PFC is worst case and there are several cost saving ideas: We think the weldment could be approx halved in cost if parts of the assembly were die cast parts. MP are also quoting the carriage, bearing and slide assembly approx. $20 higher than quotes we have obtained. With both of these combined, the PFC drops by approx. $115 to approx. $600.

3. Tooling has remained consistent with estimates in EO updates, but has increased from an estimate of $115,000 in BC2 to the more recent estimate of $175,000. We have looked at ways to minimize the investment.In tooling before we have a go no/go from YUM, and believe that at least $113,000 of the tools need to be to started now to provide samples that work well in field testing and pass agency tests.

## PDD Summary

### Phase 1

| Model | Net $ | BP | PFC | RR | SM% |
|---|---|---|---|---|---|
| IMI2000-CE | $7,364,115 | $957.00 | $600.00 | 5.0% | 45.0% |
| HBH2000 | $1,099,340 | $1,052.00 | $500.00 | 5.0% | 50.0% |
| IMI2000 | $0 | $0.00 | $0.00 | 0.0% | 0.0% |

### Phase 2

| Model | Net $ | PFC | BP | RR | SM% | |
|---|---|---|---|---|---|---|
| IMI2000-CE | $16,907,940 | $544.00 | $1,065.00 | 2.0% | 47.9% | C |
| HBH2000 | $0 | $600.00 | $1,150.00 | 5.0% | 0.0% | C |
| IMI2000 | $0 | $0.00 | $0.00 | 0.0% | 0.0% | |

### Phase 3

| Model | Net $ | PFC | BP | RR | SM% |
|---|---|---|---|---|---|
| IMI2000-CE | $18,606,672 | $714.00 | $1,172.00 | 2.0% | 37.8% |
| HBH2000 | $0 | $600.00 | $1,150.00 | 5.0% | 0.0% |
| IMI2000 | $18,606,672 | $714.00 | $1,172.00 | 2.0% | 37.8% |

HIGHLY CONFIDENTIAL

C = Cancelled

**Tooling Rights:**    Worldwide

**Situation Analysis**

**Situation:**

**Phase 1**

To deliver a high quality smoothie made of ice, dairy and fruit at a busy QSR (Quick Serve Restaurant), a level of automation is required. The optimal approach is to automatically deliver the ice, fruit syrup and or dairy ingredients directly into the blending device for improved sanitation, precise portion control, and minimized labor (relative to using a high performance blender).

For HBB to participate in this QSR solution we would need a partner who brings expertise in ice making, ice storage, and dispensing. However, none of the large food service equipment manufacturers have blending expertise. When Mc Donald's asked Taylor, Enodis/Manitowoc to quote on an automated smoothie machine, they partnered with Island Oasis and VitaMix respectively.

We have been approached by IMI Cornelius. They are the world leader in dispensing, and also manufacture ice machines, refrigerated cabinets, and various chilled beverage equipment under the Cornelius and Jet (Spray brands. IMI Cornelius is approx. the same size as HBB, and their parent company IMI Plc (who are English owned) are approx. the same size as NACCO Industries. Cornelius seem to have a very similar culture as HBB (solution/innovation driven & very process oriented).

Cornelius have asked us to partner with them to develop a machine that can automatically prepare smoothies in disposable cups. While they have expertise in their core of dispensing & Ice, they require our expertise in blending. They want us to develop a "blender module" that would fit within their larger piece of equipment. They would dispense ice and liquid ingredients into a cup, and then our blender module would blend this drink in the cup, and sanitize itself before the next drink can be blended.

Cornelius have a very strong relationship with YUM! Brands and have been asked by YUM to develop a product for Taco Bell. Taco Bell have 6,000 outlets in the US that would be targets for this equipment.

**Phase 2**

HBB has also identified a market for a "stand alone" blender module that could be housed inside a more compact cabinet. This could blend ingredients in a cup after the ingredients have been manually dispensed. For smaller chains this offers the benefit of no cleaning of blender containers, zero product waste, and excellent sanitation ..... while being far more affordable than the larger piece of equipment. Chain that already have ice equipment and are perhaps tight on space may also favor this solution.

YUM Brands will test both our machine and the Enodis / Manitowoc machine. This test will first be in their labs and then in two Taco Bell stores. The Cornelius team have been highly engaged with Taco Bell and are driving the project very well. They continue to be impressed with out abilities to solve issues quickly and provide a superior blending and cleaning solution.

The Cornelius partnership has also opened up an opportunity to create hopefully a derivative of this product for YUM Restaurants International (YRI). YRI want more of a granita flavor profile versus Taco Bell, so they team will review this request as time permits (but lower priority than delivering the prototypes for Taco Bell). YRI have 9,000 stores, but it is not perfectly clear yet how many would adopt this menu item and have room for the equipment.

Both companies have expressed interest in also "bundling" the sale of some HBC equipment (e.g. drink mixers) with their batch freezers or granita machines. This would allow a large chain to deal with one company for their frozen beverage needs, and would involve HBC earlier on in the development of frozen beverages (versus finding out about the opportunity when the spec for the menu item is set). We are working to get specifics on how this can be best structured benefit both companies.

