# EXHIBIT W

```
                     - VOLUME 1 -

          IN THE UNITED STATES DISTRICT COURT

          IN AND FOR THE DISTRICT OF DELAWARE

                        - - -


 F'REAL FOODS, LLC and RICH      :   CIVIL ACTION
 PRODUCTS CORPORATION,           :
                                 :
             Plaintiffs,         :
                                 :
     vs.                         :
                                 :
 HAMILTON BEACH BRANDS,          :
 INC., HERSHEY CREAMERY          :
 COMPANY and PAUL MILLS          :
 d/b/a MILLS BROTHERS            :
 MARKETS,                        :
                                 :   NO. 16-41 (CFC)
             Defendants.         :   CONSOLIDATED


                        - - -

                    Wilmington, Delaware
                    Monday, April 29, 2019
                    9:08 o'clock, a.m.

                        - - -

 BEFORE:   HONORABLE COLM F. CONNOLLY, U.S.D.C.J., and a jury

                        - - -

 APPEARANCES:


           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
           BY:  RODGER D, SMITH II, ESQ.,
                MICHAEL J. FLYNN, ESQ. and
                TAYLOR HUGA, ESQ.


                    -and-

                                   Valerie J. Gunning
                                   Official Court Reporter
```

```
 1    APPEARANCES (Continued):

 2
              SIDEMAN & BANCROFT LLP
 3            BY:  GUY W. CHAMBERS, ESQ. and
                   PETER COLOSI, ESQ.
 4                 (San Francisco, California)

 5
                   Counsel for Plaintiffs
 6                 f'real Foods, LLC and Rich Products
                   Corporation
 7

 8
              DRINKER BIDDLE & REATH LLP
 9            BY:  FRANCIS DiGIOVANNI, ESQ. and
                   THATCHER A. RAHMEIER, ESQ.
10

11                      -and-

12
              DRINKER BIDDLE & REATH LLP
13            BY:  WILLIAM S. FOSTER, JR., ESQ.,
                   BRIANNA L. SILVERSTEIN, ESQ. and.
14                 REEYA THAKRAR, ESQ.
                   (Washington, D.C.)
15

16                 Counsel for Defendants

17
                        -  -  -
18

19

20

21

22

23

24

25
```

1    firms.  I had trouble finding all my documents.  We did
2    raise it in subsequent letters.
3             THE COURT:  No.  Why didn't you raise the issue
4    of subsequent testing, that you were going to then try to
5    introduce subsequent testing?
6             MR. FOSTER:  Oh, Your Honor, we didn't know it
7    was a part of the case until -- we didn't know it was a part
8    of the case until you ruled at the pretrial hearing.
9             We provided that the, we provided the grinding
10   testing, sorry, the comments on the testing immediately.
11   Then we didn't have access to our expert until we were able
12   to find the most recent response.
13            Again, it's probably moot, the second
14   supplemental, second supplemental because we shouldn't have
15   anything to respond to, and it just really comes down to are
16   we permitted to respond to Dr. Maynes' report on the
17   grinding.
18            THE COURT:  All right.  You know what, I'm going
19   to let it in.  I'm going to deny the motion to strike.  I am
20   troubled by both sides.  I mean, because I have reviewed the
21   contentions.
22            I mentioned this at the pretrial conference.  I
23   do think there's some gamesmanship on both sides in this
24   case.  I think it's certainly not consistent with the spirit
25   of the rules even if it technically okay.  I question that.

1   And so it puts the Court in a real bind to figure out
2   whether there were adequate disclosures.  And, again, I
3   think if I had been in charge of the case from the
4   beginning, it was my case, I would have hopefully put an end
5   to this kind of gamesmanship.  It's sad.
6              And I'm really in an untenable position of
7   trying to figure out what is an adequate disclosure, and the
8   problem is, you all rely on documents like this letter other
9   than the response to the formal discovery requests, and then
10  you rely on the fact that the rule does refer to otherwise
11  disclosed, as you pointed out at the hearing the last time
12  we met.
13             And, you know, so what is a judge to do?  It's
14  certainly not justice because it's arbitrary, and I'm just
15  going to let it in.  And, you know, I just wouldn't -- if I
16  were aware of this kind of conduct, the back and forth on
17  both sides, I wouldn't have tolerated it from the beginning
18  and we wouldn't be here, but we are where we are.  So I will
19  make a relatively arbitrary decision, I admit that for the
20  record, because I can't go back and dissect when the
21  disclosures were made, and I'm just going to let it in.  All
22  right?
23             MR. FOSTER:  Yes.
24             THE COURT:  That's where we are.  We'll split
25  that time evenly.

