IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| F'REAL FOODS, LLC and RICH PRODUCTS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HAMILTON BEACH BRANDS, INC. and HERSHEY CREAMERY COMPANY,<br><br>Defendant. | Civil Action No. 16-41-CFC |

Rodger D. Smith II, Michael J. Flynn, and Taylor Haga, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Guy W. Chambers and Peter Colosi, SIDEMAN & BANCROFT LLP, San Francisco, California

*Counsel for Plaintiff*

Francis DiGiovanni and Thatcher A. Rahmeier, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; William S. Foster Jr., Kenneth M. Vorrasi, and Brianna L. Silverstein, FAEGRE DRINKER BIDDLE & REATH LLP, Washington, D.C.

*Counsel for Defendant*

**MEMORANDUM OPINION**

June 9, 2020
Wilmington, Delaware

*[signature]*
COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

The Court held a four-day jury trial in this patent infringement case filed by Plaintiffs f'real Foods LLC and Rich Products Corporation against Defendants Hamilton Beach Brands, Inc. (Hamilton Beach) and Hershey Creamery Company (Hershey). The jury awarded Plaintiffs $2,988,869.00 in lost profits. D.I. 264, Question 7(b). Pending before me is Defendants' Renewed Motion for Judgment as a Matter of Law of No Lost Profits or, in the Alternative, Motion for a New Trial on or Remittitur of Lost Profits. D.I. 296.

## I. BACKGROUND

Plaintiffs' only evidence of lost profits concerned the MIC2000 blenders used in Hershey's Shake Shop Express program. *See* Trial Tr. at 599:8–16. Plaintiffs hired a damages expert, Dr. Akemann, to model the profits Plaintiffs lost due to the Shake Shop Express Program. When Dr. Akemann calculated lost profits, he divided the time period of Hershey's infringement into when Hershey profited by renting its machines to retailers and when Hershey let retailers use its machines for free and profited by adding an upcharge to the cups used in its blenders. Trial Tr. at 607:8–16. He then modelled f'real's lost profits on Hershey's business model at the relevant time: part of the model was based on

adding an upcharge to cups and part of the model was based on renting machines. *Id.*

When determining Plaintiffs' market share, Dr. Akemann relied on an email written by f'real's COO Jens Voges (the "Voges Email") in which Voges summarized information from external sources regarding f'real's competitors. Trial Tr. 656:2–657:2.

When modeling Plaintiffs' lost profits due to lost sales on upcharged cups, Dr. Akemann looked to f'real's history of using an upcharge model at certain high-volume places. Trial Tr. at 387:21–388:2; Trial Tr. at 607:18–25. Dr. Akemann also looked to a "business document that f'real generated in the 2013 time period," which was when infringement from the Shake Shop Express program began. Trial Tr. at 608:5–7. In that document, f'real "focused on 70 cents as the appropriate upcharge." Trial Tr. at 608:14–15. Dr. Akemann testified that he relied on the 70-cents upcharge suggested in that document because the infringing blenders in the Shake Shop Express program had been located in a similar business context. Trial Tr. at 608:1–20.

When modeling Plaintiff's lost profits due to lost rentals, Dr. Akemann "assume[d] that [Plaintiffs] would have matched whatever rental fees [Hershey] charged." Trial Tr. at 664:5–6. Hershey charged customers roughly $150.00 per month. Trial Tr. at 664:1–12. When Defendants confronted Dr. Akemann with a

2

f'real document that showed f'real rented its machines for a $500.00 down payment and $350.00 per month, Dr. Akemann explained that he used Hershey's pricing to "control for the differences in pricing to do my analysis." Trial Tr. at 666:3–4.

Dr. Akemann calculated upcharge lost profits as $3,015,367.00; lost rental profits as $897,028.00; and total lost profits as $3,912,395.00. Trial Tr. at 615:4–5. The jury found the Defendants liable for $2,988,869.00 in lost profits. D.I. 264, Question 7(b).