**Phase 3**

The team have not focused on a "stand alone" version of this equipment. We have found limitations on the disposable cup material and the ice types used regarding cup breakage, but the concept of a stand alone machine as a derivative of the Cornelius blender module continues to have merit.

1. Below is a list of next steps & sequence of events:

HIGHLY CONFIDENTIAL

a) The store test of the Cornelius / HBB machine has been delayed and will now start early January 2010. Currently this machine is being tested at Ecolab for sanitation. This sanitation testing will be repeated by Taco Bell over Christmas, and then the machine will be moved to a corporate Taco Bell store for store testing where smoothies will be sold to customers. This unit uses PLC controls in the HB module.

b) A second machine is being built by Cornelius and will be submitted to NSF for their preliminary testing in December. Following this testing, the machine will go to Pepsi. This unit also uses PLC controls.

c) A third machine will be built by Cornelius to undergo severe environment testing at Cornelius. HBB have been asked to build two additional module prototypes for this machine & deliver them by February 2010. These will have prototype embedded PCB controls (as opposed to PLC controls).

d) A fourth Cornelius machine will be built and submitted to NSF for final NSF evaluation mid February. This unit will have prototype embedded PCB controls and will only have one HB module. This module will be a new prototype that needs to be built and supplied by HBB.

e) A fifth machine will be built by Cornelius and HB will recondition two existing prototype modules for this machine.  Cornelius will use this machine for embedded controls evaluation starting in February.

f) The first off tool machine will be built by Cornelius for UL testing. HBB intends to supply two off tool modules to assist Cornelius getting UL for the overall machine, and we are investigating HBB getting the module UL recognized via our lab in Richmond.

g) Large scale field testing is set for June time frame in New Orleans. We expect this will require approx. 30 blender modules delivered late April to Cornelius for an early June installation in Taco Bell stores. Taco Bell as spending approx. $7M to renovate all stores to a new "oasis" concept that they are also testing as part of this field test. Taco Bell are expected to pay for these 30 blender modules.

h) Following this field testing, a selection of who will get the lion share of the business (Cornelius or Manitowoc) is expected in Q3 2010.

2. Pepsi have communicated to Cornelius that the smoothie menu item is the best performing item among new products Taco Bell are considering, and that Taco Bell will introduce the menu item. In the past this had been a risk to the project (that the menu item may not sell well and be cancelled). Taco Bell have communicated to Cornelius that sensory testing this December has been cancelled, which seems to support Pepsi's opinion.

## Recommendation & Rationale
**Recommendation:**  **Phase 1** Partner with Cornelius on an exclusive basis to develop a blender module for integration into their equipment. Ensure that the design is flexible enough to also be built into a stand alone step-down version for sale by HBC.

**Phase 2** Similar to BC1. However,  we may find that we cannot use the identical design for the stand alone unit without restrictions on ice type or cup type that may limit the number of customers who can use it.

**Phase 3** Recommendation is to tool up blender module and continue to work with Cornelius to secure Taco Bell business.

**Rationale:**  **Phase 1**
*  Gives us profitable incremental growth at QSRs while taking advantage of Cornelius's contacts, infrastructure & expertise. This platform also allows us to use the same technology for our customer base who value ingredient savings (no waste), labor savings (no pouring & automatic cleaning), consistency and improved sanitation.
*  Please see the file attached in "Supporting Documentation" for the rationale of unit volume for the blender module that would be incorporated within the Cornelius machine.

**Phase 2**
*  Rationale remains unchanged and has strengthened given the change to have two modules per machine versus one module.

**Phase 3** Same as BC1 and BC2.

HIGHLY CONFIDENTIAL

HBBF0013066

## Miscellaneous Considerations

**Consumer Insight:**

**Phase 1**

Smoothies at Quick Service Restaurants (QSRs) are growing in popularity. QSR customers are making more healthy menu choices, increasingly they snack at breakfast, and they are snacking more often (and eating less at sitting). Smoothies are a prefect menu item to meet all three of these trends. 25% of all smoothies consumed in the US are sold by QSRs, and smoothie sales by QSRs are expected to increase 20% per year through 2013. *(source Doug Hoefeele, IMI Cornelius, March 09)*

**Phase 2**
- No change from BC1.

**Phase 3**
- In line with BC1.
- McDonalds have purchased 10,000 smoothie machines for their stores, indicating their commitment to the menu item.
- Pepsi have heard from Taco Bell that they intend adding smoothies to their stores. Earlier there was a risk that the menu item may not sell well and be cancelled. (we just do not know at this stage if the machines will be built by Cornelius or Manitowoc).

**Desired Placements:**

**Phase 1**
- YUM Brands (Taco Bell) have been identified by Cornelius as the most likely partner for the fully automated equipment. Smaller chains would be the target for the stand alone equipment.

**Phase 2**
- Taco Bell (US) remains the primary target. The goal is that YRI use the same machine or a derivative of the same machine, but we will not know this until we understand how to match the more granita drink texture they desire.