1    technology.

2             MR. FOSTER: Objection, Your Honor. Can we have
3    a sidebar real quick?

4             THE COURT: We'll go very quick. This is our
5    first sidebar. We're going to try to limit them. If I
6    think it's going to expedite things for you all, I'm going
7    to hold them.

8             All right. So stand up if you want. We'll try
9    to move quickly.

10            (Sidebar conference held out of the hearing of
11   the jury as follows.)

12            MR. FOSTER: Your Honor, we had a meet and
13   confer last night. There's just some random pictures that
14   were submitted as trial exhibits. We had not an agreement
15   where they could use those pictures in their opening. We
16   said no problem. They weren't actually evidence. They're
17   just a piece of paper with some text written above it. We
18   had a meet and confer and they agreed last night. Mr.
19   Chambers wasn't on the meet and confer call.

20            MR. CHAMBERS: Well, they're illustrative of the
21   prior technology approaches. They're not earth-shattering
22   but they do show what the prior technology, and, you know, I
23   mentioned them in my opening, so I thought I ought to try to
24   get them in evidence.

25            MR. FOSTER: We had an agreement last night. We

1   went through these documents and, again, they're
2   demonstratives, and we said they shouldn't go to the jury
3   room.
4             THE COURT:  All right.  So I mean, I'm just
5   confused how something could be put into evidence or how it
6   could be shown only in opening and then never referenced
7   again at trial.  I can understand why you don't want them to
8   go back to the jury, I guess, but they can be used as a
9   demonstrative.
10            Do you have an objection to them using as a
11  demonstrative?
12            MR. FOSTER:  If he wants to put them on the
13  screen, that's fine.  We had a discussion last night about
14  it.  I thought it was resolved.
15            MR. CHAMBERS:  That's fine.  If I can throw them
16  up on the screen and given credit by the jury for having
17  addressed at trial what I mentioned in the opening.
18            THE COURT:  Right.  I was going to say, so my
19  objection to the manner in which you've handled this is,
20  because I didn't know about your meet and confers.
21            MR. CHAMBERS:  Neither did I.
22            THE COURT:  You cannot put in front of the jury,
23  or you can't have a witness identify something based on what
24  you presented in opening as a means to authenticate the
25  exhibit.

1  was not self-cleaning.  It was used just like you saw in an
2  Arby's, behind the counter, so somebody had to make the
3  milkshake when somebody ordered it and take it over to them
4  and hand it to them.  So that's where I got to this first
5  cut at it.
6  Q.    And did you sell many of the B1s?
7  A.    No, we didn't sell that many.  We sold less than 50 of
8  these.  So we sold some, but not that many.  That was, we
9  were hoping to sell a lot more than that.  So as it shows
10 there, unfortunately, they were not hot.
11 Q.    What do you think was the problem?
12 A.    Well, so what really came to be known, first, we --
13 the few that we did sell were sold in convenience stores,
14 but they were behind the counter, so somebody had to make a
15 milkshake whenever anybody wanted one.
16        The person that was supposed to be checking
17 people out had to go make a milkshake and that wasn't very
18 convenient.  But we did sell some.  We went to a convenience
19 store show.  Once a year there's a trade show called the
20 National Association of Convenience Store Trade Shows.
21 NACSTS is what it's really called.  We went there with this
22 blender to find out how many other people would be willing
23 to do, like the two that we had sold.
24        In particular, one gentleman walked up to the
25 booth and I was standing there as he came up and said, well,