## II.   LEGAL STANDARDS FOR NEW TRIAL OR REMITTITUR

The law of the regional circuit governs the standard for ordering a new trial or remittitur in a patent case. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013) (new trial); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1356 (Fed. Cir. 2013) (remittitur). A district court has the discretion to order a new trial when the verdict is contrary to the evidence, a miscarriage of justice would result if the jury's verdict were left to stand, or the court believes the verdict resulted from confusion. *Cf. Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992) ("Where a new trial has been granted on the basis that the jury's verdict was tainted by confusion or that a new trial is required to prevent injustice, [the Court of Appeals] reviews [the district court's ruling] for abuse of discretion"). "A remittitur is in order when a trial

judge concludes that a jury verdict is clearly unsupported by the evidence and exceeds the amount needed to make the plaintiff whole . . . ." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995) (quotation marks and citation omitted).

### III. ANALYSIS

While this motion was pending, I granted Defendants' Renewed Motion for Judgment as a Matter of Law of Noninfringement of Claim 21 of the '662 Patent. D.I. 355. Where, as here, a judge makes a posttrial ruling of noninfringement of a patent claim as a matter of law and "the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent, the normal rule would require a new trial as to damages." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007). But the Federal Circuit has also directed courts to "apply a harmlessness analysis" before ordering a new trial and has said that a new trial is not "automatically required" if a reasonable jury would have found the same damages award even without the error. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1074 (Fed. Cir. 2019).

In addition to the jury's finding that the MIC2000 infringed claim 21 of the #662 Patent, the jury found that the MIC2000 infringed claims 20 and 22 of U.S. Patent No. 7,144,150 and claims 1 and 5 of U.S. Patent No. 7,520,658. *See* D.I.

4

263. Those other findings of infringement independently support the jury's lost profits award because those apparatus claims cover the entire MIC2000. Accordingly, my ruling of noninfringement of claim 21 of the #662 Patent does not make it necessary to order a new trial on damages.

Defendants argue that a new trial on lost profits is warranted because I erred in admitting the testimony of Plaintiffs' damages expert, Dr. Akemann. D.I. 298 at 32–34. Defendants initially made this argument in a pretrial motion to exclude. *See* D.I. 174. Defendants' posttrial brief does not present any new arguments on why Dr. Akemann's testimony should have been excluded but merely incorporates by reference the arguments Defendants made in their pretrial motion to exclude. *See* D.I. 298 at 33. Accordingly, I stand by the rationale I articulated when I denied the relevant portion of that pretrial motion. *See* D.I. 240 ¶ 1.

Defendants also argue that a new trial on damages is necessary because the jury's damages award was not supported by sufficient evidence. *See* D.I. 298 at 25–32. A court should "sustain[] a jury's award of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006) (quotation marks and citation omitted).

Defendants first argue that Plaintiffs did not provide sufficient evidence of Plaintiffs' market share. D.I. 298 at 27–29. Plaintiffs' damages expert, Dr.

5

Akemann, based his market-share calculation on the Voges Email. Trial Tr. 656:2–657:2. At trial, Voges was cross examined about this email as follows:

> Q. This is not an exhaustive list of all of f'real's competitors . . . you mentioned there are other competitors of f'real?
> A. Correct.
> Q. All right. And the e-mail does not provide any information that would allow a person to make a reliable market share calculation as to f'real's market share; is that correct?
> A. Correct.
> Q. Okay. And based on this e-mail or otherwise, you do not know what f'real's market share is, the percentage; is that correct?
> A. I do not.
> Q. All right. And isn't it true then in order to determine what f'real's market share would be, you would have to commission an individual study that would be in depth and take some time to complete?
> A. I'm not a marketing expert. I can't answer that question for you. I don't know how exactly you would go about doing that.
> Q. All right. So in your mind, you are not even sure how one would even calculate f'real's market share?
> A. I mean, I would go to an expert to get a recommendation.

Trial Tr. at 373: 19–374:17.

Defendants contend that "Voges's testimony as to the incompleteness and unreliability of his own email demonstrates that Akemann's market share calculations were not based on the requisite sound economic proof . . . ." D.I. 298 at 28. But I interpret Voges's testimony differently. What Voges said was that the Voges Email alone was not enough to determine market share, that he was not sure

6

how to calculate market share, and that he would "go to an expert to get a recommendation." He did not say the information contained in the email was unreliable. Plaintiffs hired Dr. Akemann to perform the market share calculation. Although Dr. Akemann's analysis used information from the Voges Email, his analysis went beyond reiterating the contents of that email. *See, e.g.*, Trial Tr. at 602. Defendants do not challenge whether that additional market share analysis was sound. I do not find that Voges's testimony undermined Dr. Akemann's model or the jury's damages award.