**Phase 3**
- No change on Taco Bell being the primary customer. YRI have recently indicated to Cornelius that the integrated "blend in cup" solution is a lower priority to them given their current investment in the equipment for the Krusher program (Taylor batch machine and Vita Mix drink mixer).

**Risks:**

**Phase 1**
- **Timing:** While Cornelius expect YUMI to install production units towards the end of 2010 and the bulk in 2011, they have asked for a proof of concept that can be integrated into their equipment by May 18th 2009. YUMI Brands are testing the Enodis system in June and Cornelius want to also test a prototype of their unit in this same test to be considered.
- **IP:** There are several existing patents around blend in the cup.
- **Partnership:** The early signs are very promising following two conference calls with IMI President Tim Hubbard, however we do not have a finalized agreement in place and do not want to create innovation that Cornelius could produce without HBB.

**Phase 2**
- We will be tested against the Enodis / Manitowoc system in Taco Bell & the menu item is being tested on a larger scale by Taco Bell with consumers. There is a chance that the competitive machine could be selected ahead of ours, or that the menu item may fail to meet Taco Bell expectations and the program could be cancelled.
- Timing is now June 23rd for two prototypes.
- Much progress has been made around the area of IP, and the team feels more confident than we did in BC1 in this area.
- The partnership with Cornelius has strengthened. We visited their offices and they have made two trips to Richmond since BC1. They remain very good to work with, and remain committed to us as partners.

**Phase 3**
- **Volume:** BC3 volume assumes we will the lion share of the business and beat Manitowoc. This is our goal and intention, however we cannot rule out that Manitowoc beats our price, performance etc. and we become the B supplier at much lower volume. To protect against this low side,
- **Timing:** A key part of winning the business is a successful June field test - being able to deliver blender modules by late April to Cornelius and them performing as expected in testing. The schedule is extremely tight, requiring tooling to start in December and relatively few issues with off tool parts, etc.
- **Cup Breakage:** The challenge of preventing cup breakage was moved from HB to the cup supplier (Berry Plastics). They are currently trying different material formulations and we are testing with smaller diameter blades. This work looks promising at this stage, but we cannot claim it is complete. A risk remains if HB cannot avoid cup breakage and Manitowoc can blend with no cup damage.
- **Agreement Status:** The fREAL agreement is in its final stages with execution expected in December. The Cornelius LOU is completed & agreed upon, and it is in their court to execute. They are drafting the definitive agreement and expecting a first draft shortly. We are treating the agreement with urgency, but it may be hard to get this done before Christmas. We expect no issues, however it would certainly be preferred to have both agreements completed before BC3.

HIGHLY CONFIDENTIAL

**Other Considerations:**

Phase 1
- Unit volume projections was derived from an analysis done by IMI Cornelius. HBB have recreated this analysis using our own data to ensure their volumes make sense to us and add up. Please see attachment under "Supporting Documentation". For the business case, we have used their "Medium Adoption Scenario" to be conservative.
- Since the product has yet to be fully defined, the PFC and tooling estimates do not have any level of accuracy but just represent a "best guess". Cornelius are suggesting an open book approach to pricing where our SM would be between 40% and 50%. For the financials I used 45%. The NPV file in the business case is fully burdened, however the sale of goods to Cornelius would avoid selling, warehousing, and other expenses associated with our more traditional channels.

Phase 2
- The financials above reflect updated PFC and tooling estimates, and assume that 100% of machines sold have two blender modules. If machines are sold by Cornelius with one blender module, the SM per unit for HBB would be $750 versus approx. $500 if two modules are used. Therefore, if some machines are sold with one module versus two our project NPV is not greatly affected.

Phase 3
- No change from BC2.

**Target FOB:**

| | |
|---|---|
| Core | $0.00 |
| Secondary | $0.00 |

**Benchmark Competitive Products**

| | Brand | Model Number | Retail Price Point | Image |
|---|---|---|---|---|
| Competitive Product 1: | | | $0.00 | |
| Competitive Product 2: | | | $0.00 | |
| Competitive Product 3: | | | $0.00 | |

| | | | |
|---|---|---|---|
| Concept Source: | Outside Expert | Project Genre: | Innovation Level: |
| | | 120V Commercial | 4 New To The |
| CoDev: | N | | Value Proposition: |
| | | | OTB |

**Comments:** Brian O'Flynn 06/30/2009 01:00:17 PM - Submitted to VP of Engineering for Approval - Per EC Meeting 6/29/09.

Brian O'Flynn 06/29/2009 04:48:57 PM - Submitted to Project Engineer for Approval - Presented in 6/29/09 EC Meeting. Routing for BC2 approval.

Brian O'Flynn 03/27/2009 12:57:18 PM - Submitted to VP of Marketing for Approval with the following comments:  - PFC, tooling & product definition is our best guess at this time.

HIGHLY CONFIDENTIAL

HBBF0013068

## ID Files

**Phase 1**
No ID at this stage

**Phase 2**
This is a very preliminary ID from the Cornelius team. The second file shows this updated with input and help from Mark Steiner.