1   I recognize the chain he was from.  He was from a company
2   based in Tulsa, Oklahoma called quick QuikTrip.  I knew they
3   had a lot of stores.  They're like Wawa stores, if you are
4   familiar with those, like good convenience stores you
5   actually want to go to, and they have them in Tulsa.
6           And so I knew as soon as he walked in, like, oh,
7   that guy, I'm going to listen to what he has to say.  He
8   said right off the bat, this looks great, but it's not
9   self-serve, so if you could make a self-serve, we would put
10  it in all of our stores, but if you can't, we won't.  That
11  was, for me, the inventor, that immediately started the
12  wheels turning.  This is close.  It's pretty darn easy to
13  use, but it's not self-serve.
14  Q.    When you say "we," who are you referring to?
15  A.    Yeah.  It's me.
16  Q.    Okay.
17  A.    So I learned because I don't like to exclude people, I
18  always say we, but, yeah.  This is stuff that I just spent
19  all my time thinking about.
20          So I got very focused on -- there was a team
21  actually working on this and I didn't want to distract them.
22  I started going, like, okay, what can we do, what can I do
23  to come up with an idea that is self-serve?
24          So the first question is:  Why isn't this
25  self-serve?  And so what I realized was that there's two

1  real problems with it.  You couldn't just walk up to that
2  and figure out how to use it, like just walk up the street.
3  I was a little too complicated.  I had to figure that out.
4  That's one problem.
5            But the other real problem was, that still
6  didn't keep things perfectly clean.  Stuff would kinds
7  of fly out of the cup once in a while inside.  Somebody
8  would have to clean it up a little.  It was okay because
9  there was somebody behind the counter to do that, but if you
10 are going to put it in a self-serve situation, there's
11 nobody to touch it.  Somebody behind the counter, they clean
12 up once a day.
13           So it needed to be perfectly self-cleaning,
14 self-rinsing.  It needed to take care of itself for a whole
15 day.  So that was another level of the kind of difficulty
16 that I had to figure out how to deal with.
17 Q.    At the 2001 National Association of Convenience Stores
18 Show, did you have a self-serve blender that could be
19 offered for sale or sold?
20 A.    2001?  No.  We had this.  This was not self-serve.
21 Q.    This meaning B1?
22 A.    This one, B1.
23 Q.    And did you know of anyone who had a self-cleaning
24 blender in 2001?
25 A.    No, there was no such thing.

1            MR. CHAMBERS:  We can figure that --
2            THE COURT:  What tab number are we talking
3    about?
4            MR. CHAMBERS:  It is tab 11.
5            THE WITNESS:  Okay.  There's no markings on
6    mine.  Are there markings on it?
7            THE COURT:  All right.
8            MR. FOSTER:  At the bottom, Your Honor.
9            THE COURT:  Hold on.
10           THE WITNESS:  All right.
11           THE COURT:  Mr. Farrell --
12           THE WITNESS:  Sorry.
13           THE COURT:  The witness only responds to a
14   question.
15           THE WITNESS:  Okay.  Can't ask them.
16           THE COURT:  We all play different roles in the
17   judicial process.
18           THE WITNESS:  Sorry.
19           THE COURT:  So aren't all the exhibits
20   premarked?  You didn't work this out before?
21           MR. FOSTER:  Your Honor, we did negotiate these.
22   We did say that the types of markings weren't to be
23   admitted.
24           There's another one.  Defense Exhibit 17 is the
25   same document.  He can publish it and show it.  I can show

1  it to you now.
2              MR. CHAMBERS:  Yes.  I don't want to spend a lot
3  of the jury's time --
4              THE COURT:  I don't know why you didn't work it
5  out ahead of time.  I will tell you what, let's have a
6  sidebar.
7              (Sidebar conference held out of the hearing of
8  the jury as follows.)
9              MR. CHAMBERS:  What are the markings you're
10 concerned about?
11             MR. FOSTER:  Well, there are markings here.
12 Your Honor, it's the chart at the bottom.
13             THE COURT:  I'm sorry?
14             MR. FOSTER:  It refers to the IPR at the bottom,
15 the other procedure.  We've already worked out that we
16 wouldn't include the markings from the IPR.
17             MR. DiGIOVANNI:  This was part of a lengthy meet
18 and confer.
19             MR. CHAMBERS:  We can use a defense exhibit if
20 you wanted that moved.
21             MR. FOSTER:  It's just because of the markings.
22 The only problem is the document.
23             THE COURT:  Let's have a defense exhibit moved
24 in.  In the future, this is something that can be worked
25 out.  All right.  Okay.  I'm not casting blame on --  I'm