Defendants also argue that Plaintiffs did not provide sufficient evidence of but-for pricing. D.I. 298 at 29–32. Defendants first object to Dr. Akemann using "a model; a fictional construct" because "[t]he pricing Akemann used in his model was never offered by f'real or accepted by any actual customers." D.I. 298 at 30. "The but for inquiry . . . requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would have made." *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350–51 (Fed. Cir. 1999) (quotation marks and citation omitted). Reconstructing the market as it would have developed absent the infringing product is "by definition a hypothetical enterprise" because it "requires the patentee to project economic results that did not occur." *Id.* It was, therefore, not only permissible for Dr. Akemann to use a model, it was required.

7

Defendants next argue that "there is no evidence that f'real would have ever offered the 70-cent upcharge that Akemann assumed for his lost profits calculation." D.I. 298 at 31. This is not accurate. Plaintiffs presented evidence at trial that f'real had put together a model for a potential customer in a similar business context that used the 70-cent upcharge. *See* Trial Tr. at 388:16–389:7.

Defendants also argue that there is no evidence that any of Hershey's actual customers would have accepted the 70-cent upcharge because Hershey had set its upcharge at 25 cents and Hershey's director of strategic growth testified that was the "absolute maximum that [Hershey] could really charge to allow that price point to stay at a reasonable level." Trial Tr. at 738:14–16. But this argument ignores that the average price of a f'real cup was lower than a Hershey cup during the relevant time period and, therefore, the total price of a f'real cup plus a 70-cent upcharge was competitive with the total price of a Hershey cup. Hershey's cups ranged in price from $1.67 to $2.07 during the relevant time period, and the price increased as Hershey switched from renting mixing machines to customers to providing the machine for free and upcharging customers for cups. *See* D.I. 325 Ex. 31; D.I. 325 Ex. 32. During the same time period, the price of a f'real cup with a 70-cent upcharge ranged from $2.06 to $2.11. D.I. 325 Ex. 33. Retailers using f'real products also tended to sell more cups per day than retailers using Hershey products. Trial Tr. at 609:3–22; D.I. 325 Ex. 34. The jury, therefore, had

sufficient evidence from which it could conclude that customers would have accepted the 70-cent upcharge.

Lastly, Defendants argue that the portion of the damages calculation attributable to when Hershey rented its machines is flawed. When Dr. Akemann calculated f'real's lost profits due to Hershey renting machines, he used the fees that Hershey charged its customers—roughly $150.00 per month. Trial Tr. at 664:1–12. But there was no evidence introduced at trial that f'real ever rented its machines for $150.00 per month or would rent its machines for $150.00 per month.

"To prevent the hypothetical from lapsing into pure speculation" the Federal Circuit requires sound proof of the "likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp.*, 185 F.3d at 1350. To calculate lost profits as Dr. Akemann did, f'real needed to provide some evidence that it would have rented its machines for $150.00 per month had Hershey's infringing blenders not been in the market. Alternatively, f'real could have shown that even with a higher rental price f'real would have rented its machines to retailers that used Hershey's infringing blenders—though, in that instance, f'real would have needed to account for the effect of increased rental price on the number of rentals. As it stands, f'real presented no evidence that but for Hershey's infringement f'real would have rented its machines for $150.00 per month. Therefore, the portion of

9

the damages award attributable to lost rentals is clearly not supported by the evidence.

Dr. Akemann calculated rental lost profits as $897,028.00. Trial Tr. at 615:4. The jury's lost profits award reduced by that amount is $2,091,841.00. Accordingly, I will deny the motion for new trial on the condition that Plaintiffs accept a remittitur to the amount of $2,091,841.00.

## IV. CONCLUSION

For the foregoing reasons, I will deny the motion for new trial on the condition that Plaintiffs accept a remittitur to the amount of $2,091,841.00.

The Court will issue an Order consistent with this Memorandum Opinion.