Cornelius ID.jpg

Cornelius ID with Steiner Updates.jpg

**Phase 3**



## NPV Files

**Phase 1**
- NPV Template BCSumP1.xls

**Phase 2**
- NPV Template BCSumP2.xls

**Phase 3**
- NPV Template BCSumP3.xls

## Asset Form

## Tooling Quote

HIGHLY CONFIDENTIAL

## Supporting Documentation

Rationale for unit volume is detailed in this attachment.

Cornelius Business Case Projection 3-26-09.xls

Background of who IMI Cornelius are is detailed in this presentation:

Cornelius Introduction.pdf

Business Case 2: 5 Year NPV file is attached. At 12.4% SG&A, the
**5yr NPV is $3,044,354, IRR 172%, and Payback 1.07yrs.**

Cornelius 5 Year NPV BC2.xls

The presentation given to the EC on 6/29/09 is also attached:

EC Mtg 6-29-09 & BC2.pdf

## History

Business Case Approval/Rejection History:

| Reviewers: | History/Date: |
|---|---|
| | Approved By:  Greg Trepp on 03/27/2009 01:06:16 PM - - |
| VP of Marketing:  Jill Gaynor | Approved By:  Ernie Pryor on 06/30/2009 11:32:53 AM - - |
| Project Engineer:  Brian Williams | Approved By:  Keith Burns on 06/30/2009 01:44:08 PM - - We have added ~$275K to STF2 to cover |
| VP of Engineering:  Keith Burns | increased prototype costs.  We are also exploring alternative ways to reduce the upfront costs. |
| | |
| Purchasing Representative:  Juan Chairez; Blue Hu | |
| CFO:  Jim Taylor | |
| CEO:  Greg Trepp | |