1          (Sidebar conference held out of the hearing of
2     the jury as follows.)
3               THE COURT: Okay. So just a general comment to
4     the lawyers, all lawyers on both sides. If you are going to
5     stand up, I realize you're all trite to be polite, but you
6     have to say objection or I'm going to let it go.
7               MR. RAHMEIER: Yes.
8               THE COURT: All right?
9               MR. RAHMEIER: Yes, Your Honor.
10              THE COURT: Okay. So you objected?
11              MR. RAHMEIER: Yes.
12              THE COURT: All right.
13              MR. RAHMEIER: Two issues really. One, this
14    might be for a few of the documents he doesn't have much
15    knowledge of. If you want to ask him that, I guess that's
16    fine. That's why I said admit it.
17              Two, we asked last night and you guys agreed to
18    use the unredacted copy of that. It's PTX-eight.
19              MR. CHAMBERS: That's going to be my next
20    question. Can I go ahead with my next question?
21              THE COURT: Regardless, so just for the record
22    so everybody knows, again, the Federal Circuit knows what's
23    going on. So shown on the screen right now is a document
24    with redactions.
25              The first question: Is the document in

1  evidence?
2           MR. RAHMEIER: Well, we agreed to not object to
3  the unredacted one.
4           MR. CHAMBERS: That wasn't my question. Is the
5  document in evidence?
6           MR. RAHMEIER: I don't think it is. Is it?
7           MR. CHAMBERS: I just moved it.
8           MR. RAHMEIER: He just moved it and we didn't
9  object.
10          THE COURT: You didn't object to it being
11 introduced into evidence. So it is in evidence.
12          MR. RAHMEIER: With the misunderstanding
13 about -- yes.
14          THE COURT: And the second question is, and I
15 noticed this in the draft jury instruction. You all have a
16 paragraph or two about redacted confidential information,
17 which we have not hat jury charge yet, so we'll address that
18 in due course. But I guess the question is, I'm a little
19 concerned with why we're asking witnesses about redactions
20 that I would imagine the parties had agreed to.
21          MR. CHAMBERS: No. Do you mind if I lay a
22 foundation, Your Honor?
23          THE COURT: Not in front of the witness. What
24 is the whole purpose? What are you trying to do?
25          MR. CHAMBERS: Well, let me show you what was

1    redacted.

2                MR. FOSTER:  Your Honor, this document was

3    produced originally with redactions.  We later produced an

4    unredacted version after we did the advice of counsel

5    defense.

6                THE COURT:  Okay.  So what's the point?  Let me

7    get my glasses.  Hold on.

8                MR. CHAMBERS:  This was our foam board at

9    opening.

10               THE COURT:  All right.  So, again, so we have a

11   clear record, what has been redacted from the document

12   that's being presented is, "the method by which the machine

13   cleans itself between cycles became a challenge during the

14   development phase.  This is being solved with a license

15   agreement between a company called f'real (who have IP in

16   this area that we intend using, and HBB), end of quote.

17               All right.  Now, I can see why you would want to

18   get this statement in, Mr. Chambers.  In fact, you put it up

19   in front of the jury during your opening statement.

20               My question though is:  Why are we doing this

21   through a redacted version of the document?  I mean, I don't

22   know the history because I didn't handle the discovery.  Was

23   there a determination that, by the Court that the redaction

24   was improperly made or --

25               MR. SMITH:  No, Your Honor.

Williams - cross

1          THE COURT:  What's going on?
2          MR. FOSTER:  Your Honor, I produced the
3  document.  We ultimately decided to produce an unredacted
4  version just based on how discovery was proceeding, so we
5  supplemented our discovery and produced it.  It has already
6  been admitted.
7          THE COURT:  Why was it redacted in the first
8  place?
9          MR. FOSTER:  Because it was under the advice
10 of counsel.  It was a description counsel was providing.
11 Again --
12         THE COURT:  No.  So how do you redact this under
13 advice of counsel?
14         MR. FOSTER:  We thought it was based on analysis
15 of counsel.  We later learned, it wasn't, it was written by
16 Mr. O'Flynn.  B, if there was anything about the f'real
17 patents, we waived any privilege when we were, internally,
18 because we did the advice of counsel defense.
19         THE COURT:  You redacted it.  I'm going to let
20 the question go forward then.
21         (End of sidebar conference.)
22 BY MR. CHAMBERS:
23 Q.    Mr. Williams, I asked you about the redaction on
24 PTX-7, which was admitted into evidence.  I now ask you to
25 direct your attention to tab 2 of your notebook, which is