HIGHLY CONFIDENTIAL

AFE Assigner: Tina Saintsing; Trent Keith

HIGHLY CONFIDENTIAL

HBBF0013071

EXHIBIT 7

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF DELAWARE
 3
 4     F'REAL FOODS, LLC and          )
       RICH PRODUCTS CORPORATION,     )
 5                                     )
                  Plaintiffs,          )
 6                                     )
 7        -vs-                         )  C.A. No. 16-41 (GMS)
 8                                     )  CONSOLIDATED
       HAMILTON BEACH BRANDS, INC.,    )
 9     HERSHEY CREAMERY COMPANY and    )
       PAUL MILLS d/b/a MILLS BROTHERS )
10     MARKETS,                        )
                                       )
11                Defendants.          )
       _____
12
13          HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
14             VIDEOTAPED DEPOSITION OF BRIAN P. WILLIAMS
15                    8:56 a.m. to 6:04 p.m.
16                     December 13, 2017
17                     Glen Allen, Virginia
18
19
20
21     REPORTED BY:
22     Rhonda D. Tuck, RPR, CRR
23     Job No. 2761269
24
25     Pages 1 - 226
```

Page 1

# REMAINDER OF THIS EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# HBB Business Case Summary
## Phase 3

| | | |
|---|---|---|
| **Project Name:** | Blend in Cup – Cornelius | |
| **Initiator:** | Brian O'Flynn | |
| **Product Category:** | Commercial Blender | |
| **Category Retail $:** | $5,000,000 | |

| **Business Case #:** | BC09230 |
|---|---|
| **Date Initiated:** | 03/27/2009 |
| **Product Manager:** | Terry Copenhaver |
| **HBPS $ Share:** | 0.0% |

| | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|
| **Projected Completion Date:** | 10/01/2010 | 10/01/2010 | 10/01/2010 |
| **Supplier:** | Main Power Electrical Factory, Ltd. | Main Power Electrical Factory, Ltd. | Main Power Electrical Factory, Ltd. |

**Category Growth:** 10.0%

## Financial Summary

| | Phase 1 | | | | Phase 2 | | | | Phase 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Total | Year 1 | Year 2 | Year 3 | Total | Year 1 | Year 2 | Year 3 | Total |
| Unit Sales: | 2,950 | 3,050 | 3,200 | 9,200 | 5,400 | 5,400 | 5,400 | 16,200 | 10,800 | 10,800 | 10,800 | 32,400 |
| NetSales$: | $2,704,555 | $2,804,495 | $2,954,405 | $8,463,455 | $5,635,980 | $5,635,980 | $5,635,980 | $16,907,940 | $12,404,448 | $12,404,448 | $12,404,448 | $37,213,344 |
| SM$: | $1,229,555 | $1,279,495 | $1,354,405 | $3,863,455 | $2,698,380 | $2,698,380 | $2,698,380 | $8,095,140 | $4,693,248 | $4,693,248 | $4,693,248 | $14,079,744 |
| SM%: | 45.5% | 45.6% | 45.8% | 45.6% | 47.9% | 47.9% | 47.9% | 47.9% | 37.8% | 37.8% | 37.8% | 37.8% |
| NPV: | | | | $494,218 | | | | $1,117,814 | | | | $276,201 |
| ROI: | | | | 51.1% | | | | 63.8% | | | | 22.6% |
| Payback: | | | | 2.2 | | | | 2.3 | | | | 3.7 |

## Capital & Project Expenses

| | Phase 1 | | | Phase 2 | | | Phase 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 0 | Year 1 | Year 2 | Total | Year 0 | Year 1 | Year 2 | Total | Year 0 | Year 1 | Year 2 | Total |
| Capital $: | $275,000 | $0 | $0 | $275,000 | $126,500 | $0 | $0 | $126,500 | $192,500 | $0 | $0 | $192,500 |
| Packaging $: | | | | $5,000 | | | | $0 | | | | $0 |
| Agency $: | | | | $20,000 | | | | $20,000 | | | | $20,000 |
| Sample $: | | | | $25,000 | | | | $283,800 | | | | $283,800 |
| OH Variance $: | | | | $0 | | | | $0 | | | | $0 |
| Other Project Expense $: | | | | $100,000 | | | | $21,000 | | | | $21,000 |
| Commissions/Royalty: | | | | 0.0% | | | | 0.0% | | | | 0.0% |

HIGHLY CONFIDENTIAL

*Treal Foods, LLC. et al. v. Hamilton Beach Brands, Inc., et al.*
**PTX 8**
C.A. No. 16-41 (CFC)

HBBF0171457

**Other Selling Expenses %:**   0.0%   0.0%   0.0%

**Phase 2 Notable Changes:**

Cornelius now wants to put two of our blender modules per machine which greatly increases our volume and NPV. They also want to get a greater number of prototypes which greatly increases our expenses. The quote for electronics development is higher than earlier estimated ($20K versus $10K using our earlier internal estimate). The delivery date for us to deliver two blender module prototypes is now July 23rd (initially Cornelius wanted to send a complete machine to Taco Bell on 7/1, this date is now 8/1). The sample expenses are included assuming that all prototypes before tool start are purchased from a local model shop versus utilizing Asian or other lower cost options.

SG&A has been changed to 12.4% (excludes sales but includes admin, engineering & marketing). Note: template NPV cannot be changed in BC at this time ...however, the 5 and 3 year financials with 12.4% SG&A are as follows:

5 Year: NPV $3,044,354, ROI 172.4%, Payback 1.07 years.
3 Year: NPV $1,853,414, ROI 110.4%, Payback 1.59 years.

The HBH2000 stand alone module (that would be sold under the HBC brand) has been eliminated from BC2 for several reasons: all resources at this time are focused on Cornelius, the stand alone module would require additional tooling, agency and expense costs. We would prefer the Cornelius project stand on its own and then follow up with a new BC (or a derivative of this BC) for the stand alone unit.

Engineering have improved the design greatly from the initial concept, and now only one large identified issue is unresolved. Taco Bell want to blend in very fragile PP cups. The equipment we (Cornelius and HBB) are competing with for the Taco Bell business is made by Enodis / Manitowoc. We have been told by Pepsi that their machine does not break cups, so our challenge is to also not break cups while delivering a better blended drink.

**Phase 3 Notable Changes:**

1. The method by which the machine cleans itself between cycles became a challenge during the development phase. This is being solved with a licence agreement between a company called fREAL (who have IP in this area that we intend using) and HBB. The fREAL agreement calls for a $50,000 up front payment and $35 royalty per blender module. These costs have been included in the financials. We believe having access to this IP is a competitive advantage and it will cause problems for our competitor (Manitowoc / Enodis).

2. Main Power have quoted the blender module material cost and we have estimated the PFC to be $679. This is considerably more than our BC2 estimate for three reasons: 1. We have added the $35 royalty payment to fREAL, making our total cost to Cornelius $679 + $35 = $714. 2. Our last costed BOM assumed a die cast frame. To save time we are proposing to build EB units for testing with a welded frame that costs $100 more than earlier estimates. 3. The linear actuator quoted by MP is approx. $40 more expensive than our BC2 estimate.

We believe this PFC is worst case and there are several cost saving ideas. We think the weldment could be approx halved in cost if parts of the assembly were die cast parts. MP are also quoting the carriage, bearing and slide assembly approx. $20 higher than quotes we have obtained. With both of these combined, the PFC drops by approx. $115 to approx. $600.

3. Tooling has remained consistent with estimates in EC updates, but has increased from an estimate of $115,000 in BC2 to the more recent estimate of $175,000. We have looked at ways to minimize the investment in tooling before we have a go no/go from YUM!, and believe that at least $113,000 of the tools need to be to started now to provide samples that work well in field testing and pass agency tests.

## PDD Summary

| Model | Phase 1 | | | | | Phase 2 | | | | | Phase 3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Net $ | PFC | BP | RR | SM% | Net $ | PFC | BP | RR | SM% | Net $ | PFC | BP | RR | SM% |
| IMI2000-CE | $7,364,115 | $500.00 | $957.00 | 5.0% | 45.0% | $16,907,940 | $544.00 | $1,065.00 | 2.0% | 47.9% | $18,606,672 | $714.00 | $1,172.00 | 2.0% | 37.8% |
| HBH2000 | $1,099,340 | $500.00 | $1,052.00 | 5.0% | 50.0% | $0 | $600.00 | $1,150.00 | 5.0% | 0.0% | $0 | $600.00 | $1,150.00 | 5.0% | 0.0% |
| IMI2000 | $0 | $0.00 | $0.00 | 0.0% | 0.0% | $0 | $0.00 | $0.00 | 0.0% | 0.0% | $18,606,672 | $714.00 | $1,172.00 | 2.0% | 37.8% |

HIGHLY CONFIDENTIAL

HBF0171458

**C = Cancelled**

**Tooling Rights:** Worldwide

**Situation Analysis**
**Situation:**

**Phase 1**

To deliver a high quality smoothie made of ice, dairy and fruit at a busy QSR (Quick Serve Restaurant), a level of automation is required. The optimal approach is to automatically deliver the ice, fruit syrup and or dairy ingredients directly into the blending device for improved sanitation, precise portion control, and minimized labor (relative to using a high performance blender).

For HBB to participate in this QSR solution we would need a partner who brings expertise in ice making, ice storage, and dispensing. However, none of the large food service equipment manufacturers have blending expertise. When Mc Donald's asked Taylor, Enodis/Manitowoc to quote on an automated smoothie machine, they partnered with Island Oasis and VitaMix respectively.

We have been approached by IMI Cornelius. They are the world leader in dispensing, and also manufacture ice machines, refrigerated cabinets, and various chilled beverage equipment under the Cornelius and Jet Spray brands. IMI Cornelius is approx. the same size as HBB, and their parent company IMI Plc (who are English owned) are approx. the same size as NACCO Industries. Cornelius seem to have a very similar culture as HBB (solution/innovation driven & very process oriented).

Cornelius have asked us to partner with them to develop a machine that can automatically prepare smoothies in disposable cups. While they have expertise in their core of dispensing & ice, they require our expertise in blending. They want us to develop a "blender module" that would fit within their larger piece of equipment. They would dispense ice and liquid ingredients into a cup, and then our blender module would blend this drink in the cup, and sanitize itself before the next drink can be blended.

Cornelius have a very strong relationship with YUM! Brands and have been asked by YUM to develop a product for Taco Bell. Taco Bell have 6,000 outlets in the US that would be targets for this equipment.

**Phase 2**

HBB has also identified a market for a "stand alone" blender module that could be housed inside a more compact cabinet. This could blend ingredients in a cup after the ingredients have been manually dispensed. For smaller chains this offers the benefit of no cleaning of blender containers, zero product waste, and excellent sanitation ..... while being far more affordable than the larger piece of equipment. Chain that already have ice equipment and are perhaps tight on space may also favor this solution.

YUM Brands will test both our machine and the Enodis / Manitowoc machine. This test will first be in their labs and then in two Taco Bell stores. The Cornelius team have been highly engaged with Taco Bell and are driving the project very well. They continue to be impressed with out abilities to solve issues quickly and provide a superior blending and cleaning solution.

The Cornelius partnership has also opened up an opportunity to create hopefully a derivative of this product for YUM Restaurants International (YRI). YRI want more of a granita flavor profile versus Taco Bell, so they team will review this request as time permits (but lower priority than delivering the prototypes for Taco Bell). YRI have 9,000 stores, but it is not perfectly clear yet how many would adopt this menu item and have room for the equipment.

Both companies have expressed interest in also "bundling" the sale of some HBC equipment (e.g. drink mixers) with their batch freezers or granita machines. This would allow a large chain to deal with one company for their frozen beverage needs, and would involve HBC earlier on in the development of frozen beverages (versus finding out about the opportunity when the spec for the menu item is set). We are working to get specifics on how this can be best structured benefit both companies.

The team have not focused on a "stand alone" version of this equipment. We have found limitations on the disposable cup material and the ice types used regarding cup breakage, but the concept of a stand alone machine as a derivative of the Cornelius blender module continues to have merit.

**Phase 3**

1. Below is a list of next steps & sequence of events:

HIGHLY CONFIDENTIAL

HBBF0171459

a) The store test of the Cornelius / HBB machine has been delayed and will now start early January 2010. Currently this machine is being tested at Ecolab for sanitation. This sanitation testing will be repeated by Taco Bell over Christmas, and then the machine will be moved to a corporate Taco Bell store for store testing where smoothies will be sold to customers. This unit uses PLC controls in the HB module.

b) A second machine is being built by Cornelius and will be submitted to NSF for their preliminary testing in December. Following this testing, the machine will go to Pepsi. This unit also uses PLC controls.

c) A third machine will be built by Cornelius to undergo severe environment testing at Cornelius. HBB have been asked to build two additional module prototypes for this machine & deliver them by February 2010. These will have prototype embedded PCB controls (as opposed to PLC controls).

d) A fourth Cornelius machine will be built and submitted to NSF for final NSF evaluation mid February. This unit will have prototype embedded PCB controls and will only have one HB module. This module will be a new prototype that needs to be built and supplied by HBB.

e) A fifth machine will be built by Cornelius and HB will recondition two existing prototype modules for this machine.  Cornelius will use this machine for embedded controls evaluation starting in February.

f) The first off tool machine will be built by Cornelius for UL testing. HBB intends to supply two off tool modules to assist Cornelius getting UL for the overall machine, and we are investigating HBB getting the module UL recognized via our lab in Richmond.

g) Large scale field testing is set for June time frame in New Orleans. We expect this will require approx. 30 blender modules delivered late April to Cornelius for an early June installation in Taco Bell stores. Taco Bell as spending approx. $7M to renovate all stores to a new "oasis" concept that they are also testing as part of this field test. Taco Bell are expected to pay for these 30 blender modules.

h) Following this field testing, a selection of who will get the lion share of the business (Cornelius or Manitowoc) is expected in Q3 2010.

2. Pepsi have communicated to Cornelius that the smoothie menu item is the best performing item among new products Taco Bell are considering, and that Taco Bell will introduce the menu item. In the past this had been a risk to the project (that the menu item may not sell well and be cancelled). Taco Bell have communicated to Cornelius that sensory testing this December has been cancelled, which seems to support Pepsi's opinion.

# Recommendation & Rationale

**Recommendation:**

**Phase 1**

Partner with Cornelius on an exclusive basis to develop a blender module for integration into their equipment. Ensure that the design is flexible enough to also be built into a stand alone step-down version for sale by HBC.

**Phase 2**

Similar to BC1. However, we may find that we cannot use the identical design for the stand alone unit without restrictions on ice type or cup type that may limit the number of customers who can use it.

**Phase 3**

Recommendation is to tool up blender module and continue to work with Cornelius to secure Taco Bell business.

**Rationale:**

**Phase 1**

- Gives us profitable incremental growth at QSRs while taking advantage of Cornelius's contacts, infrastructure & expertise. This platform also allows us to use the same technology for our customer base who value ingredient savings (no waste), labor savings (no pouring & automatic cleaning), consistency and improved sanitation.
- Please see the file attached in "Supporting Documentation" for the rationale of unit volume for the blender module that would be incorporated within the Cornelius machine.

**Phase 2**

- Rationale remains unchanged and has strengthened given the change to have two modules per machine versus one module.

**Phase 3**

- Same as BC1 and BC2.

HIGHLY CONFIDENTIAL

HBF0171460

# Miscellaneous Considerations

**Consumer Insight:**

**Phase 1**

Smoothies at Quick Service Restaurants (QSRs) are growing in popularity. QSR customers are making more healthy menu choices, increasingly they are snacking at breakfast, and they are snacking more often (and eating less at each sitting). Smoothies are a prefect menu item to meet all three of these trends. 25% of all smoothies consumed in the US are sold by QSRs, and smoothie sales by QSRs are expected to increase 20% per year through 2013. (source Doug Hoefele, IMI Cornelius, March 09)

- No change from BC1
- In line with BC1.
- McDonalds have purchased 10,000 smoothie machines for their stores, indicating their commitment to the menu item.
- Pepsi have heard from Taco Bell that they intend adding smoothies to their stores. Earlier there was a risk that the menu item may not sell well and be cancelled. (we just do not know at this stage if the machines will be built by Cornelius or Manitowoc).

**Phase 2**

**Phase 3**

**Desired Placements:**

**Phase 1**

- YUM Brands (Taco Bell) have been identified by Cornelius as the most likely partner for the fully automated equipment. Smaller chains would be the target for the stand alone equipment.

**Phase 2**

- Taco Bell (US) remains the primary target. The goal is that YRI use the same machine or a derivative of the same machine, but we will not know this until we understand how to match the more granita drink texture they desire.

**Phase 3**

- No change on Taco Bell being the primary customer. YRI have recently indicated to Cornelius that the integrated "blend in cup" solution is a lower priority to them given their current investment in the equipment for the Krusher program (Taylor batch machine and Vita Mix drink mixer).

**Risks:**

**Phase 1**

- **Timing:** While Cornelius expect YUM to install production units towards the end of 2010 and the bulk in 2011, they have asked for a proof of concept that can be integrated into their equipment by/May 18th 2009. YUM Brands are testing the Enodis system in June and Cornelius want to also test a prototype of their unit in this same test to be considered.
- **IP:** There are several existing patents around blend in the cup.
- **Partnership:** The early signs are very promising following two conference calls with IMI President Tim Hubbard, however we do no: have a finalized agreement in place and do not want to create innovation that Cornelius could produce without HBB.

**Phase 2**

- We will be tested against the Enodis / Manitowoc system in Taco Bell & the menu item is being tested on a larger scale by Taco Bell with consumers. There is a chance that the competitive machine could be selected ahead of ours, or that the menu item may fail to meet Taco Bell expectations and the program could be cancelled.
- Timing is now June 23rd for two prototypes.
- Much progress has been made around the area of IP, and the team feels more confident than we did in BC1 in this area.
- The partnership with Cornelius has strengthened. We visited their offices and they have made two trips to Richmond since BC1. They remain very good to work with, and remain committed to us as partners.

**Phase 3**

- **Volume:** BC3 volume assumes we will the lion share of the business and beat Manitowoc. This is our goal and intention, however we cannot rule out that Manitowoc beats our price, performance etc. and we become the B supplier at much lower volume. To protect against this low side.
- **Timing:** A key part of winning the business is a successful June field test - being able to deliver blender modules by late April to Cornelius and them performing as expected in testing. The schedule is extremely tight, requiring tooling to start in December and relatively few issues with off tool parts, etc.
- **Cup Breakage:** The challenge of preventing cup breakage was moved from HB to the cup supplier (Berry Plastics). They are currently trying different material formulations and we are testing with smaller diameter blades. This work looks promising at this stage, but we cannot claim it is complete. A risk remains if HB cannot avoid cup breakage and Manitowoc can blend with no cup damage.
- **Agreement Status:** The fREAL agreement is in its final stages with execution expected in December. The Cornelius LOU is completed & agreed upon, and it is in their court to execute. They are drafting the definitive agreement and expecting a first draft shortly. We are treating the agreement with urgency, but it may be hard to get this done before Christmas. We expect no issues, however it would certainly be preferred to have both agreements completed before BC3.

HIGHLY CONFIDENTIAL

HBBF0171461

**Other Considerations:**

**Phase 1**
- Unit volume projections was derived from an analysis done by IMI Cornelius. HBB have recreated this analysis using our own data to ensure their volumes make sense to us and add up. Please see attachment under "Supporting Documentation". For the business case, we have used their "Medium Adoption Scenario" to be conservative.
- Since the product has yet to be fully defined, the PFC and tooling estimates do not have any level of accuracy but just represent a "best guess". Cornelius are suggesting an open book approach to pricing where our SM would be between 40% and 50%. For the financials I used 45%. The NPV file in the business case is fully burdened, however the sale of goods to Cornelius would avoid selling, warehousing, and other expenses associated with our more traditional channels.

**Phase 2**
- The financials above reflect updated PFC and tooling estimates, and assume that 100% of machines sold have two blender modules. If machines are sold by Cornelius with one blender module, the SM per unit for HBB would be $750 versus approx. $500 if two modules are used. Therefore, if some machines are sold with one module versus two our project NPV is not greatly affected.

**Phase 3**
- No change from BC2.

**Target FOB:**

| | | |
|---|---|---|
| Core | $0.00 | |
| Secondary | $0.00 | |

**Benchmark Competitive Products**

| | Brand | Model Number | Retail Price Point | Image |
|---|---|---|---|---|
| Competitive Product 1: | | | $0.00 | |
| Competitive Product 2: | | | $0.00 | |
| Competitive Product 3: | | | $0.00 | |

| Concept Source: | Outside Expert | Project Genre: | 120V Commercial | Innovation Level: | 4 New To e |
|---|---|---|---|---|---|
| CoDev: | N | | | Value Proposition: | OTB |

**Comments:**

Brian O'Flynn 06/30/2009 01:00:17 PM --Submitted to VP of Engineering for Approval - -Per EC Meeting 6/29/09.

Brian O'Flynn 06/29/2009 04:48:57 PM --Submitted to Project Engineer for Approval - - Presented in 6/29/09 EC Meeting. Routing for BC2 approval.

Brian O'Flynn 03/27/2009 12:57:18 PM --Submitted to VP of Marketing for Approval with the following comments:  - -PFC, tooling & product definition is our best guess at this time.

HIGHLY CONFIDENTIAL

HBBF0171462

## ID Files

**Phase 1**
No ID at this stage

**Phase 2**
This is a very preliminary ID from the Cornelius team. The second file shows this updated with input and help from Mark Steiner.

Cornelius ID.jpg

Cornelius ID with Steiner Updates.jpg

**Phase 3**



## NPV Files

**Phase 1**
- NPV Template BCSumP1.xls

**Phase 2**
- NPV Template BCSumP2.xls

**Phase 3**
- NPV Template BCSumP3.xls

## Asset Form

## Tooling Quote

HBBF0171463

HIGHLY CONFIDENTIAL

## Supporting Documentation

Rationale for unit volume is detailed in this attachment:



Cornelius Business Case Projection 3-26-09.xls

Background of who IMI Cornelius are is detailed in this presentation:



Cornelius Introduction.pdf

**Business Case 2:** 5 Year NPV file is attached. At 12.4% SG&A, the

## 5yr NPV is $3,044,354, IRR 172%, and Payback 1.07yrs.



Cornelius 5 Year NPV BC2.xls

The presentation given to the EC on 6/29/09 is also attached:



EC Mtg 6-29-09 & BC2.pdf

## History

## Business Case Approval/Rejection History:

**Reviewers:**

VP of Marketing: Atle Larsen
Project Engineer: Brian Williams
VP of Engineering: Keith Burns

Purchasing Representative: Juan Chairez; Blue Hu
CFO: Jim Taylor
CEO: Greg Trepp

**History/Date:**

Approved By: Greg Trepp on 03/27/2009 01:06:16 PM --
Approved By: Ernie Pryor on 06/30/2009 11:32:53 AM --
Approved By: Keith Burns on 06/30/2009 01:44:08 PM -- We have added ~$275K to STF2 to cover increased prototype costs. We are also exploring alternative ways to reduce the upfront costs.

HIGHLY CONFIDENTIAL

HBBF0171464

HBBF0171465

**AFE Assigner:** Tina Saintsing; Trent Keith

HIGHLY CONFIDENTIAL